IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

|  |  |
|---|---|
| BEDIVERE INSURANCE COMPANY<br>f/d/b/a ONEBEACON INSURANCE<br>COMPANY,<br><br>       **Plaintiff,**<br><br>v.<br><br>BLUE CROSS AND BLUE SHIELD OF<br>KANSAS, INC. and ALLIED WORLD<br>SURPLUS LINES INSURANCE<br>COMPANY f/k/a DARWIN SELECT<br>INSURANCE COMPANY,<br><br>       **Defendants.** | **Case No. 18-2371-DDC-JPO** |

## MEMORANDUM AND ORDER

Plaintiff Bedivere Insurance Company f/d/b/a OneBeacon Insurance Company

("OneBeacon") seeks various declaratory relief against defendants Blue Cross and Blue Shield of

Kansas, Inc. ("BCBSKS") and Allied World Surplus Lines Insurance Company f/k/a Darwin

Select Insurance Company[1] ("Allied World") under 28 U.S.C. § 2201.  This matter comes before

the court on OneBeacon's Motion for Leave to File Its First Amended Complaint (Doc. 44),

BCBSKS's Motion to Dismiss (Doc. 17), Allied World's Motion to Dismiss (Doc. 20), and

OneBeacon's Motion for Leave to File Under Seal (Doc. 47).

OneBeacon seeks leave to file its First Amended Complaint (the "Proposed Complaint")

under Fed. R. Civ. P. 15(a)(2).  Doc. 44 at 1.  BCBSKS opposes the motion.  Doc. 50.

OneBeacon's memorandum supporting its motion notes that Allied World was unwilling to

---

[1] OneBeacon's Complaint names this defendant as Allied World Surplus Lines Insurance Company f/k/a
Darwin Select Insurance Company.  But, in its Motion to Dismiss, Allied World refers to itself as Allied World
Specialty Insurance Company f/k/a Darwin National Assurance Company.  *See* Doc. 20 at 1.

stipulate to filing the Proposed Complaint, but Allied World has not filed a response to the motion. *See* Doc. 46 at 3. With respect to the pending Motions to Dismiss, OneBeacon opposes both motions and each defendant has replied. *See* Docs. 19, 26, 31, 32.

For reasons explained below, the court (1) grants OneBeacon's Motion for Leave to File Its First Amended Complaint (Doc. 44), (2) denies BCBSKS's Motion to Dismiss (Doc. 17), (3) denies Allied World's Motion to Dismiss (Doc. 20), and (4) denies OneBeacon s Motion for Leave to File Under Seal (Doc. 47). The court orders OneBeacon to file its Proposed Complaint within 14 days of the filing of this Order.

## I.      Procedural Background

OneBeacon filed this lawsuit against BCBSKS and Allied World on July 17, 2018 (Doc. 1). On August 30, 2018, BCBSKS moved to dismiss all Counts against it (Doc. 17). Allied World moved to dismiss the single Count against it under the existing Complaint on September 21, 2018 (Doc. 20). On September 25, 2018, Allied World filed a related lawsuit against BCBSKS seeking declaratory relief, *Allied World Specialty Insurance Company v. Blue Cross & Blue Shield of Kansas, Inc.*, Case No. 18-2515 (the "Related Case"), which is also pending before this court.[2] The parties fully briefed the Motions to Dismiss, but agreed that the court should not rule on the motions while the parties mediated their claims in both lawsuits. Doc. 39 at 3. All discovery in this case was stayed as well. *Id.* And, the deadline to amend the pleadings in this case was "deferred until after mediation." *Id.* at 4.

---

[2]      The court may take judicial notice of the Related Case. *Tal v. Hogan*, 453 F.3d 1244, 1264, n.24 (10th Cir. 2006) ("[F]acts subject to judicial notice may be considered in a rule 12(b)(6) motion without converting the motion to dismiss into a motion for summary judgment. This allows the court to take judicial notice of its own files and records, as well as facts which are a matter of public record. However, the documents may only be considered to show their contents, not to prove the truth of matters asserted therein." (internal citations and quotations omitted)).

OneBeacon had requested the opportunity to file supplemental briefing to "address issues raised in the Related Case that was filed after [OneBeacon filed] its opposition" to BCBSKS's Motion to Dismiss. Doc. 35 at 3. But, Judge O'Hara—noting the extensive briefing already on file—determined that the court should decide whether to permit supplemental briefing after meditation, if unsuccessful, and only after a new motion explaining why supplemental briefing is necessary. Doc. 39 at 3–4. Judge O'Hara also directed the parties to file motions to consolidate this case and the Related Case once the court has resolved the pending Motions to Dismiss. Doc. 39 at 4–5. Meditation was unsuccessful. Doc. 43. OneBeacon now seeks leave to file its Proposed Complaint because, OneBeacon contends, the facts have developed since its original pleading and it desires to update its existing claims, add additional claims, and add an additional defendant. Docs. 44, 46.

## II.    Factual Background

The court takes the following facts from OneBeacon's Proposed Complaint (Doc. 44-1)[3] and attached supporting documents and views them in the light most favorable to OneBeacon. *S.E.C. v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014) (explaining that the court must "accept as true all well-pleaded factual allegations in the complaint and view them in the light most favorable to the [plaintiff]" (citation and internal quotation marks omitted)); *Hall v. Associated Int'l Ins.*, 494 F. App'x 902, 904 (10th Cir. 2012) (explaining that a court may also consider "attached exhibits[] and documents incorporated into the complaint by reference").

BCBSKS purchased three insurance policies: (1) a Primary Managed Care Organization Errors and Omissions Liability Policy issued by Allied World, with a $10 million coverage limit

---

[3]    The court considers the Motion for Leave to Amend based upon the facts alleged in the Proposed Complaint, but the Motions to Dismiss based upon the facts alleged in the existing Complaint. The court has footnoted the differences between the two Complaints throughout this Order.

("Allied World E&O Policy"); (2) a Primary Healthcare Organizations Directors and Officers

Liability Policy issued by Allied World, with a $15 million coverage limit ("Allied World D&O

Policy"); and (3) a Managed Care Errors and Omissions Excess Indemnity Policy issued by

OneBeacon ("OneBeacon Policy").  Doc. 44-1 at 1–2 (Am. Compl. ¶¶ 2–3).[4]  BCBSKS has

requested coverage from Allied World under both the Allied World E&O Policy and the Allied

World D&O Policy in connection with several antitrust class actions (the "Antitrust Litigation")

against BCBSKS and Blue Cross Blue Shield Association ("BCBSA"), which have been

"consolidated for pretrial discovery proceedings in the Northern District of Alabama."  *Id.* at 2

(Am. Compl. ¶¶ 5–6).[5]  BCBSKS requested reimbursement of defense expenses and indemnity

under both Allied World policies.  *Id.* at 2 (Am. Compl. ¶ 6).[6]  While Allied World, subject to a

reservation of rights, agreed to provide coverage under the Allied World E&O Policy, it denied

coverage under the Allied World D&O Policy.  *Id.* (Am. Compl. ¶ 7).[7]  BCBSKS believes it is

entitled to coverage under the Allied World D&O Policy and has filed a counterclaim against

Allied World for wrongful denial of coverage in the Related Case.  *Id.* at 2–3 (Am. Compl. ¶¶ 8–

9).[8]  The Allied World E&O Policy has been exhausted and OneBeacon has started to reimburse

BCBSKS for defense expenses under the OneBeacon Policy.  *Id.* at 3 (Am. Compl. ¶ 12).[9]

---

[4]    These factual allegations are identical to the existing Complaint.  Doc. 1 at 1-2 (Compl. ¶¶ 2–3).

[5]    The original Complaint alleges substantially similar facts, without references to BCBSA.  Doc. 1 at 2
(Compl. ¶¶ 4–5).

[6]    This factual allegation is identical to the existing Complaint.  Doc. 1 at 2 (Compl. ¶ 5).

[7]    This factual allegation is identical to the existing Complaint.  Doc. 1 at 2 (Compl. ¶ 6).

[8]    This allegation has been updated from the original Complaint, which asserted that BCBSKS had not
formally challenged the denial of coverage.  Doc. 1 at 2 (Compl. ¶¶ 7–8).

[9]    This allegation has been updated from the original Complaint, which asserted that the coverage limit on the
Allied World E&O policy was nearing exhaustion, but OneBeacon had not begun reimbursing defense expenses yet.
Doc. 1 at 3, 19 (Compl. ¶¶ 9, 65).

New allegations in OneBeacon's Proposed Complaint assert that BCBSKS has a Blue Cross License Agreement (the "License Agreement") with BCBSA, under which BCBSA agrees to defend and hold BCBSKS harmless against claims arising from the Antitrust Litigation. Doc. 44-1 at 2–3 (Am. Compl. ¶¶ 4, 9). But, BCBSKS "has not tendered its defense or sought indemnity from BCBSA, nor has BCBSA paid any defense expenses on behalf of BCBSKS." *Id.* at 3 (Am. Compl. ¶¶ 10–11). OneBeacon's Proposed Complaint describes the Antitrust Litigation as alleging that BCBSKS, BCBSA, and other member plans "conspired to leverage their economic power and market dominance to under-compensate healthcare providers for their services and to increase healthcare costs to subscribers by coordinating their operations and limiting their activities through restrictions in their trademark licenses." *Id.* at 7 (Am. Compl. ¶ 29).

### A. Proposed Count I and Original Count I against BCBSKS and Allied World

Proposed Count I against BCBSKS and Allied World requests a judicial declaration that BCBSKS must exhaust "all other insurance and indemnity to which it is entitled" before the OneBeacon Policy is triggered, including coverage from BCBSA under the License Agreement and coverage from Allied World under the Allied World Primary D&O Policy. Doc. 44-1 at 28–29 (Am. Compl. ¶¶ 84–91).[10] The OneBeacon Policy contains several provisions relevant to proposed Count I's request for declaratory relief.[11] First, the OneBeacon Policy, when outlining its insuring agreement for excess coverage, provides:

---

[10] The original Complaint makes similar allegations about exhaustion of the Allied World D&O policy. The Proposed Complaint updates the alleged facts to reflect that the Allied World E&O Policy now has been exhausted and BCBSKS is formally contesting Allied World's denial of coverage under the Allied World D&O Policy. It also adds allegations about exhaustion of *indemnity*, in addition to other insurance, and asserts that its policy "is not yet triggered given the liability of Allied World *and BCBSA*" to plaintiff. *Compare* Doc. 1 at 21–22 (Compl. ¶¶ 70–78) (italicized emphasis added) *with* Doc. 44-1 at 28–29 (Am. Compl. ¶¶ 84–91).

[11] Although this case is before the court on a motion to dismiss under Fed. R. Civ. P. 12(b), the court is permitted to consider the language of the insurance policies underlying this action. *See Jacobsen v. Deseret Book*

> The Underwriter shall provide the **Insured** with insurance excess of the **Underlying Insurance** set forth in ITEM [5][12] of the Declarations for **Claims** first made against the **Insured** during the **Policy Period,** provided that the **Underlying Insurance** also applies and has been exhausted by actual payment thereunder, or would apply but for the exhaustion of the applicable limit(s) of liability thereunder.

Doc. 1-3 at 10.  The OneBeacon Policy defines "**Underlying Insurance**" and "**Primary Policy**" as the Allied World E&O Policy.  *Id.* at 3, 11.  As OneBeacon acknowledges, the OneBeacon Policy makes no reference to the Allied World D&O Policy.  *See id.*; Doc. 19 at 11.

The OneBeacon Policy does state, however, that it "will apply in conformance with, and will follow the form of, the terms, conditions, agreements, exclusions, definitions and endorsements of the **Underlying Insurance**."  Doc. 1-3 at 10.  It goes on to identify exceptions to conformance with the Allied World E&O Policy, including that OneBeacon, as underwriter, "will not have any obligation to make any payment hereunder unless and until the full amount of the applicable limit of liability of the **Underlying Insurance** has been paid by the issuer(s) of the **Underlying Insurance**."  *Id.* at 11.  Meanwhile, Allied World's E&O Policy, from which the OneBeacon Policy follows form, contains a provision entitled "**Other Insurance; Other Indemnification**."  It provides:

> This Policy shall be excess of and shall not contribute with:
> (a)  any other insurance or plan or program of self-insurance (whether collectible or not), unless such other insurance or self-insurance is specifically stated to be in excess of this Policy; and
> (b)  any indemnification to which an **Insured** is entitled from any entity other than another **Insured**.

*Co.*, 287 F.3d 936, 941 (10th Cir. 2002) ("In addition to the complaint, the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity.").  The court notes that plaintiff attached an incomplete version of the Allied World E&O Policy to the Complaints, but Allied World attached a separate exhibit of what it claims is an authentic, complete copy of the policy to its Memorandum in Support of its Motion to Dismiss.  *See* Doc. 21 at 6, n.1.  Except where it uses the complete copy to fill in missing gaps, as noted by the court, the policy terms set out in this Order are from the policy plaintiff attached to the Complaints, which aligns with the policy attached to Allied World's Memorandum in Support.  The parties have not disputed the Doc. 21-1 provisions.

[12]     Through Endorsement Number 1, "all references in [the OneBeacon] Policy to 'ITEM 4 of the Declarations' [were] replaced with 'ITEM 5 of the Declarations.'"  Doc. 1-3 at 5.

> This Policy shall not be subject to the terms of any other policy of insurance or plan or program of self-insurance.

Doc. 1-1 at 24.

The Allied World D&O Policy also contains an "Other Insurance" provision, which states, in relevant part:

> The insurance provided by this Policy shall apply only as excess over any other valid and collectible insurance, whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written specifically as excess insurance over the applicable Limit of Liability provided by this Policy. This Policy shall specifically be excess of any other valid and collectible insurance pursuant to which any other insurer has a duty to defend a **Claim** for which this Policy may be obligated to pay **Loss**. This Policy shall not be subject to the terms and conditions of any other insurance policy.

Doc. 1-2 at 45–46.

The Allied World E&O Policy, and the OneBeacon Policy by following form, provide coverage for any "**Loss** which the **Insured** is legally obligated to pay as a result of a **Claim**" made during the policy period. Doc. 1-1 at 52 (insuring agreement). The relevant portions of definitions related to this coverage are summarized below:

- "**Loss**" includes "**Defense Expenses** and any monetary amount which an **Insured** is legally obligated to pay as a result of a **Claim**" but does not include punitive or exemplary or multiplied damages for **Claims** for **Antitrust Activity**. Doc. 1-1 at 7.

- "**Defense Expenses**" include "reasonable legal fees and expenses incurred in the investigation, adjustment, defense, or appeal of a **Claim**." Doc. 1-1 at 61; Doc. 1-3 at 11 (defining "**Defense Expenses**" by referencing the Allied World E&O Policy definition).

7

- "**Claim**" is defined to mean "any written notice . . . that a person intends to hold an **Insured** responsible for a **Wrongful Act**."  Doc. 1-1 at 61; Doc. 1-3 at 11 (defining "**Claim**" by referencing the Allied World E&O Policy definition).

- "**Insured**" includes any "**Insured Entity**" (defined as BCBSKS, as the "**Named Insured**")[13] and any "**Insured Person**" (defined to include "any past, present, or future . . . employee, director, officer, trustee, [or] member of the board of managers for" BCBSKS).  Doc. 1-1 at 1, 17, 61; Doc. 1-3 at 11 (defining "**Insured**" to mean the insured under the Allied World E&O Policy).

- "**Wrongful Act**" is defined as "any actual or alleged act, error or omission in the performance of, or any failure to perform, a **Managed Care Activity** by any **Insured Entity** or by any **Insured Person** acting within the scope of his or her duties or capacity as such."  Doc. 44-1 at 11.[14]

- "**Antitrust Activity**" means "any actual or alleged:  price fixing; restraint of trade; monopolization; unfair trade practices; or violation of the Federal Trade Commission Act, the Sherman Act, the Clayton Act or any other federal statute involving antitrust, monopoly, price fixing, price discrimination, predatory pricing or restraint of trade activities . . . ."  Doc. 1-1 at 61.

