## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

BEDIVERE INSURANCE COMPANY
f/d/b/a ONEBEACON INSURANCE
COMPANY,

        **Plaintiff,**

v.

BLUE CROSS BLUE SHIELD
ASSOCIATION, et al.,

        **Defendants.**

Case No.  18-2371-DDC-JPO

## MEMORANDUM AND ORDER

Plaintiff Bedivere Insurance Company f/d/b/a OneBeacon Insurance Company

("OneBeacon") seeks various declaratory and monetary relief against defendants Blue Cross and

Blue Shield of Kansas, Inc. ("BCBSKS"), Allied World Surplus Lines Insurance Company f/k/a

Darwin Select Insurance Company ("Allied World"), and Blue Cross Blue Shield Association

("BCBSA") under 28 U.S.C. § 2201.  Doc. 55.  This matter comes before the court on BCBSA's

Motion to Dismiss.  Docs. 83, 84.  OneBeacon opposes the motion.  Doc. 90.  And BCBSA has

replied.  Doc. 91.  For reasons explained below, the court grants BCBSA's motion.

### I.    Factual Background

The court takes the following facts from OneBeacon's First Amended Complaint (Doc.

55) and attached supporting documents and views them, as it must, in the light most favorable to

OneBeacon.  *S.E.C. v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014) (explaining that the court

must "accept as true all well-pleaded factual allegations in the complaint and view them in the

light most favorable to the [plaintiff]" (citation and internal quotation marks omitted)); *Hall v.*

*Associated Int'l Ins. Co.*, 494 F. App'x 902, 904 (10th Cir. 2012) (explaining that a court may also consider "attached exhibits[] and documents incorporated into the complaint by reference").

BCBSKS purchased three insurance policies:  (1) a primary Managed Care Organization Errors and Omissions Liability Policy from Allied World, with a $10 million coverage limit ("Allied World E&O Policy"); (2) a primary Healthcare Organizations Directors and Officers Liability Policy from Allied World, with a $15 million coverage limit ("Allied World D&O Policy"); and (3) a Managed Care Errors and Omissions Excess Indemnity Policy from OneBeacon ("OneBeacon Policy").  Doc. 55 at 1–2 (Am. Compl. ¶¶ 2–3).  BCBSKS also entered into License Agreements with BCBSA (the "License Agreements").  *Id.* (Am. Compl. ¶ 4); *see also* Docs. 55-5 & 55-6 (License Agreements).

BCBSKS has requested coverage from Allied World under both the Allied World E&O Policy and the Allied World D&O Policy in connection with several antitrust class actions (the "Antitrust Litigation") against BCBSKS and BCBSA which have been "consolidated for pretrial discovery proceedings in the Northern District of Alabama."  Doc. 55 at 2, 25 (Am. Compl. ¶¶ 5–6, 72).  BCBSKS requested reimbursement of defense expenses and indemnity under both Allied World policies.  *Id.* at 2 (Am. Compl. ¶ 6).  While Allied World, subject to a reservation of rights, agreed to provide coverage under the Allied World E&O Policy, it denied coverage under the Allied World D&O Policy.  *Id.* at 2, 25 (Am. Compl. ¶¶ 7, 73–74).[1]

BCBSKS also seeks coverage under its excess OneBeacon Policy in connection with the Antitrust Litigation.  *Id.* at 3 (Am. Compl. ¶¶ 12–13).  The Allied World E&O Policy has been

---

[1]     BCBSKS believes it is entitled to coverage under the Allied World D&O Policy and has filed a counterclaim against Allied World for wrongful denial of coverage in a related lawsuit filed by Allied World against BCBSKS, *Allied World Specialty Insurance Company v. Blue Cross & Blue Shield of Kansas, Inc.*, Case No. 18-2515-DDC-JPO, which also is pending before this court.  *Id.* at 2–3, 25 (Am. Compl. ¶¶ 8, 74–75).

exhausted and OneBeacon has started to reimburse BCBSKS for defense expenses under the OneBeacon Policy, which follows the form of the Allied World E&O Policy.  *Id.* at 3, 26 (Am. Compl. ¶¶ 12, 79–80); Doc. 55-3 at 10.  OneBeacon seeks a judicial declaration about the OneBeacon Policy and whether it must provide coverage under it before BCBSKS exhausts the Allied World Primary D&O Policy.  Doc. 55 at 3 (Am. Compl. ¶ 13).  OneBeacon contends that its coverage is not triggered under the OneBeacon Policy terms until BCBSKS exhausts the Allied World Primary D&O Policy.  *Id.* at 28 (Am. Compl. ¶ 85).  It also seeks other declarations about BCBSKS's and OneBeacon's rights and obligations under the OneBeacon Policy, and OneBeacon's subrogation rights against BCBSA and Allied World.  *Id.* at 3–4, 6, 26–28 (Am. Compl. ¶¶ 14–19, 27–28, 80–83).

OneBeacon also contends its coverage is not triggered yet because BCBSA must indemnify BCBSKS, and OneBeacon's coverage is only in excess of that indemnification under the OneBeacon Policy's terms.  Doc. 55 at 28–29 (Am. Compl. ¶ 86).  OneBeacon alleges that, under the License Agreements, BCBSA has agreed to defend and hold BCBSKS harmless against claims arising from activities like those alleged in the Antitrust Litigation.  Doc. 55 at 3, 24, 25 (Am. Compl. ¶¶ 9, 67, 77).  But, BCBSKS "has not tendered its defense or sought indemnity from BCBSA" under the License Agreements' terms, nor has BCBSA "paid any defense expenses" on BCBSKS's behalf in connection with the Antitrust Litigation.  *Id.* at 3, 25 (Am. Compl. ¶¶ 10–11, 78).  OneBeacon seeks a declaration about its subrogation right under the OneBeacon Policy, and monetary relief against BCBSA "by way of subrogation for defense expenses" that OneBeacon has reimbursed BCBSKS for prematurely.  *Id.* at 6 (Am. Compl. ¶¶ 27–28).

OneBeacon asserts one count against BCBSA—Count IX (Subrogation against BCBSA). *Id.* at 41–42.  To place this subrogation claim in context, the court briefly summarizes the relevant OneBeacon Policy terms, the License Agreements' terms, and the First Amended Complaint's allegations about the Antitrust Litigation that led BCBSKS to request coverage from OneBeacon, and OneBeacon to assert its subrogation claim against BCBSA.

**A.  The OneBeacon Policy Terms**

The OneBeacon Policy contains several provisions relevant to the declarations OneBeacon seeks and its subrogation claim.[2]  First, the OneBeacon Policy, when outlining its insuring agreement for excess coverage, provides:

> The Underwriter shall provide the **Insured** with insurance excess of the **Underlying Insurance** set forth in ITEM [5][3] of the Declarations for **Claims** first made against the **Insured** during the **Policy Period,** provided that the **Underlying Insurance** also applies and has been exhausted by actual payment thereunder, or would apply but for the exhaustion of the applicable limit(s) of liability thereunder.

Doc. 55-3 at 10 (emphasis in original).  The OneBeacon Policy defines "**Underlying Insurance**" as the Allied World E&O Policy.  *Id.* at 3, 11.

The OneBeacon Policy also states that it "will apply in conformance with, and will follow the form of, the terms, conditions, agreements, exclusions, definitions and endorsements of the **Underlying Insurance**."  *Id.* at 10.  It goes on to identify exceptions to conformance with the Allied World E&O Policy, including that OneBeacon, as underwriter, "will not have any obligation to make any payment hereunder unless and until the full amount of the applicable

---

[2]     Although this case is before the court on a motion to dismiss under Fed. R. Civ. P. 12(b), the court is permitted to consider insurance policies' language.  *See Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002) ("In addition to the complaint, the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity.").

[3]     Through Endorsement Number 1, "all references in [the OneBeacon] Policy to 'ITEM 4 of the Declarations' [were] replaced with 'ITEM 5 of the Declarations.'"  Doc. 1-3 at 5.

limit of liability of the **Underlying Insurance** has been paid by the issuer(s) of the **Underlying Insurance**."  *Id.* at 11.

Meanwhile, the Allied World E&O Policy issued to BCBSKS, from which the OneBeacon Policy follows form, contains a provision entitled "**Other Insurance; Other Indemnification**."  It provides:

> This Policy shall be excess of and shall not contribute with:
> (a)     any other insurance or plan or program of self-insurance (whether collectible or not), unless such other insurance or self-insurance is specifically stated to be in excess of this Policy; and
> (b)     any indemnification to which an **Insured** is entitled from any entity other than another **Insured**.
> This Policy shall not be subject to the terms of any other policy of insurance or plan or program of self-insurance.