---

[13]    The court referred to Doc. 21-1 at 62 (the complete Allied World E&O Policy attached to Allied World's Memorandum in Support) to clarify the definition of "Named Insured," as the policies attached to OneBeacon's Complaints were incomplete.  Doc. 21-1 at 62 (defining "Named Insured" as the entity in Item 1 of the Declarations).  The parties' briefs have not disputed Doc. 21-1's authenticity.  *See Mavrovich v. Vanderpool*, 427 F. Supp. 2d 1084, 1090 (D. Kan. 2006) (explaining "a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss" where plaintiff did not attach or incorporate by reference to its complaint).

[14]    The page including the definition of "Wrongful Act" was not included in the copy of the policy attached to plaintiff's Complaints.  The definition set forth in the Proposed Complaint (Doc. 44-1 at 11) matches the definition in the complete policy provided by Allied World (Doc. 21-1 at 62–63).

Under the "Conditions" of the Allied World E&O Policy, the Underwriter has no duty to defend any Claims, but "[u]pon written request of the **Named Insured**, the **Underwriter** will pay or reimburse, on a current basis, **Defense Expenses** for which this Policy provides coverage. Except for such **Defense Expenses**, the **Underwriter** will pay **Loss** only on the final disposition of a **Claim**."  Doc. 1-1 at 26, 56.

The Allied World D&O Policy generally provides coverage during the policy period for, among other coverage, **Loss** arising from a **Claim** (i) against any **Insured Person** or the **Company** for a **Wrongful Act** or (ii) against the **Insureds** for **Antitrust Activities**.  Doc. 1-2 at 28.  The relevant portions of definitions related to this coverage are summarized below:

- "**Loss**" includes "damages, settlements or judgments" and "**Defense Costs**" among other items.  Doc. 1-2 at 12.

- "**Defense Costs**" include "reasonable and necessary fees, costs, charges or expenses incurred by or on behalf of an **Insured** in the investigation, defense or appeal of a **Claim**."  Doc. 1-2 at 33.

- "**Claim**" is defined to mean any "written demand for monetary, non-monetary or injunctive relief made against an **Insured**" and any "judicial, administrative or regulatory proceeding" for such relief.  Doc. 1-2 at 31.

- "**Insured**" includes the "**Company**" (defined to include BCBSKS, the "**Named Insured**") and any **Insured Person** (defined to include any **Executive**, which includes any "past, present, or future duly elected or appointed director, officer, trustee . . . or member of the board of managers of the **Company**").  Doc. 1-2 at 32, 34–35, 37.

- "**Wrongful Act**" means "any actual or alleged, act, error, omission, neglect, breach of duty, breach of trust, misstatement, or misleading statement by an **Insured Person** in his or her capacity as such, or any matter claimed against an **Insured Person** by reason of his or her status as such" or "with respect to the **Company** and **Insured Person**s, any actual or alleged act, error or omission in connection with the performance of or failure to perform **Provider Selection Practices**." Doc. 1-2 at 39.

- "**Antitrust Activities**" means "price fixing; restraint of trade; monopolization; unfair trade practices; or violation of the Federal Trade Commission Act, as amended, the Sherman Act[,] the Clayton Act, as amended, or any other federal statute involving antitrust, monopoly, price fixing, price discrimination, predatory pricing or restraint of trade activities . . . ." Doc. 1-2 at 31.

The Allied World D&O Policy explicitly states that it "shall not cover any **Loss** in connection with any **Claim**" that arises out of, is based on, or is attributable to "any actual or alleged act, error or omission in the performance of, or failure to perform, **Managed Care Activities** by any **Insured** or by any individual or entity for whose acts, errors or omissions an **Insured** is legally responsible, except that this Exclusion shall not apply to that portion of an otherwise covered **Claim** for **Provider Selection Practices**." Doc. 1-2 at 24. The definitions of "Managed Care Activity and "Provider Selection" and "Managed Care Activities" and "Provider Selection Practices" from the Allied World E&O Policy and Allied World D&O Policy, respectively, which substantially align, are below:

| Allied World E&O Policy | Allied World D&O Policy |
|---|---|
| "'**Managed Care Activity**' means any of the following services or activities: **Provider Selection; Utilization Review**; advertising, marketing, selling, or enrollment for health care or workers' compensation plans; **Claim Services**; establishing health care provider networks; reviewing the quality of **Medical Services** or providing quality assurance; design and/or implementation of financial incentive plans; wellness or health promotion education; development or implementation of clinical guidelines, practice parameters or protocols; triage for payment of **Medical Services**; and services or activities performed in the administration or management of health care, consumer directed health care, behavioral healthcare, prescription drug, dental, vision, long or short term disability, life, automobile medical payments, workers compensation plans, long term care, EAP services, and TPA services, any and all of which Managed Care Activity may be referred or sponsored to or by the Insured entity; insurance broker/agency services" (Doc. 1-1 at 45, as amended at Doc. 1-1 at 62). It also includes "all such services and activities, listed above, whether provided on paper, in person, electronically, or via any other medium." Doc. 1-1 at 15. | "**Managed Care Activities**" means any of the following services or activities: **Provider Selection Practices**; **Utilization Review**; advertising, marketing, selling, or enrollment for health care or workers' compensation plans; **Claim Services**; establishing health care provider networks; reviewing the quality of **Medical Services** or providing quality assurance; design and/or implementation of financial incentive plans; wellness or health promotion education; development or implementation of clinical guidelines, practice parameters or protocols; triage for payment of **Medical Services**; and services or activities performed in the administration or management of health care, consumer directed health care, behavioral health, prescription drug, dental, vision, long or short term disability, life, automobile medical payment, or workers' compensation plans, Employee Assistance Program services, Third Party Administrator services, or insurance broker/insurance agency services and activities. Doc. 1-2 at 17. |
| "'**Provider Selection**' means any of the following, but only if performed by an **Insured**: evaluating, selecting, credentialing, contracting with or performing peer review of any provider of **Medical Services**." Doc. 21-1 at 62.[15] | "'**Provider Selection Practices**' means the process of evaluating, by members of a formal duly constituted professional review board or committee, any individual or entity for the purpose of selecting, contracting with or credentialing providers for **Medical Services**, including peer review, but only if performed by a **Company** which is not a **Managed Care Organization**. Doc. 1-2 at 38. |

---

[15] The court refers to Doc. 21-1 at 62 for this definition, as the policy attached to the Complaints was missing this portion of the definitions section, plaintiff did not include the detail of this definition in its Complaints, and the parties have not disputed Doc. 21-1's authenticity. *See Mavrovich*, 427 F. Supp. 2d at 1090.

### B. Proposed Counts II, III, and IV and Original Counts II, IV, and V against BCBSKS

Relative to proposed Counts II–IV of the Proposed Complaint, the OneBeacon Policy contains a "Claim Participation" clause, stating:

> The Underwriter may, at its sole discretion, elect to associate in the investigation, settlement or defense of any **Claim** against the **Insured,** even if the **Underlying Insurance** has not been exhausted. If the Underwriter so elects, *the **Insured** will cooperate with the Underwriter and will make available all such information and records as the Underwriter may reasonably require.*

Doc. 1-3 at 12 (italicized emphasis added). The Allied World E&O Policy, from which the OneBeacon Policy follows form, also contains a provision entitled "Assistance and Cooperation" which states: "In the event of a **Claim**, the **Insured**s shall provide the Underwriter with all information, assistance and cooperation that the **Underwriter** reasonably requests." Doc. 1-1 at 56. The court refers to the "Claim Participation" and "Assistance and Cooperation" clauses collectively as the "Cooperation Clauses." OneBeacon alleges it requested a series of documents to help it assess the possibility of a potential settlement of BCBSKS's liability in the Antitrust Litigation, and to determine what coverage it owed BCBSKS. Doc. 44-1 at 3–4 (Am. Compl. ¶ 14).[16] Paragraph 95 of OneBeacon's Proposed Complaint identifies 20 different types of requested documents, including documents acquired or produced during discovery in the Antitrust Litigation, analysis of events in the Antitrust Litigation and BCBSKS's potential liability in it, and documents about settlement discussions in the Antitrust Litigation. *Id.* at 30–32 (Am. Compl. ¶ 95).[17] Thereafter, OneBeacon alleges BCBSKS "has not provided the

---

[16]     This factual allegation is identical to the one in the existing Complaint. Doc. 1 at 3 (Compl. ¶ 11).

[17]     This factual allegation is substantially the same as the list of information requested in the existing Complaint. The court notes that, unlike the Proposed Complaint, the existing Complaint also included "A list of all persons deposed in the MDL action and their employer/affiliation." *Compare* Doc. 1 at 23–24 (Compl. ¶ 82) *with* Doc. 44-1 at 30–32 (Am. Compl. ¶ 95).

majority of the information or documents" requested in Paragraph 95, as BCBSKS asserted attorney-client privilege and/or work-product doctrine in response to OneBeacon's requests. *Id.* at 32–33 (Am. Compl. ¶¶ 96–97).[18]

From these allegations, OneBeacon seeks several seemingly alternative forms of relief. In the proposed Counts II and III, OneBeacon seeks a judicial declaration (i) that (a) BCBSKS must cooperate with OneBeacon in compliance with the Cooperation Clauses, (b) BCBSKS has failed to do so, and (c) the failure to cooperate "prevents it from seeking coverage," and (ii) "concerning the scope of the rights and obligations of the parties" under the Cooperation Clauses. Doc. 44-1 at 5, 29–34 (Am. Compl. ¶¶ 17, 92–104).[19] In the proposed Count IV, OneBeacon requests "specific compliance" in the form of a declaratory judgment requiring BCBSKS to produce the requested information and documents. Doc. 44-1 at 34–35 (Am. Compl. ¶¶ 105–111).[20]

### C. Proposed Count V and Original Count VI against BCBSKS

Material to proposed Count V of the Proposed Complaint, the OneBeacon Policy contains a "Subrogation and Recoveries Clause" clause. It provides:

> In the event of any payment under this Policy, the Underwriter will be subrogated to all the **Insured**'s rights of recovery against any person or entity, and the **Insured** shall execute and deliver all instruments and papers and do whatever else is necessary to secure such rights. The **Insured** shall do nothing that may prejudice the Underwriter's position or potential or actual right of recovery. The obligations

---

[18]     These factual allegations are identical to the ones in the existing Complaint. Doc. 1 at 24 (Compl. ¶¶ 83–84).

[19]     Counts II and III of the original Complaint essentially make the same allegations as proposed Counts II and IV, respectively, of the Proposed Complaint. *Compare* Doc. 1 at 22–25 (Compl. ¶¶ 79–85) *with* Doc. 44-1 at 29–33 (Am. Compl. ¶¶ 92–98) and Doc. 1 at 26 (Compl. ¶¶ 91–96) *with* Doc. 44-1 at 33–34 (Am. Compl. ¶¶ 99–104).

[20]     Count V of the original Complaint asks for similar relief as proposed Count IV of the Proposed Complaint, with the former being asserted as a breach of contract claim requesting "specific performance" and the latter being asserted as declaratory relief requesting "specific compliance," *i.e.*, a court order "stating that it is entitled to compliance by way of production of the requested information and documents." *Compare* Doc. 1 at 27 (Compl. ¶¶ 97–103) *with* Doc. 44-1 at 34–35 (Compl. ¶¶ 105–111).

of the **Insured** under this provision shall survive the expiration or termination of this Policy. The expenses of all such recovery proceeds shall first be subtracted from the amount of any recovery and the remaining amount so recovered shall be apportioned in the inverse order of payment to the extent of actual payment.

Doc. 44-1 at 23–24 (Am. Compl. ¶ 66).[21] The Allied World E&O Policy, from which the

OneBeacon Policy follows form, contains a provision entitled "**Subrogation**." It states:

In the event of any payment hereunder, the **Underwriter** shall be subrogated to the extent of any payment to all of the rights of recovery of the **Insured**s. The **Insured**s shall execute all papers and do everything necessary to secure such rights, including the execution of any documents necessary to enable the **Underwriter** effectively to bring suit in their name. The **Insured**s shall do nothing that may prejudice the **Underwriter**'s position or potential or actual rights of recovery. The obligations of the **Insured**s under this CONDITION (F) shall survive the cancellation or other termination of this Policy.

Doc. 1-1 at 56–57.

OneBeacon alleges BCBSKS "has not agreed to assist OneBeacon with its efforts to

obtain subrogation from BCBSA and Allied World and, in failing to provide the requested

cooperation, has prejudiced OneBeacon's potential or actual right of recovery and forced it to

prematurely reimburse defense expenses," leading OneBeacon to file this action trying to secure

the information it requests. Doc. 44-1 at 4 (Am. Compl. ¶¶ 16–17).[22] In the proposed Count V,

OneBeacon seeks a declaratory judgment about OneBeacon's right to subrogation against Allied

World and BCBSA for any sums OneBeacon reimburses BCBSKS for under the OneBeacon

Policy. Doc. 44-1 at 36–37 (Am. Compl. ¶¶ 112–118).[23] In a new but related proposed Count

---

[21]     The policy language in the OneBeacon Policy provided as an exhibit to plaintiff's existing Complaint and the Proposed Complaint cuts off after "whatever else", and the exhibit appears incomplete. *See* Doc. 1-3 at 12. The court thus cites the provision included in plaintiff's Proposed Complaint (and existing Complaint). See Doc. 44-1 at 23–24 (Am. Compl. ¶ 66) and Doc. 1 at 18 (Compl. ¶ 59).

[22]     The court finds no similar allegations in the existing Complaint. Notably, when the existing Complaint was filed, OneBeacon had not made any payments under its policy that would provide the subrogation rights it now alleges it is entitled to receive.

[23]     Count VI of the original Complaint requests the same declaratory relief as proposed Count V of the Proposed Complaint, though the alleged facts have changed in the Proposed Complaint (the Allied World E&O

VI, OneBeacon requests a declaratory judgment (a) that BCBSKS has failed to comply with the Other Insurance/Other Indemnification clause and the Subrogation/Subrogation and Recoveries clauses in the One Beacon Policy and the Allied World E&O Policy by (i) not agreeing to cooperate in its subrogation efforts, (ii) failing to "provide information and documentation in order to assist OneBeacon with its subrogation efforts," and (iii) failing to pursue indemnification from BCBSA, and (b) that such failures "preclude[] it from seeking reimbursements or coverage under the OneBeacon Policy." Doc. 44-1 at 37–39 (Am. Compl. ¶¶ 119–126).[24]

### III.    Legal Standards for Motion for Leave to Amend and Motions to Dismiss

The court first addresses the standards courts must apply when considering a motion for leave to amend a complaint. Next, because the decision whether to grant leave to amend depends in part on defendants' arguments for dismissal, the court sets forth the law governing motions to dismiss under Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

### A.  Leave to Amend

Federal Rule of Civil Procedure 15(a)(1) permits a party to amend its pleadings in one of two ways:  (A) first, as a matter of course within 21 days after serving it, or (B) second, within 21 days of service of a responsive pleading. Fed. R. Civ. P. 15(a)(1)(A)–(B).  Outside those periods, any amendment to the pleadings requires leave, and courts should "freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2); *Foman v. Davis*, 371 U.S. 178, 182 (1962).  A court should refuse to grant leave to amend only on "a showing of undue delay, undue

---

Policy now has been exhausted, plaintiff has begun reimbursing expenses under the OneBeacon Policy, and plaintiff now is seeking a declaration of subrogation rights against BCBSA in addition to Allied World).  *Compare* Doc. 1 at 28–29 (Compl. ¶¶ 104–109) *with* Doc. 44-1 at 36–37 (Am. Compl. ¶¶ 112–118).

[24]    The court has not addressed plaintiff's new factual allegations and claims in detail here.  As explained below, defendants may address any arguments for dismissal following the court's grant of leave to amend.

prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies . . . , or futility of amendment." *Bylin v. Billings,* 568 F.3d 1224, 1229 (10th Cir. 2009) (quoting *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1365 (10th Cir. 1993)).