Doc. 55-1 at 24.

The Allied World E&O Policy, and the OneBeacon Policy by following form, provide coverage for any "**Loss** which the **Insured** is legally obligated to pay as a result of a **Claim**" made during the policy period.  Doc. 55-1 at 52 (insuring agreement).  Under the "Conditions" of the Allied World E&O Policy, the Underwriter has no duty to defend any Claims, but "[u]pon written request of the **Named Insured**, the **Underwriter** will pay or reimburse, on a current basis, **Defense Expenses** for which this Policy provides coverage.  Except for such **Defense Expenses**, the **Underwriter** will pay **Loss** only on the final disposition of a **Claim**."  Doc. 55-1 at 26.

The OneBeacon Policy also contains a "Subrogation and Recoveries" clause.  It provides:

> In the event of any payment under this Policy, the Underwriter will be subrogated to all the **Insured**'s rights of recovery against any person or entity, and the **Insured** shall execute and deliver all instruments and papers and do whatever else is necessary to secure such rights.  The **Insured** shall do nothing that may prejudice the Underwriter's position or potential or actual right of recovery.  The obligations of the **Insured** under this provision shall survive the expiration or termination of this Policy.  The expenses of all such recovery proceedings shall be first subtracted

> from the amount of any recovery and the remaining amount so recovered shall be apportioned in the inverse order of payment to the extent of actual payment.

Doc. 55 at 23–24 (Am. Compl. ¶ 66).[4]  The Allied World E&O Policy, from which the

OneBeacon Policy follows form, contains a provision entitled "**Subrogation**."  It states:

> In the event of any payment hereunder, the **Underwriter** shall be subrogated to the extent of any payment to all of the rights of recovery of the **Insured**s. The **Insured** shall execute all papers and do everything necessary to secure such rights, including the execution of any documents necessary to enable the **Underwriter** effectively to bring suit in their name.  The **Insured**s shall do nothing that may prejudice the **Underwriter**'s position or potential or actual rights of recovery.  The obligations of the **Insured**s under this CONDITION (F) shall survive the cancellation or other termination of this Policy.

Doc. 55-1 at 56–57.

Count I against BCBSKS and Allied World requests a judicial declaration that BCBSKS

must exhaust "all other insurance and indemnity to which it is entitled" before the OneBeacon

Policy's coverage is triggered—including coverage from BCBSA under the License Agreements

and coverage from Allied World under the Allied World Primary D&O Policy—because the

OneBeacon Policy's Other Insurance/Other Indemnification provision (incorporated into the

policy by following the form of the Allied World E&O Policy) says the OneBeacon Policy is

excess to those other agreements.  Doc. 55 at 28–29 (Am. Compl. ¶¶ 84–91).  Count V against

BCBSKS seeks a declaration about OneBeacon's subrogation rights under the OneBeacon

Policy's Subrogation and Recoveries provisions (one of which is included in the OneBeacon

Policy and one of which is in the Allied World Primary E&O Policy to which the OneBeacon

Policy follows form).  OneBeacon seeks a declaration that it has a right to seek subrogation

against Allied World and BCBSA for any expenses it has paid prematurely because, OneBeacon

---

[4]      This provision in the OneBeacon Policy attached as an exhibit to plaintiff's First Amended Complaint cuts off after "whatever else," and the exhibit thus appears incomplete.  *See* Doc. 55-3 at 12. The court thus cites the provision as quoted in plaintiff's First Amended Complaint, which contains the full text of this provision.  *See* Doc. 55 at 23–24 (Am. Compl. ¶ 66).

alleges, the Allied World D&O Policy and BCBSA's indemnification under the License

Agreements should have covered those expenses before OneBeacon was required to pay them.

*Id.* at 36–37 (Am. Compl. ¶¶ 112–118).  In Count IX, OneBeacon asserts this subrogation right

against BCBSA under the Subrogation and Recoveries provisions and seeks damages from

BCBSA for any expenses it has prematurely reimbursed BCBSKS for in connection with the

Antitrust Litigation.  *Id.* at 41–42 (Am. Compl. ¶¶ 142–149).

Count IX explains OneBeacon seeks damages from BCBSA because BCBSA "is

obligated, pursuant to the License Agreements" to indemnify BCBSKS for "BCBSA's conduct"

alleged in the Antitrust Litigation.  Doc. 55 at 42 (Am. Compl. ¶ 146).  But, OneBeacon alleges,

BCBSA has failed "to defend and/or pay defense expenses on BCBS-KS's behalf [under] the

License Agreements[.]"  *Id.* (Am. Compl. ¶ 149).  OneBeacon, on the other hand, has reimbursed

BCBSKS for defense expenses from the Antitrust Litigation already.  *Id.* (Am. Compl. ¶ 144).

And, under the OneBeacon Policy, its coverage is in excess of any indemnification to which

BCBSKS is entitled so, OneBeacon now seeks payment from BCBSA under its subrogation right

for amounts it prematurely reimbursed.  *Id.* (Am. Compl. ¶¶ 145, 147–149).

## B.  The License Agreements' Terms

Under the License Agreements,[5] BCBSA "agrees to save, defend, indemnify and hold

[BCBSKS] . . . harmless from and against all claims, damages, liabilities and costs of every kind,

nature and description which may arise exclusively and directly as a result of the activities of

BCBSA."  Doc. 55-5 at 7 (¶ 14); Doc. 55-6 at 7 (¶ 14).  BCBSKS similarly "agrees to save,

defend, indemnify and hold BCBSA . . . harmless from and against all claims, damages,

---

[5]        Like insurance policies, the court is permitted to consider the License Agreements' language on a
motion to dismiss.  *See Jacobsen*, 287 F.3d at 941 ("In addition to the complaint, the district court may
consider documents referred to in the complaint if the documents are central to the plaintiff's claim and
the parties do not dispute the documents' authenticity.").

liabilities and costs of every kind, nature and description which may arise exclusively and directly as a result of the activities of [BCBSKS]."  *Id.*

### C.  The Antitrust Litigation

The First Amended Complaint describes the claims in the Antitrust Litigation as alleging that BCBSA, BCBSKS, and other member plans "conspired to leverage their economic power and market dominance to under-compensate healthcare providers for their services and to increase healthcare costs to subscribers by coordinating their operations and limiting their activities through restrictions in their trademark licenses."  Doc. 55 at 7, 47 (Am. Compl. ¶¶ 29, 161).  When consolidating the underlying antitrust lawsuits, the Judicial Panel on Multidistrict Litigation described how the underlying lawsuits shared common questions of fact about BCBSKS's (among other member plans) relationship with BCBSA and BCBSA's licensing agreements with the members that limited each plan's activity to exclusive areas.  *Id.* at 7 (Am. Compl. ¶ 30) (citing MDL transfer order); *see also* Doc. 55-4 at 2–3 (MDL transfer order describing how plaintiffs contend the member plans "work[ed] together with and through the BCBSA" to "allegedly divide[] and allocate[] . . . health insurance markets throughout the nation to eliminate competition" and used "the licensing agreements [to] limit the Blue Plans' activity to exclusive service areas, among other restrictions").  BCBSA and BCBSKS are defendants in both the subscriber track and provider track complaints in the consolidated multidistrict Antitrust Litigation.  Doc. 55 at 7–8 (Am. Compl. ¶¶ 31–32).[6]

---

[6]       The court also may take judicial notice of public filings in the Antitrust Litigation, but can't consider the allegations asserted in them as true.  *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006) ("[F]acts subject to judicial notice may be considered in a Rule 12(b)(6) motion without converting the motion to dismiss into a motion for summary judgment.  This allows the court to take judicial notice of its own files and records, as well as facts which are a matter of public record.  However, the documents may only be considered to show their contents, not to prove the truth of matters asserted therein." (internal citations and quotations omitted)).

The First Amended Complaint describes the conspiracy in the provider track of the Antitrust Litigation this way:  Under the license agreements between BCBSA and its members, the member plans have agreed "not to compete against one another" and, instead, to "cooperate and coordinate their activities on a nationwide basis" to maximize profits.  *Id.* at 8 (Am. Compl. ¶ 33).  So, instead of the member plans competing against each other, the provider track alleges that they have agreed to carve out exclusive service areas and use national programs and uniform rules and regulations.  *Id.*  They accomplished this "through the restrictions in their trademark licenses, such as the requirement of mandatory participation in the national programs."  *Id.*  And, the conspiracy has allowed each member to occupy a dominant market position in its geographic market and enabled the members to force healthcare providers to accept lower rates and less favorable terms.  *Id.* (Am. Compl. ¶ 34).  The plaintiffs in the provider track seek injunctive relief prohibiting the members, like BCBSKS, from enforcing the agreements that restrict their geographic territories and from using programs that allow them to fix prices paid to healthcare providers.  *Id.* at 8–9 (Am. Compl. ¶ 35).