The decision whether to grant leave to amend is within a court's sound discretion. *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1204 (10th Cir. 2006) (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330 (1971)). "In exercising its discretion, the court must be mindful that the Federal Rules of Civil Procedure are designed to facilitate decisions on the merits rather than on pleading technicalities." *Bank Midwest, N.A. v. Millard*, No. 10-2387-JAR-DJW, 2012 WL 4006423, at *1 (D. Kan. Sept. 12, 2012) (citing *Koch v. Koch Indus.*, 127 F.R.D. 206, 209 (D. Kan. 1989)). Also, the court must keep in mind that the Federal Rules of Civil Procedure "should be construed, administered and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. As our court has explained, "[t]his discretionary approach of the federal rules fosters a full adjudication of the merits of the parties' disputes within a single comprehensive proceeding." *First Savings Bank, F.S.B. v. U.S. Bancorp*, 184 F.R.D. 363, 368 (quoting *Katzman v. Sessions*, 156 F.R.D. 35, 38 (E.D.N.Y. 1994)). The purpose is to "'promote as complete an adjudication of the dispute between the parties as is possible.'" *Id.* (quoting *LaSalvia v. United Dairymen of Ariz.*, 804 F.2d 1113, 1119 (9th Cir. 1986)).

BCBSKS opposes OneBeacon's motion, asserting the proposed claims against BCBSKS are futile.[25]  Doc. 50 at 1–3.  Except for a passing and generalized reference,[26] BCBSKS never argues the court should deny OneBeacon's motion for undue delay, undue prejudice, bad faith, or failure to cure deficiencies.

 "A proposed amendment is futile if the complaint, as amended, would be subject to dismissal for any reason . . . ."  *Watson ex rel. Watson v. Beckel*, 242 F.3d 1237, 1239–40 (10th Cir. 2001) (citations omitted).  "[A] district court is justified in denying a motion to amend if the amendment would be futile because it cannot withstand a motion to dismiss or otherwise fails to state a claim."  *Lyle v. Commodity Credit Corp.*, 898 F. Supp. 808, 810 (D. Kan. 1995); *see also Little v. Portfolio Recovery Assoc., LLC*, 548 F. App'x 514, 515 (10th Cir. 2013); *Katzman*, 156 F.R.D. at 38.

Here, BCBSKS and Allied World argue that OneBeacon's original Complaint is subject to dismissal under Fed. R. Civ. P. 12(b)(1) and 12(b)(6).  The court thus applies the standard governing motions to dismiss under Rules 12(b)(1) and 12(b)(6) to determine whether OneBeacon's Proposed Complaint, which seeks in part the same relief as the existing Complaint, states plausible claims for relief or if amendment is futile.

---

[25]     BCBSKS also asserts that federal courts can decline jurisdiction over declaratory judgment claims under the *Mhoon* five-factor test—which the court discusses *infra*, Part IV.A.—and should do so here.  Doc. 50 at 3.  The court focuses on BCBSKS's futility arguments under its discussion of the legal standard explaining when courts should refuse to grant leave to amend.  This is particularly appropriate as BCBSKS, except for a cursory reference, did not address the *Mhoon* factors in its response to plaintiff's motion.  And, BCBSKS never asserted this argument in its Motion to Dismiss.  Docs. 18, 26.

[26]     BCBSKS merely claims that the allegations in the Proposed Complaint "do not justify delaying the [c]ourt's ruling on BCBSKS's fully briefed Motion to Dismiss."  Doc. 50 at 1–2.

**B. Rule 12(b)(1)**

Under Rule 12(b)(1), a defendant may move to dismiss for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Federal district courts have original jurisdiction over all civil actions arising under the constitution, laws, or treaties of the United States or where there is diversity of citizenship. 28 U.S.C. § 1331; 28 U.S.C. § 1332. "Federal courts are courts of limited jurisdiction and, as such, must have a statutory basis to exercise jurisdiction." *Montoya v. Chao*, 296 F.3d 952, 955 (10th Cir. 2002) (citation omitted). "A court lacking jurisdiction cannot render judgment but must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking." *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974) (citation omitted). Since federal courts are courts of limited jurisdiction, the party invoking federal jurisdiction bears the burden to prove it exists. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Kinney v. Blue Dot Servs. of Kan.*, 505 F. App'x 812, 814 (10th Cir. 2012) (explaining that the "court may not assume that a plaintiff can establish subject matter jurisdiction; it is the plaintiff's burden to prove it").

Generally, a Rule 12(b)(1) motion to dismiss consists of either a facial attack or a factual attack. *Davenport v. Wal-mart Stores, Inc.*, No. 14-2124-JAR-JPO, 2014 WL 3361729, at *1 (D. Kan. July 9, 2014). The Tenth Circuit has explained the difference between the two:

> First, a facial attack on the complaint's allegations as to subject matter jurisdiction questions the sufficiency of the complaint. In reviewing a facial attack on the complaint, a district court must accept the allegations in the complaint as true. *Id.* Second, a party may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends. When reviewing a factual attack on subject matter jurisdiction, a district court may not presume the truthfulness of the complaint's factual allegations. A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1).

*Holt v. United States*, 46 F.3d 1000, 1002–03 (10th Cir. 1995) (citations omitted).

Here, defendants make a facial attack on certain Counts, arguing no case or controversy exists for the court to consider.  Article III of the United States Constitution limits federal courts' jurisdiction to "cases" and "controversies."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).  To constitute a "live, concrete controversy" in an action seeking declaratory relief, the "crucial question is whether granting a *present* determination of the issues offered will have some effect in the real world."  *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1109–10 (10th Cir. 2010) (internal citations and quotations omitted).  To make such relief a "case or controversy"—as opposed to an impermissible advisory opinion—the resolution must "settl[e] [ ] some dispute which affects the behavior of the defendant toward the plaintiff."  *Id.* at 1109–1110; *see also Jordan v. Sosa*, 654 F.3d 1012, 1025 (10th Cir. 2011) ("[W]here a plaintiff seeks declaratory judgment against his opponent, he must assert a claim for relief that, if granted, would affect the behavior of the parties listed in his complaint.").  "The difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy.  Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941).

### C.  Rule 12(b)(6)

Under Rule 12(b)(6), a defendant may move to dismiss for failing to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  Fed. R. Civ. P. 8(a)(2) provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is

entitled to relief."  Although this Rule "does not require 'detailed factual allegations,'" it demands more than "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" which, as the Supreme Court explained, "'will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court must assume that the factual allegations in the complaint are true.  *Id.*  But this requirement does not extend to every assertion made in a complaint.  The court is "'not bound to accept as true a legal conclusion couched as a factual allegation.'"  *Id.* (quoting. *Twombly*, 550 U.S. at 555).  "'Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice'" to state a claim for relief.  *Bixler v. Foster*, 596 F.3d 751, 756 (10th Cir. 2010) (quoting *Ashcroft*, 556 U.S. at 678).  Also, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555 (citations omitted).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 556); *see also Christy Sports, LLC v. Deer Valley Resort Co., Ltd.*, 555 F.3d 1188, 1192 (10th Cir. 2009) ("The question is whether, if the allegations are true, it is plausible and not merely possible

that the plaintiff is entitled to relief under the relevant law." (citation omitted)). Essentially, "the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims." *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007). This plausibility standard reflects the requirement in Fed. R. Civ. P. 8 that pleadings must provide defendants with fair notice of the nature of the claims as well as the grounds upon which each claim rests. *See Khalik v. United Air Lines*, 671 F.3d 1188, 1191–92 (10th Cir. 2012).

The court also will grant a motion to dismiss under Fed. R. Civ. P. 12(b)(6) if an issue of law is dispositive. *Neitzke v. Williams*, 490 U.S. 319, 326 (1989). "[I]f as a matter of law 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations,' a claim must be dismissed, without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one." *Id.* at 327 (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)).

## IV.    Analysis—Motion for Leave to Amend and Motions to Dismiss

OneBeacon asserts that the Proposed Complaint will (1) add another party and (2) "add additional claims against the existing parties based upon significant new developments and additional information developed since the filing of the original complaint." Doc. 46 at 1. OneBeacon argues the court should grant leave to amend because factual developments have rendered certain portions of the pending motions to dismiss moot and filing an amended complaint will "promote efficiency and judicial economy." *Id.* at 2–3.

BCBSKS argues that the court should not allow OneBeacon to amend to assert any of the proposed Counts against it. BCBSKS asserts that proposed Counts I–IV of the Proposed Complaint "essentially replead" Counts I, II, IV, and V of the original Complaint, and the new

factual allegations do not affect BCBSKS's arguments for dismissal of those Counts. *Id.* at 4–6. So, BCBSKS argues, OneBeacon's proposed amendments are futile. For proposed Count V, which modifies existing Count VI but seeks similar relief, BCBSKS argues OneBeacon seeks an impermissible advisory opinion and thus the Count is futile. For the new, proposed Counts VI, X, and XI, BCBSKS similarly argues futility because the claims are premature. Doc. 50 at 6–12.

BCBSKS and Allied World filed separate Motions to Dismiss under Fed. R. Civ. P. 12(b)(1) and 12(b)(6). In its motion, BCBSKS contends (1) Count I (new and existing) fails to state a claim because the OneBeacon Policy is in excess of the Allied World E&O Policy, but not the Allied World D&O Policy; (2) Counts II through V in the original Complaint (proposed Counts II–IV) fail to state claims because the Complaint does not specify which documents BCBSKS failed to produce and because the requested documents are protected by attorney-client privilege, the work-product doctrine, and joint-defense privilege; (3) Count IV (proposed Count III) also fails because BCBSKS did not adequately plead how it was substantially prejudiced by BCBSKS's failure to produce documents; and (4) the court lacks jurisdiction over Count VI (proposed Count V) because no controversy exists between OneBeacon and BCBSKS over OneBeacon's ability to seek subrogation from Allied World. *See* Doc. 18. In its motion, Allied World argues the court should dismiss Count I (the only count asserted against Allied World in the original Complaint) because no justiciable case or controversy exists between OneBeacon and Allied World, and it fails to state a claim upon which relief can be granted for similar reasons, as argued in BCBSKS' Motion to Dismiss. *See* Doc. 21.

Below, the court first determines what law it should be apply to this insurance contract dispute over declaratory relief. Next, the court turns to each proposed Count and analyzes the parties' arguments raised in the briefing on the Motion for Leave to Amend and the Motions to

Dismiss. Because the court imposed an expedited briefing schedule with limited pages, the court reserves consideration of the merits of BCBSKS's arguments against leave to amend the new Counts against it, and, instead, will address any arguments for dismissal directed at OneBeacon's First Amended Complaint when filed.

### A. Diversity Jurisdiction, Declaratory Judgments, and Choice of Law

OneBeacon has pleaded facts sufficient to establish that the court has diversity subject matter jurisdiction under 28 U.S.C. § 1332(a). *See* Doc. 1 at 4–6; Doc. 44-1 at 5–6. OneBeacon seeks declaratory relief under 28 U.S.C. § 2201 about certain insurance policies provided to BCBSKS. The Declaratory Judgment Act "authorizes federal courts to declare the legal rights and obligations of adversaries, but does not impose a duty to do so." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Midland Bancor, Inc.*, 854 F. Supp. 782, 788 (D. Kan. 1994). "Whether to entertain a justiciable declaratory judgment action is a matter committed to the sound discretion of the trial court." *Id.* at 788 (internal quotations and citation omitted).

When determining whether to exercise this discretion, the Tenth Circuit has directed district courts to consider the following factors: "[1] whether a declaratory action would settle the controversy; [2] whether it would serve a useful purpose in clarifying the legal relations at issue; [3] whether the declaratory remedy is being used merely for the purpose of procedural fencing or to provide an arena for a race to *res judicata*; [4] whether use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and [5] whether there is an alternative remedy which is better or more effective." *State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 983 (10th Cir. 1994) (internal quotations omitted). "Declaratory judgment actions are particularly appropriate for situations in which

insurance companies seek a declaration of their liability." *Nat'l Union Fire Ins.*, 854 F. Supp. at 789.

Here, the court finds actual controversies in the overlapping Counts between the existing and proposed Complaints. They suffice for the requested declaratory relief to clarify the legal relations at issue and settle at least part of the parties' disputes. The court finds an actual controversy exists between the parties in Count I in the existing and proposed Complaint over their respective obligations under the OneBeacon Policy and the Allied World D&O Policy; namely, do the two policies cover the same loss and is OneBeacon's Policy triggered only after the Allied World D&O Policy coverage is exhausted? The settlement of the controversies among the parties here, particularly when this case is consolidated with the Related Case, will settle a dispute among the parties and affect the way each insurer behaves under its insurance policy with BCBSKS. For the cooperation Counts II-IV in the Proposed Complaint and Counts II, IV, and V in the existing Complaint, again, the court finds a controversy exists between BCBSKS and OneBeacon over their obligations and rights under the OneBeacon Policy. Declaratory relief will help settle that controversy. Proposed Count V (existing Count VI), a dispute over the extent of OneBeacon's subrogation rights, is similar. And this is particularly true now that BCBSKS is presently tendering defense expenses to OneBeacon for reimbursement and, allegedly, it has not agreed to assist OneBeacon with its subrogation efforts or provide OneBeacon requested information. The declaratory relief sought in these Counts will "have some effect in the real world" and affect how the parties perform their contractual obligations. *See Rio Grande Silvery Minnow*, 601 F.3d at 1109–10; *Jordan*, 654 F.3d at 1025. The parties have not alleged, nor does the court find, that OneBeacon is using the declaratory remedy for

procedural fencing, the remedy would improperly encroach upon state jurisdiction, or that an alternative remedy exists that would be more effective.

Before it can address defendants' dismissal and futility arguments, the court must determine which state's substantive law governs OneBeacon's claims. *Rigby v. Clinical Reference Lab., Inc.*, 995 F. Supp. 1217, 1221 (D. Kan. 1998) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)). Federal courts sitting in diversity apply the choice of law rules of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). This court is in Kansas, so it applies Kansas choice of law provisions.

When a dispute contests the "substance of [a party's contractual] obligation," Kansas courts apply the choice of law rule known as *lex loci contractus*, or "the law of the state where the contract is made." *Moses v. Halstead*, 581 F.3d 1248, 1252 (10th Cir. 2009) (applying Kansas law). "A contract is made where the last act necessary for its formation occurs." *In re K.M.H.*, 169 P.3d 1025, 1032 (Kan. 2007). And, in insurance policy disputes, "Kansas courts generally find that the contract is made in the state where the policy is delivered." *PetroSantander (USA), Inc. v. HDI Glob. Ins.*, 308 F. Supp. 3d 1207, 1211 (D. Kan. 2018) (applying Kansas law); *see also Cent. Power Sys. & Servs., Inc. v. Universal Underwriters Ins.*, 319 P.3d 562, 567–68 (Kan. Ct. App. 2014) (finding a contract is made "in the place in which the last act required for contract formation occurs," which typically is where the policy is delivered). The parties have failed to identify where the policy was delivered here. But, they cite Kansas law in their briefs and agree that Kansas law applies. The insured is a Kansas entity, with a Kansas address on the policy, and the insurance policies at times reference Kansas law within them. The court thus applies Kansas law.[27]

---

[27] Such a "'[f]ailure to present facts sufficient to determine where the contract is made may justify a default to forum law.'" *In re K.M.H.*, 169 P.3d at 1032 (quoting *Layne Christensen Co. v. Zurich Canada*, 38 P.3d 757, 767

"'When the federal courts are called upon to interpret state law, the federal court must look to rulings of the highest state court, and, if no such rulings exist, must endeavor to predict how that high court would rule.'" *Amparan v. Lake Powell Car Rental Cos.*, 882 F.3d 943, 947 (10th Cir. 2018) (quoting *Stickley v. State Farm Mut. Auto. Ins.*, 505 F.3d 1070, 1077 (10th Cir. 2007)). When a federal court must predict how a state's highest court would rule, the federal court should start its analysis with decisions from the state's intermediate court of appeals. *Id.* And, in such a situation, a federal court should adopt the position of the state intermediate court of appeals "unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940).