The First Amended Complaint describes the subscriber track of the Antitrust Litigation in a similar fashion.  Doc. 55 at 9 (Am. Compl. ¶ 36).  In that track, the members, again under the license agreements with BCBSA, have agreed not to compete with each other and, instead, to coordinate their activities to maximize their profits by setting up exclusive service areas and uniform rules and regulations for membership.  *Id.*  The plaintiffs in this track also seek injunctive relief prohibiting the member plans, including BCBSKS, from enforcing agreements that restrict geographic areas and other activities that have allowed them to inflate premiums above competitive levels.  *Id.* (Am. Compl. ¶ 37).

To support its allegations that BCBSA must indemnify BCBSKS, and OneBeacon because of OneBeacon's subrogation rights, OneBeacon relies on certain arguments about BCBSA's rules that the plaintiffs in the Antitrust Litigation have asserted.  The First Amended Complaint alleges that the subscriber plaintiffs use documents and testimony from a different lawsuit about the failed merger of Anthem, a member plan, and Cigna to argue certain Blue Cross member plans "believe that the purpose of the BCBSA's National Best Efforts rule ("NBE") is to restrict competition."  *Id.* at 24 (Am. Compl.  ¶¶ 68–69).  The subscriber plaintiffs "allege that certain [member plans] believe that the limitation on non-Blue revenue caused by the [NBE] rule only protects and enhances the Blue brand by restricting competition against the Blue brand."  *Id.* (Am. Compl. ¶ 70).  And to support their arguments, the Antitrust Litigation plaintiffs used a letter sent to BCBSA on behalf of certain member plans discussing how "BCBSA's efforts to restrict unbranded business outside of exclusive territories could raise concerns over potential violations of antitrust laws."  *Id.* at 24–25 (Am. Compl. ¶ 71); *see also* Doc. 55-7 at 5–6, 10 (2005 letter explaining "there is significant doubt whether, under the antitrust laws, an association like BCBSA *could* lawfully bar members from engaging in unbranded business outside their exclusive territories" but also explaining the BCBSA rules do not bar such conduct and noting BCBSA's Board has engaged antitrust counsel to advise on complex antitrust issues).

In short, the provider and subscriber track complaints "are based upon the same or related conduct of the [member plans] relating to the [member plans'] 'relationship with . . . BCBSA, and the [l]icensing [a]greements that limit the Blue Plans' activity . . . .'"  *Id.* at 9 (Am. Compl. ¶ 38) (quoting the MDL transfer order).

## II.      Legal Standard

BCBSA argues the court must dismiss OneBeacon's Count IX under Fed. R. Civ. P.

12(b)(6).  Doc. 83 at 1.  Under Rule 12(b)(6), a defendant may move to dismiss for failing to

state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  Fed. R. Civ. P. 8(a)(2)

provides that a complaint must contain "a short and plain statement of the claim showing that the

pleader is entitled to relief."  Although this Rule "does not require 'detailed factual allegations,'"

it demands more than "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation

of the elements of a cause of action'" which, as the Supreme Court explained, "'will not do.'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

555 (2007)).

When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court must

assume the complaint's factual allegations are true.  *Id.*  But this requirement does not extend to

every assertion made in a complaint.  The court is "'not bound to accept as true a legal

conclusion couched as a factual allegation.'"  *Id.* (quoting *Twombly*, 550 U.S. at 555).

"'Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice'" to state a claim for relief.  *Bixler v. Foster*, 596 F.3d 751, 756 (10th

Cir. 2010) (quoting *Iqbal*, 556 U.S. at 678).  Also, the complaint's "[f]actual allegations must be

enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555 (citations

omitted).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*,

556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556); *see also Christy Sports, LLC v. Deer Valley Resort Co., Ltd.*, 555 F.3d 1188, 1192 (10th Cir. 2009) ("The question is whether, if the allegations are true, it is plausible and not merely possible that the plaintiff is entitled to relief under the relevant law." (citation omitted)). Essentially, "the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims." *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007). This plausibility standard reflects the requirement in Fed. R. Civ. P. 8 that pleadings must provide defendants with fair notice of the nature of the claims against them as well as the grounds on which each claim rests. *See Khalik v. United Air Lines*, 671 F.3d 1188, 1191–92 (10th Cir. 2012).

## III.   Analysis

BCBSA argues OneBeacon has failed to state a plausible claim in Count IX because the License Agreements grant BCBSKS indemnification rights only for costs that arise exclusively and directly from BCBSA's activities. OneBeacon has not alleged, however, that the costs BSBSKS has spent defending the Antitrust Litigation are exclusively and directly tied to BCBSA's conduct. Doc. 83 at 1–2. Instead, BCBSA contends, the First Amended Complaint describes how the Antitrust Litigation alleges joint conduct among BCBSA, BCBSKS, and the other member plans. *Id.* And so, BCBSA asserts, BCBSKS has no right to indemnification from BCBSA. And neither does OneBeacon because—according to BCBSA—any subrogation rights it has can be no greater than BCBSKS's rights. Doc. 84 at 2–3.

BCBSA argues the explicit indemnification terms of the License Agreements and the allegations in the First Amended Complaint describing the Antitrust Litigation contradict OneBeacon's allegation that BCBSA must indemnify BCBSKS for its expenses defending the Antitrust Litigation.  Doc. 84 at 5.  This is so, BCBSA contends, because the underlying "claims are premised on alleged joint conduct by BCBSA and all BCBS licensees, including [BCBSKS]," and thus they cannot "exclusively and directly as a result of the activities of BCBSA."  *Id.*; Doc. 55-5 at 7 (¶ 14); Doc. 55-6 at 7 (¶ 14).  So, BCBSA argues, OneBeacon "has not pled and cannot plead facts that would give rise to a cause of action under the License Agreements for indemnification."  Doc. 83 at 1–2.  It thus asks the court to dismiss Count IX.  BCBSA seeks dismissal with prejudice, arguing the unambiguous language of the indemnification provisions, the First Amended Complaint's allegations, and the allegations in the Antitrust Litigation "confirm that OneBeacon has no rights against BCBSA as a matter of law."  Doc. 84 at 6.

OneBeacon responds arguing BCBSA cannot rely on mere allegations in the Antitrust Litigation to defeat the allegations in OneBeacon's Complaint in this case that BCBSA is liable.  Doc. 90 at 1.  OneBeacon argues that, although its First Amended Complaint never explicitly alleges BCBSA is the exclusive and direct cause of the Antitrust Litigation, OneBeacon has alleged that BCBSA must defend and indemnify BCBSKS in connection with the Antitrust Litigation—and that implies as much so it's enough to state a plausible claim.  *Id.*  OneBeacon argues that just because the claims in the Antitrust Litigation allege joint activity doesn't mean the indemnification provisions of the License Agreements do not apply.  *Id.*  Instead, OneBeacon argues, it will discover facts in this lawsuit that show the indemnification provisions do apply.  *Id.*  OneBeacon claims it is entitled to proceed to discovery to determine these contested facts.

*Id.*  In the meantime, OneBeacon contends, it has alleged sufficient facts to put BCBSA on notice of the claim against it.  *Id.*  And that, OneBeacon asserts, suffices to with stand the current motion.  *Id.*

OneBeacon makes four specific arguments against dismissal.  First, it argues the First Amended Complaint provides fair notice of OneBeacon's claim.  Doc. 90 at 4–5.  Second, it contends whether the indemnification provisions in the License Agreements apply must depend on facts, and BCBSA has pointed merely to allegations from the Antitrust Litigation to argue they don't apply.  *Id.* at 5–6.  Third, OneBeacon argues the indemnification provisions are not an all or nothing proposition, and BCBSA could be found liable to indemnify BCBSKS for some of the costs it has incurred if BCBSA is the exclusive and direct cause even of parts of the Antitrust Litigation.  *Id.* at 7–8.  Finally, OneBeacon argues it has "refrained from publicly disclosing other details" that it is "not at liberty to allege . . . in a public filing."  *Id.* at 8.  And, if the court concludes that BCBSA's arguments have merit, OneBeacon contends the court should, at most, grant OneBeacon leave to amend to plead additional facts.  *Id.*  The court addresses each argument, in turn, below.