The court next turns to OneBeacon's proposed claims for relief, analyzing each Count under Kansas law to determine whether leave to amend is appropriate or if defendants' arguments for dismissal render the amended Counts futile.

### B. Proposed Count I and Original Count I against BCBSKS and Allied World

In Count I of the Proposed Complaint and Count I of the existing Complaint, OneBeacon asks the court to declare, based on the "Other Insurance; Other Indemnification" provision in the OneBeacon Policy, because it follows form to the Allied World E&O Policy, that the OneBeacon Policy is not triggered until BCBSKS exhausts all "other insurance," including the Allied World D&O Policy. In the Proposed Complaint, OneBeacon asks the court also to declare that its policy is not triggered until BCBSKS looks to all other indemnity. BCBSKS argues that OneBeacon's proposed Count I is futile for the same reasons argued in its Motion to Dismiss.

---

(Kan. Ct. App. 2002)). Also, in Kansas, "'the law of the forum applies unless it is expressly shown that a different law governs, and in case of doubt, the law of the forum is preferred.'" *Brenner v. Oppenheimer & Co., Inc.*, 44 P.3d 364, 376 (Kan. 2002) (quoting *Sys. Design and Mgmt. Info., Inc. v. Kansas City Post Office Emps. Cred. Union*, 788 P.2d 878, 881 (Kan. Ct. App. 1990)). Because the parties have failed to present sufficient facts for the court to determine the choice of law question, the court defaults to the law of the forum state—Kansas.

The viability of OneBeacon's Count I claim hinges, in part, on whether the coverage provided in the OneBeacon Policy is in excess of and triggered upon exhaustion of just the Allied World E&O Policy, or in excess of and not triggered until "other insurance" and "other indemnification" provides coverage and is exhausted. If the latter, the court next must determine whether any other insurance or other indemnification that exists to invoke the clause. The court focuses on the parties' "other insurance" arguments, as the "other indemnification" provisions were not included in the existing Complaint and thus not briefed by the parties in connection with the Motions to Dismiss.

BCBSKS asserts that only the Allied E&O Policy must be exhausted before the OneBeacon Policy is triggered, despite the "other insurance" clause. Doc. 50 at 4. It argues that "the OneBeacon Policy is expressly written as in excess" of the Allied World E&O Policy and does not mention the Allied World D&O Policy. Doc. 18 at 2, 8. And, if the court finds the policy language to be ambiguous in its meaning of when coverage is triggered, Kansas law provides that "the construction most favorable to the insured must prevail." *Id.* at 7. BCBSKS also claims that the Allied World D&O policy provides a different type of coverage and that OneBeacon cannot force BCBSKS to litigate Allied World's denial of coverage under the Allied World D&O Policy before the OneBeacon Policy is triggered. *Id.* at 2. Instead, BCBSKS's position contends that OneBeacon must provide coverage now and can exercise its subrogation rights later against Allied World based on the "other insurance" clause. *Id.*

OneBeacon responds that Kansas law follows the principles of horizontal exhaustion, which requires BCBSKS "to exhaust *all* primary insurance before looking to any excess insurance." Doc. 19 at 1–2, 4–5. In short, OneBeacon contends that the law does not require it first to provide coverage to BCBSKS, then seek contribution from Allied World, but instead it

can deny coverage until all other primary insurance is exhausted in addition to the Allied E&O Policy. *Id*. at 5.

As explained below, the court agrees that OneBeacon's Count I has stated a plausible claim for relief and thus is sufficient to survive BCBSKS's and Allied World's Motions to Dismiss. The court first addresses Allied World's argument for dismissal based on lack of subject matter jurisdiction. Next, the court describes Kansas rules of construction for insurance contracts and applies them to the OneBeacon Policy in connection with defendants' arguments for dismissal for failure to state a claim. Finally, the court addresses BCBSKS's argument that OneBeacon cannot plausibly state a claim that its policy is not yet triggered, because coverage under the Allied World D&O Policy is disputed.

## 1. Allied World's 12(b)(1) Argument

Allied World argues that Count I fails to present a justiciable case or controversy. When made, this argument relied in part on the fact that BCBSKS had not formally challenged its denial of coverage under the Allied World D&O Policy. *See* Doc. 21 at 3. And, because OneBeacon is not a party to the Allied World D&O Policy, Allied World contends it has no basis to seek a declaration of coverage. *Id.* But, the Proposed Complaint now asserts that BCBSKS has challenged the denial of coverage in the Related Case and adds that OneBeacon is seeking reimbursement from Allied World for any costs it has paid to BCBSKS. The remainder of Allied World's arguments inhere in the language of the policies and the differences in the types of coverage, intertwining its arguments of no justiciable case or controversy with its arguments for dismissal for failure to state a claim based on interpretation of the policy language. *See* Doc. 21 at 5–10; Doc. 32 at 1–3.

As discussed *supra* in Part IV.A., the court finds the *Mhoon* factors favor exercising jurisdiction over the declaratory action here. The court also concludes it has subject matter jurisdiction over Allied World with respect to proposed Count I as it is an interested party directly involved in the controversy, and for reasons explained below, OneBeacon has a present interest in determining how the two policies interact because of its "other insurance" clause. *See State Farm Mut. Auto. Ins. v. Mid-Continent Cas. Co.*, 518 F.2d 292, 296 (10th Cir. 1975) ("We recognize that all *interested parties* should be joined in a declaratory judgment action whenever possible and that a declaratory judgment should not be entered unless it disposes of a controversy and serves a useful purpose." (emphasis added)); *Rhone-Poulenc Inc. v. Int'l Ins.*, 71 F.3d 1299, 1302 (7th Cir. 1995) (explaining that where an excess policy's liability is contingent on the liability of a primary insurer, under Fed. R. Civ. P. 19(b), the suit "cannot proceed in the absence of the primary insurer[ ] until [it has] acknowledged [its] liability to the insured or [has] been determined by a court to be liable to him."). The court thus denies Allied World's Motion to Dismiss Count I for lack of subject matter jurisdiction as it will become moot when OneBeacon files its First Amended Complaint.

## 2. Kansas Law on Interpreting Insurance Contracts

Kansas law classifies insurance contract construction and effect as issues of law that the court must decide. *Kindergartners Count, Inc. v. DeMoulin*, 249 F. Supp. 2d 1233, 1242 (D. Kan. 2003); *AMCO Ins. v. Beck*, 929 P.2d 162, 165 (Kan. 1996) ("Insurance policies are considered contracts. The interpretation and construction of a contract is a question of law." (internal citations omitted)). The Kansas Supreme Court has summarized Kansas law governing interpretation of insurance contracts:

> The language of a policy of insurance, like any other contract, must, if possible, be construed in such manner as to give effect to the intention of the parties. Where

the terms of a policy of insurance are ambiguous or uncertain, conflicting, or susceptible of more than one construction, the construction most favorable to the insured must prevail.  Since the insurer prepares its own contracts, it has a duty to make the meaning clear.  If the insurer intends to restrict or limit coverage provided in the policy, it must use clear and unambiguous language in doing so; otherwise, the policy will be liberally construed in favor of the insured.

*Catholic Diocese of Dodge City v. Raymer*, 840 P.2d 456, 459 (Kan. 1992) (internal citations omitted).

"If the language in an insurance policy is clear and unambiguous, it must be construed in its plain, ordinary, and popular sense," and the court shall enforce the contract as made. *Bhd. Mut. Ins. v. M.M. ex rel. T.C.*, 292 F. Supp. 3d 1195, 1205 (D. Kan. 2017) (applying Kansas law); *see also City of Shawnee v. Argonaut Ins.*, 546 F. Supp. 2d 1163, 1173–74 (D. Kan. 2008) (applying Kansas law) ("If a policy is unambiguous, the intention of the parties and the meaning of the contract are determined from the instrument itself.").  The question a court should ask when deciding whether a policy is ambiguous is this:  What would a reasonably prudent insured understand the language to mean?  *Id.*  Ambiguity exists if the policy "contains language of doubtful or conflicting meaning based on a reasonable construction of the policy's language."  *Id.*  If the terms are ambiguous, "the construction most favorable to the insured must prevail."  *Id.*  But, "[c]ourts should not strain to find an ambiguity where common sense shows there is none.  The court must consider the terms of an insurance policy as a whole, without fragmenting the various provisions and endorsements."  *City of Shawnee*, 546 F. Supp. 2d at 1174.  "An ambiguity does not exist merely because the parties disagree on the interpretation of the language . . . [it] arises only if language at issue is subject to two or more reasonable interpretations and its proper meaning is uncertain."  *Id.*

### 3.  Interpretation of the OneBeacon Policy

The parties have not cited nor has the court found any Kansas law directly answering the question posed here—*i.e.*, whether (a) OneBeacon's obligations to BCBSKS are triggered immediately upon the exhaustion of the Allied World E&O Policy before any "other insurance" is exhausted leaving only a subrogation right, or (b) OneBeacon can deny coverage entirely until exhaustion of any "other insurance" is complete, despite listing only the Allied World E&O Policy as scheduled underlying insurance.  Indeed, cases from other jurisdictions appear split on how a court should apply "other insurance" clauses in primary and excess insurance policies.

To support its argument—that under the terms of the OneBeacon Policy, OneBeacon's coverage is triggered upon exhaustion of the Allied E&O Policy only—BCBSKS and Allied World cite *Continental Casualty Co. v. Amerisure Insurance Co.*, 886 F.3d 366 (4th Cir. 2018) (applying North Carolina law).  *See* Doc. 18 at 8; Doc. 21 at 9–10.  The facts in *Continental* are illustrative, but ultimately not persuasive.

There, Continental Casualty Company sued Amerisure Insurance Company seeking a declaration that Amerisure was obligated to reimburse Continental for the settlement amount and all attorneys' fees and expenses it had incurred defending an underlying personal injury lawsuit. *Amerisure*, 886 F.3d at 368.  Three policies potentially covered the damages, costs, and fees.  *Id.* at 369.  Amerisure provided two policies to a second-tier subcontractor—a commercial general liability policy with a $1,000,000 limit and an umbrella policy with a $5,000,000 limit.  *Id.* Continental provided a commercial general liability contract to the first-tier subcontractor.  *Id.* Under the terms of a contract between the second-tier subcontractor and a first-tier subcontractor, the second-tier subcontractor was required to have its own insurance with minimum coverage of $2,000,000 and such coverage had to be "primary and noncontributory" to the first-tier

subcontractor's insurance.  *Id.*  Amerisure refused to participate in the defense of the underlying lawsuit, claiming the suit fell within an exception in its policies that precluded coverage.  *Id.* at 370.  Continental defended the action through settlement and then sought reimbursement from Amerisure.  *Id.*

The Fourth Circuit found Amerisure's alleged coverage exclusion did not apply and that Amerisure's umbrella policy provided that it "will have the right and duty to defend the insured . . . *when* . . . the limits of the underlying insurance have been exhausted."  *Amerisure*, 886 F.3d at 372–73 (emphasis added).  "Underlying insurance" was defined as the Amerisure commercial general liability policy only and, "notably, the Continental [policy] was not listed."  *Id.* at 373.  So, the court held that "under the plain language of the Amerisure umbrella policy, coverage was triggered *when* the Amerisure [commercial general liability policy] had been exhausted."  *Id.* (emphasis added).

But, Amerisure next argued that its umbrella coverage was not triggered until after the primary coverage provided by Continental's policy was exhausted based on the "other insurance" provisions in each policy.  *Amerisure*, 886 F.3d at 373–74.  The "other insurance" clause in the Continental policy stated that the policy provided primary coverage except when the insurance was excess over any other *primary* insurance available.  *Id*.  The "other insurance" clause in Amerisure's umbrella policy provided that the policy was excess over *any* other insurance *whether primary or excess*.  *Id*. at 374.  Yet, because Amerisure "did not issue its umbrella policy contingent on the existence of the Continental [ ] policy[,]" the Fourth Circuit held that "the umbrella policy coverage was triggered when the limit of the [Amerisure commercial general liability policy] was exhausted."  *Id.*  Even if some ambiguity arose from the "other insurance" clauses in the two policies, the court pointed to the contract between the first-

tier subcontractor and second-tier subcontractor, which required Amerisure's policies to be "'*primary and non-contributory*' to *all* other insurance provided" to the first-tier contractor.  *Id.* (emphasis added).  So, "the umbrella policy coverage was triggered immediately upon the exhaustion of the Amerisure [commercial general liability] policy, and [ ] the Continental [commercial general liability policy] did not take priority over the umbrella policy."  *Id.*

*Continental* is analogous to the policies at issue in this case, but the facts are not identical.  Here, the face of the OneBeacon Policy establishes that it was issued contingent upon the existence of only the Allied World E&O Policy.  Doc. 1-3 at 3, 10–11. And, under its plain language, OneBeacon agreed to "provide the **Insured** with insurance excess of the [Allied World E&O Policy] . . . provided that the [Allied World E&O Policy] also applies and has been exhausted."  *Id*. at 10.  *See also id.* at 11 (exclusionary provision explaining OneBeacon "will not have any obligation to make any payment . . . *unless and until* the full amount" of the Allied World E&O Policy has been paid (emphasis added)).  But, unlike *Continental*, no underlying contract required the OneBeacon Policy to be a primary policy.  So, no alternate basis exists here to support a conclusion that the OneBeacon Policy is triggered immediately upon exhaustion of the specified underlying insurance despite its "other insurance" clause.  To reach such a conclusion, this court would have to interpret the insuring and exclusionary clauses, above, in a manner mirroring the Fourth Circuit's interpretation of the Amerisure insuring provision (which provided that coverage is triggered *when* the scheduled insurance was exhausted), despite the "other insurance" provision.

The OneBeacon Policy's "other insurance" provision, similar to the provision in Amerisure's umbrella policy, provides that it will be "excess of and shall not contribute with . . . *any* other insurance . . . (whether collectible or not)."  Doc. 1-1 at 24 (emphasis added).  Based

on policy interpretation alone, other jurisdictions may have reached a different conclusion than *Continental* when determining priority of two contracts with "other insurance" clauses. These other cases hold that *any* primary insurance should apply before holding an excess insurer responsible—even if the other primary insurance is not specifically listed as "underlying insurance" in the excess policy.