### A.  Fair Notice

*First*, OneBeacon argues that the First Amended Complaint provides BCBSA fair notice of its subrogation claim and the basis for it, so the court should deny the motion to dismiss. OneBeacon explains that BCBSA "is, ultimately, the entity whose exclusive and direct actions caused the antitrust lawsuits."  Doc. 90 at 3.  And, OneBeacon argues, it has alleged as much as the parties need to engage in discovery to develop the facts needed to "determine if the indemnification provision[s] ultimately appl[y] to support OneBeacon's request for recovery." *Id.*

OneBeacon's argument contends that its allegation that BCBSA must defend and indemnify BCBSKS for the Antitrust Litigation is sufficient to allege implicitly that BCBSA's activities "are the exclusive and direct cause of the antitrust lawsuits." *Id.* at 4.  The First Amended Complaint alleges that, under the License Agreements, "BCBSA agreed to defend and hold [BCBSKS] harmless against claims arising from activities such as those alleged" in the Antitrust Litigation.  Doc. 55 at 3 (Am. Compl. ¶ 9); *see also id.* at 24, 25, 42 (Am. Compl. ¶¶ 67, 77, 146–47).  And, OneBeacon argues, the First Amended Complaint also contains other allegations that place BCBSA on notice of the claim against it.  OneBeacon points to three other allegations that, it contends, adequately allege the Antitrust Litigation is exclusively and directly BCBSA's fault, making its claim that BCBSA must indemnify BCBSKS under the License Agreements plausible.

First, OneBeacon cites its allegations about a 2005 letter sent from a member plan to BCBSA where, OneBeacon says, the member "notes that [*BCBSA's*] barring its members from certain types of business activities could raise questions under antitrust laws."  Doc. 90 at 4. Second, OneBeacon refers to the subscriber plaintiffs' class certification motion in the Antitrust Litigation, where the subscriber plaintiffs "discuss how [BCBSA] monitors and enforces exclusive service areas (which prohibit Blue entities from selling insurance outside certain geographic areas) and the national best efforts rule (which sets revenue caps on certain portions of a Blue's income)." *Id.*  OneBeacon explains the subscriber plaintiffs' motion "also states that [*BCBSA*] enforced the restrictions, including by monetarily sanctioning Blues." *Id.*  Third, OneBeacon points to a different case—"the Anthem-Cigna litigation"—where one member plan "considered ways to modify, attack or eliminate the national best efforts rule, including by potentially joining the *plaintiffs* in the antitrust lawsuit against [BCBSA]," that is, the member

"viewed [*BCBSA*] as restricting its ability to act." *Id.* OneBeacon argues these allegations "show[] that its position is not founded in rank speculation:  others—including Blue entities— have directly and indirectly asserted that [BCBSA's] activities are the cause of the alleged antitrust restrictions." *Id.* at 4–5.  So, it asserts, it has alleged BCBSA's "activities are the exclusive and direct cause of the antitrust lawsuits." *Id.* at 4.

But, BCBSA argues OneBeacon has not alleged facts that bring the monetary relief it seeks within the indemnification provisions.  Doc. 91 at 3–6.  BCBSA asserts the costs BCBSKS has incurred arise from defending the Antitrust Litigation where, as OneBeacon admits and indeed alleges itself, the subscriber and provider plaintiffs allege BCBSKS jointly conspired with BCBSA and other member plans.  Doc. 91 at 2.  So, BCBSA contends, OneBeacon has not asserted any allegations plausibly showing the costs arose exclusively and directly from BCBSA's activities, as required for the indemnification provisions to apply.  Doc. 91 at 2.  Nor could OneBeacon so allege, BCBSA contends, because the claims in the Antitrust Litigation allege joint conduct, meaning the claims cannot arise *exclusively and directly* from BCBSA's activities under the plain meaning of those words.  *Id.* at 2–3.  BCBSA correctly argues that the First Amended Complaint never alleges explicitly that BCBSA's conduct was the exclusive and direct cause of the Antitrust Litigation.  Doc. 91 at 4.  And, BCBSA contends, the allegations OneBeacon does identify to support its claim that BCBSA must indemnify BCBSKS (and OneBeacon through its subrogation rights) do not allege adequately any exclusive and direct conduct of BCBSA leading to OneBeacon's requested relief either.  *Id.*

The court begins with OneBeacon's allegations about BCBSA's obligation to indemnify BCBSKS under the License Agreements.  Then, the court addresses the other allegations that, OneBeacon contends, make its claim indemnity claim against BCBSA plausible.  As explained

below, OneBeacon makes merely conclusory allegations that BCBSA must defend and

indemnify BCBSKS for "BCBSA's conduct as alleged" in the Antitrust Litigation, Doc. 55 at 42

(Am. Compl. ¶ 146), and nowhere has OneBeacon alleged plausibly that BCBSKS has sustained

"claims, damages, liabilities and costs . . . [that] arise exclusively and directly as a result of the

activities of BCBSA."  Doc. 55-5 at 7 (¶ 14); Doc. 55-6 at 7 (¶ 14).  So, the court rejects

OneBeacon's argument that it has stated a plausible claim and put BCBSA on notice of it.

Indeed, the problem with OneBeacon's argument is that it has alleged no facts that make

its allegation that BCBSA must defend and indemnify BCBSKS plausible under the plain

language of the License Agreements.  BCBSA may have notice of the claim—in the sense that

the First Amended Complaint asserts a subrogation claim—and the only way subrogation could

apply is if OneBeacon covered BCBSKS's costs that arose exclusively and directly from

BCBSA's activities.  But, OneBeacon just makes a conclusory allegation that BCBSA must

defend and indemnify BCBSKS for the amounts BSBSKS has paid defending the Antitrust

Litigation.  Doc. 55 at 42 (Am. Compl. ¶ 146).  And, it attaches the License Agreements which

provide BCBSA has agreed to indemnify BCBSKS for "claims, damages, liabilities, and costs of

every kind" that "arise *exclusively and directly* as a result of the activities of BCBSA."  Doc. 55-

5 at 7 (¶ 14); Doc. 55-6 at 7 (¶ 14) (emphasis added).  OneBeacon's "'conclusory statement'"

that BCBSA must indemnify BCBSKS in connection with the Antitrust Litigation does not

"'suffice'" to state a claim for relief.  *Bixler*, 596 F.3d at 756 (quoting *Iqbal*, 556 U.S. at 678).

Instead, OneBeacon must supply factual allegations that "raise [its claimed] right to relief above

the speculative level."  *Twombly*, 550 U.S. at 555 (citations omitted).  And OneBeacon hasn't

done that here.  The First Amended Complaint simply provides no factual allegations to support

OneBeacon's claim made in its Opposition that BCBSA's exclusive and direct activities caused the antitrust lawsuits.

The First Amended Complaint does not allege what claims, damages, liabilities, or costs from the Antitrust Litigation BCBSKS has undertaken that arise "exclusively and directly" from BCBSA's activities.  OneBeacon insists it could discover facts that make its claim plausible. But, to survive a motion to dismiss, a complaint first must contain factual allegations sufficient to state a plausible claim for relief.  *See Christy Sports, LLC*, 555 F.3d at 1191–92 (explaining a complaint is not required to provide detailed factual allegations but they must raise plaintiff's right to relief above a speculative level).  OneBeacon's implicit assertion that all or at least part of the Antitrust Litigation that BCBSKS has defended and sought coverage for must arise exclusively and directly from BCBSA's activities does not achieve that level.  OneBeacon's allegations only identify the joint conduct in the Antitrust Litigation; but they never explain how the claims, damages, liabilities, or costs BCBSKS has incurred arose exclusively and directly as from BCBSA's activities.