Thus, it appears that a split of authority exists. On one side, in what some courts have called the majority position, "other insurance" clauses are not considered on the same level, *i.e.*, one policy is, by its general nature, primary and the other is a true excess policy. So, the primary policy must provide coverage first.[28] *Farmers Ins. Exch. v. Fed. Ins.*, No. 10-611 JP/GBW, 2011 WL 13116736, at *9–10 (D.N.M. Nov. 21, 2011) (explaining that "a clear majority of courts" that have considered the issue, "have held that all primary insurance must be exhausted before an excess insurance policy is reached" and predicting New Mexico would follow the majority

---

[28]  For cases applying the majority approach, *see, e.g., Farmers Ins. Exch. v. Fed. Ins.*, No. 10-611 JP/GBW, 2011 WL 13116736, at *9–10 (D.N.M. Nov. 21, 2011) (collecting and analyzing cases following both the majority and minority approach, and predicting that New Mexico would follow the majority rule); *Cont'l Cas. Ins. v. Armstrong World Indus., Inc.*, 776 F. Supp. 1296, 1298–1301 (N.D. Ill. 1991) (denying motion for summary judgment involving two umbrella excess insurance policies both with specific scheduled underlying insurance and "other insurance" provisions, finding non-movant could argue that the excess policies were not triggered until all applicable primary insurance (not just the underlying policies listed) was exhausted because, looking at the polices as a whole, the plain meaning did not support movant's "claim that only the listed underlying primary policies needed to be exhausted before the . . . excess coverage begins"); *U.S. Gypsum Co. v. Admiral Ins.*, 643 N.E.2d 1226, 1261 (Ill. Ct. App. 1994) (holding, in a case involving an excess insurance policy with an "other insurance" clause, that all triggered primary insurance first must be exhausted, not just the "underlying primary policy particular to the excess policy in question[,]" before the excess policy must provide coverage); *LeMars Mut. Ins. v. Farm & City Ins.*, 494 N.W.2d 216, 218–19 (Iowa 1992) (holding a primary policy with clause indicating it becomes excess if a non-owned vehicle is involved in the accident must be exhausted before umbrella insurance policy could be reached for payment because "a primary insurance provider cannot hide behind an excess insurance clause in its 'other insurance' provision to require an umbrella insurer to cover liability for its insured"); *Rivere v. Heroman*, 96-1568, p.4 (La. App.4 Cir. 2/5/97); 688 So.2d 1293, 1295 (holding that primary policy with "other insurance" provision must provide coverage before follow form excess insurance policy, even where excess policy did not provide umbrella coverage); *Utica Nat'l Ins. of Tex. v. Fid. & Cas. Co. of N.Y.*, 812 S.W.2d 656, 661 (Tex. App. 1991) (summarizing another Texas Court of Appeals decision interpreting contract language as a matter of law, which held "in conformity with the majority rule . . . and established practice in the insurance industry" (a) that umbrella insurer did not have to contribute to a settlement until both its scheduled underlying insurance and other applicable underlying insurance were exhausted because of the language in its "other insurance" clause that made it excess to any "other valid and collectible insurance with any other insurer" and (b) that primary insurer with its own applicable "excess insurance" provision must be held responsible first (summarizing the holding in *Carraba v. Emp'rs Cas. Co.*, 742 S.W.2d 709 (Texas App. 1987)).

position); *Great Divide Ins. v. Lexington Ins.*, 84 N.E.3d 844, 846–51 (Mass. 2017)

(acknowledging that "the majority of courts in other States have held that a primary policy with

an 'other insurance' clause is essentially a primary policy, and therefore must be exhausted

before a 'true excess' policy is triggered" but adopting the minority approach that "primary

insurance policies with 'other insurance' clauses cover the same level of risk as 'true excess'

policies"); *see also* Steven Plitt et. al.; 15 *Couch on Insurance* § 218:5 (3d ed. Supp. 2019)

("'Other insurance' clauses become relevant only where several insurers insure the same risk at

the same level of coverage. An 'other insurance' dispute cannot arise between primary insurers

and true excess insurers."). The minority position is that the two "other insurance" clauses are

competing if the primary policy is not the specified underlying policy that the excess insurance

was issued to provide coverage above and, because they are thus considered on the same level,

courts should interpret the language of the two clauses to determine priority.[29]

The *Emcasco* decision demonstrates the majority approach. Applying Illinois law, the

Appellate Court of Illinois considered the priority between a primary policy provided by Illinois

Emcasco Insurance Company ("Emcasco") and an umbrella policy provided by Continental

---

[29]     For cases applying the minority position *see, e.g.*, *Liberty Mut. Ins. v. Fireman's Fund Ins.*, 479 A.2d 289, 292–93 (Del. Super. Ct. 1983) (considering umbrella policy and comprehensive automobile liability policy on same level both as excess policies, where underlying primary policy was exhausted and comprehensive policy had "excess insurance" endorsement); *Great Divide Ins. v. Lexington Ins.*, 84 N.E.3d 844, 846–51 (Mass. 2017) (adopting the minority approach that "primary insurance policies with 'other insurance' clauses cover the same level of risk as 'true excess' policies"); *Gaston Cty. Dyeing Mach. Co. v. Northfield Ins.*, 524 S.E.2d 558, 568 (N.C. 2000) (rejecting argument that a "pure" excess policy "can never be made primary" to a primary policy where the pure excess policy did not list the primary policy in its declarations as an underlying policy and the construction of the "other insurance" provisions in the primary policy made clear it was in excess of all other policies, including the pure excess policy). *Cf. Liberty Mut. Ins. v. Indian Harbor Ins.*, No. 11-0624 BEN (NLS), 2012 WL 642890, at *5–6 (S.D. Cal. 2012) (holding, without the involvement of an "other insurance" clause, that vertical exhaustion (meaning "the policy limits under just one particular primary policy must be exhausted before the excess policy kicks in") was required and triggered excess policy when "the limits of a specifically scheduled underlying policy" were exhausted, and rejecting the applicability of horizonal exhaustion (meaning the exhaustion of "all applicable primary policies. . . before the excess policy kicks in") because the excess policy only provided that it was in excess of that *specific* underlying policy).

Casualty Company ("CNA"), where a third policy provided by State Farm Mutual Insurance Company was the scheduled underlying insurance to the umbrella policy and already had been exhausted. *Ill. Emcasco Ins. v. Cont'l Cas. Co.*, 487 N.E.2d 110, 110–11 (Ill. Ct. App. 1985). The CNA policy required a primary automobile insurance policy—State Farm's policy—to be effective and provided excess coverage over the amount recoverable from the State Farm policy. *Id.* A dispute arose between CNA and Emcasco over which company was responsible for the damages arising from a car accident and subsequent lawsuit where each policy had an "other insurance" clause.[30] *Id.* CNA argued that its umbrella policy was "in excess of the primary coverage provided by Emcasco" and so, the coverage under the Emcasco policy "must be exhausted before the CNA policy is reached." *Id.* at 111–12. Emcasco, on the other hand, argued that the CNA policy was in excess only to State Farm's policy. *Id.* at 111. So, Emasco argued, the appellate court should examine the "other insurance" clauses on the same level, as the trial court had, and thus should affirm the conclusion that "the two other insurance clauses are irreconcilable and therefore coverage under each policy should be applied pro rata in proportion to their liability limits." *Id.* The appellate court disagreed.

The Emcasco policy's "other insurance" clause provided that "the insurance with respect to a non-owned automobile shall be excess over any valid any collectible insurance." *Emcasco*, 487 N.E.2d at 111. And the excess provision applied—the car involved in the accident was owned by someone other than the insured. *Id.* at 110–11. The CNA policy was "in excess of any other policy." *Id.* The Illinois Appellate Court examined the two policies, "construe[d] the policies as a whole and the underlying policy considerations[,]" concluding that the umbrella

---

[30]     In the Illinois case, the judgments from the underlying lawsuit were satisfied by the insurance companies first, then they filed a declaratory judgment action to determine responsibility between the insurance companies. *Emsasco*, 487 N.E.2d at 111.

policy was a true excess policy and "CNA should be required to contribute only after the limits of the Emcasco policy have been reached." *Id.* at 112.

To reach its conclusion, the Illinois Appellate Court recognized that umbrella policies "provid[e] unique and special coverage" and, agreeing with a treatise discussing "other insurance" clauses as applied to umbrella policies, found that such policies are "almost without dispute . . . regarded as true excess over and above any type of primary coverage, excess provisions arising in regular policies in any manner, or escape clauses." *Emcasco*, 487 N.E.2d at 112–13. The court also compared the coverage limits and premiums charged between the CNA policy and Emscaco policy, finding that CNA's significantly lower premiums were "indicative of the reduced risk assumed by the umbrella policy." *Id.* at 112. Also, the court considered that the Emcasco policy provided primary coverage under most circumstances, while the CNA policy provided for primary coverage in only limited circumstances. *Id.* And, the court noted, only the CNA policy required underlying insurance as a condition to coverage. *Id.*

Kansas case law supports a prediction that Kansas would follow the majority position, requiring exhaustion of all primary insurance before an excess insurance policy with an "other insurance" clause like OneBeacon's is required to provide coverage. In *Associated Wholesale Grocers, Inc. v. Americold Corp.*, 934 P.2d 65, 80 (Kan. 1997), the Kansas Supreme Court considered whether an excess insurer had raised a material issue of fact when it argued that it had no obligation to provide coverage yet based on its "other insurance" clause. The scheduled underlying policy had been exhausted and the "other insurance" clause provided that "[i]f other insurance applies to claims covered by this policy, the insurance under this policy is excess and we will NOT make any payments until the other insurance has been used up." *Americold*, 934 P.2d at 80. "Other insurance" was defined as "[i]nsurance other than Scheduled Underlying

Insurance or insurance specifically purchased to be in excess of this policy affording coverage that this policy also affords." *Id.* The excess insurer argued that certain other primary policies should provide coverage first. *Id.* But, the Court reviewed the primary policies, found they would not apply under the events causing the loss, and concluded that the insurer "had not shown the existence of any valid coverage" under those policies.[31] *Id.* So, the Kansas Supreme Court affirmed summary judgment against the excess insurer. *Id. Cf. Atchison, Topeka & Santa Fe Ry. Co. v. Stonewall Ins.*, 71 P.3d 1097, 1131–32, 1134 (Kan. 2003) (determining that horizontal exhaustion principles required Santa Fe to pay its self-insured retention for each policy period before looking to coverage under excess insurance policies with "other insurance" clauses, because self-insured retentions were the equivalent of primary coverage). Based on the current Kansas case law, the court thus predicts that Kansas would follow the majority approach.

Now, the court turns to interpret the language in the OneBeacon Policy under Kansas rules of construction and this majority approach. The court finds the language in the OneBeacon Policy is unambiguous. No doubt exists that the OneBeacon Policy is intended to provide insurance in excess of the Allied World E&O Policy under the plain language of the policy. *See* Doc. 1-3 at 10 (insuring agreement stating OneBeacon will "provide the **Insured** with insurance excess of the [Allied World E&O Policy] . . . provided that the [Allied World E&O Policy] also

---

[31]    The Kansas Supreme Court explained how primary coverage and excess coverage differ:

> Primary insurance coverage is insurance coverage whereby, under the terms of the policy, liability attaches immediately upon the happening of the occurrence that gives rise to liability. An excess policy is one that provides that the insurer is liable for the excess above and beyond that which may be collected on primary insurance. In a situation in which there are primary and excess insurance coverages, the limits of the primary insurance must be exhausted before the primary carrier has a right to require the excess carrier to contribute to a settlement. In such a situation, the various insurance companies are not covering the same risk; rather, they are covering separate and clearly defined layers of risk. The remote position of an excess insurer thus greatly reduces its chance of exposure to a loss. This reduced risk is generally reflected in the cost of the excess policy.

*Americold*, 934 P.2d at 81 (internal citations and quotations omitted).

applies and has been exhausted). And, it is clear, no payments shall be made under the OneBeacon Policy "unless and until" the underlying insurance—the Allied World E&O Policy—has been exhausted. *Id.* at 11 (exclusionary provision providing that OneBeacon "will not have any obligation to make any payment . . . unless and until the full amount" of the Allied World E&O Policy has been paid). But, considering the policy as a whole, the court finds that the terms of the OneBeacon Policy, which include the "other insurance" provision of the Allied World E&O Policy by following form,[32] also unambiguously intend coverage to apply under the policy only after all "other insurance" has been exhausted. *See* Doc. 1-1 at 24 ("This Policy shall be *excess of and shall not contribute with*: (a) any other insurance. . . ; and (b) any indemnification to which an **Insured** is entitled . . . ." (emphasis added)). The court must not "fragment[ ] the various provisions." *See City of Shawnee*, 546 F. Supp. 2d at1174. The "other insurance" clause here does not conflict with the insuring clause and exclusionary provision. Rather, a reasonable construction of the policy is that the OneBeacon Policy is in excess of both the Allied World E&O Policy and any "other insurance." And, it is excess to such other insurance "(whether collectible or not)." *Id.*

In contrast, BCBSKS's arguments invite the court to add language to the policy, language providing that coverage attaches immediately upon exhaustion of the Allied World E&O Policy despite the excess "other insurance" clause. Also, its arguments require the court to find that the "other insurance" clause may be used in conjunction with the subrogation clause to seek reimbursement, but not to deny coverage, at least where coverage under the "other" policy is

---

[32]      *See Utah Power & Light Co. v. Fed. Ins.*, 983 F.2d 1549, 1159–60 (10th Cir. 1993) (interpreting "other insurance" clauses that were incorporated into policies by reference to underlying insurance); *Bayou Steel Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 642 F.3d 506, 509 (5th Cir. 2011) ("A 'following form' excess policy incorporates by reference all terms and conditions of the primary insurance policy."); *Coffeyville Res. Ref. & Mktg., LLC v. Liberty Surplus Ins.*, 714 F. Supp. 2d 1119, 1129–30 (D. Kan. 2010) (applying primary policy's "other insurance" clause to excess insurer where excess insurer had follow form policy).

39

disputed.  The court declines these invitations.  Instead, it enforces the contract as made.  *See Bhd. Mut. Ins.*, 292 F. Supp. 3d at 1205; *see also City of Shawnee*, 546 F. Supp. 2d at 1174 (directing courts not to "strain to find an ambiguity" as "an ambiguity does not exist merely because the parties disagree on the interpretation of the language").

As the majority position explains, coverage under an excess policy generally does not attach until *all* primary insurance has been exhausted.  This remains true even where the excess policy both has specified primary underlying insurance and an "other insurance" provision like OneBeacon's that provides it is excess to any "other insurance" as well.  Exceptions to this rule may apply where the policy contains clear language to the contrary, as discussed below.  But no such clear language exists here.  And, the court finds OneBeacon has stated a plausible claim for relief in Count I to the extent it requests a declaratory judgment that its policy does not attach until BCBSKS exhausts all primary "other insurance."

The cases cited by BCBSKS and Allied World do not lead to a different conclusion here. *See* Doc. 26 at 8 (arguing that "[e]ven courts that have adopted horizontal exhaustion acknowledge that there is an exception to that rule [if] the excess insurance policy specifically names the underlying policy and states it will provide coverage when that specific policy is exhausted"); Doc. 21 at 8–9.  First, defendants cite *Coffeyville Resources Refining & Marketing, LLC v. Liberty Surplus Insurance Corp.*, 714 F. Supp. 2d 1119 (D. Kan. 2010).  *Coffeyville* applied Kansas law to determine priority between policies issued by National Union and Illinois Union.  *Coffeyville*, 714 F. Supp. 2d at 1124–25.  The Illinois Union policy was issued as an excess policy, listing a Liberty Surplus Insurance Company policy on its schedule of underlying insurance.  *Id.* at 1125.  It also included specific language that it will "continue in force as primary coverage" once Liberty's policy was exhausted, and had a follow form "other insurance"

clause which stated that the coverage was "primary insurance" and described a method of sharing if other primary insurance was also available. *Id.* at 1125–26. National Union provided a general liability policy with coverage that attached above a "Retained Limit." *Id.* at 1126. The "Retained Limit" included certain scheduled underlying insurance[33] and "any applicable Other Insurance" (which was defined to include "a valid and collectible policy of insurance providing coverage for damages covered in whole or in part by this policy"). *Id.* at 1126–27. And, the National Union policy contained an "other insurance" clause reiterating that if "other valid and collectible" insurance applied then the National Union policy was in excess. *Id.* at 1127.

National Union argued that, if both policies provide coverage, the Illinois Union policy is primary and must be exhausted before the National Union policy. *Coffeyville*, 714 F. Supp. 2d at 1128. Its position contended that (1) the Liberty policy had been exhausted, so under the express terms of the Illinois Union policy its liability had attached and it "continued . . . as primary coverage," (2) under Illinois Union's follow form "other insurance" clause it provided primary insurance, and (3) the Illinois Union policy was "Other Insurance" under the National Union policy, so the court should interpret the two policies and their "other insurance" clauses to require exhaustion of the Illinois Union policy first. *Id.*

Illinois Union argued that the National Union policy was a primary policy because it was in excess only if the scheduled underlying insurance applied or "Other Insurance" was available. *Coffeyville*, 714 F. Supp. 2d at 1129. Illinois Union's position asserted that its policy was a true excess policy because it required exhaustion of a predetermined amount of primary coverage before it could ever be collectible. *Id.* According to Illinois Union, horizontal exhaustion under

---

[33] The National Union policy's scheduled underlying insurance was not asserted to provide coverage for the liability here and did not list the Liberty or Illinois Union policies.