For example, as BCBSA argues, the First Amended Complaint's allegations about the Antitrust Litigation describe joint conduct.  *See, e.g.*, Doc. 55 at 7 (Am. Compl. ¶ 29) (alleging the antitrust lawsuits involve claims that BCBSKS, BCBSA, and other member plans "conspired to leverage their economic power and market dominance" violating antitrust laws), 8 (Am. Compl. ¶ 33) (alleging the claims in the provider track of the Antitrust Litigation allege BCBSA and the member plans agreed "not to compete against one another, but instead to cooperate and coordinate their activities"), 9 (Am. Compl. ¶ 36) (alleging the claims in the subscriber track of the Antitrust Litigation allege the member plans have agreed "not to compete against one another, but instead cooperate and coordinate their activities" and they "agreed to cease

competing and to impose operational uniformity on themselves . . . by carving out exclusive

service areas and establishing BCBSA's uniform rules and regulations, including BCBSA's

Membership Standards and Guidelines under the License Agreements," and they "formalized"

this cooperation in the license agreements).[7]  But beyond the conclusory allegations about

BCBSA's liability, the First Amended Complaint never alleges explicitly any facts that show the

Antitrust Litigation claims and the costs of defending them arose "exclusively and directly" from

BCBSA's activities.  And, as explained next, the First Amended Complaint doesn't include

---

[7]     Indeed, Count One of the subscriber track of the Antitrust Litigation alleges a conspiracy in restraint of trade violating Section 1 of the Sherman Act.  Subscriber Track Third Amended Consolidated Class Action Complaint, *In re Blue Cross Blue Shield Antitrust Litig. MDL 2406*, No. 2:13-cv-20000-RDP (N.D. Ala. Apr. 17, 2017), ECF No. 1082 at 215.  Count Two asserts a conspiracy to monopolize violating Section 2 of the Sherman Act.  *Id.* at 216.  The Kansas claims, Counts 45 through 51, similarly allege conspiracy in restraint of trade and monopoly claims, as well as a claim for unjust enrichment.  *Id.* at 270–279.  The subscriber plaintiffs allege BSBSA, BCBSKS, and other member plans conspired to restrain trade by agreeing to divide and allocate geographic markets to sell health insurance into exclusive geographical areas through license agreements, membership standards, and guidelines.  *See, e.g.*, *id.* at 271 (¶ 1117).  They also allege BCBSKS has monopoly power that it uses to restrain trade unreasonably and inflate premiums artificially.  *See, e.g.*, *id.* at 273 (¶ 1127).  The provider track is similar.  *See* Consolidated Fourth Amended Provider Complaint, *In re Blue Cross Blue Shield Antitrust Litig. MDL 2406*, No. 2:13-cv-20000-RDP (N.D. Ala. Apr. 17, 2017), ECF No. 1083 at 170–181, 225–236 (asserting various damages claims based on market allocation conspiracy, price fixing and boycott conspiracy, monopsonization, and conspiracy to monopsonize).

        The court may take judicial notice of the filings in the Antitrust Litigation, but the allegations asserted in them are considered only for their content—the court does not accept them as true.  *Tal*, 453 F.3d at 1264 n.24; *see also St. Louis Baptist Temple, Inc. v. F.D.I.C.*, 605 F.2d 1169, 1172 (10th Cir. 1979) ("[F]ederal courts, in appropriate circumstances, may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue.").  The court cannot surmise from its review of the complaints in the Antitrust Litigation that any *exclusive and direct* activities of BCBSA may have resulted in claims, damages, liabilities and costs that BCBSKS has incurred.  Section 1 of the Sherman Act reaches concerted activity, but "does not reach conduct that is wholly unilateral."  *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984) (citation and internal quotation marks omitted).  Section 2 of the Sherman Act, on the other hand, "does reach both concerted and unilateral behavior."  *Id.* at 767 & n.13.  But, OneBeacon never provides any factual allegations plausibly showing how any claims in the Antitrust Litigation arose exclusively and directly from BCBSA's activities while no conduct by BCBSKS played a part in those claims.  And, as discussed in more detail next, OneBeacon has not explained how any of its allegations give rise to an inference that BCBSKS has sought coverage for defense expenses that arise exclusively and directly as a result of BCBSA's activities either.

allegations that give rise to a reasonable inference that BCBSKS has defended such claims or incurred such costs.

OneBeacon contends "the March 2005 letter," the fact BCBSA has "sanctioned Blues for not complying with its dictates," and BCBSA's ability to "follow[ ] the Anthem-Cigna trial" show that BCBSA's "activities are the exclusive and direct cause of the antitrust lawsuits." Doc. 90 at 9. The court disagrees. Those allegations and the materials they cite do not plausibly allege that the costs BCBSKS has incurred defending the Antitrust Litigation arose "exclusively and directly" from BCBSA's activities. Nor do they support any inference to that effect that rises above a speculative level.

### 1. 2005 Letter

First, OneBeacon cites the 2005 letter and argues that BCBSA's "barring its members from certain types of business activities could raise questions under antitrust laws." Doc. 90 at 4. The First Amended Complaint attaches this letter sent to BCBSA on behalf of certain member plans and alleges it discusses how "BCBSA's efforts to restrict unbranded business outside of exclusive territories could raise concerns over potential violations of antitrust laws." Doc. 55 at 24–25 (Am. Compl. ¶ 71). BCBSA argues in response, "That one Blue Plan may have disagreed with particular rules at one point in time does not support that the MDL or issues in that case result from BCBSA's exclusive conduct." Doc. 91 at 4.

It's true. OneBeacon neither alleges in the First Amended Complaint nor explains in its Opposition what it is that BCBSA barred BSBSKS from doing, let alone how any such activity of BCBSA was the *exclusive and direct* cause of the Antitrust Litigation and the costs BSBSKS has incurred defending it.[8] OneBeacon's citation to this 2005 letter does not raise its assertion

---

[8]     Presumably, OneBeacon is arguing the NBE rule and the License Agreements' exclusive service area restricted BCBSKS in a way that violated antitrust laws. But, OneBeacon doesn't include any

that BCBSA is the *exclusive and direct* cause of the Antitrust Litigation above a speculative level.  Also, OneBeacon doesn't explain how a discussion between certain member plans and BCBSA in 2005 about BCBSA rules makes the costs BCBSKS has incurred defending the Antitrust Litigation exclusively and directly a result of BCBSA's activities.  The letter does include a discussion whether—if BCBSA adopted certain rules—it *could* implicate antitrust issues.  Doc. 55-7 at 6.  But, that discussion doesn't explain and it won't support a reasonable inference that the Antitrust Litigation and the costs BCBSKS has incurred defending it arise *exclusively and directly* from BCBSA's activities.[9]  The court thus concludes the 2005 letter does not suffice to make OneBeacon's contention—one not even explicitly made in the First Amended Complaint—that the Antitrust Litigation was "exclusively and directly" caused by BCBSA more than speculative.

---

allegations supporting an inference that the NBE rule or exclusive service areas were "exclusively and directly" the result of BCBSA's activities.  And OneBeacon never addressees the implications of BCBSKS and the other member plans agreeing to the restrictions.

[9]   The letter explains it was sent to BCBSA to respond to a memorandum directed to all Blue Plan CEOs that discussed the benefits and disadvantages of consolidating ownership of the Blue Plans based on trademark law issues.  Doc. 55-7 at 1.  The letter summarizes how the memorandum had warned that the member plans presently were not restricted from operating competitive, non-Blue-branded business in other states.  *Id.* at 2.  But, the letter explains BCBSA's Board "repeatedly has decided to permit non-branded business outside a licensee's primary service area."  *Id.*  The memorandum also had argued that BCBSA's rules permitted licensees to engage in directly competitive practices.  *Id.* at 5.  And, the memorandum opined, BCBSA's Board had "circumscribed the use of co-brands outside of a Plan's exclusive service area."  *Id.*  The letter responded to the memorandum, asserting that BCBSA's Board had reviewed issues about "competition with the Blue brand" and adopted new rules that restricted branded competition but did not restrict unbranded competition or prohibit co-branding.  *Id.*  The letter explained that "there is significant doubt whether, under the antitrust laws, an association like BCBSA *could* lawfully bar members from engaging in unbranded business outside their exclusive territories."  *Id.* at 6.  And, it explained that the BCBSA rules *permit* the use of co-brands or unbranded business outside a plan's exclusive service area.  *Id.* at 5–6.  The letter opined that the BCBSA rules restricting certain trade names "are sufficient, without a flat and illegal bar on all competing products."  *Id.* at 6–7.