Kansas law required all primary policies to be exhausted before the court could reach its layer of excess insurance. *Id.*

Our court, however, sided with National Union. Because the Illinois Union policy "generally follows form to the Liberty policy . . . it stands to reason it would attach after exhaustion of the underlying policy." *Coffeyville*, 714 F. Supp. 2d at 1129. And, the court found, the policy language made clear that this indeed was the case because the policy stated that upon exhaustion of the primary policy it would "continue in force as primary insurance" and had an "other insurance" clause that solidified its position as a primary policy even if other insurance was available. *Id.* The National Union policy, however, was excess to the "Retained Limit," which included the Illinois Union and Liberty policies as "Other Insurance." *Id.* Reading all the provisions together, the court found the only reasonable interpretation was that the National Union policy was excess and the Illinois Union policy primary (because under the terms of the policy, once the Liberty coverage was exhausted it became primary). *Id.* at 1130. The court also considered the horizontal exhaustion argument. *Coffeyville*, 714 F. Supp. 2d at 1130. But, because the court determined the National Union coverage was excess, not primary, the argument could not support Illinois Union's position.

This is not a case like *Coffeyville* where the language in two excess policies (at least prior to exhaustion of the Liberty policy) was at issue and the court endeavored to interpret the priority of the policies. Here, while the Allied World E&O Policy now is alleged to be exhausted which, in a situation without any "other insurance," would mean coverage attaches, no language exists in the OneBeacon Policy explicitly providing for primary coverage upon such exhaustion. And, OneBeacon's "other insurance" clause differs significantly from the "other insurance" clause in *Coffeyville*, providing it is in "excess of" and "shall not contribute with" any other insurance.

Unlike *Coffeyville*, OneBeacon seeks a declaration that its *excess* policy does not attach until other *primary* insurance is exhausted.

The other cases cited by BCBSKS also did not involve an excess insurer with policy language and an "other insurance" clause sufficiently similar to the OneBeacon Policy. *See Am. Auto. Ins. v. First Mercury Ins.*, No. 13:CV-439 MCA/LF, 2017 WL 3575882, at *2, 9–10 (D.N.M. Mar. 31, 2017) (holding that excess policy attached after exhaustion of only specified underlying insurance and before other insurance policy (which had "other insurance" clause providing it was excess under the circumstances at hand), where excess policy language stated that coverage attached "only after all Underlying Insurance has been exhausted" and that in the event of exhaustion it "shall continue in force as primary insurance", and no "other insurance" clause in the excess policy was discussed); *Travelers Cas. & Sur. Co. v. Transcontinental Ins.*, 19 Cal. Rptr. 3d 272, 274–80 (Cal. Ct. App. 2004) (interpreting insurer's duty to defend under policy language with two types of coverage where (a) "other insurance" language specifically was included in coverage provision that did not apply, (b) coverage provision that applied explicitly stated that insurer had duty to defend when applicable scheduled underlying insurance was exhausted and did not include "other insurance" language, and (c) general "other insurance" clause applicable to both types of coverages applied to payment of claims but *not* duty to defend); *id.* at 959 (discussing principles of horizontal exhaustion and holding that language of policy was "sufficiently clear to overcome the usual presumption that *all* primary coverage must be exhausted" before excess policy was triggered because the excess policy was specifically stated to be excess over the scheduled insurance and policy language was clear that the duty to defend arose upon exhaustion of that policy not other insurance); *Fed. Ins. v. St. Paul Fire & Marine Ins.*, 649 N.E.2d 460, 462–64 (Ill. Ct. App. 1995) (holding that "absent specific policy

language to the contrary" generally a primary policy's "other insurance" clause cannot be compared to an excess policy's other insurance clause because "[u]nder the primary exhaustion principle" the excess coverage is not triggered until the limits of primary policies are exhausted, but here, the excess policy was stated to be excess to only one specific underlying policy and did not have an "other insurance" clause that made it excess to other polices—it provided for a method of sharing among "all valid and collectible insurance," so the court found excess policy was triggered upon exhaustion of only the specified underlying policy); *Mayor & City Council of Baltimore v. Utica Mut. Ins.*, 802 A.2d 1070, 1105 (Md. Ct. Spec. App. 2002) (adopting horizontal exhaustion because "[t]he exhaustion of all of the primary policies on the risk should occur prior to the requirement that any excess policy respond to the loss, unless the language of the excess policy states that (1) it is excess insurance over a particular, specific, primary policy, and (2) will be triggered when that discrete policy is exhausted[,]" but without addressing whether "other insurance" language would permit an excess policy with a specific primary policy to avoid triggering its obligations until all other primary policies in addition to the specified policy were exhausted). These cases show that courts have, at times, determined that excess policies are excess *only* to the specified underlying policy and are triggered upon exhaustion of that policy alone, despite the general rule requiring exhaustion of primary policies before excess policies. But, as illustrated above, they have done so after analyzing the specific policy language and finding primary "other insurance" clauses or language elsewhere in the policy (or lack thereof) that makes clear the excess policy is intended to apply only after the specified underlying insurance. That is not the case here.

Based on the unambiguous language in the policy itself, the guidance of the majority position, and the Kansas Supreme Court's holding in *Americold*, the court concludes that

OneBeacon has plausibly stated a claim for relief to the extent it seeks a declaration that its "other insurance" clause requires all primary coverage to be exhausted before it must provide coverage under the OneBeacon Policy.

But, the court recognizes, another wrinkle exists here. Allied World denies that the Allied World D&O Policy provides any coverage and OneBeacon seeks specific declaratory relief that the Allied World D&O Policy must be exhausted before its policy is implicated. Indeed, coverage under the Allied World D&O policy also is raised in the Related Case between Allied World and BCBSKS. BCBSKS and Allied World argue that the Allied World D&O Policy covers different risks than the OneBeacon Policy, and thus it cannot be considered "other insurance" even under the court's interpretation of the policy language above. Doc. 18 at 2, 5; Doc. 21 at 5–8; Doc. 29 at 9; Doc. 32 at 3–8. And Allied World's position is it owes no coverage at all. Doc. 21 at 7 n.2. The court considers the question this wrinkle presents in the next section.

### 4. Do the Policies Cover the Same Loss?

An "other insurance" clause "merely sets forth priority when there is more than one policy that provides coverage for a loss." *Progressive Nw. Ins. v. Vangilder*, Nos. 15-2324-JAR-TJJ, 15-1128-JAR-TJJ, 2016 WL 427740, at *4 (D. Kan. Feb. 4, 2016) (first citing *Narron v. Cincinnati Ins.*, 97 P.3d 1942, 1048 (Kan. 2004); then citing *Cain v. Goodville Mut. Cas. Co.*, No. 92, 451, 2005 WL 697462, at *2 (Kan. Ct. App. Mar. 25, 2005)). "Priority only comes into play where two or more policies provide coverage." *Id.*; *see also Progressive Nw. Ins. v. Handshumaker*, 662 F. App'x 630, 632 (10th Cir. 2016) (applying Kansas law to affirm summary judgment in declaratory judgment action and explaining that other insurance clauses are used to determine priority when more than one policy provides coverage for a loss); *First*

*Mercury*, 2017 WL 3575882, at *5 ("Critically, in order for an 'other insurance' clause to be effective, the two policies at issue must insure the same [loss] . . . If two policies do not cover the same loss, then an 'other insurance' clause cannot operate to render one policy excess over the other." (internal quotations and citations omitted)). *Cf. Farmers Ins. Exch.*, 2011 WL 13116736, at *3 (determining priority of coverage *if* both policies provided coverage in the underlying suit, but reserving a ruling on the merits whether one of the policies actually "provided coverage in the underlying suit or whether [insurer] might have a valid affirmative defense."). Even where two policies do not provide identical coverage, if the policies provide some of the same coverage, the court may need to determine which policy should be given priority. *See Hennes Erecting Co. v. Nat'l Union Fire Inc. Co. of Pittsburgh, Pa.*, 813 F.2d 1074, 1077 (10th Cir. 1987).

The answer to the question whether the Allied World D&O Policy provides any primary coverage overlapping with the OneBeacon Policy's excess coverage turns on the facts in the underlying Antitrust Litigation. The court concludes this question best can be resolved when the Related Case and this case are consolidated. As explained below, the court cannot determine now whether other primary insurance is available here—as OneBeacon contends—which provides coverage to BCBSKS for the same losses covered by the OneBeacon Policy.

Allied World argues that the Allied World E&O Policy and the Allied World D&O Policy "provide coverage for mutually exclusive risks" because the former covers losses arising from claims arising from Managed Care Activities and the latter "excludes coverage for such claims." Doc. 32 at 3–4. The court disagrees. Instead, the court finds there is a potential for overlapping coverage under the two policies. The Allied World D&O Policy's exclusion for a "**Loss**" arising out of "**Managed Care Activities**" does not apply to portions of a "an otherwise

covered **Claim**" for "**Provider Selection Practices**."  Doc. 1-2 at 24.  And, "**Provider Selection**" is included in the definition of "**Managed Care Activity**" in the Allied World E&O Policy, and by following form, the OneBeacon Policy.  Doc. 1-1 at 45.  So, to the extent the claims stemming from the Antitrust Litigation arise out of "**Provider Selection Practices**," the policies may cover the same "**Loss**," which in each case includes the defense costs under each policy for which BCBSKS currently seeks reimbursement.  *See* Doc. 1-1 at 7; Doc. 1-2 at 12. Both policies also contain provisions about claims for "**Antitrust Activity**."  *See* Doc. 1-1 at 2, 6 (Allied World E&O Policy); Doc. 1-2 at 28 (specific insuring agreement for "Antitrust Activities Coverage" under Allied World D&O Policy).  At this stage of the pleadings, the court does not have enough information to determine if the policies provide coverage for some of the same losses arising from "**Provider Selection Practices**" and "**Antitrust Activities**," or if the claims arising from the Antitrust Litigation involve only "**Managed Care Activities**" that fit squarely within an exclusion, making the policies' coverage mutually exclusive.  *See Anapolsky v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, No. 12-21275-civ-Cooke/Turner, 2013 WL 11842018, at *6 (S.D. Fla. Aug. 21, 2013) (denying summary judgment where "a fact question remains as to whether the Director and Officer insurance policy . . . covered the claims . . . asserted in the underlying action.").  On this record, court cannot decide as a matter of law that the two policies do not insure the same loss, and thus finds OneBeacon has stated a plausible claim for relief.

Moreover, in the interest of judicial economy, the court finds it appropriate to address these questions surrounding insurance coverage and indemnity under the Allied World D&O Policy, the License Agreement, and the OneBeacon Policy when the Related Case and this suit are consolidated, and after OneBeacon has amended its Complaint to add BCBSA as a party. The court finds, under the policy language and facts alleged, OneBeacon has stated a plausible

claim for relief in Count I.  Going forward, the burden will be on OneBeacon "to establish facts which bring the case within the exception[ ] [to coverage] set forth in the policy"—*i.e.*, that the Allied World D&O Policy is applicable primary "other insurance" that first must provide coverage.[34]  *City of Shawnee*, 546 F. Supp. 2d at 1174.

### 5. Trigger of Duty to Reimburse Defense Expenses Where "Other Insurance" is in Dispute

Neither party has identified any Kansas law addressing the remaining question on Count I, discussed briefly *supra* Part IV.B.3—whether an excess insurer fails to state a plausible claim that its policy is not triggered when a dispute over coverage under another policy exists. BCBSKS argues that OneBeacon cannot plausibly state a claim that its policy is not yet triggered, where coverage under the Allied World D&O Policy is disputed.  BCBSKS argues that "[e]ven if OneBeacon ha[s] a meritorious argument" that its policy is secondary to other primary policies in addition to the Allied World E&O Policy, "the law does not support the notion that BCBSKS should be forced to forgo insurance coverage while an insurer who recognizes a coverage obligation points a finger at another insurer who has denied any coverage obligation for the same claim."  Doc. 18 at 9.  Instead, BCBSKS contends that OneBeacon must reimburse its defense expenses first, then pursue a contribution claim against Allied World.  *Id.*  As support, BCBSKS cites *Everaard v. Hartford Accident & Indemnity Co.*, 842 F.2d 1186 (10th Cir. 1988), arguing that the Tenth Circuit has found other insurance clauses to allow subrogation or

---

[34]     In the Related Case, Allied World seeks a declaration of no coverage because, in part, it alleges the Antitrust Litigation falls within an exclusion to its policy for acts done in the performance of "Managed Care Activities."  *See* No. 18-2513, Doc. 1 at 15.  BCBSKS denies this allegation.  *See* No. 18-2515, Doc. 16 at 21.  For Allied World to secure the declaratory relief it seeks, it must shoulder the burden of proving facts establishing that coverage for the Antitrust Litigation falls within an exception to its policy.  *See Assoc. Wholesale Grocers, Inc. v. Americold Corp.*, 934 P.2d 65, 76 (Kan. 2001) ("In seeking to avoid liability on the ground that the injury is covered under an exception to the general terms of its policy, [insurer] has the burden of proving facts bringing this case within the exception.").

indemnification from other available sources, but that the insurer must pay its obligations first. *Everarrd* is distinguishable.

In *Everaard*, an insurance company argued that its uninsured motorist insurance provided excess coverage to its insured, and thus it was not liable to provide coverage until all underlying coverage was exhausted. *Everarrd*, 842 F.2d at 1187–88, 1191. Its policy had an "other insurance" clause that provided it was excess over any other collectible insurance if its insured was in a non-owned vehicle. *Id.* at 1191. But, the Tenth Circuit rejected this argument because, under Oklahoma uninsured motorist statutes, it was clear that such coverage is primary coverage as "[i]t does not undertake to protect the insured against liability he may incur to others but rather compensates him for a loss caused by a . . . tortfeasor." *Id.* at 1190–92. Because the insurance company's obligation was primary, the Circuit determined that it "may rely on the other insurance clause to seek subrogation or indemnification from the other available liability insurance," but it could not insist that the insured first litigate the priority of all available coverage. *Id.* at 1192.

The Eighth Circuit and Southern District of Iowa also have decided when an insurer's obligation to reimburse defense costs is triggered. *See Liberty Mut. Ins. v. Pella Corp.*, 633 F. Supp. 2d 714, 724–26 (S.D. Iowa 2009), *aff'd in part*, 650 F.3d 1161, 1172–74 (8th Cir. 2011). There, the district court granted declaratory relief to the insured holding that Liberty Mutual's duty to reimburse the insured's defense costs was triggered despite "other insurance" clauses because Liberty Mutual's policies were primary. *Id.* at 726. The court explained that the distinction between an excess policy and a primary policy was critical. *Id.* at 725. "Other insurance" clauses in primary policies are intended "to define which coverage is primary and which coverage is excess *between policies*," but do not affect the insured's right to recover under

concurrent primary policies. *Id.* (citations and internal quotations omitted). However, with a true excess policy, "any underlying primary insurance must be exhausted before coverage . . . is triggered." *Id.*; *see also Pella*, 650 F.3d at 1172 (noting an insurer with a true excess policy "is not liable for any portion of the loss until the primary insurer's policy limit has been exhausted, even if the primary policy contains an other-insurance clause" (internal quotations and citations omitted)).

While the Liberty Mutual policies were labeled "excess" policies, the court determined that they did not meet the criteria to be a "true excess" policy. *Liberty*, 633 F. Supp. 2d. at 725. True excess policies generally require a primary policy as a condition of coverage, do not attach until a specified amount of primary coverage is exhausted, "are excess in all instances except for limited circumstances," and their "nature is reflected by low premiums compared to the typically large amount of risk insured." *Id.* Primary policies, on the other hand, are "purchased to be the first tier of insurance coverage" and are "intended to kick in the moment liability is established, but which may be excess in certain, specified situations." *Id.* The Liberty Mutual polices did "*not require* the existence of a primary policy as a condition of coverage (nor list any underlying schedule of insurance that they [were] in excess to)" and provided coverage similar to insured's other primary policies. *Id.* at 725–26. Thus, the court found that the policies provided primary coverage and, while Liberty Mutual could separately seek to determine priority among other insurers based on its "other insurance" clauses, its insured had a right to recover its defense costs now. *Id.* at 726; *see also Rhone-Poulenc, Inc. v. Int'l Ins.*, No. 94 C 3303, 1996 WL 328011, at *11–13 (N.D. Ill. June 11, 1996) (holding that insurer of *primary* insurance policy with an excess "other insurance" clause "may not refuse to pay an otherwise valid claim by asserting other

insurance potentially may cover the claim" where other primary insurers had not acknowledged coverage).  The Eighth Circuit affirmed the district court's conclusion.  *Pella*, 650 F.3d at 1174.