## 2.  Subscriber Plaintiffs' Class Certification Motion

Next, OneBeacon relies on its allegations about the subscriber plaintiffs' class certification motion and materials used to support it.  OneBeacon alleges that the subscribers in the Antitrust Litigation allege "certain Blues believe that the limitation on non-Blue revenue caused by the national best efforts rule only protects and enhances the Blue brand by restricting competition against the Blue brand."  Doc. 55 at 24 (Am. Compl. ¶ 70).  OneBeacon's Opposition elaborates, explaining that the subscriber plaintiffs "discuss how [BCBSA] monitors and enforces exclusive service areas (which prohibit Blue entities from selling insurance outside certain geographic areas) and the national best efforts rule (which sets revenue caps on certain portions of a Blue's income)."  Doc. 90 at 4.  OneBeacon notes the subscriber plaintiffs' motion "also states that [*BCBSA*] enforced the restrictions, including by monetarily sanctioning Blues." *Id.*

BCBSA's Reply argues that this allegation doesn't allege—at least not adequately— that the Antitrust Litigation is based on BCBSA's exclusive conduct.  Doc. 91 at 4.  Instead, BCBSA argues, the subscriber plaintiffs' motion discusses "the alleged joint conduct underlying both the MDL plaintiffs' and OneBeacon's complaints."  *Id.*  And, BCBSA asserts, "that certain Blue Plans may have disliked certain Blue rules—to which all Blue Plans agree to be bound—says nothing about BCBSA's exclusive conduct."  *Id.*

Again, the First Amended Complaint's allegations do not allege plausibly or support a reasonable inference that the costs BCBSKS has incurred arose exclusively and directly from BCBSA's activities.  As BCBSA noted, and as OneBeacon itself alleges, the Antitrust Litigation alleges *joint conduct* where BCBSKS and other member plans, through license agreements with BCBSA, have agreed "not to compete against one another" and, instead, to "cooperate and

coordinate their activities on a nationwide basis" to maximize profits.  Doc. 55 at 8 (Am. Comp. ¶ 33).  The subscriber plaintiffs' class certification motion similarly discusses joint conduct.  It does not support a reasonable inference that BCBSA's exclusive and direct conduct led to the costs for which BCBSKS seeks coverage.

Indeed, the court has reviewed the parts of the subscriber plaintiffs' motion cited by OneBeacon.  *See* Memorandum of Points and Authorities in Support of Subscriber Plaintiffs' Motion for Certification of Nationwide Injunctive Class or, in the Alternative, Alabama Injunctive Class, *In re Blue Cross Blue Shield Antitrust Litig. MDL 2406*, No. 2:13-cv-20000-RDP (N.D. Ala. Apr. 15, 2019), ECF No. 2408 at 11–14.  One page earlier the subscriber plaintiffs describe how the defendants are 36 independent companies—35 plans licensed to sell health insurance using the Blue Cross and Blue Shield names and marks and BCBSA, an "entity created and controlled by the Blues to issue those licenses."  *Id.* at 10.  And, the materials cited by OneBeacon describe how the member plans "have all agreed to be bound by the license agreements," and "the license agreements constitute an agreement not to compete."  *Id.* at 11.  When some members began to compete by selling unbranded business, the subscriber plaintiffs assert "*the Member Plans* developed the National 'Best Efforts' rule" which restricts "revenue and competition."  *Id.* at 12 (emphasis added).  They assert that "[e]very *Member Plan agreed* to be bound by NBE revenue caps."  *Id.* at 13 (emphasis added).

Then, the motion goes on to discuss the points argued by OneBeacon—noting that BCBSA "monitors and enforces" the exclusive service areas and NBE rule and enforces them through monetary sanctions.  *Id.*  So, while the member plans may have believed the NBE rule and exclusive service areas restrict competition and while BCBSA may enforce the rules, the subscriber plaintiffs' motion asserts the members developed the rule and all agreed to the

restrictions.  The factual accuracy of the subscriber plaintiffs' assertions is not for this court to decide on a motion to dismiss.  But, to decide this motion properly, the court must decide whether the materials cited by OneBeacon can support a reasonable inference that BCBSA's activities "exclusively and directly" caused the Antitrust Litigation claims and the expenses for which BCBSKS seeks coverage from OneBeacon.  They do not.

### 3.  Anthem-Cigna Litigation

Finally, OneBeacon relies on its allegations about the Anthem-Cigna litigation.  Doc. 55 at 24 (Am. Compl. ¶¶ 68–69) (alleging "[d]ocuments and testimony provided by Anthem in the Anthem-Cigna Litigation, according to the Subscribers, demonstrate that certain Blues believe that the purpose of the BCBSA's National Best Efforts rule ("NBE") is to restrict competition"). OneBeacon's Opposition describes how the subscriber plaintiffs cited this litigation in their class certification motion because one member plan had "considered ways to modify, attack or eliminate the national best efforts rule, including by potentially joining the *plaintiffs* in the antitrust lawsuit against [BCBSA]"—*i.e.*, the member "viewed [*BCBSA*] as restricting its ability to act."  Doc. 90 at 4.  BCBSA responds to OneBeacon's argument, contending that the Anthem-Cigna litigation is about two parties to a failed merger and is irrelevant to this case.  Doc. 91 at 4. And, it argues, OneBeacon's arguments based on that litigation do "not support that the MDL is about BCBSA's exclusive conduct."  *Id.*

The court concludes that OneBeacon's allegations cannot support a reasonable inference that BCBSA is liable for the subrogation claim alleged by OneBeacon's First Amended Complaint.  The subscriber plaintiffs' motion explains Anthem complained about the NBE rule and how it limited its ability to grow.  *See* Memorandum of Points and Authorities in Support of Subscriber Plaintiffs' Motion for Certification of Nationwide Injunctive Class or, in the

Alternative, Alabama Injunctive Class, *In re Blue Cross Blue Shield Antitrust Litig. MDL 2406*, No. 2:13-cv-20000-RDP (N.D. Ala. Apr. 15, 2019), ECF No. 2408 at 17–18.  Anthem wanted to merge with Cigna, but the NBE rule would constrain its growth, post-merger, by restricting the revenue for non-Blue branded business.  *Id.*  So, Anthem looked for ways to eliminate the NBE rule.  *Id.*  These options included helping the subscriber plaintiffs as a means to get the rule changed.  *Id.* at 18.  The proposed merger ultimately was ruled anticompetitive.  *Id.*  The First Amended Complaint's allegations about the Anthem-Cigna litigation, accepted as true and viewed in the light most favorable to OneBeacon, show merely that the subscriber plaintiffs in the Antitrust Litigation believe certain BCBSA rules were intended to restrict competition, and that some member plans believed the rules restricted competition or their ability to act.  But, for the same reasons that apply to the subscriber plaintiffs' other class certification arguments, the Anthem-Cigna allegations do not allege plausibly or support an inference that the Antitrust Litigation and costs BCBSKS has incurred defending it arose *exclusively and directly* from BCBSA's activities.  OneBeacon's discussion of the Anthem-Cigna litigation and one member's dissatisfaction with a rule it agreed to follow does not transform the Antitrust Litigation's claims alleging an agreement among entities not to compete to ones where BCBSA's activities could have exclusively and directly caused the costs for which BCBSKS seeks coverage.  Nor do the Anthem-Cigna litigation allegations give the court reason to believe OneBeacon can muster support for its claim that BCBSA's activities "exclusively and directly" led to the defense expenses OneBeacon has covered under its policy.

In sum, OneBeacon argues its allegations are sufficient to allege BCBSA was the exclusive and direct cause of the Antitrust Litigation and make OneBeacon's position that BCBSA is liable more than mere speculation because "others—including Blue entities—have

directly and indirectly asserted that [BCBSA's] activities are the cause of the alleged antitrust restrictions." Doc. 90 at 4–5. But none of its allegations plausibly allege the costs incurred by BCBSKS arose *exclusively and directly* from BCBSA's activities. Nor can they support an inference that can rise above a speculative level to that effect because the allegations all tie back to the Antitrust Litigation, where the subscriber and provider plaintiffs allege a conspiracy among BCBSKS, BCBSA, and the other member plans. So, OneBeacon's allegations about a letter from a member plan to BCBSA from 2005, a subscriber plaintiffs' motion in the Antitrust Litigation, and the Anthem-Cigna litigation do not plausibly allege BCBSKS has incurred defense expenses or is defending claims that arose exclusively and directly as a result of BCBSA's activities.

Without alleging any facts suggesting BCBSKS has incurred costs "exclusively and directly" as a result of BCBSA's activities that OneBeacon then covered under the OneBeacon Policy, OneBeacon has not stated a plausible subrogation claim. The court is unable to draw a reasonable inference that BCBSA is liable here. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). The court thus dismisses the subrogation claim, despite OneBeacon's argument that it provided fair notice to BCBSA.