The situation here differs from *Everaard* and *Liberty Mutual*.  OneBeacon has plausibly alleged that BCBSKS holds a true excess policy from OneBeacon that does not attach until the Allied World E&O Policy and any applicable primary "other insurance" are exhausted.  Indeed, the plain language of the policy provides that the OneBeacon Policy is excess to any other insurance, "whether collectible or not."  Doc. 1-1 at 24.  So, if the Allied World D&O Policy provides coverage for the same losses (a contested issue to be determined at a later date) but the insurer has refused to pay, the OneBeacon Policy is clear that it is in excess of that amount.  And, the OneBeacon Policy protects BCBSKS against liability it may incur to others, which does not raise the same public policy concerns as the Oklahoma uninsured motorist statutes intended to address—*i.e.*, the statutes at issue in *Everaard*.

The court acknowledges BCBSKS paid premiums to OneBeacon to ensure coverage in the situation it finds itself in now—where the specific underlying policy has been exhausted and it is incurring defense expenses that it intended to be covered by its excess policy with OneBeacon.  And, courts have required a *primary* insurer to pay claims or provide indemnity before litigating whether coverage under another policy should take priority.  *See Rhone-Poulenc*, 1996 WL 328011, at *11–13 (requiring payment of claims where insurer provided a *primary* insurance policy with excess "other insurance" clause and other primary insurers had not acknowledged coverage); *In re Deepwater Horizon*, 807 F.3d 689, 694–96 (5th Cir. 2015) (rejecting primary insurer's[35] argument that its coverage was not triggered until a final judicial

---

[35]     Insurer here provided coverage in a "tower" of insurance policies, and the court referred to its coverage of the losses between $100 million and $150 million to be a primary coverage obligation, not a "policy of last resort." But, the policy was excess to underlying insurance and, under the "other insurance" provision, other insurance.  *Id.* at 692, 695.

determination whether a third party had to indemnify its insured because the Fifth Circuit determined it was reasonable to interpret the "other insurance" clause (which provided that policy was excess if other insurance or indemnification "*applies* to a loss that is also covered by the policy") to mean that other insurance presently must apply; and, if third party disputes indemnification, it does not presently apply, and insurer must provide coverage now and seek contribution from third party later under its subrogation rights); *id.* at 695–96 ("In short, we do not read the Other Insurance Clause to require that [insured] exhaustively litigate other potential sources of coverage before [insurer's] payment obligation is triggered."). But, OneBeacon plausibly has alleged that it provides *excess* coverage that does not attach until *all* primary insurance has been exhausted *whether collectible or not*. So, the court concludes, OneBeacon can state a plausible claim that its policy is not yet triggered because it has provided excess coverage.

The majority rule supports this conclusion. The question remains whether the Allied World D&O Policy and the OneBeacon Policy provide coverage for the same loss, but BCBSKS has not shown its desired result—mandating coverage before the dispute is resolved—is required as a matter of law. *See Americold*, 934 P.2d at 80 (affirming summary judgment because plaintiff could not show the existence of any valid coverage under any primary policies); *Farmington Cas. Co. v. United Educators Ins. Risk Retention Grp., Inc.*, 117 F. Supp. 2d 1022, 1026–27 (D. Colo. 1999) (holding that insurer of policy with excess "other insurance" clause stating that it was "excess of and shall not contribute with" other valid and collectible insurance "cannot be required to pay defense costs" where other primary policy also covered the same loss). *Cf. Rhone-Poulenc Inc.*, 71 F.3d at 1302 (noting that "the excess insurer's duty to

indemnify does not attach until the insured has tried and failed to collect under his primary policies"). The court thus denies defendants' Motions to Dismiss.[36]

### 6. Count I Conclusion

Accepting as true the facts alleged in OneBeacon's Proposed Complaint and interpreting the OneBeacon Policy as a matter of Kansas law, the court finds OneBeacon has stated a plausible claim for relief in Count I. BCBSKS's and Allied World's Motions to Dismiss Count I are denied. And, as further explained below, OneBeacon is granted leave to amend its Complaint.

### C. Proposed Counts II, III, and IV and Original Counts II, IV, and V against BCBSKS

BCBSKS again argues that OneBeacon's proposed Counts II, III, and IV are futile for the same reasons its Motion to Dismiss argues that the court should dismiss OneBeacon's existing Counts II, IV, and V. BCBSKS argues that "[p]roposed Counts II, II, and IV are, in substance, virtually identical to Counts II, IV, and V in the [o]riginal Complaint" and subject to dismissal for failure to state a claim. Doc. 50 at 4–5. The court agrees the Counts, substantively, are identical. *Compare* Doc. 1 at 22–25 (Compl. ¶¶ 79–85) *with* Doc. 44-1 at 29–33 (Am. Compl. ¶¶ 92–98); *compare* Doc. 1 at 26 (Compl. ¶¶ 91–96) *with* Doc. 44-1 at 33–34 (Am. Compl. ¶¶ 99–104); *compare* Doc. 1 at 27 (Compl. ¶¶ 97–103) *with* Doc. 44-1 at 34–35 (Compl. ¶¶ 105–111). But, as explained below, the court does not find they are subject to dismissal under Rule 12(b)(6).

---

[36]      BCBSKS could assert a claim against OneBeacon for breach of contract if no "other insurance" applies and OneBeacon has failed to provide coverage when required. *See Everarrd*, 842 F.2d at 1192. However, OneBeacon's "[r]esort to a judicial forum is not *per se* bad faith." *See id.*; *see also Hennes Erecting*, 813 F.2d at 1077 ("An 'other insurance' clause is designed to limit, reduce or *avoid* an insurer's loss in those cases where there is multiple coverage." (internal quotations and citation omitted) (emphasis added)).

BCBSKS argues that OneBeacon is trying to avoid its contractual obligations by alleging breach of the Cooperation Clauses. Doc. 18 at 2. BCBSKS contends that OneBeacon has not provided fair notice of the information it requests "or even whether such information or documents exist," *i.e.*, BCBSKS asserts OneBeacon has made, at best, bare and conclusory allegations that do not rise above a speculative level. Doc. 18 at 3, 11–12. And, to the extent OneBeacon seeks privileged documents, BCBSKS asks the court to dismiss these claims "because they are based on the false premise that BCBSKS is required to provide OneBeacon with information and documents . . . that are protected from disclosure by the attorney-client privilege, the joint-defense privilege, and/or the work product doctrine." Doc. 18 at 2–3. While BCBSKS concedes that the Kansas courts have not addressed the issue, it contends that Kansas would follow the majority rule and "reject[ ] OneBeacon's argument that a cooperation clause in an insurance policy compels an insured to disclose privileged communications and protected work product to its insurer." *Id.* at 13. Finally, even if OneBeacon has pleaded with requisite specificity the information it requests, BCBSKS argues that OneBeacon's Complaint does not adequately allege that breach of the Cooperation Clauses has prejudiced OneBeacon substantially—as required by Kansas law to void coverage obligations. Doc. 18 at 3, 19–22.

In Counts II and III, OneBeacon seeks a judicial declaration that BCBSKS has failed to cooperate in compliance with the Cooperation Clauses and that such a failure prevents it from seeking coverage under the OneBeacon Policy. In the proposed Count IV, OneBeacon requests "a declaratory judgment that BCBSKS must produce the requested information and documents. Under Kansas law, a "[b]reach of a cooperation clause in a liability insurance policy does not by itself relive an insurer of responsibility. The breach must cause substantial prejudice to the insurer's ability to defend itself." *Boone v. Lowry*, 657 P.2d 64, 70 (Kan. Ct. App. 1983); *see*

*also Boardwalk Apartments, L.C. v. State Auto Prop. and Cas. Ins.*, No. 15-2714-JAR, 2015 WL

197308, at *6, 18–19 (D. Kan. Jan. 14, 2015); *Potomac Ins. of Ill. v. Huang*, No. 00-4013-JPO,

2002 WL 418008, at *16 (D. Kan. Mar. 1, 2002). For example, our court, applying Kansas law,

has found that breach of a cooperation clause by admitting liability in an underlying suit caused

substantial prejudice because it affected the insurer's ability to defend the claims and limit its

liability under the insurance contract. *See Youell v. Grimes*, 217 F. Supp. 2d 1167, 1174 (D.

Kan. 2002). "Where an insurer seeks to avoid liability under its policy for failure of the

[insured] to cooperate as required by a condition of the policy, the burden is on the insurer to

establish the facts which bring the case within the specified condition in the policy." *Watson v.

Jones*, 610 P.2d 619, 624 (Kan. 1980). "Lack of cooperation as a policy defense depends upon

the facts and circumstances in each case." *Id. at* 626. In a case where an insurer argued it was

entitled to deny coverage under a cooperation clause in part based on insured's failure to provide

requested documents and information, the Kansas Court of Appeals applied the following

standard, in addition to requiring substantial prejudice: "In order to prevail on [a] defense of

noncooperation, the insurer must show, by a preponderance of evidence, an unreasonable and

willful pattern of refusing to answer material and relevant questions or supply material and

relevant documents." *Evergreen Recycle, L.L.C. v. Ind. Lumbermens Mut. Ins.*, 350 P.3d 1091,

1117 (Kan. Ct. App. 2015) (quoting 14 Couch on Insurance 3d § 199:39 (2014)). In *Evergreen*,

the Kansas Court of Appeals found the insurer "failed to show that [the insured] did not

cooperate and that the lack of cooperation resulted in substantial prejudice," so the court

affirmed summary judgment in favor of the insured.

      So, to secure a declaration precluding coverage under the policy unless BCBSKS

cooperates, OneBeacon must allege not only that BCBSKS has failed to cooperate, but also that

this failure caused BCBSKS substantial prejudice. OneBeacon ultimately will bear the burden to establish facts showing substantial prejudice from non-cooperation. *Watson*, 610 P.2d at 624. But, at the initial pleading stage, the court finds the allegations in the Complaint suffice to state a claim as examined below.

The Proposed Complaint and existing Complaint identify specific categories of information and documents that OneBeacon seeks from BCBSKS. They also allege BCBSKS has not provided the majority of the requested items, thus violating the Cooperation Clauses. *See* Doc. 44-1 at 30–32 (Am. Compl. ¶ 95).[37] BCBSKS's argument that OneBeacon must include more detail about what BCBSKS has refused to provide or asserted is privileged, goes beyond the short and plain statement required under Fed. R. Civ. P. 8. BCBSKS also argues OneBeacon includes only a "threadbare recital" of the elements making only a "conclusory statement" of substantial prejudice from breach of the cooperation clauses. Doc. 18 at 20; *Bixler*, 596 F.3d at 756. In Count III, OneBeacon alleges that BCBSKS's "failure to comply with the above-noted cooperation clauses has substantially prejudiced OneBeacon." Doc. 44-1 at 34 (Am. Compl. ¶ 103).[38] But, that allegation does not stand alone. OneBeacon also asserts that refusing to provide the requested documents was "necessary for its coverage investigation." *Id.* at 34 (Am. Compl. ¶ 102).[39] And, that the documents would enable OneBeacon to "assess [BCBSKS's] potential liability" and "make determinations regarding coverage" for "any potential settlement

---

[37] This factual allegation is substantially the same as the list of information requested in the existing Complaint. But unlike the Proposed Complaint, the existing Complaint also included "[a] list of all persons deposed in the MDL action and their employer/affiliation." *Compare* Doc. 1 at 23–24 (Compl. ¶ 82) *with* Doc. 44-1 at 30–32 (Am. Compl. ¶ 95).

[38] This factual allegation is identical to the existing Complaint. Doc. 1 at 26 (Compl. ¶ 95).

[39] This factual allegation is identical to the existing Complaint. Doc. 1 at 27 (Compl. ¶ 100).

or judgment." Doc. 44-1 at 3–4, 26 (Am. Compl. ¶¶ 14, 81).[40] The court finds OneBeacon has provided BCBSKS with fair notice of the nature of the claims as well as the grounds upon which each claim rests. *See Khalik*, 671 F.3d at 1191–92. For each of the proposed Counts II, III, and IV, OneBeacon has alleged sufficient facts, accepted as true, to state a claim for relief that is plausible on its face. And for the same reason, BCBSKS's Motion to Dismiss each of existing Counts II, IV, and V for failure to state a claim is denied, as the existing Counts are based on substantially similar allegations in the existing Complaint.

Because OneBeacon also is seeking a declaration about "the scope of the rights and obligations of the parties" under the Cooperation Clauses and has identified categories of documents rather than particular documents at issue, BCBSKS asks the court to decide now, as a matter of law, whether the OneBeacon Policy's Cooperation Clauses "operate as a waiver of the insured's privileges and work product protections." Doc. 26 at 11, 16–18; Doc. 44-1 at 33 (Am. Compl. ¶ 98). The court, however, reserves any determination on this matter until an actual issue about waiver of privileged communications arises in this case. On its face, the Proposed Complaint requests various types of documents, but does not assert that OneBeacon is entitled to them even if privileged or that BCBSKS has waived its privileges. But, it does admit that BCBSKS takes the position that some of its requests are "covered by the mediation privilege" or "barred by the attorney-client privilege and/or work product doctrine." Doc. 44-1 at 32–33 (Am. Compl. ¶ 97). To the extent BCBSKS believes any categories of information or documents are entitled to attorney-client privilege, work product doctrine, or joint-defense privilege under Kansas law, it may raise that argument in discovery proceedings and in its arguments on the substance of the requested declaration. But, it is premature to interpret the Cooperation Clauses

_____

[40] This factual allegation is identical to the existing Complaint. Doc. 1 at 3, 25 (Compl. ¶¶ 11, 89).

under Kansas law before BCBSKS has established that OneBeacon is requesting items barred by privilege and OneBeacon has asserted waiver. At this stage of the proceedings, the court finds OneBeacon has alleged sufficient facts to state a claim for relief in Counts II–IV that are plausible on their face. Those claims survive the Motion to Dismiss.

### D.  Proposed Count V and Original Count VI against BCBSKS

BCBSKS argues that the proposed Count V "is the same claim as Count VI of the [o]riginal Complaint with only slight modifications." Doc. 50 at 5. Proposed Count V seeks a declaration that BCBSKS may pursue subrogation against Allied World and BCBSA for any sums it reimburses to BCBSKS under the OneBeacon Policy. Doc. 44-1 at 36–37 (Am. Compl. ¶¶ 112–118). Count VI of the original Complaint requests the same general declaratory relief as the proposed Count V of the Proposed Complaint, though the alleged facts have changed in the Proposed Complaint (and OneBeacon now also seeks a declaration of subrogation rights against BCBSA in addition to Allied World). *Compare* Doc. 1 at 28–29 (Compl. ¶¶ 104–109) *with* Doc. 44-1 at 36–37 (Am. Compl. ¶¶ 112–118). Though interrelated, the Proposed Complaint distinguishes proposed Count V as seeking relief about the extent of OneBeacon's subrogation rights and proposed Count VI as seeking a declaration that BCBSKS has failed to comply with the "other insurance" and subrogation clauses and such failure precludes coverage. *Compare* Doc. 44-1 at 36–37 (Am. Compl. ¶¶ 112–118) *with* Doc. 44-1 at 37–39 (Am. Compl. ¶¶ 119–126).