### B.  Facts to Support Indemnification

The crux of OneBeacon's second argument against dismissal is that "[a]llegations do not defeat allegations." Doc. 90 at 1. OneBeacon contends that, because BCBSA relies on allegations from the Antitrust Litigation to argue the License Agreements' indemnification provisions do not apply, the court should deny its motion to dismiss. It asserts the allegations in the Antitrust Litigation "do not dictate whether the indemnification provision applies—the facts do." *Id.* So, OneBeacon argues, just because "the antitrust lawsuits allege a conspiracy among

multiple entities" and that BCBSA "acted in concert with others" doesn't mean it can't produce facts that show BCBSA was the exclusive and direct cause of the Antitrust Litigation.  *Id.* at 5.  And, OneBeacon says, it intends to discover facts through this lawsuit that show the indemnification provisions apply, even though joint activity is alleged in the Antitrust Litigation. *Id.* at 1, 6.

OneBeacon refutes BCBSA's argument that the indemnification provisions can't apply because the claims allege conduct by other entities and not just BCBSA, asserting whether the indemnification provisions applies "depends on facts."  *Id.* at 6.  It admits:  "The relevant facts [in the Antitrust Litigation] have not been determined."  *Id.*  But, at the motion to dismiss stage, OneBeacon argues, the court cannot consider BCBSA's potential evidence—the allegations from the Antitrust Litigation about joint conduct—and must only consider whether the First Amended Complaint is legally sufficient to state a claim.  *Id.* at 5.  And, OneBeacon asserts that plaintiffs in the Antitrust Litigation may not care "*who* is ultimately responsible for the alleged antitrust activity if they obtain joint and several liability," but OneBeacon cares.  *Id.* at 6.  It intends to exercise its subrogation rights to recover damages from BCBSA under the License Agreements' indemnity provisions for amounts BCBSKS incurred for conduct for which BCBSA was responsible.  *Id.*  So, while the Antitrust Litigation *alleges* a conspiracy, OneBeacon contends it still can argue that "the underlying conduct originates with [BCBSA]" and, it asserts, BCBSKS can allocate responsibility for the Antitrust Litigation costs to BCBSA based on the indemnity provisions.  *Id.*

But, the problem is OneBeacon itself has not alleged plausibly that BCBSKS has incurred costs that arose "exclusively and directly" from BCBSA's activities.  So, it is OneBeacon's own allegations that fail to state a claim upon which relief can be granted.  And, as BCBSA correctly

argues, OneBeacon's own allegation that BCBSA is liable relies on allegations and arguments from the same Antitrust Litigation that BCBSA uses to argue for dismissal. Indeed, the First Amended Complaint alleges that "BCBSA is obligated, pursuant to the License Agreements . . . to save, defend, indemnify and hold [BCBSKS] harmless with respect [to] BCBSA's conduct *as alleged in the Underlying Lawsuits and/or MDL Action.*" Doc. 55 at 42 (Am. Compl. ¶ 146) (emphasis added); *see also id.* at 25 (Am. Compl. ¶ 77) ("The License Agreements between BCBS-KS and BCBSA require that BCBSA defend and indemnify BCBS-KS in connection with the Underlying Lawsuits.").

OneBeacon itself alleges the Antitrust Litigation involves allegations of joint conduct. *Id.* at 47 (Am. Compl. ¶ 161). It never makes any factual allegations about exclusive and direct conduct of BCBSA in the Antitrust Litigation for which BCBSKS has incurred defense expenses. So, it is proper for BCBSA to discuss allegations from the Antitrust Litigation because OneBeacon itself cited them in its First Amended Complaint and relied on them for its claim that BCBSA is liable. Doc. 91 at 5. By considering the parties' arguments about the Antitrust Litigation, the court is not "weigh[ing] potential evidence that the parties might present at trial"—it is "assess[ing] whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citation and internal quotation marks omitted). The court accepts the factual allegations in the First Amended Complaint about the Antitrust Litigation as true and views them in the light most favorable to OneBeacon. Even in that forgiving light, the First Amended Complaint's allegations do not plausibly allege that BCBSA's activities "exclusively and directly" caused the costs BCBSKS asks OneBeacon to cover.

OneBeacon also contends that the court's dismissal of its claim would make the indemnification provisions illusory because it would mean BCBSA doesn't have to defend BCBSKS simply because the Antitrust Litigation names BCBSKS as a defendant.  Doc. 90 at 6. This is so, it argues, because if a complaint names BCBSKS as a defendant it should include allegations saying BCBSKS is a responsible party.  *Id.*  And, if that is all it takes to eliminate indemnification, the provision in the License Agreements would be illusory and BCBSA would never have to indemnify BCBSKS for any claims or other costs in lawsuits against BCBSKS and BCBSA.  *Id.*  BCBSA refutes this argument effectively.  It explains that "BCBSA is not arguing that it would never have to indemnify [BCBSKS] (or any Blue Plan) for a lawsuit filed against it for BCBSA's exclusive and direct conduct."  Doc. 91 at 6.  "Nor is BCBSA arguing that the indemnification provision does not apply just *because* [BSBSKS] is a named defendant in the MDL."  *Id.*  Instead, BCBSA contends, the indemnification provision "does not apply here because, as OneBeacon alleges, the case for which OneBeacon seeks indemnification alleges a conspiracy among BCBSA, [BCBSKS], and other Blue Plans."  *Id.*

OneBeacon's illusory argument is unpersuasive.  Again, OneBeacon never alleges any exclusive and direct conduct of BCBSA for which BCBSKS has incurred costs.  The Antitrust Litigation involves conspiracy claims, and OneBeacon never alleges any facts about how these claims arise exclusively and directly from BCBSA's activities.  OneBeacon doesn't explain nor can the court surmise how BCBSA's activities are the exclusive and direct cause of the defense costs BCBSKS has incurred; both allegations and proof of a conspiracy necessarily involve more than one defendant and OneBeacon alleges BCBSKS agreed to the License Agreements.  The Antitrust Litigation asserts other monopoly and unjust enrichment claims against BCBSKS as well.  But, OneBeacon's First Amended Complaint never alleges any facts that plausibly allege

29

these claims arose exclusively and directly from BCBSA's activities either.  While the Antitrust

Litigation appears, in large measure, to center on an alleged conspiracy where all member plans

agreed not to compete, OneBeacon speculates the Antitrust Litigation ultimately will find

BCBSA solely responsible for the alleged antitrust activity.  But, it never provides factual

allegations to support this assertion.  And, without any factual allegations plausibly alleging

exclusive and direct activities of BCBSA that are the basis for the claims BCBSKS has incurred

costs defending, OneBeacon's illusory argument is not persuasive.

### C.  Partial Indemnification

*Next*, OneBeacon argues the indemnification provisions aren't all or nothing.  Doc. 90 at

7.  OneBeacon contends it has alleged sufficiently that BCBSA was the exclusive and direct

cause of the entire Antitrust Litigation.  *Id.* at 7–8.  But, alternatively, it argues that BCBSA was

the exclusive and direct cause of part of that litigation.  *Id.*  And so, it contends, BCBSA may not

have to indemnify BCBSKS for the entire Antitrust Litigation.  *Id.*  But, at a minimum, BCBSA

could have to indemnify BCBSKS for some claims, damages, liabilities, or costs if OneBeacon

shows that BCBSA is the exclusive and direct cause of some part of the lawsuit.  *Id.*  BCBSA

responds to this argument, contending that "OneBeacon cites no authority for the proposition that

the indemnification provisions here allow [BCBSKS] (or OneBeacon as subrogee) to allocate

defense costs and potential liabilities among types of conduct."  Doc. 91 at 6.  And, BCBSA

argues, even if OneBeacon could allocate costs, it would be futile because the Antitrust

Litigation alleges joint conduct and no claims in the Antitrust Litigation allege exclusive conduct

against BCBSA.  *Id.*

Once more, OneBeacon has not alleged any facts that plausibly state a claim, so

OneBeacon's argument can't save its claim.  As explained above, the First Amended Complaint

does not allege any facts that, accepted as true, plausibly show BCBSA exclusively and directly caused all, or even part of, the Antitrust Litigation.  Nor does OneBeacon explain in its Opposition what part or parts of the Antitrust Litigation BCBSKS has defended that were caused exclusively or directly by BCBSA.  To state a plausible claim for relief, OneBeacon must do so.  It has not.  OneBeacon's Opposition merely argues that "even if [BCBSA] is not the exclusive and direct cause of the *entire* lawsuit, that does not prevent [BCBSA] from being the exclusive and direct cause of *some part* of the lawsuit."  Doc. 90 at 7.