In its Motion to Dismiss, BCBSKS argues for dismissal of existing Count VI (now the proposed Count V) for lack of subject matter jurisdiction because the existing Complaint "fails to state that an actual case or controversy exists between OneBeacon and BCBSKS with respect to OneBeacon's subrogation rights." Doc. 18 at 22. BCBSKS notes that the existing Complaint

"does not allege that a dispute exists between OneBeacon and BCBSKS regarding OneBeacon's subrogation rights," and does not allege "that BCBSKS has taken *any* position" about such subrogation rights." *Id.* at 23. Rather, it seeks a declaration about OneBeacon's rights in the future, if the Allied World E&O Policy is exhausted and BCBSKS seeks reimbursement of defense expenses from OneBeacon. *Id.* at 23–24. But, because the existing Complaint does not allege BCBSKS has taken any position on the potential subrogation rights, BCBSKS argues the relief sought in this claim is an impermissible advisory opinion. *Id.* Finally, BCBSKS argues that a court cannot not grant declaratory relief if a plaintiff is trying to litigate "a single issue in a dispute that must await another lawsuit for complete resolution." *Id.* at 25. Since OneBeacon does not assert any subrogation/contribution rights against Allied World for denying coverage and failing to pay defense expenses under the Allied World D&O Policy, BCBSKS asserts the declaration sought would not provide complete relief to any party. *Id.* OneBeacon responds that it will dismiss existing Count VI if BCBSKS stipulates that OneBeacon's subrogation rights would not be foreclosed if it began to advance defense expenses. Doc. 19 at 18.

Under the factual circumstances alleged in the existing Complaint, the court struggles to find any actual controversy about OneBeacon's subrogation rights. Indeed, as BCBSKS points out, no subrogation rights exist under the language of the subrogation clauses until payment is made. Doc. 18 at 25; Doc. 26 at 20; Doc. 44-1 at 23 (Am. Compl. ¶ 66)[41] ("In the event of any payment under this Policy, the Underwriter will be subrogated to all the **Insured's** rights of recovery against any person or entity . . . ."); Doc. 1-1 at 56 ("In the event of any payment hereunder, the **Underwriter** shall be subrogated to the extent of any payment to all of the rights

---

[41] The policy language in the OneBeacon Policy provided as an exhibit to plaintiff's existing Complaint and the Proposed Complaint cuts off after "whatever else," and the exhibit appears incomplete. *See* Doc. 1-3 at 12. The court thus refers to the provision as it is recited in plaintiff's Proposed Complaint (and existing Complaint). *See* Doc. 44-1 at 23–24 (Am. Compl. ¶ 66) and Doc. 1 at 18 (Compl. ¶ 59).

of recovery of the **Insured**s.").  So, OneBeacon's request for a stipulation that such rights would not be foreclosed if it makes a payment is counterintuitive.  And, BCBSKS was not alleged to take any position about potential subrogation rights in the future that might present an actual dispute.

But, BCBSKS's dismissal arguments are defeated by the updated factual allegations and claims asserted in OneBeacon's Proposed Complaint.  For example, OneBeacon now alleges that the Allied World E&O Policy limit has been exhausted and OneBeacon has started reimbursing BCBSKS for defense expenses in the Antitrust Litigation.  Doc. 44-1 at 3 (Am. Compl. ¶ 12).  OneBeacon now alleges that BCBSKS "has not agreed to assist . . . with its efforts to obtain subrogation from BCBSA and Allied World," which has "prejudiced OneBeacon's potential or actual right of recovery and forced it to prematurely reimburse defense expenses."  *Id.* at 4 (Am. Compl. ¶ 16); *see also id.* at 26 (Am. Compl. ¶ 81).  In the new proposed Count VI, OneBeacon alleges that it advised BCBSKS that it was seeking subrogation from BCBSA and "requested that [BCBSKS] provide certain information and documents . . . to assist . . . with its subrogation efforts" but BCBSKS "has not agreed to cooperate . . . and has prejudiced OneBeacon's potential or actual right of recovery by, among other things, failing to pursue indemnification from [ ] BCBSA."  Doc. 44-1 at 39 (Am. Compl. ¶¶ 124–125).  And, in the new proposed Counts VII and VIII, OneBeacon alleges that Allied World is obligated to pay BCBSKS's defense expenses under the Allied World D&O Policy, and OneBeacon seeks damages from Allied World through its subrogation rights.  *Id.* at 39–41 (Am. Compl. ¶¶ 127–133).  OneBeacon asserts a subrogation claim against BCBSA in new proposed Count IX as well.  *Id.* at 40–41 (Am. Compl. ¶¶ 134–141).  And, if leave to amend is granted, the filing of OneBeacon's First Amended Complaint will render BCBSKS's arguments for dismissing the existing Count VI moot.

Responding to OneBeacon's motion for leave to file the Proposed Complaint, BCBSKS maintains that OneBeacon has not alleged any facts to support OneBeacon's conclusory allegation that an actual controversy exists with BCBSKS about OneBeacon's subrogation rights against Allied World or BCBSA. Doc. 50 at 5–6. BCBSKS asserts that OneBeacon has not alleged "that BCBSKS has taken any position regarding OneBeacon's subrogation rights" and thus OneBeacon still is merely seeking "an impermissible advisory opinion." *Id.* at 6. OneBeacon disagrees. It argues the proposed Count V raises justiciable issues because it now has paid defense expenses under the OneBeacon Policy and requested assistance in pursuing subrogation rights. Doc. 51 at 3. And, by not agreeing to assist OneBeacon, BCBSKS has violated the subrogation clauses' requirements that the insured "do nothing that may prejudice [insurer's] position or potential or actual rights of recovery." Doc. 51 at 4; *see also* Doc. 44-1 at 23 (Am. Compl. ¶ 66);[42] Doc. 1-1 at 57.

The court finds that BCBSKS's futility arguments directed at proposed Count V do not outweigh the other factors favoring leave to amend, discussed *infra* Part IV.F. The extent of OneBeacon's rights to pursue subrogation against Allied World and BCBSA, and BCBSKS's obligation to "do nothing that may prejudice" OneBeacon's position or recovery, tie to Count I and whether the Allied World D&O Policy and OneBeacon Policy cover any of the same loss. Also, the scope of the "other insurance" and subrogation clauses are affected by the alleged indemnity obligations of BCBSA under the License Agreement. And, the parties have not substantively briefed this issue, because these are new allegations in the Proposed Complaint and

---

[42]    The policy language in the OneBeacon Policy provided as an exhibit to plaintiff's existing Complaint and the Proposed Complaint cuts off after "whatever else," and the exhibit appears incomplete. *See* Doc. 1-3 at 12. The court thus refers to the provision as it is recited in plaintiff's Proposed Complaint (and existing Complaint). *See* Doc. 44-1 at 23–24 (Am. Compl. ¶ 66) and Doc. 1 at 18 (Compl. ¶ 59).

BCBSA is not a party to the suit yet. Allowing leave to amend this Count to reflect the current state of affairs among the parties will promote a full adjudication of the merits of the disputes among the parties within a comprehensive proceeding. *See First Savings Bank*, 184 F.R.D. at 368.

Because BCBSKS's arguments in its Motion to Dismiss directed at the existing Count VI will become moot when OneBeacon files its First Amended Complaint, the court denies that portion of the motion as moot. This decision is without prejudice to BCBSKS's right to assert any challenges to the sufficiency of OneBeacon's proposed Count V through a motion to dismiss or other timely motion directed at the First Amended Complaint and its updated allegations. The updated allegations in the proposed Count V affected the substance of BCBSKS's dismissal arguments for the existing Count VI, unlike the court's analysis of the futility and dismissal arguments for the proposed Counts I–IV and the existing Counts I, II, IV, and V. Those proposed Counts relied on essentially the same allegations in the original Complaint. And thus, the court's analysis of the merits of the futility of the motion to amend and the motions to dismiss are the same. And, as discussed below in connection with the new proposed Counts VI, X, and XI, the court limited the briefing on the Motion for Leave to Amend.

### E. Proposed Counts VI, X, XI Against BCBSKS

BCBSKS argues that adding Counts VI, X, and XI against it—as outlined in the Proposed Complaint—also are futile. Doc. 50 at 6–10. But, as OneBeacon appropriately points out, the court set an expedited briefing scheduling on the Motion for Leave to Amend and limited the length of any responses and replies. Doc. 49. OneBeacon argues it should have an opportunity to address BCBSKS's arguments in a full response to a future motion to dismiss. Doc. 51 at 5. If a party opposes a motion for leave to amend solely on the basis that the amendment would be

futile, the court may exercise its discretion to "allow the amendment . . . [so long as] the party opposing it will have an opportunity to challenge the sufficiency of newly added claims through a motion to dismiss." *Koehler v. Freightquote.com, Inc.*, No. 12-2505-KHV-GLR, 2013 WL 3878170, at *4 (D. Kan. July 26, 2013).

Here, the court has rejected BCBSKS's futility arguments for Counts I–V of the Proposed Complaint. And below, the court addresses the remaining factors and grants leave to amend. Thus, as amended, the Complaint itself (as opposed to claims within it) is not subject to dismissal. *See id.* The court finds it is in the interests of justice and judicial efficiency to permit the parties to brief any arguments for dismissal of these new claims fully. BCBSKS will have an opportunity to challenge the sufficiency of the new proposed Counts VI, X, and XI through an appropriate motion following OneBeacon's filing of its First Amended Complaint in accordance with this Order. *See id.* For this reason, and because the factors discussed in the next section favor granting leave to amend, the court grants OneBeacon's motion for leave to amend and assert the proposed Counts VI, X, and XI. Similarly, OneBeacon is granted leave to amend with respect to all proposed Counts not specifically addressed in this Order. BCBSKS, Allied World, and BCBSA may challenge the sufficiency of the claims asserted in the First Amended Complaint through responsive motions.

### F. Other Factors Favor Allowing Amendment

As explained above, the court does not find BCBSKS's futility arguments justify refusing to grant leave to amend. The court also finds that several other factors the court should consider on a Rule 15 motion favor granting leave to amend. *First*, OneBeacon has not engaged in undue delay. It has moved for leave to update allegations and add additional claims based on changed circumstances that have occurred recently, like the exhaustion of the Allied World E&O Policy,

and following unsuccessful mediation. *Second*, the court finds no bad faith or dilatory motive here. *Third*, the proposed amendments do not seek to cure deficiencies of other amendments, but seek to add a party and bring certain factual allegations current. *Finally*, defendants will not suffer undue prejudice if the court grants leave to amend. Despite the fact OneBeacon filed the original Complaint more than a year ago, this case is still in its early stages. Much of this timeline was designed by the parties. At their request, the court has stayed the case for much of the time it has been pending before the court. *See* Docs. 39 at 3, 42. It is OneBeacon's first requested amendment, and defendants may file new motions to dismiss to present any motion-worthy issues. The court finds that OneBeacon's proposed amendments will promote a full adjudication of the merits of the parties' disputes within a comprehensive proceeding, particularly once consolidated with the Related Case, and thus grants the requested leave to amend. *See First Savings Bank*, 184 F.R.D. at 368.

### G. Original Complaint Count III

BCBSKS's Motion to Dismiss also argues for dismissal of OneBeacon's Count III of the original Complaint. Because the court has granted OneBeacon's motion to amend its Complaint as set forth in this Order and OneBeacon's Proposed Complaint no longer asserts Count III from the original Complaint, the court denies BCBSKS's motion with respect to the original Complaint's Count III as moot.

### V. OneBeacon's Motion for Leave to File Under Seal

OneBeacon filed a Motion for Leave to File Under Seal, seeking leave from the court to file proposed Exhibits 5, 6, and 7 to its Proposed Complaint under seal. Doc. 47. OneBeacon asserts that these exhibits "were previously filed under seal" in the underlying Antitrust Litigation and, "[a]lthough it appears that these documents were subsequently unsealed by [that]

court . . . defendant [BCBSKS] maintains that Exhibits 5 and 6 are still subject to confidentiality protections and [p]laintiff believes . . . would maintain the same position as to Exhibit 7." *Id.* at 1–2. So, OneBeacon moves to file under seal "to preserve any protections that may apply." *Id.* at 2. Neither BCBSKS nor Allied World has responded to OneBeacon's motion and the time to do so has expired.

The Supreme Court recognizes a "general right to inspect and copy public records and documents, including judicial records and documents." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S 589, 597 (1978) (citations omitted). Nevertheless, a party may rebut the presumption of access to judicial records by demonstrating that "countervailing interests heavily outweigh the public interests in access." *Mann v. Boatright*, 477 F.3d 1140, 1149 (10th Cir. 2007) (citation and internal quotation marks omitted). The party seeking to deny access must shoulder the burden to establish a sufficiently significant interest that outweighs the presumption of access. *Id.* (citation and internal quotation marks omitted). This legal standard requires federal courts to assess competing interests, weighing those interests that favor the general right of public access and those that genuinely deserve some protection. When engaging in this endeavor, the case authority confers substantial discretion on district judges. *See, e.g.*, *Nixon*, 435 U.S. at 599; *see also Mann*, 477 F.3d at 1149.

After reviewing OneBeacon's motion and the corresponding documents it seeks to file under seal, the court denies the Motion for Leave to File Under Seal, but it does so without prejudice to refiling another motion. OneBeacon's request to file under seal does not comport with the Supreme Court and Tenth Circuit's standards for sealed filings. The court must adhere to this standard, as must the parties. So, the court cannot abide OneBeacon's request to seal here, even though it is unopposed by the other parties.

OneBeacon has not presented the court with enough information to shoulder its burden to establish that a sufficiently significant interest outweighs the presumption of public access to judicial records. Instead, the motion just makes blanket assertions that such documents were once filed under seal in the Antitrust Litigation and the Exhibits contain information that BCBSKS *may* deem confidential. BCBSKS has not weighed in. The court recognizes that some of the exhibits might qualify for a sealed filing, for example if they include "sources of business information that might harm a litigant's competitive standing." *Nixon*, 435 U.S at 597. But OneBeacon has not made that showing with its motion. And, OneBeacon explains that such Exhibits now are unsealed in the Antitrust Litigation. So, they are available to the public already and unlikely to qualify for confidential protection.

For these reasons, the court denies OneBeacon's Motion for Leave to File Under Seal (Doc. 47) without prejudice. OneBeacon or any other party may file a motion seeking leave to file under seal such documents if they provide an explicit explanation showing why sealed protection is appropriate.

## VI.     Conclusion

For reasons explained, the court:

- Grants plaintiff OneBeacon's Motion for Leave to File Its First Amended Complaint (Doc. 44) as the court finds the factors favor amendment here and BCBSKS's futility arguments do not justify refusing to grant leave to amend.

- Denies defendant BCBSKS's Motion to Dismiss (Doc. 17) and defendant Allied World's Motion to Dismiss (Doc. 20) as the court finds a justiciable case or controversy, exercises its discretion over the declaratory relief Counts, and finds plaintiff has stated claims for relief plausible to survive the Motions to Dismiss.

- Denies plaintiff OneBeacon's Motion for Leave to File Under Seal (Doc. 47) as it has not demonstrated a sufficient need for protection.

OneBeacon must file its First Amended Complaint consistent with this Order within 14 days of this Order. And, the court directs the parties to file motions to consolidate this case and the Related Case, consistent with Judge O'Hara's Scheduling Order (Doc. 39) within five business days of this Order.

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiff OneBeacon's Motion for Leave to File Its First Amended Complaint (Doc. 44) is granted. OneBeacon shall file its First Amended Complaint consistent with this Order within 14 days of this Order.

**IT IS FURTHER ORDERED BY THE COURT THAT** defendant BCBSKS's Motion to Dismiss (Doc. 17) is denied.

**IT IS FURTHER ORDERED BY THE COURT THAT** defendant Allied World's Motion to Dismiss (Doc. 20) is denied.

**IT IS FURTHER ORDERED BY THE COURT THAT** plaintiff OneBeacon's Motion for Leave to File Under Seal (Doc. 47) is denied without prejudice.

**IT IS FURTHER ORDERED BY THE COURT THAT** the parties shall file motions to consolidate this case and the Related Case, consistent with Judge O'Hara's Scheduling Order (Doc. 39) within five business days of this Order.

**IT IS SO ORDERED.**

**Dated September 30, 2019, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**