OneBeacon also attacks BCBSA's assertion that "exclusively and directly" is plain and unambiguous language.  It relies on a Wisconsin intermediate appellate court opinion that interpreted "exclusively" in the context of a property tax exemption statute to mean "primarily" or "principally" and not "solely" or "purely."  Doc. 90 at 7 (citing *Wis. Dep't of Revenue v. Parks-Pioneer Corp.*, 487 N.W.2d 63, 66 (Wisc. Ct. App. 1992)).  There, the court determined the equipment was "exclusively" used for recycling even though 10% of its use was performing deliveries because it was primarily used for recycling activities and the deliveries were an incidental use to the exempt purpose.  *Parks-Pioneer Corp.*, 487 N.W.2d at 66.  Basically, OneBeacon argues it has stated a plausible claim against BCBSA as long as it alleges BCBSA's activities are the primary cause of the Antitrust Litigation.  *See* Doc. 90 at 7–8.  And, it contends, the parties further can "probe the meaning, intent and application" of the "exclusively and directly" language during discovery.  *Id.* at 8.

This argument is unavailing as well.  For one, OneBeacon hasn't alleged any exclusive and direct activities of BCBSA, nor has it alleged how BCBSA's activities "primarily" caused the Antitrust Litigation or even part of it.  And, even if it plausibly had alleged facts capable of supporting a finding that BCBSA bears primary responsibility for the claims BCBSKS has

defended, the parties chose Illinois law to govern their License Agreements.  *See* Doc. 55-5 at 9 (¶ 21); Doc. 55-6 at 9 (¶ 21).  As BCBSA argues, Doc. 91 at 7–8, under Illinois law the construction of a contract is a question of law and that state's law directs courts to give undefined contract terms their plain and ordinary meaning.  *See Lapham-Hickey Steel Corp. v. Prot. Mut. Ins. Co.*, 655 N.E.2d 842, 846 (Ill. 1995); *Hunt v. Farmers Ins. Exch.*, 831 N.E.2d 1100, 1102 (Ill. Ct. App. 2005).  A contract provision is not ambiguous just because a party can "suggest creative possibilities for its meaning."  *Hunt*, 831 N.E.2d at 1102 (citations and internal quotation marks omitted).  Instead, the court first should see if the undefined term has a plain, ordinary, and popular meaning and, if so, enforce the term as written.  *Id.*; *see also Founders Ins. Co. v. Munoz*, 930 N.E.2d 999, 1005 (Ill. 2010) (directing courts to look to a term's dictionary definition to determine its plain, ordinary, and popular meaning).

"Exclusively" has a plain, ordinary, and popular meaning.  Black's Law Dictionary defines exclusive to mean "[l]imited to a particular person, group, entity, or thing," and "[w]hole; undivided."  *Exclusive*, *Black's Law Dictionary* (11th ed. 2019).  Similarly, Merriam-Webster defines exclusively as "in an exclusive manner:  in a way limited to a single person, group, category, method, etc."  *Exclusively*, *Merriam-Webster.com*, https://www.merriam-webster.com/dictionary/exclusively (last visited Aug. 1, 2020).  Neither of these plain, ordinary, and popular meanings supports interpreting the indemnification provisions to mean BCBSA must indemnify BCBSKS if BCBSA's activities were a primary contributor to the Antitrust Litigation, or certain parts of it, as opposed to the single entity responsible between BCBSA and BCBSKS.  In contrast, the definitions of "primarily" and "principally" have distinctly different meanings.  "Primarily" is defined as "for the most part."  *Primarily*, *Merriam-Webster.com*, https://www.merriam-webster.com/dictionary/primarily (last visited Aug. 1, 2020).  And Black's

Law Dictionary describes primary liability as "[l]iability for which one is directly responsible." *Liability*, *Black's Law Dictionary* (11th ed. 2019).  Also, "principal" is defined as "most important, consequential, or influential."  *Principal*, *Merriam-Webster.com*, https://www.merriam-webster.com/dictionary/principal (last visited Aug. 1, 2020).  Black's Law Dictionary describes "principal" as "[c]hief; primary; most important" or as someone with "primary responsibility on an obligation, as opposed to a surety or indorser."  *Principal adj.*, *Black's Law Dictionary* (11th ed. 2019); *Principal n.*, *Black's Law Dictionary* (11th ed. 2019). So, even if OneBeacon had made factual allegations that BCBSA is primarily responsible for some of the claims BCBSKS has defended, such an allegation would not state a plausible claim for indemnification under the plain language of those provisions.

### D.  Leave to Amend

*Finally*, OneBeacon argues the court should allow it to amend its First Amended Complaint if the court "believes [BCBSA's] motion carries weight."  Doc. 90 at 8.  OneBeacon maintains that its First Amended Complaint is enough to put BCBSA on notice "particularly" because BCBSA "has been intricately involved in the antitrust MDL defense" and jointly has defended it with BCBSKS.  *Id.*  But, if not, OneBeacon explains that BCBSA and BCBSKS's joint defense is prejudicing its subrogation rights, and it "is not at liberty to allege details in a public filing."  *Id.*  For example, other allegations in the First Amended Complaint allege BCBSKS has refused to provide requested documents and information to OneBeacon because BCBSKS asserts a joint-defense privilege.  *Id.*  OneBeacon argues this refusal has prevented it from determining how to allocate the liability between BCBSA and BCBSKS in the Antitrust Litigation.  *Id.*  So, while OneBeacon asserts its First Amended Complaint contains enough facts to state a viable claim, it contends that it could amend its First Amended Complaint to plead

those additional facts if necessary.  *Id.* at 8–9.  If necessary, OneBeacon would plead certain allegations under seal to comply with the protective order.  *Id.*

BCBSA responds to OneBeacon's alternative position.  It argues that if OneBeacon needed to amend its First Amended Complaint or file portions of it under seal, it already could have moved the court for leave to do so.  Doc. 91 at 7.  And, BCBSA argues, OneBeacon's vague suggestions in its Opposition are not sufficient to support leave to amend.

Our court's local rules provide the requirements for a party seeking leave to amend a pleading.  *See* D. Kan. Rule 15.1.  OneBeacon's contention that it could amend its First Amended Complaint to cure deficiencies, if the court finds any, does not comply with this rule's requirements.  Nor does OneBeacon adequately explain why amendment is merited.  And, it never analyzes the factors courts consider when determining whether to grant leave to amend a pleading under Fed. R. Civ. P. 15(a)(2).  *See Calderon v. Kan. Dep't of Soc. & Rehab. Servs.*, 181 F.3d 1180, 1185–87 (10th Cir. 1999) (explaining that "normally a court need not grant leave to amend when a party fails to file a formal motion" and that a request for leave to amend must provide the "basis of the proposed amendment before the court is required to recognize that a motion for leave to amend is before it").  With no properly supported Rule 15 motion to amend, the court need not provide OneBeacon an opportunity to amend based on its vague request at the end of its Opposition.  *Id.*; *see also Barrett v. Univ. of N.M.*, 562 F. App'x 692, 694–95 (10th Cir. 2014) (affirming district court's decision to deny request to amend asserted in opposition papers and noting a "formal motion to amend, accompanied by a purported amended complaint, gives the [trial] judge an opportunity to consider whether the new complaint can pass muster").  The court thus denies OneBeacon's request for leave to file a Second Amended Complaint.

## IV.     Conclusion

For reasons explained, the court grants BCBSA's Motion to Dismiss (Doc. 83).  The indemnification provisions provide BCBSA will indemnify BCBSKS for "claims, damages, liabilities and costs of every kind, nature, and description which may arise exclusively and directly as a result of the activities of BCBSA."  Doc. 55-5 at 7 (¶ 14); Doc. 55-6 at 7 (¶ 14). OneBeacon makes merely a conclusory allegation that BCBSA must indemnify BCBSKS, and as subrogee, OneBeacon, for BCBSA's conduct in connection with the Antitrust Litigation.  But, OneBeacon has not alleged plausibly any facts to support its claim that BCBSA's activities were the exclusive and direct cause of the defense costs for which OneBeacon has provided coverage to BCBSKS.  So, the court grants BCBSA's motion and dismisses Count IX, the subrogation claim against BCBSA.

Because the court dismisses the only claim against BCBSA, the court directs the Clerk of the Court to terminate defendant Blue Cross Blue Shield Association as a defendant in this action.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Blue Cross Blue Shield Association's Motion to Dismiss (Doc. 83) is granted.

**IT IS FURTHER ORDERED THAT** the Clerk of the Court is directed to terminate defendant Blue Cross Blue Shield Association as a defendant in this action.

**IT IS SO ORDERED.**

**Dated September 21, 2020, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**
