IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

|  |  |
|---|---|
| BEDIVERE INSURANCE COMPANY f/d/b/a ONEBEACON INSURANCE COMPANY,<br><br>       Plaintiff,<br><br>v.<br><br>BLUE CROSS AND BLUE SHIELD OF KANSAS, INC., and ALLIED WORLD SURPLUS LINES INSURANCE COMPANY f/k/a DARWIN SELECT INSURANCE COMPANY,<br><br>       Defendants. | Case No.  18-2371-DDC-JPO |

## MEMORANDUM AND ORDER

Before the court is defendant Blue Cross and Blue Shield of Kansas, Inc.'s ("BCBSKS")

Motion for Reconsideration, or in the Alternative, to Certify Questions (Doc. 57).  Plaintiff

Bedivere Insurance Company f/d/b/a OneBeacon Insurance Company ("OneBeacon") has

responded (Doc. 62).  And BCBSKS has replied (Doc. 63).  For reasons explained below the

court grants, in part, BCBSKS's Motion for Reconsideration but denies BCBSKS's Motion to

Certify Questions.

### I.      Procedural History

OneBeacon filed this lawsuit against defendants BCBSKS and Allied World Surplus

Lines Insurance Company f/k/a Darwin Select Insurance Company[1] ("Allied World") on July 17,

---

[1]      OneBeacon's Complaint names this defendant as Allied World Surplus Lines Insurance Company f/k/a Darwin Select Insurance Company.  But, in its Motion to Dismiss, Allied World referred to itself as Allied World Specialty Insurance Company f/k/a Darwin National Assurance Company.  *See* Doc. 20 at 1.

2018.  Doc. 1.  OneBeacon seeks a variety of declaratory relief against BCBSKS and Allied World under 28 U.S.C. § 2201.  *Id.*; *see also* Doc. 55 (First Amended Complaint seeking declaratory and monetary relief).  On August 30, 2018, BCBSKS moved to dismiss all six Counts asserted against it in the original Complaint.  Doc. 17.  Allied World moved to dismiss the single Count against it on September 21, 2018.  Doc. 20.  On September 25, 2018, Allied World filed a related lawsuit against BCBSKS seeking declaratory relief, *Allied World Specialty Insurance Company v. Blue Cross & Blue Shield of Kansas, Inc.*, Case No. 18-2515-DDC-JPO (the "Related Case"), which also is pending before this court.[2]  For a period, the case was stayed while the parties mediated their claims in both lawsuits.  Doc. 39 at 3.  Meditation was unsuccessful.  Doc. 43.  And, on September 30, 2019, the court entered a Memorandum and Order ("September 2019 Order") denying BCBSKS's and Allied World's Motions to Dismiss.  Doc. 52.  That Order also granted OneBeacon leave to file a First Amended Complaint.  *Id.*  And OneBeacon filed its First Amended Complaint on October 14, 2019.  Doc. 55.

BCBSKS now asks the court to reconsider one portion of the September 2019 Order—the court's denial of BCBSKS's motion to dismiss Count I.  Doc. 57 at 2.  The court briefly summarizes the facts relevant to the claim in that count, below.

## II.    Factual Background

The court takes the following facts from OneBeacon's Complaint (Doc. 1) and attached supporting documents and views them in the light most favorable to OneBeacon—the same standard it applied when considering BCBSKS's Motion to Dismiss.  *S.E.C. v. Shields*, 744 F.3d

---

[2]      The court may take judicial notice of the Related Case.  *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006) ("[F]acts subject to judicial notice may be considered in a Rule 12(b)(6) motion without converting the motion to dismiss into a motion for summary judgment.  This allows the court to take judicial notice of its own files and records, as well as facts which are a matter of public record.  However, the documents may only be considered to show their contents, not to prove the truth of matters asserted therein." (citations, alterations, and internal quotations omitted)).

633, 640 (10th Cir. 2014) (explaining that the court must "accept as true all well-pleaded factual allegations in the complaint and view them in the light most favorable to the [plaintiff]" (citation and internal quotation marks omitted)); *Hall v. Associated Int'l Ins. Co.*, 494 F. App'x 902, 904 (10th Cir. 2012) (explaining that a court may also consider "attached exhibits[] and documents incorporated into the complaint by reference").

BCBSKS purchased three insurance policies:  (1) a primary Managed Care Organization Errors and Omissions Liability Policy from Allied World, with a $10 million coverage limit ("Allied World E&O Policy"); (2) a primary Healthcare Organizations Directors and Officers Liability Policy from Allied World, with a $15 million coverage limit ("Allied World D&O Policy"); and (3) a Managed Care Errors and Omissions Excess Indemnity Policy from OneBeacon ("OneBeacon Policy").  Doc. 1 at 1–2 (Compl. ¶¶ 2–3).  BCBSKS requested reimbursement of defense expenses and indemnity coverage from Allied World under both the Allied World E&O Policy and the Allied World D&O Policy in connection with several antitrust class actions (the "Antitrust Litigation") against BCBSKS, which have been "consolidated for pretrial discovery proceedings in the Northern District of Alabama."  *Id.* at 2 (Compl. ¶¶ 3–5). While Allied World, subject to a reservation of rights, agreed to provide coverage under the Allied World E&O Policy, it denied coverage under the Allied World D&O Policy.[3]  *Id.* (Compl. ¶ 6).  BCBSKS also seeks reimbursement of its defense expenses under the OneBeacon Policy. *Id.* at 3 (Compl. ¶¶ 9–10).[4]

---

[3]     The First Amended Complaint explains that BCBSKS believes it is entitled to coverage under the Allied World D&O Policy and has filed a counterclaim against Allied World for wrongful denial of coverage in the Related Case.  Doc. 55 at 2–3 (Am. Compl. ¶¶ 8–9).

[4]     The First Amended Complaint alleges the Allied World E&O Policy has been exhausted and OneBeacon has started to reimburse BCBSKS for defense expenses under the OneBeacon Policy.  *Id.* at 3 (Am. Compl. ¶ 12).

Count I against BCBSKS and Allied World requests a judicial declaration that BCBSKS must exhaust "all primary insurance" before the OneBeacon Policy is triggered, including coverage from Allied World under the Allied World D&O Policy.  Doc. 1 at 21–22 (Compl. ¶¶ 70–78); *see also* Doc. 55 at 28–29 (Am. Compl. ¶¶ 84–91) (seeking a declaratory judgment that "the OneBeacon Policy is excess and that BCBS-KS must properly exhaust all other insurance and indemnity to which it is entitled before the OneBeacon Policy is triggered").

The OneBeacon Policy contains several provisions relevant to Count I's request for declaratory relief.[5]  First, the OneBeacon Policy, when outlining its insuring agreement for excess coverage, provides:

> The Underwriter shall provide the **Insured** with insurance excess of the **Underlying Insurance** set forth in ITEM [5][6] of the Declarations for **Claims** first made against the **Insured** during the **Policy Period,** provided that the **Underlying Insurance** also applies and has been exhausted by actual payment thereunder, or would apply but for the exhaustion of the applicable limit(s) of liability thereunder.

Doc. 1-3 at 10 (emphasis in original).  The OneBeacon Policy defines "**Underlying Insurance**" as the Allied World E&O Policy.  *Id.* at 3, 11.  As OneBeacon acknowledges, the OneBeacon Policy makes no reference to Allied World's D&O Policy.  *See id.*; Doc. 19 at 11.

The OneBeacon Policy does state, however, that it "will apply in conformance with, and will follow the form of, the terms, conditions, agreements, exclusions, definitions and endorsements of the **Underlying Insurance**."  Doc. 1-3 at 10.  It goes on to identify exceptions to "conformance with" the Allied World E&O Policy, including that OneBeacon, as underwriter,

---

[5]     This case is before the court on a motion to reconsider a motion to dismiss.  So, the court is permitted to consider the insurance policies' language.  *See Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002) ("In addition to the complaint, the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity.").

[6]     Through Endorsement Number 1, "all references in [the OneBeacon] Policy to 'ITEM 4 of the Declarations' [were] replaced with 'ITEM 5 of the Declarations.'"  Doc. 1-3 at 5.

"will not have any obligation to make any payment hereunder unless and until the full amount of the applicable limit of liability of the **Underlying Insurance** has been paid by the issuer(s) of the **Underlying Insurance**." *Id.* at 11.

Meanwhile, the Allied World E&O Policy issued to BCBSKS, from which the OneBeacon Policy follows form, contains a provision entitled "**Other Insurance; Other Indemnification**." That provision provides, "This Policy"—meaning Allied World's E&O policy:

> shall be excess of and shall not contribute with:
> (a)  any other insurance or plan or program of self-insurance (whether collectible or not), unless such other insurance or self-insurance is specifically stated to be in excess of this Policy; and
> (b)  any indemnification to which an **Insured** is entitled from any entity other than another **Insured**.
> This Policy shall not be subject to the terms of any other policy of insurance or plan or program of self-insurance.

Doc. 1-1 at 24.

The Allied World D&O Policy also contains an "Other Insurance" provision, which states, in relevant part:

> The insurance provided by this Policy shall apply only as excess over any other valid and collectible insurance, whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written specifically as excess insurance over the applicable Limit of Liability provided by this Policy. This Policy shall specifically be excess of any other valid and collectible insurance pursuant to which any other insurer has a duty to defend a **Claim** for which this Policy may be obligated to pay **Loss**. This Policy shall not be subject to the terms and conditions of any other insurance policy.

Doc. 1-2 at 45–46.

The Allied World E&O Policy, and the OneBeacon Policy by following form, provide coverage for any "**Loss** which the **Insured** is legally obligated to pay as a result of a **Claim**" made during the policy period. Doc. 1-1 at 52 (insuring agreement). "**Loss**" includes "**Defense**

**Expenses** and any monetary amount which an Insured is legally obligated to pay as a result of a **Claim**" but does not include punitive or exemplary or multiplied damages for **Claims** for **Antitrust Activity**.  *Id.* at 7.  Under the "Conditions" of the Allied World E&O Policy, the Underwriter has no duty to defend any Claims, but "[u]pon written request of the **Named Insured**, the **Underwriter** will pay or reimburse, on a current basis, **Defense Expenses** for which this Policy provides coverage.  Except for such **Defense Expenses**, the **Underwriter** will pay **Loss** only on the final disposition of a **Claim**."  *Id.* at 26.

The Allied World D&O Policy generally provides coverage during the policy period for, among other coverage, **Loss** arising from a **Claim** (i) against any **Insured Person** or the **Company** for a **Wrongful Act** or (ii) against the **Insureds** for **Antitrust Activities**.  Doc. 1-2 at 28.  "**Loss**" includes "damages, settlements or judgments" and "**Defense Costs**" among other items.  *Id.* at 12.

In its Motion to Dismiss, BCBSKS contended Count I failed to state a claim because the OneBeacon Policy "is expressly written as excess only to" the Allied World E&O Policy, but not the Allied World D&O Policy, so its policy is triggered when the Allied World E&O Policy alone is exhausted.  Doc. 18 at 2.  OneBeacon's Count I asks the court to declare, based on the "Other Insurance; Other Indemnification" provision in the OneBeacon Policy, because it follows form to the Allied World E&O Policy, that the OneBeacon Policy is not triggered until BCBSKS exhausts all primary "other insurance," including the Allied World D&O Policy.  So, the controversy in Count I revolves around the parties' respective obligations under the OneBeacon Policy and the Allied World D&O Policy.  Namely, Count I calls on the court to decide whether the two policies cover the same loss and whether the OneBeacon Policy is triggered by

exhaustion of the Allied World E&O Policy alone or, instead, only after both primary policies are exhausted?

Applying Kansas law to interpret the OneBeacon Policy, the court determined that OneBeacon had stated a plausible claim—*i.e.*, under the terms of the OneBeacon Policy it is plausible that BCBSKS must exhaust *all* primary insurance before the OneBeacon Policy is triggered, not just the Allied World E&O Policy.  Doc. 52 at 25–53.  The court looked to the terms of the OneBeacon Policy to determine whether OneBeacon's obligations to BCBSKS are triggered immediately upon BCBSKS exhausting the Allied World E&O Policy, or if OneBeacon could require BCBSKS to exhaust "other insurance" too before OneBeacon provides coverage.  *Id.* at 31–45.  The court explained that some courts have determined that a primary policy should provide coverage before an excess policy—a principle called horizontal exhaustion—and that, depending on the policy terms, some courts apply this principle even if the primary insurance isn't the policy specified as underlying the excess policy.  *Id.* at 34–37.  The court predicted Kansas would apply horizontal exhaustion if presented with the question posed here.  *Id.* at 37–38.

The court then interpreted the OneBeacon Policy and concluded, looking at the language of the policy as a whole, that it unambiguously was intended to be excess to both the Allied World E&O Policy and any "other insurance."  *Id.* at 38–40.  Next, the court examined whether any exceptions to horizontal exhaustion existed—*i.e.*, whether the general rule that an excess policy does not attach until all primary insurance has been exhausted should not apply here.  *Id.* at 40–45.  But, the court determined BCBSKS had not identified an applicable exception to horizontal exhaustion based on the cases it cited.  *Id.*

Finally, the court considered BCBSKS's argument that OneBeacon cannot force BCBSKS to litigate Allied World's denial of coverage under the Allied World D&O Policy before OneBeacon's policy is triggered, but must instead exercise subrogation rights against Allied World later if the Allied World D&O policy is determined to provide coverage. *Id.* at 45–53. The court explained it could not yet determine if the Allied World D&O Policy and OneBeacon Policy provide any overlapping coverage, creating a circumstance under which OneBeacon could invoke its "other insurance" clause. *Id.* at 46–47. And, the court concluded it could not determine as a matter of law that OneBeacon must provide coverage while the Allied World D&O Policy coverage was disputed. *Id.* at 48–53. The cases BCBSKS cited to support its position dealt with primary coverage. *Id.* It had not shown that OneBeacon as an excess insurer must provide coverage now and seek subrogation from the primary insurer later.

BCBSKS argues the court should reconsider the portion of its September 2019 Order declining to dismiss Count I under D. Kan. Rule 7.3(b)(3), or alternatively should certify questions to the Kansas Supreme Court under Kan. Stat. Ann. § 60-3201. Doc. 57 at 2–4. The court first addresses the motion to reconsider. Then, it turns to the motion to certify questions.

### III.   Motion for Reconsideration

#### A.  Legal Standard

"A motion to reconsider is only appropriate where the [c]ourt has obviously misapprehended a party's position, the facts or applicable law, or where the party produces new evidence that it could not have obtained earlier through the exercise of due diligence." *Skepnek v. Roper & Twardowsky, LLC*, No. 11-4102-KHV, 2012 WL 5907461, at *1 (D. Kan. Nov. 26, 2012); *see also Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000). It is "not a second opportunity for the losing party to make its strongest case, to rehash arguments or to

dress up arguments that previously failed." *Skepnek*, 2012 WL 5907461, at *1; *see also Coffeyville Res. Refin.& Mktg., LLC v. Liberty Surplus Ins. Co.*, 748 F. Supp. 2d 1261, 1264 (D. Kan. 2010) ("A motion to reconsider is available when the court has misapprehended the facts, a party's position, or the controlling law, but it is not appropriate to revisit issues already addressed or to advance arguments that could have been raised in prior briefing." (citing *Servants of Paraclete*, 204 F.3d at 1012)). Finally, "[w]hether to grant a motion to reconsider is left to the [c]ourt's discretion." *Skepnek*, 2012 WL 5907461, at *1.

Motions to reconsider under D. Kan. Rule 7.3(b) "must be based on: (1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error or prevent manifest injustice." D. Kan. Rule 7.3(b). BCBSKS's motion invokes D. Kan. Rule 7.3(b)(3)—the need to correct clear error or prevent manifest injustice. When reviewing a district court's decision to deny a motion to reconsider under the abuse of discretion standard, the Tenth Circuit has described "clear error of judgment" to mean a district court's decision that was "arbitrary, capricious, whimsical, or manifestly unreasonable . . . . " *Wright ex rel. Tr. Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1235–36 (10th Cir. 2001) (internal quotation marks and citations omitted). Our court has described the term "manifest injustice" "to mean direct, obvious, and observable error." *Hadley v. Hays Med. Ctr.*, No. 14-1055-KHV, 2017 WL 748129, at *2 (D. Kan. Feb. 27, 2017) (internal quotation marks and citations omitted).

## B.  Analysis

BCBSKS asserts three reasons why, it contends, the court should reconsider its ruling on Count I to correct clear errors and prevent manifest injustice.

*First*, BCBSKS argues the OneBeacon Policy is triggered solely by exhaustion of the specific underlying Allied World E&O Policy under a "well-established exception to horizontal

exhaustion that applies to excess policies, like the OneBeacon Policy."  Doc. 57 at 2.  BCBSKS

argues the court misstated this exception to horizontal exhaustion in its September 2019 Order

and OneBeacon's coverage is triggered solely by exhausting the explicitly specified underlying

primary policy.  *Id.*

*Second*, BCBSKS argues the court predicted the Kansas Supreme Court "would adopt the

majority rule requiring horizontal exhaustion, but then simply assumes that horizontal exhaustion

applies to the OneBeacon Policy without actually analyzing the factors courts use to determine

whether this rule applies to a particular excess policy."  *Id.* at 3.  Had the court analyzed these

factors, BCBSKS contends the court would have held that horizontal exhaustion doesn't apply to

the OneBeacon Policy.  *Id.*

*Third*, BCBSKS argues the court concluded "without significant analysis or explanation

that OneBeacon can avoid its coverage obligations . . . based on the 'other insurance clause.'"

*Id.*  BCBSKS contends "[t]his holding is based on the erroneous premise that an 'other insurance

clause' determines when an insurer's coverage obligations to the policyholder are 'triggered.'"

*Id.*  BCBSKS argues that "well-established principles of insurance law . . . dictate that 'other

insurance' clauses do not determine when coverage is triggered[;]" they "only govern the priority

of payments among and between insurers after the insurers have provided coverage."  *Id.*

OneBeacon's Response to BCBSKS's Motion for Reconsideration focuses on a common

theme.  It contends every issue BCBSKS now raises was "previously argued or could have been

argued" in the Motion to Dismiss and so, BCBSKS improperly is attempting to rehash arguments

and make a stronger case for arguments that already failed.  Doc. 62 at 1–2.  And, OneBeacon

contends, none of the additional cases BCBSKS now cites render the court's previous decision

clearly erroneous.  *Id.* at 2.

The court addresses each of BCBSKS's clear error arguments below.  The court starts with BCBSKS's third argument because the court agrees it should correct one clear error in its September 2019 Order and thereby prevent a manifest injustice affecting coverage owed to BCBSKS while the coverage dispute on the Allied World D&O Policy is resolved.

### 1.  Other Insurance Clauses

BCBSKS argues an other insurance clause doesn't determine "when an insurer's coverage obligations to the policyholder are 'triggered.'"  Doc. 57 at 3.  To support its position that an "other insurance" clause never can be applied to affect an insurer's coverage obligations to its policyholder, BCBSKS relies on "well-established principles of insurance law."  *Id.* at 3.  It argues that these "well-established principles" show "other insurance" clauses can't be applied to decide when an insurer owes coverage to its insured, but only can be applied to determine priority among insurers "*after* the insurers have provided coverage."  *Id.* (emphasis added).  So, "[b]ased on these axioms of insurance law," BCBSKS argues that the court committed clear error when it concluded OneBeacon's Count I—which requests a judicial declaration that "the OneBeacon Policy is excess and that BCBS-KS must properly exhaust all primary coverage before the OneBeacon Policy is triggered"—states a plausible claim.  Doc. 1 at 22 (Compl. ¶ 78).  In short, BCBSKS contends Count I isn't plausible because an insured should never go without coverage based on an other insurance clause and thus, particularly so as long as Allied World continues to deny BCBSKS coverage, OneBeacon must provide coverage under its policy.

Specifically, BCBSKS argues the court clearly erred (1) in interpreting the OneBeacon Policy and (2) in its conclusion that horizontal exhaustion could apply to the OneBeacon Policy.  Doc. 57 at 18.  It contends the September 2019 Order "appears to" hold that if the Allied World D&O Policy and the OneBeacon Policy insure the same risk "then OneBeacon can cease paying

BCBSKS's defense expenses, even if [Allied World] continues to deny coverage under its D&O Policy." *Id.* BCBSKS contends this interpretation of the policy and whether horizontal exhaustion should apply are "clear error and will result in a manifest injustice." *Id.*

BCBSKS contends the "other insurance" clause's effect on OneBeacon's coverage obligation *to BCBSKS* is a "separate and independent issue" from the dispute whether the OneBeacon Policy is excess to the Allied World D&O Policy. *Id.* BCBSKS asserts that the "other insurance" clause applies to determine priority *among insurers*, but it never was intended to apply to determine when OneBeacon owes coverage *to BCBSKS*. *Id.* Instead, BCBSKS argues, "other insurance" clauses only "govern the relationship among and between insurers" and they do not exclude or limit an "insurer's coverage obligations to the policyholder." *Id.* at 18–19. BCBSKS thus asserts that OneBeacon can't invoke the "other insurance" clause in its policy to avoid its coverage obligations to BCBSKS, particularly while Allied World continues to deny coverage. *Id.* at 18. BCBSKS argues that OneBeacon always must cover its defense costs and otherwise provide coverage regardless of Allied World's coverage because other insurance clauses don't govern an insured's right to recovery from its insurer and, an insurer should never use an "other insurance" clause to allocate loss to the insured. *Id.* at 18–26. BCBSKS asserts that insurance law and industry custom and practice make it clear that providing coverage to the insured must take priority over allocating who among concurrent insurers owe coverage, and don't ever allow an insurer to use an other insurance clause to deny coverage to its insured. *Id.*

In sum, BCBSKS contends OneBeacon can never deny it coverage based on the "other insurance" clause, so the court shouldn't have concluded that OneBeacon had alleged plausibly that it could stop providing coverage to BCBSKS, if the Allied World D&O Policy insures the

same risk.  BSBSKS argues the September 2019 Order "is contrary to the purpose and function of 'other insurance' clauses, a well-established and longstanding body of insurance law[,] and the plain language of the Insuring Agreement in the OneBeacon Policy."  *Id.* at 18.

For reasons explained below, the court doesn't find clear error in the conclusion that Count I states a plausible claim.  The court's task on the Motion to Dismiss was to determine if OneBeacon had stated a plausible claim.  To do so, the court endeavored to interpret the OneBeacon Policy.  And, it concluded that, under the policy's terms, it was plausible that the OneBeacon Policy would be excess to the Allied World D&O Policy, and thus wouldn't be triggered until BCBSKS exhausted that primary coverage.  Stated another way, the court concluded that, if the court determines Allied World owes coverage under the Allied World D&O Policy and that Allied World's coverage obligation is primary to OneBeacon's, then it is plausible BCBSKS should have to exhaust its coverage from Allied World first before seeking coverage from OneBeacon.  But, the court agrees with BCBSKS that the court erred when discussing OneBeacon's obligations to BCBSKS, *at least while Allied World's coverage is disputed*.  And, the court now clarifies that it did not intend to address the parties' obligations in the hypothetical situation where Allied World continues to deny coverage even after a court orders that it owes coverage.

The majority of the court's Count I analysis focused on principles of horizontal and vertical exhaustion and, in turn, whether OneBeacon could rely on horizontal exhaustion to require the Allied World D&O Policy to provide coverage to BCBSKS first.  The court determined horizontal exhaustion allows an excess policy to avoid coverage until *all* primary insurance is exhausted, so OneBeacon had stated a plausible claim for relief in Count I on its request for a declaratory judgment that its policy does not attach until BCBSKS exhausts all

13

primary "other insurance." Doc. 52 at 39–40. Later in this Order, the court addresses BCBSKS's arguments about the court's horizontal exhaustion analysis, but concludes now, on a motion to reconsider, BCBSKS cannot rehash arguments and try to make a stronger case than it did in the first increment of this issue. *See Skepnek*, 2012 WL 5907461, at *1.

In this section, the court addresses one part of its September 2019 Order—the aspect where the court concluded "BCBSKS has not shown its desired result—mandating coverage before the [other insurance] dispute is resolved—is required as a matter of law." Doc. 52 at 52. The court agrees this statement was wrong. OneBeacon can't rely on its "other insurance" clause to avoid covering BCBSKS's defense costs while the dispute over Allied World's coverage obligation continues because the language of OneBeacon's "other insurance" clause isn't sufficiently clear about OneBeacon's coverage obligation during such a dispute. But, the court doesn't dismiss Count I because—if the court determines the Allied World D&O Policy owes BCBCKS coverage *and* its coverage responsibility applies before OneBeacon's—BCBSKS's argument that the "other insurance" clause *never* can be used by OneBeacon to avoid proving coverage isn't as convincing. That is, if the court reaches that conclusion, why shouldn't BCBSKS rely on Allied World for coverage instead of continuing to pursue coverage from OneBeacon?

The cases the court analyzed in its September 2019 Order primarily determined priority *between insurers*—not whether an insurer could avoid providing coverage to *its insured* when potential other insurance refused coverage. Still, the court concluded OneBeacon wasn't required to pay BCBSKS's defense costs while coverage under the Allied World D&O Policy is disputed. *Id.* at 48–53. The court reasoned that the cases cited by BCBSKS dealt with primary policies and thus were distinguishable. *Id.* And, when a true excess policy exists (*i.e.*, when

14

horizontal exhaustion applies), coverage under the excess policy isn't triggered until *any* underlying primary insurance is exhausted. *Id.* at 50. So—if Allied World owes coverage for the same losses and horizontal exhaustion applies—the OneBeacon Policy wouldn't apply until BCBSKS has exhausted the Allied World D&O Policy. *Id.* at 51–52. The court thus denied BCBSKS's request for the court to dismiss Count I and also opined that OneBeacon wasn't required as a matter of law to provide coverage to BCBSKS while the dispute over Allied World's coverage continued. *Id.* at 52–53. Now, the court has reviewed BCBSKS's reconsideration arguments and agrees that its analysis erred in one respect. Specifically, the court holds that where no other insurance currently is available because the other insurer disputes coverage, BCBSKS—who paid premiums for coverage—should not go without coverage based on OneBeacon's "other insurance" clause while the applicability and priority of its insurance policies are litigated.

As explained below, BCBSKS cites numerous sources concluding that to leave an insured without coverage while a dispute about insurers' priority continues is contrary to established insurance law principles and industry custom and practice. And, such a result would impose a manifest injustice on BCBSKS. Also, while the cases cited by BCBSKS in its Motion to Dismiss were in some respects distinguishable, the court now agrees they do not establish BCBSKS should be left without coverage while the existence of other insurance is disputed, no matter whether OneBeacon's policy is excess or primary. Finally, the court ultimately reaches this corrected conclusion because the language of OneBeacon's "other insurance" clause is not sufficiently clear to allow OneBeacon to avoid its coverage obligation to BCBSKS, at least not until the court has made a decision about existence of other concurrent insurance.

### a. Insurance Law Principles and Industry Custom and Practice

Various cases and treatises align with BCBSKS's position that "other insurance" clause disputes should affect only the rights among insurers.  "'Other insurance' clauses govern the relationship between insurers, they do not affect the right of the insured to recover under each concurrent policy."  Steven Plitt, *et al.*, 15 *Couch on Insurance* § 219:1 (3d ed. Supp. 2020); *see also Chem. Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co.*, 817 F. Supp. 1136, 1154 n.11 (D.N.J. 1993) (explaining other insurance clauses "affect the rights of the insurers among themselves" but "do not implicate [the insured's] right to full recovery under each triggered policy"); *Emps. Reinsurance Corp. v. Phoenix Ins. Co.*, 230 Cal. Rptr. 792, 796–98 (Cal. Ct. App. 1986) (explaining the court should "consider the policy alone as if no other insurance is available" to determine whether a particular policy provides coverage, then the court may look to the other insurance clauses to determine priority among the policies that provide coverage (citation and internal quotation marks omitted)); *Zurich Ins. Co. v. Northbrook Excess & Surplus Ins. Co.*, 494 N.E.2d 634, 650 (Ill. App. Ct. 1986) ("The fact that a policy may contain an 'other insurance' clause does not affect the individual insurance company's obligations to the insured. . . .  Only when a policy is triggered and the insurer becomes obligated to pay . . . does the 'other insurance' clause come into play to allow liability to be apportioned among the insurers."); *Bazinet v. Concord Gen. Mut. Ins. Co.*, 513 A.2d 279, 281 (Me. 1986) ("We have held that 'other insurance' clauses cannot be used by the insurers to defeat liability to their insureds. . . .  The battle between insurers as regards their mutual rights and obligations must be waged in appropriate cross-actions or later proceedings and cannot be employed to thwart recovery by an insured.").

So, while other insurance clauses often are used to apportion liability among insurers, they generally have "no bearing upon insurance companies' respective obligations to the policyholder."  Eugene R. Anderson, *et al*., *Insurance Coverage Litigation* § 19.03[A][1] (2d ed. 2018-2 Supp.); *id.* at § 19.03[A][6][a] ("It is a well-established principle of insurance law and industry custom and practice that 'other insurance' clauses apply only in battles between insurance companies.  'Other insurance' clauses do not apply to policyholders or provide for any allocation to the policyholder.").  *But see Rhone-Poulenc, Inc. v. Int'l Ins. Co.*, No. 94 C 3303, 1996 WL 328011, at *12–13 (N.D. Ill. June 11, 1996) (discussing how an other insurance clause could be used against an insured as a defense to a claim "but only *if* other [insurers] have acknowledged coverage" (emphasis added)).

And, an "other insurance" clause should not place an insured in a worse position than if it had no other insurance.  *Insurance Coverage Litigation*, *supra* at § 19.03[A][1] & n.56 (explaining other insurance clauses can dictate "the order in which the policyholder's insurance policies apply" but they "should not be used to diminish the insurance coverage available to the policyholder," and they "should not apply to disadvantage policyholders" or "to exclude coverage").  "Inter-insurer loss allocation by way of 'other insurance' clauses never permits allocation of a loss to the insured."  Douglas R. Richmond, *Issues and Problems in 'Other Insurance,' Multiple Insurance, and Self-Insurance*, 22 Pepp. L. Rev. 1373, 1380 (1995).  Instead, "[p]ayment of the insured's claim always takes priority over the allocation of the loss between concurrent insurers."  *Id.*; *see also Dart Indus., Inc. v. Com. Union Ins. Co.*, 28 Cal. 4th 1059, 1080–81 (Cal. 2002) (explaining other insurance clauses are used to apportion liability among multiple triggered policies but they have "no bearing upon the insurers' obligations to the policyholder" and the insurers still are contractually obligated "to cover the full extent of the

policyholder's liability (up to the policy limits)" (citations and internal quotation marks omitted)); *E.R. Squibb & Sons, Inc. v. Accident & Cas. Ins. Co.*, 860 F. Supp. 124, 127 (S.D.N.Y. 1994) (explaining an insurer's obligation to pay its insured must take priority over disputes about how to allocate insurance because the "fundamental purpose of insurance"— "protect[ing] the insured in return for the premium paid"—is the top priority); Gary D. Nelson & Mark A. Ludolph, 3 *Law & Practice of Insurance Coverage Litigation* § 38.3 (June 2020 Update) ("'[O]ther insurance' clauses affect only the insurers' rights among themselves.  They do not affect the insured's right to recover under each policy.  Paying the insured's claim always takes priority over allocating the loss between insurers . . . [and] 'other insurance' clauses never permit an allocation of loss to the insured."); *Restatement of the Law of Liability Insurance* § 20 & cmt. b. (Am. Law. Inst. 2019 & June 2020 Update) (explaining an insured "who has access to multiple policies" should not be put in a "worse off" position than one who "has access to only one policy" and other insurance clauses aren't intended to apply to policyholders but are included to determine priority among insurers); *id.* at § 40 & cmt. e. (explaining generally "[w]hen more than one insurance policy provides coverage to an insured . . . the insurers are independently and concurrently liable under their policies" except the policies can include terms that "alter[] the default rule . . . provided that the insured is not required to bear more of the costs").

As discussed more in Part III.B.2. below, "other insurance" disputes typically arise when two policies at the same insurance level cover a loss at the same time and the court must examine the policies and their "other insurance" clauses to determine each insurer's liability.  *See Insurance Coverage Litigation*, *supra* at § 19.03[A][6][c] (noting other insurance clauses apportion coverage only where "concurrent" coverage exists, which means it is both concurrent

in time and the risk); *see also Reliance Nat'l Ins. Co. v. Gen. Star Indem. Co.*, 72 Cal. App. 4th 1063, 1077 (Cal. Ct. App. 1999) (applying California law and explaining other insurance clause disputes "cannot arise between excess and primary carriers but only between insurers on the same level" because such clauses are "only relevant when two or more policies apply at the same level").[7]  Indeed, other insurance clauses are not "triggered" unless there are "concurrent insurance policies that cover the same risk."  *Insurance Coverage Litigation*, *supra* at § 19.03[A][6][c]; *see also Progressive Nw. Ins. Co. v. Handshumaker*, 662 F. App'x 630, 632 (10th Cir. 2016) (explaining that other insurance clauses are used to determine priority when more than one policy provides coverage for a loss); *AmHs Ins. Co. v. Mut. Ins. Co. of Ariz.*, 258 F.3d 1090, 1098 (9th Cir. 2001) (describing how other insurance clauses are intended to change an insurer's obligation "depending on the existence of coverage by other valid insurance" but they do not create an exception to coverage); *Progressive Nw. Ins. Co. v. Vangilder*, Nos. 15-2324-JAR-TJJ,15-1128-JAR-TJJ, 2016 WL 427740, at *4 (D. Kan. Feb. 4, 2016) ("Priority only comes into play where two or more policies provide coverage."); *Narron v. Cincinnati Ins. Co.*, 97 P.3d 1042, 1047–48 (Kan. 2004) ("Such clauses are commonly used to establish priority among multiple insurance policies covering an insured.").  If the policies do not provide concurrent coverage, "other insurance clauses do not apply."  *Insurance Coverage Litigation*, *supra* at § 19.03[A][6][c].

---

[7]      For example, the Tenth Circuit, applying Oklahoma law, has explained that two policies covering the same loss are "concurrent policies," but they may not provide the same level of coverage (*i.e.*, one may provide primary coverage but another excess).  *Phila. Indem. Ins. Co. v. Lexington Ins. Co.*, 845 F.3d 1330, 1336–38 (10th Cir. 2017) (suit between insurers).  And, the language of a policy's "other insurance" clause may help determine if it provides primary or excess coverage.  *See, e.g.*, *Am. Cas. Co. of Reading Pa. v. Health Care Indem., Inc.*, 520 F.3d 1131, 1135–37 (10th Cir. 2008) (reviewing other insurance language to determine whether policies at issue provided primary or excess coverage and discussing how defense costs should be apportioned between two policies insuring the same risk at the same level of coverage).

Here, OneBeacon argues it covers a different *level* of risk and thus, under horizontal exhaustion principles, its policy is triggered only when *all* primary policies are exhausted.  So, OneBeacon seeks a declaration that its coverage isn't triggered until BCBSKS exhausts the Allied World D&O Policy (and not just the Allied World E&O Policy).  BCBSKS and Allied World, on the other hand, argue horizontal exhaustion doesn't apply at all.  Essentially, they assert the OneBeacon Policy is triggered and becomes primary coverage as soon as the Allied World E&O Policy alone is exhausted.

The court previously concluded OneBeacon's position was plausible because the OneBeacon Policy is an excess policy with an "other insurance" clause making it excess to any other insurance in addition to the scheduled underlying insurance.  OneBeacon's argument that its coverage obligation isn't triggered until the Allied World D&O Policy is exhausted is inextricably linked to its "other insurance" clause—a clause BCBSKS argues the insurance industry uses to govern priority among insurers who provide concurrent coverage but that can never be applied against a policyholder.  At present, existence of concurrent coverage hasn't been determined.  The parties have asked the court to determine if the Allied World D&O Policy provides concurrent coverage in this case and the Related Case, but that determination hasn't been made yet.  Now, after taking a second look at the OneBeacon Policy terms, *infra* Part III.B.1.c., the court concludes OneBeacon's policy is ambiguous about its coverage obligation while the existence of other insurance is in dispute, and it would be unjust to leave the insured without coverage—coverage it paid premiums for—while the parties await that determination.

OneBeacon's obligation to BCBSKS—at least absent other insurance—must be "triggered" for the other insurance clause even to apply.  *See Emps. Reinsurance Corp*., 230 Cal. Rptr. at 796–98 (explaining the court should "consider the policy alone as if no other insurance is

available" to determine if a particular policy provides coverage, then the court may look to the other insurance clauses to determine priority among the policies that provide coverage (citation and internal quotation marks omitted)); *Zurich Ins. Co.*, 494 N.E.2d at 650 ("The fact that a policy may contain an 'other insurance' clause does not affect the individual insurance company's obligations to the insured. . . .  Only when a policy is triggered and the insurer becomes obligated to pay . . . does the 'other insurance' clause come into play to allow liability to be apportioned among the insurers.").  OneBeacon doesn't appear to dispute that—if the Allied World D&O Policy didn't exist—OneBeacon's policy would be triggered by exhaustion of the Allied World E&O Policy alone.  The OneBeacon Policy states OneBeacon "shall provide" BCBSKS "with insurance excess of the **Underlying Insurance**"—which is defined to mean the Allied World E&O Policy only—"provided that the **Underlying Insurance** *also applies and has been exhausted by actual payment thereunder . . . .*"  Doc. 1-3 at 3, 10–11 (emphasis added).  And, by following form to the Allied World E&O Policy, it provides OneBeacon "will pay or reimburse, *on a current basis*, **Defense Expenses** for which this Policy provides coverage."  Doc. 1-1 at 26 (emphasis added).  So, the OneBeacon policy—ignoring its "other insurance" clause—provides coverage when the Allied World E&O Policy is exhausted.

Then, for the "other insurance" clause to come into play, two policies must provide concurrent coverage.  So, to trigger OneBeacon's "other insurance" clause, the Allied World D&O Policy must provide coverage concurrent to OneBeacon's coverage.  BCBSKS has tried to secure coverage from Allied World under its D&O Policy but without avail.  Allied World has refused to acknowledge coverage or provide the benefits of coverage.  This case and the Related Case are poised to answer the question whether Allied World owes coverage.  But, in these circumstances—before the court has decided if the other insurance clause even applies—the

court concludes OneBeacon cannot refuse coverage to BCBSKS based on its "other insurance" clause. It would be manifestly unfair to leave the insured without coverage. And, the OneBeacon Policy's terms can't support that result.

While OneBeacon can rely on its "other insurance" clause to argue who, between Allied World and OneBeacon, must provide coverage first, the court now is convinced that it shouldn't have opined OneBeacon could rely on that provision to defeat its coverage obligation to BCBSKS—at least not before the court determines whether concurrent coverage even exists. So, the court agrees, it erred in that respect. As explained more fully in Part III.B.1.c., OneBeacon can't avoid covering BCBSKS's defense expenses based on its "other insurance" clause while the dispute tied to the "other insurance" clause continues because its policy language doesn't support that result. This aligns with the principles, discussed above, that providing the insured the coverage it paid for must take priority over disputes among insurers.

OneBeacon seemingly acknowledges its responsibility as an insurer to prioritize payments to the insured over disputes about priority among insurers. In its Opposition, OneBeacon argues that BCBSKS should not be able to reassert arguments already made in its Motion to Dismiss, and BCBSKS previously argued OneBeacon must provide coverage first and then seek contribution from Allied World. Doc. 62 at 5–6. But, OneBeacon also notes that it presently is reimbursing defense costs and will continue to do so (unless other issues void coverage). *Id.* at 11. OneBeacon thus appears to focus its claim in Count I on whether it can require BCBSKS to exhaust other primary coverage before the OneBeacon Policy is triggered, "*if . . . the [c]ourt determines that the [Allied World] D&O [P]olicy affords coverage.*" *Id.* (emphasis added).[8] The court's correction in this Order makes one thing clear: OneBeacon can't

---

[8]     So, even before the court's correction to the September 2019 Order here, it appears OneBeacon continued to reimburse defense costs. Insurance industry custom and practice may drive OneBeacon's

rely on its "other insurance" clause to deny coverage to BCBSKS, at least before that determination is made.  For those defense expenses OneBeacon covers in the interim that it believes the Allied World D&O Policy should have covered first, it has asserted a subrogation claim against Allied World.  *See* Doc. 55 at 39–40 (Am. Compl. Count VII).

### b.  Primary versus Excess Policies and the Coverage Owed to the Insured

The court previously concluded—based on its conclusion that OneBeacon's policy may not be triggered until the Allied World D&O Policy is exhausted—that OneBeacon wasn't required to pay BCBSKS's defense expenses before the dispute over Allied World's coverage was resolved.  Doc. 52 at 48–53.  The court distinguished certain cases cited by BCBSKS because they dealt with a primary obligation as opposed to excess coverage.  *Id.*  But, the court now reconsiders that portion of its Order because the purpose behind "other insurance" clauses and the equitable principles discussed above, plus a closer examination of OneBeacon's policy below, lead the court to agree:  BCBSKS should not be left without coverage while the existence of any concurrent coverage is disputed—regardless of whether the OneBeacon Policy is excess

---

reimbursement of defense costs despite its contention that the Allied World D&O Policy owes coverage first.  And, the manifest injustice that would result if BCBSKS was left without coverage while the actual existence of "other insurance" is in dispute may play a role.  It also could be driven by the broader nature of a duty to defend or, here, cover defense costs, than the duty to indemnify.  *See Platinum tech., inc. v. Fed. Ins. Co.*, No. 99 C 7378, 2000 WL 875881, at *2–3, 6 (N.D. Ill. 2000) (applying Illinois law and explaining the duty to defend arises when the underlying allegations state claims that are within the scope of coverage provided by the policy and noting "[o]ther' insurance clauses have been recognized as not applying to the duty to defend because unless stated otherwise, that obligation is independent of liability and any limitations thereon" (citations and internal quotation marks omitted)); *see also Insurance Coverage Litigation*, *supra* at § 19.03[A][1], [A][6][A] (discussing duty to defend as unaffected by an "other insurance" clause).  *But see Liberty Mut. Ins. Co. v. Pella Corp.*, 633 F. Supp. 2d 714, 721, 725–26 (S.D. Iowa 2009), *aff'd in part*, 650 F.3d 1161, 1172–74 (8th Cir. 2011) (recognizing duty to reimburse defense costs, like duty to defend, as a contemporaneous duty, but discussing how a true excess policy may not be liable for defense costs until an insured exhausts primary coverage); *Farmington Cas. Co. v. United Educators Ins. Risk Retention Grp., Inc.*, 117 F. Supp. 2d 1022, 1026–28 (D. Colo. 1999) (holding that insurer with excess other insurance clause "cannot be required to pay defense costs" where other primary policy had pro rata other insurance clause and also covered the same loss).

or primary.  Instead, at least until that dispute is resolved, OneBeacon can't rely on its "other insurance" clause to avoid honoring its obligations to BCBSKS.  Indeed, OneBeacon concedes it presently is reimbursing defense costs and will continue to do so (unless other issues void coverage).  Doc. 62 at 11.

For example, the September 2019 Order cited *Liberty Mutual Insurance v. Pella Corporation*, 633 F. Supp. 2d 714, 725 (S.D. Iowa 2009), *aff'd in part*, 650 F.3d 1161, 1172–74 (8th Cir. 2011).  This case explained that the distinction between primary and true excess policies was "critical" when determining when an insurer's coverage obligation and the duty to reimburse defense costs commences.  Liberty Mutual had agreed to cover certain of Pella's defense costs, subject to a reservation of rights, for one suit filed against Pella.  *Id.* at 716.  But, it refused coverage for another suit.  *Id.*  And, Liberty Mutual filed a declaratory judgment action against Pella to determine when its obligation to reimburse defense costs was triggered.  *Id.* at 715.

Liberty Mutual argued that, "under well-established law," it was "not required to reimburse Pella's defense costs so long as any primary coverage is available" because it provided true excess policies.  *Id.* at 725.  The United States District Court for the Southern District of Iowa agreed that for "a 'true excess' policy[] . . . any underlying primary insurance must be exhausted before coverage under the excess policy is triggered."  *Id.* at 725.  But, it concluded Liberty Mutual's policies were not true excess policies.  *Id.* at 725–26.  Unlike true excess policies, Liberty Mutual's policies weren't designed to cover "a catastrophic loss" exceeding available primary coverage.  *Id.*  They didn't require existence of a primary policy as a condition to coverage, weren't excess "in all instances except for limited circumstances," and didn't have "low premiums compared to the typically large amount of risk insured."  *Id.*  Instead, Liberty

Mutual had designed the policies to function as first tier coverage, kicking in as soon as liability was established, though they could be excess in certain specified situations. *Id.* And, the court explained that "other insurance" clauses in primary policies like Liberty Mutual's govern the relationship among insurers. But they don't affect the insured's rights to indemnification and a defense. *Id.* at 725. So, Liberty Mutual could determine whether its policy was excess to any other primary policies among the insurers, but "resolution of that issue does not affect Pella's right to coverage under the Policies." *Id.* at 726.

On appeal, the Eighth Circuit agreed that a *primary* insurer could seek contribution from other insurers based on an "other insurance" clause, but "the insured's right to coverage[] . . . will not be affected." *Liberty Mut. Ins. Co.*, 650 F.3d at 1173. And, it explained, "[i]n contrast, a 'true excess,' or 'umbrella policy'" is intended only to cover catastrophic losses exceeding the primary insurance limit. *Id.* A true excess insurer "is not liable for any portion of the loss until the primary insurer's policy limit has been exhausted, even if the primary policy contains an other-insurance clause." *Id.* But, like the district court, the Circuit concluded the Liberty Mutual policies were primary policies "that would allow Liberty Mutual to seek contribution from other insurers—but not affect Pella's right to recover from Liberty Mutual in the first instance." *Id.* at 1174. So, "the district court did not err in concluding that Pella did not have to exhaust all of its available insurance coverage before Liberty Mutual would owe a duty to reimburse defense costs." *Id.*

Importantly, the cases the Southern District of Iowa and Eighth Circuit cited to explain how a true excess policy shouldn't trigger until any underlying primary insurance is exhausted involved circumstances where either: (1) the excess insurer had paid the insured and then sought contribution from the primary insurers, or (2) situations involving disputes between insurers (and

not between an insurer and its insured).  *See Liberty Mut. Ins. Co.*, 650 F.3d at 1173 (first citing *Nat'l Sur. Corp. v. Ranger Ins. Co.*, 260 F.3d 881, 883–84 (8th Cir. 2001) (two insurers covered insured's total loss and then sued each other to determine whether they should pro rate the loss or if one policy was excess to the other); then citing *Vigilant Ins. Co. v. Allied Prop. & Cas. Ins. Co.*, 609 N.W.2d 538, 539, 541 (Iowa 2000) (case between two liability insurers arguing about whose coverage was excess after wrongful death action); then citing *LeMars Mut. Ins. Co. v. Farm & City Ins. Co.*, 494 N.W.2d 216, 218–19 (Iowa 1992) (umbrella excess insurer paid claim to insured and then sued primary insurer seeking contribution, arguing primary insurer "must exhaust its limit of liability toward the settlement before the . . . umbrella policy is implicated")); *Pella Corp.*, 633 F. Supp. 2d at 725 (citing *LeMars*, 494 N.W.2d at 219).

Also, in *Ranger, Vigilant*, and *LeMars*, the actual existence of other concurrent insurance wasn't disputed, or at least it wasn't used to deny the insured coverage.  In short, the cases cited in *Pella* do not show that an insured should go without coverage while the existence of other insurance is in dispute.  Instead, they reinforce BCBSKS's arguments about industry practice repeated in the various treatises cited above, *i.e.*, other insurance disputes shouldn't take priority over payment to the insured and generally are resolved among insurers.  So, while the district court and Eighth Circuit did hold true excess policies, unlike primary policies, may affect an insured's right to coverage, they did so under circumstances where (1) the policies at issue were primary, (2) the insurer argued it was excess to avoid paying while other "primary coverage [was] *available*," and (3) the supporting cases resolved a true excess policy's priority without leaving the insured without coverage.  *Pella Corp.*, 633 F. Supp. 2d at 725–26 (emphasis added); *see also Liberty Mut. Ins. Co.*, 650 F.3d at 1173–74.

*LeMars* demonstrates the principle that payment to the insured should take priority, even where horizontal exhaustion is involved.  The Iowa Supreme Court compared a primary policy with a clause indicating it becomes "excess over any other collectible insurance" if a non-owned vehicle was involved in the accident (which was the case) with an umbrella policy that had its own "other insurance" clause making it "excess of any other valid and collectible insurance[.]" *LeMars Mut. Ins.*, 494 N.W.2d at 217–218.  The umbrella policy and a different primary policy already had settled the insured's case and paid the injured individual.  *Id.* at 217.  Then, the umbrella carrier sued the primary carrier, who hadn't contributed to the settlement, to recover what it had paid.  *Id.*

The Iowa Supreme Court considered the type of policies, the scope of coverage provided, the circumstances surrounding the policies, and "the objects the parties were striving to attain" to determine the priority.  *Id.* at 218 ("To determine the priority among applicable insurance policies, we construe these policies as a whole in light of the pattern of coverage intended to result from multiple policies").  The primary policy was "marketed and sold as a primary insurance policy" and generally intended to function as first tier coverage, excess only in certain, specified situations (*i.e.*, when a non-owned vehicle was involved).  *Id.*  But, the umbrella policy was "excess in nearly all cases" and "intended to cover only catastrophic losses" exceeding the limit of a primary, underlying policy.  *Id.*  And, umbrella policies generally function as the final tier of insurance coverage over all other coverage available.  *Id.* at 218–19.  So, after taking a "common sense look at the basic function each policy was intended to serve" the Iowa Supreme Court concluded it couldn't compare the two other insurance clauses under pure "contract construction rules" but, instead, it should determine priority based on the policies' functions.  *Id.* at 219.  And, the court held, the "primary insurance policy must be exhausted before the

umbrella policy . . . may be reached for payment of the settlement damages." *Id.* The umbrella insurer thus was entitled to contribution from the primary insurer for the amounts it had paid to the insured. *Id.* at 217, 219.

In short, the primary policy (that functioned as an excess policy under the circumstances) was required to provide coverage before the umbrella policy was reached. But, the insured still received coverage while priority among insurers was determined. So, while this court previously determined OneBeacon had plausibly alleged that BCBSKS must exhaust *all* primary policies before its excess policy is reached under horizontal exhaustion principles, its conclusion does not mean the insured should be left without coverage while the court determines the applicability and priority of two insurance policies. Instead, the same principles applied when using an "other insurance" clause to determine priority among concurrent insurers on the same level should apply here—a situation where OneBeacon argues the policies provide different levels of coverage—because OneBeacon's excess coverage position relies on the "other insurance" clause. As explained more in Part III.B.1.c., the court concludes OneBeacon can rely on its "other insurance" provision to argue Allied World should have to provide coverage first. But, OneBeacon can't rely on that provision to deny coverage to BCBSKS so long as Allied World continues to refuse to accept coverage and the court hasn't determined if concurrent coverage exists.

Even with this important modification to its earlier Order, the court still doesn't dismiss Count I because—if the court determines Allied World indeed owes coverage before OneBeacon—some authorities support OneBeacon's position that BCBSKS must exhaust that coverage first before looking to OneBeacon. *See, e.g.*, *Liberty Mut. Ins. Co.*, 650 F.3d at 1173–74 (explaining a true excess insurer properly may argue its insured must exhaust available

primary coverage before it owes a duty to reimburse defense costs); *Rhone-Poulenc, Inc. v. Int'l Ins. Co.*, No. 94 C 3303, 1996 WL 328011, at *12–13 (N.D. Ill. June 11, 1996) (discussing how an other insurance clause could be used against an insured as a defense to a claim "but only *if* other [insurers] have acknowledged coverage" (emphasis added)); *see also Insurance Coverage Litigation*, *supra* at § 19.03[A][7] (recognizing that "[i]nsurance companies sometimes use 'other insurance' clauses to argue that they are not obligated to defend or indemnify the policyholder"); Larry M. Golub, *et al*., 2 *California Insurance Law & Practice* § 14.07[5][a] (2020) ("The horizontal exhaustion requirement applies to coverage actions between the insured and insurers; in other words, the principle is not limited to equitable claims between insurers. Therefore, an insured may not target excess insurers to defend or indemnify if there is any unexhausted primary insurance applicable to the claim.").

BCBSKS continues to argue the OneBeacon Policy is not a true excess policy and the court clearly erred when it found OneBeacon's horizontal exhaustion argument plausible. The court addresses this assertion in Parts III.B.2. and III.B.3. But, at this stage, the court is not prepared to conclude, as a matter of law, OneBeacon's only option (if the Allied World D&O Policy owes coverage) is to provide coverage to BCBSKS and then exercise its subrogation rights against Allied World. If the court holds that the Allied World D&O Policy applies and Allied World owes coverage primary to OneBeacon's, OneBeacon has stated a plausible claim that BCBSKS must look to that policy first. That theory is plausible and thus sufficient to survive the Motion to Dismiss.[9]

---

[9]     BCBSKS notes in a footnote that "[t]o the extent" OneBeacon "is relying on [its] 'other insurance' clause to limit or avoid its coverage obligations to BCBCKS," it's OneBeacon's burden to prove the Allied World D&O Policy owes coverage. Doc. 57 at 25 n.9. It appears that indeed is what OneBeacon is trying to do, given that Count I seeks a declaration that BCBSKS must exhaust both Allied World policies "before the OneBeacon Policy is triggered." Doc. 1 at 22 (Compl. ¶ 78). OneBeacon made this clear in its Opposition to the Motion to Dismiss as well, explicitly stating that the "other

c.   **The "Other Insurance" Clause in the OneBeacon Policy**

This Order's correction to the September 2019 Order is mandated by taking a closer look at OneBeacon's "other insurance" clause.  The court previously held that the OneBeacon Policy wasn't ambiguous, and OneBeacon had alleged plausibly that its policy was intended to apply only after exhausting all other insurance.  Doc. 52 at 38–40.  And so, the court declined to adopt BCBSKS's position that the "other insurance" clause only could be used in conjunction with the subrogation clause to seek reimbursement from Allied World, and not to deny coverage to BCBSKS because that result would invite the court to add language to the policy.  *Id.* at 39–40.[10] *Where other insurance owes coverage*, this interpretation isn't clearly erroneous because it is plausible that OneBeacon's coverage obligation isn't triggered yet under its "other insurance" clause and principles of horizontal exhaustion.  But, to the extent OneBeacon seeks to deny BCBSKS coverage *before existence of "other insurance" is determined*, the court now agrees the policy language isn't sufficiently clear to allow OneBeacon to do so.  As explained below, if

---

insurance" clause "is the express basis of Count One."  Doc. 19 at 5.  The *Insurance Coverage Litigation* treatise explains that when an insurance company uses an "other insurance" clause to try to limit or avoid coverage, the "clause works like an exclusion" and the insurer should bear the burden of proof.  *Insurance Coverage Litigation*, *supra* at § 19.03[A][7]; *see also Platinum tech., inc. v. Fed. Ins. Co.*, No. 99 C 7378, 2000 WL 875881, at *6 (N.D. Ill. 2000) ("When an exclusionary clause in an insurance policy is relied upon to deny coverage, its application must be clear and free from doubt.  The insurer has the burden of showing that a claim falls within an exclusion [because] . . . (1) the insured's intent in purchasing an insurance policy is to obtain coverage, therefore any ambiguity jeopardizing such coverage should be construed consistent with the insured's intent, and (2) the insurer is the drafter of the policy and could have drafted the ambiguous provision to be clear and specific." (citations and internal quotation marks omitted)).

[10]     BCBSKS had argued the only reasonable interpretation of its policy requires OneBeacon to "begin fulfilling its contractual obligations" as soon as the Allied World E&O Policy is exhausted (under the insuring agreement), but allowing OneBeacon "to pursue a claim against any concurrent 'other insurance' it believes should apply" through the "other insurance" and subrogation clauses.  Doc. 26 at 6. In short, BCBSKS contended only the insuring agreement governs when OneBeacon owes it coverage and the court can't interpret the "other insurance" condition to affect that obligation; instead, BCBSKS asserted, the court must interpret the "other insurance" clause only to allow OneBeacon to sue other insurers for amounts it believes it shouldn't have covered.  *Id.* at 5–6.  This argument is partially tied to BCBSKS's position that horizontal exhaustion doesn't apply.  *Id.* at 7–10.

30

OneBeacon had intended to restrict or limit coverage while the actual existence of concurrent coverage was litigated, it should have used clear and unambiguous language to say so.

Kansas law governs this dispute. The Kansas Supreme Court has summarized Kansas law governing interpretation of insurance contracts this way:

> The language of a policy of insurance, like any other contract, must, if possible, be construed in such manner as to give effect to the intention of the parties. Where the terms of a policy of insurance are ambiguous or uncertain, conflicting, or susceptible of more than one construction, the construction most favorable to the insured must prevail. Since the insurer prepares its own contracts, it has a duty to make the meaning clear. *If the insurer intends to restrict or limit coverage provided in the policy, it must use clear and unambiguous language in doing so; otherwise, the policy will be liberally construed in favor of the insured.*

*Catholic Diocese of Dodge City v. Raymer*, 840 P.2d 456, 459 (Kan. 1992) (internal citations omitted) (emphasis added).

OneBeacon's "other insurance" clause provides, "This Policy shall be excess of and shall not contribute with: (a) any other insurance or plan or program of self-insurance (whether collectible or not), unless such other insurance or self-insurance is specifically stated to be in excess of this Policy . . . ." Doc. 1-1 at 24. The court concluded this provision wasn't ambiguous—the policy was intended to apply only after exhaustion of all other insurance because it explicitly provides the "*Policy*" is "excess of" and will "not contribute with" other insurance, "whether collectible or not." *Id.* (emphasis added); *see, e.g.*, *Farmington Cas. Co. v. United Educators Ins. Risk Retention Grp., Inc.*, 117 F. Supp. 2d 1022, 1026–28 (D. Colo. 1999) (holding that insurer with excess other insurance clause stating it was "excess of and shall not contribute with" other valid and collectible insurance "cannot be required to pay defense costs" where other primary policy with pro rata other insurance clause also covered the same loss, and thus pro rata primary insurer was not entitled to contribution from the insurer with excess other insurance clause for amounts it had paid the insured). But, the court didn't analyze interpretation

31

of this clause in depth where the purported other insurer hasn't acknowledged coverage.  Now, BCBSKS argues that the court clearly erred its interpretation of the "other insurance" clause language.

> **i.   Interpretation of the "Other Insurance" Clause Where the Other Insurer Hasn't Acknowledged Coverage**

As noted, the court's September 2019 Order didn't adequately examine the "other insurance" clause language under circumstances where no other insurer has acknowledged coverage to determine whether it is ambiguous.  Instead, the court examined the clause generally to determine if OneBeacon's claim in Count I was plausible.  BCBSKS's Motion for Reconsideration argues that the "whether collectible or not" language is susceptible to different meanings and the court should resolve those ambiguities in favor of the insured.  Doc. 57 at 23–25.  It posits that the words "whether collectible or not" are intended to "address[] situations where the 'other insurance' policy provides coverage for the claim, but the other insurer is insolvent." *Id.* at 25; *see also Couch on Insurance*, *supra*, at §§ 219:9, 219:10 (discussing how provisions that require "valid and collectible" insurance are meant to exclude insurance that is uncollectible because an insurer is insolvent from falling within the "the effect of the other insurance clause"—*i.e.*, they don't count as "other insurance" that must share the loss or cover it first—but, if an insurer wants to limit its coverage even where the other insurance isn't collectible, it could include a "valid and collectible or not" provision).  So, BCBSKS asserts, this language may affect OneBeacon's rights and obligations between itself and an insolvent insurer.  But, BCBSKS claims, the words don't "allow OneBeacon to avoid its coverage obligations altogether when the other insurer has denied coverage."  Doc. 57 at 25.  BCBSKS reiterates the

"other insurance" clause doesn't even apply until concurrent coverage is established.  *Id.* at 24–25.

BCBSKS's argument that the "other insurance" clause is ambiguous about OneBeacon's coverage obligation—particularly where the actual existence of any other insurance is disputed—is persuasive.  "Whether collectible or not" could refer to the other insurer's insolvency, and not the parties' intentions about whether the other insurer owes coverage.  *See Couch on Insurance*, *supra*, at §§ 219:9, 219:10.  For example, the Kansas Supreme Court has held the phrase, "collectible insurance," and similar phrases "are susceptible to more than one interpretation."  *Narron v. Cincinnati Ins. Co.*, 97 P.3d 1042, 1047–48 (Kan. 2004) (providing examples, including two examples where courts had interpreted "collectible" under circumstances where an insurer became insolvent after an accident and the courts had held the excess insurer wasn't liable because the insurance was collectible (applicable and available) when the accident occurred).  And, the "shall not contribute with" language in OneBeacon's "other insurance" clause implies the other insurer has a recognized obligation to contribute to the loss before the "other insurance" clause takes effect.  This aligns with the purpose of an "other insurance" clause. As discussed above, the court must decide whether concurrent coverage exists before OneBeacon can invoke its "other insurance" clause and related horizontal exhaustion argument.

The OneBeacon Policy doesn't specify that OneBeacon won't provide coverage to its insured until the liability of potential other insurers has been determined definitively.  And a reasonably prudent insured wouldn't understand the "other insurance" condition—that provides the policy is excess of and will not contribute with other insurance whether collectible or not—to require it to litigate coverage from other insurers exhaustively before OneBeacon will provide

coverage to BCBSKS either.  *See Bhd. Mut. Ins. Co. v. M.M. ex rel. T.C.*, 292 F. Supp. 3d 1195,

1205 (D. Kan. 2017) (explaining a court should consider "what a reasonably prudent insured

would understand" the policy language to mean to determine whether policy language is

"ambiguous," *i.e.*, has a "doubtful or conflicting meaning based on a reasonable construction of

the policy's language"); *see also In re Deepwater Horizon*, 807 F.3d 689, 694–96 (5th Cir. 2015)

(rejecting insurer's argument that its insured was not yet entitled to coverage because its policy

had an other insurance clause and the insured hadn't exhausted *potential* other insurance (where

third party disputed its obligation) because the Fifth Circuit didn't read the other insurance clause

to require the insured to "exhaustively litigate other potential sources of coverage before

[insurer's] payment obligation is triggered," and requiring it to do so where the policy didn't

require the alternative source of protection would be manifestly unfair).[11]  Instead, a reasonably

---

[11]     This court previously distinguished *Deepwater Horizon* from this case because *Deepwater Horizon* relied on the specific wording of the "other insurance" provision there.  It provided that "'[i]f other insurance *applies* to a 'loss' that is also covered by this policy, this policy will apply excess of such other insurance.'"  *Id.* at 693–95 (emphasis added).  The *Deepwater Horizon* court interpreted this language to mean that other insurance presently must apply; and, if a third party disputes indemnification, it does not presently apply, so the insurer must provide coverage now and seek contribution from the third party later under its subrogation rights.  *Id.*

         The *Deepwater Horizon* court also noted other provisions in the policy made it excess "even if [the scheduled] underlying insurer is unable or refuses to pay," but the general other insurance clause did not contain any language making clear the policy was "excess even to 'other insurance' that is uncollectible."  *Id.* at 695.  The court declined to "read language into the Other Insurance Clause," making it excess to uncollectible insurance where another clause had included language to that effect.  *Id.* The OneBeacon Policy is different in this respect—it explicitly provides that the policy is excess to other insurance "whether collectible or not."  Doc. 1-1 at 24.  But, as Part III.B.1. discusses, for an other insurance clause to be triggered, the policies must cover the same risk, which hasn't been determined yet. And, while OneBeacon's policy has "whether collectible or not" language, this language coupled with the "excess of" and won't "contribute with" language is ambiguous where the other insurer hasn't acknowledged coverage.  The won't "contribute with" language indicates the other insurance has an apparent obligation to contribute—similar to the *Deepwater Horizon* requirement for other insurance to apply.  Finally, as *Deepwater Horizon* explains, it would be unfair to leave the insured without coverage, putting the insured in a worse position than if it had obtained no other insurance, where the policy didn't require the insured to purchase that other insurance policy in the first place.  *In re Deepwater Horizon*, 807 F.3d at 695–96; *see also Narron*, 97 P.3d at 1048 (describing how holding excess insurer liable was fair under circumstances presented because the policy wasn't written based on the other insurance being available and the insured paid premiums for the coverage).

prudent insured would understand the "other insurance" clause to mean OneBeacon won't contribute where another insurer owes coverage first.

When the other insurer has denied coverage—as Allied World has here—there's arguably nothing for OneBeacon to be "excess of" and "not contribute with" until that coverage dispute is resolved.  OneBeacon, as the insurer, didn't unambiguously require its insured to litigate whether any "other insurance" exists before the OneBeacon Policy will provide coverage.  *See Rhone-Poulenc, Inc.*, 1996 WL 328011, at *1–2 (explaining how the Seventh Circuit had held other insurance language that provided it "shall not be called upon in contribution" and "shall not attach" for "expenses recoverable under any other insurance" ambiguous because that language could "refer to contribution actions among insurance companies" or it could mean actions "in which the insurance company 'contributes' to an insured by paying the insured"); *id.* at *11–13 (holding on remand after considering expert opinions and evidence about "the customary use" of "other insurance" clauses that other insurance provision could be used to deny an insured's claim until other insurance is exhausted, "but only if other carriers have acknowledged coverage"); *id.* at *13 (noting even if the clause was ambiguous about whether it could apply "when other insurance had disclaimed coverage, this ambiguity must be construed in favor of the insured").

Under Kansas law, where ambiguous language exits in a contract of insurance, "the construction most favorable to the insured must prevail[.]"  *Narron*, 97 P.3d at 1047 (citation and internal quotation marks omitted).  So then, if OneBeacon intended to avoid its coverage until the existence of potential other insurance was litigated to conclusion, Kansas law required it to use clear and unambiguous language to that effect.  *Catholic Diocese*, 840 P.2d at 459.  Since OneBeacon's policy is ambiguous on that point, the court liberally construes the policy in favor of the insured while no other insurer has acknowledged or been determined to owe coverage.  *Id.*

OneBeacon's assertion that it will continue to reimburse defense costs indicates the exhaustion dispute in Count I indeed centers on the Allied World D&O Policy applying, and the parties' obligations after that determination.  *See* Doc. 62 at 11.

> ### ii.    September 2019 Order's Reference to "Whether Collectible or Not" Language

In response to BCBSKS's Motion to Dismiss, OneBeacon briefly argued that the "law" doesn't require it to provide coverage first and seek contribution later.  Doc. 19 at 7–8. OneBeacon asserted its other insurance clause is triggered where any other insurance *exists*, "whether collectible or not," unlike cases that have found "other insurance" clauses are triggered only when other insurance *applies* and covers the loss.  *Id.* at 8.  And, it argued, if ambiguities are found in the "other insurance" clause the court should allow parol evidence to resolve them. *Id.* at 7.  BCBSKS replied that OneBeacon can't rely on its "other insurance" clause to deny coverage, at least not until the declaratory judgment requested to resolve the Allied World D&O Policy's coverage is resolved.  Doc. 26 at 2–4.  And, if OneBeacon's exhaustion argument was tied to the Allied World D&O policy being triggered, BCBSKS asserted the "exhaustion claim is indisputably premature."  *Id.* at 3.  "In the interim," BCBSKS argued, OneBeacon must "fulfill its contractual obligations to BCBSKS."  *Id.*  Finally, BCBSKS argued, parol evidence can't help OneBeacon because Kansas law construes any ambiguities in favor of the policyholder as a matter of law.  *Id.* at 6.

The court's September 2019 Order referenced the "whether collectible or not" language when it explained that, if the Allied World D&O Policy covers the same loss, the OneBeacon Policy provides it is excess to that coverage.  Doc. 52 at 51–52.  And, based on OneBeacon's horizontal exhaustion argument, the court concluded OneBeacon plausibly had alleged that its excess coverage doesn't attach until all primary insurance was exhausted.  *Id.*  The court

explained that if the Allied World D&O Policy provides coverage, "a contested issue to be determined at a later date," and still "the [other] insurer has refused to pay," "the OneBeacon Policy is clear that it is in excess of that amount" because of the "whether collectible or not" language. *Id.* at 51. BCBSKS's reconsideration motion now argues that the court committed clear error and must find the "whether collectible or not" phrase ambiguous. Doc. 57 at 23–25.

The court's description of this hypothetical and unlikely scenario—one where Allied World continues to deny coverage after a judicial determination that it is liable—was dicta. And, the court now clarifies that it doesn't deny BCBSKS's Motion to Dismiss based on the "whether collectible or not language" and the allegation that Allied World has refused coverage. Instead, the court views Count I in a broader light: Does the declaration that OneBeacon seeks—that its policy "is excess" and BCBSKS "must properly exhaust all primary coverage" including the Allied World D&O Policy before it "is triggered"—state a plausible claim? Doc. 1 at 22 (Compl. ¶ 78). The court concludes it does.

While the correction in this Order clarifies that OneBeacon can't avoid its obligations to BCBSKS before the court determines if the Allied World D&O Policy provides concurrent coverage, once that dispute is resolved, OneBeacon has a plausible claim that BCBSKS must turn to that policy before looking to coverage from OneBeacon.[12] BCBSKS argued the declaration OneBeacon seeks is premature until the court makes that determination. But,

---

[12]        *See, e.g.*, *Insurance Coverage Litigation*, *supra* at § 19.03[A][7] (recognizing that "[i]nsurance companies sometimes use 'other insurance' clauses to argue that they are not obligated to defend or indemnify the policyholder"); *Liberty Mut. Ins. Co.*, 650 F.3d at 1173–74 (explaining a true excess insurer may be able to argue its insured must exhaust available primary coverage before it owes a duty to reimburse defense costs); *Rhone-Poulenc, Inc.*, 1996 WL 328011, at *12–13 (discussing how an other insurance clause could be used against an insured as a defense to a claim "but only *if* other [insurers] have acknowledged coverage" (emphasis added)); *California Insurance Law & Practice*, *supra* at § 14.07[5][a] (2020) ("The horizontal exhaustion requirement applies to coverage actions between the insured and insurers; in other words, the principle is not limited to equitable claims between insurers.").

BCBSKS and OneBeacon both believe Allied World owes coverage.  And, this case and the Related Case are poised to answer that question; *i.e.*, that determination is part of the controversy in this case and will allow the court to consider the merits of Count I.  *See* Doc. 52 at 19, 24, 28–29.  So, the court declines to dismiss Count I.

The court does not address, however, the meaning of the "other insurance" clause in the event—at this stage a purely hypothetical event—that the Allied World D&O Policy is determined to owe coverage but Allied World still refuses to pay or cannot pay.  The court won't decide that question where an actual controversy doesn't exist yet and without hearing OneBeacon's position on its obligations under those circumstances.

In sum, at this stage of the case, the court can't rule as a matter of law that OneBeacon—should the court determine the Allied World D&O Policy owes coverage and bears first responsibility for payment—must continue to provide coverage to BCBSKS and rely only on its subrogation rights.[13]  So, the court doesn't dismiss Count I.  But, the court does clarify this

---

[13]     If Allied World wrongfully denies coverage at any point, BCBSKS argues that OneBeacon can't use the "other insurance" clause to deny BCBSKS the coverage it paid for, regardless of the "whether collectible or not" language.  Doc. 57 at 23–26.  Indeed, BCBSKS argues "other insurance" clauses never affect an insurer's coverage obligation to its insured.  *Id.* at 18–26.  This argument is tied to BCBSKS's arguments in Part III.B.1.a. about how the insurance industry uses "other insurance" clauses and how they should never be used to allocate loss to an insured.  This argument has convincing support, as cited below, but on a Motion to Dismiss the court considers only if the Complaint has stated a plausible claim.  BCBSKS's positions about how the industry would never apply such a clause to an insured is better suited for a later stage of the case.

To support its position that an "other insurance" clause can never affect an insurer's obligation to its insured, BCBSKS cites various cases and treatises.  *See, e.g.*, *Insurance Coverage Litigation*, *supra* at § 19.03[A][7] (The issue of which insurance company pays, or in what percentages, should not be the policyholder's concern, as the application of other insurance clauses should arise only in actions for contribution among insurance companies. . . .  Policyholders purchase insurance in order to have coverage in the event of a loss, not to litigate who, among their insurance companies, will be responsible as between the various policies . . . .");  *id.* at § 19.03[A][1] (explaining if another insurer "has refused to acknowledge coverage" the "other insurance" clause can't be used to deny a policyholder's claim); Allan D. Windt, 2 *Insurance Claims & Disputes* § 6:13 (6th ed. Apr. 2020 Update) (discussing how questions can arise if two policies provide coverage and "one policy proves to be uncollectible and the other policy has an other insurance clause that, by its terms, is effective whether or not the insured's other insurance is

aspect of its September 2019 Order: If that Order indicated OneBeacon could avoid providing BCBSKS coverage based on its "other insurance" clause before the court has determined whether any other insurance exists, those passages are now overruled. Such a result is not supported by the policy language. And, finally, the court clarifies that it makes no determination about the parties' obligations should a concurrent insurer that the court has determined legally owes coverage still refuses to pay.

### d.   Conclusion

The court agrees with BCBSKS that it erred to the extent the court concluded OneBeacon could avoid its coverage obligation to BCBSKS while the actual existence of other insurance is disputed. OneBeacon's Count I and its horizontal exhaustion argument are tied to its "other insurance" clause. Generally, "other insurance" clause disputes—including those involving policies argued to apply at different levels—are resolved between insurers after the insured has received coverage. *See, e.g.*, *Hennes Erecting Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh,*

---

collectible" because an insurer may argue "that the other insurance clause serves to reduce the insured's coverage;" but concluding reducing coverage would be "manifestly unfair"—the "insured should not be penalized because the additional insurance the insured happened to [secure] proves to be uncollectible;" instead, even if the unambiguous terms provide for a loss or reduction of coverage, "those policy terms should be ignored in accordance with the reasonable expectations rule"); *id.* at § 6:11 (explaining equitable principles dictate the insured shouldn't have to proceed against a second insurer to recoup its full loss where two primary policies provide coverage but have other insurance clauses; instead, an insurer should provide the full amount of its coverage then sue the second insurer for reimbursement of obligations it believes should have been covered by the other because this comports with the insured's reasonable expectation of coverage under the policy; but noting at least one case has allowed an insurer to "attempt to prove that another policy afforded protection to the insured so as to reduce the defendant-insurer's own liability" to its insured); *see also Flintkote Co. v. Gen. Accident Assurance Co. of Can.*, No. C 04-01827 MHP, 2008 WL 3270922, at *14 (N.D. Cal. Aug. 6, 2008) ("'[O]ther insurance' clauses do not serve to reduce the insurer's obligations to a policyholder."); *Narron v. Cincinnati Ins. Co.*, 97 P.3d 1042, 1048–50 (Kan. 2004) (discussing how an excess insurer should not be permitted to avoid liability when its insured paid premiums to the excess insurer and can't actually collect the other insurance when interpreting provision that made policy excess to other "collectible insurance"); *N.H. Indem. Co., Inc. v. Budget Rent-A-Car Sys., Inc.*, 64 P.3d 1239, 1243 (Wash. 2003) (applying Washington law to explain an insured "should not be left without a prompt and proper defense" if a primary insurer fails to meet its obligations, so the secondary insurer "should provide the defense" then can "recoup its costs from the primary insurer").

*Pa.*, 813 F.2d 1074, 1076–77, 1081 (10th Cir. 1987) (where insured had two policies and St. Paul paid the loss and then sued National Union arguing its blanket policy was excess in nature and not effective until National Union's specific policy was exhausted); *Farmers Ins. Exch. v. Fed. Ins. Co.*, No. 10-611 JP/GBW, 2011 WL 13116736, at *1, 3 (D.N.M. Nov. 21, 2011) (resolving on partial summary judgment motion priority dispute among three insurance policies after excess policy paid the settlement and determining priority of coverage *if* both policies provided coverage in the underlying suit, but reserving ruling on the merits whether one of the policies actually "provided coverage in the underlying suit or whether [insurer] might have a valid affirmative defense"); *Md. Cas. Co. v. Am. Fam. Ins. Grp. of Madison, Wis.*, 429 P.2d 931, 934, 939–41 (Kan. 1967) (where two insurers "undertook defense of their respective insureds," and one insurer paid the settlement and then sued the other to recover arguing that its policy provided excess coverage and the other insurer owed primary coverage); *W. Cas. & Sur. Co. v. Trinity Univ. Ins. Co. of Kan., Inc.*, 764 P.2d 1256, 1258 (Kan. Ct. App. 1988) (where two policies first paid insured's claim, then sued each other to determine if one policy was excess and entitled to recover its contribution).

And, because OneBeacon's "other insurance" clause isn't triggered until concurrent coverage exists, the court now concludes OneBeacon can't rely on that clause to deny coverage while the actual existence of other insurance is in dispute.  Whether the Allied World D&O policy provides overlapping coverage is yet to be determined.  And, the OneBeacon Policy is not sufficiently clear that OneBeacon owes no coverage while the existence of "other insurance" is litigated to allow it to avoid its coverage obligation while the "other insurance" dispute is ongoing.  So, the court overrules any portions of its September 2019 Order that concluded

OneBeacon could avoid providing BCBSKS coverage based on its "other insurance" clause before the court has determined if any other concurrent insurance exists.

To the extent OneBeacon affords coverage to BCBSKS that this court later determines Allied World was obligated to cover first, OneBeacon has the option to seek reimbursement from Allied World through its subrogation rights.  Still, for purposes of BCBSKS's Motion to Dismiss and Motion for Reconsideration, the court denies the request to dismiss Count I because BCBSKS hasn't shown under all circumstances that OneBeacon must provide coverage to BCBSKS only after the Allied World E&O Policy is exhausted, despite its "other insurance" clause.  *Cf. Assoc. Wholesale Grocers, Inc. v. Americold Corp.*, 934 P.2d 65, 80 (Kan. 1997) (rejecting excess insurer's argument on summary judgment that tenant policies should afford coverage primary to its coverage based on "other insurance" provision because excess insurer had "not shown the existence of any valid coverage" for the insured under any other policies).  If OneBeacon indeed shows the existence of other coverage for BCBSKS, then the court will consider the "other insurance" clause and OneBeacon's horizontal exhaustion argument to determine OneBeacon and Allied World's coverage priorities.  The court agrees that BCBSKS, the insured, should not be forced to litigate that coverage before OneBeacon's coverage is triggered.  But, it's plausible OneBeacon may invoke that clause to avoid its coverage obligation to its insured if the court determines another policy is obligated to provide coverage primary to OneBeacon's.  So, OneBeacon's Count I has stated a plausible claim.

As discussed in the next section, BCBSKS argues the court clearly erred when it concluded horizontal exhaustion could apply to the OneBeacon policy.  "In construing a policy of insurance, a court should consider the instrument as a whole and endeavor to ascertain the intention of the parties from the language used, taking into account the situation of the parties,

the nature of the subject matter, and the purpose to be accomplished." *O'Bryan v. Columbia Ins. Grp.*, 56 P.3d 789, 792 (Kan. 2002). So, the language in an insurance policy and the purpose to be accomplished by securing the policy are important when determining when an insurer owes coverage to its insured and coverage priority among insurers (including whether horizontal exhaustion should apply). But, while BCBSKS now makes a stronger case against horizontal exhaustion, the court does not find clear error sufficient to merit reconsideration of its horizontal exhaustion analysis at this motion to dismiss stage. So, the court finds OneBeacon's Count I does state a plausible claim that BCBSKS must exhaust all primary coverage first, if the Allied World D&O Policy is determined to cover the loss.

## 2. Exception to Horizontal Exhaustion

*Next*, BCBSKS argues the OneBeacon Policy was triggered solely by exhaustion of the specific underlying Allied World E&O Policy under a "well-established exception to horizontal exhaustion that applies to excess policies, like the OneBeacon Policy." Doc. 57 at 2. BCBSKS argues the court misstated this exception to horizontal exhaustion in its September 2019 Order and OneBeacon's coverage is triggered solely by exhaustion of the specific underlying primary policy. *Id.* Above, the court concludes OneBeacon can't rely on its "other insurance" clause to avoid its coverage obligation to BCBSKS while the existence of other insurance is disputed. Now, in this section 2, the court addresses BCBSKS's arguments about horizontal exhaustion. The court addresses this question because—should the court decide the Allied World Policy provides concurrent coverage—the horizontal exhaustion issue could affect the declaratory relief OneBeacon seeks in Count I. And that outcome, in turn, could affect who BCBSKS must turn to first between Allied World and OneBeacon for coverage.

a.  **BCBSKS's Argument that the Court must Consider the Insuring Agreement Alone**

BCBSKS relies on the insuring agreement in the OneBeacon Policy which, it argues, "expressly states that OneBeacon's coverage obligations are triggered by the exhaustion of" the Allied World E&O Policy and doesn't mention the Allied World D&O Policy. *Id.* at 2–3.  It contends "[n]othing else is required . . . for the exception to horizontal exhaustion to apply." *Id.* at 3.  And, it argues, the existence of the "other insurance" clause doesn't change this result. *Id.* As long as the insuring agreement provides for coverage after only a specific primary policy is exhausted, BCBSKS contends the exception to horizontal exhaustion applies. *Id.* at 4.

The court interpreted the OneBeacon Policy and concluded, looking at the language of the policy as a whole (including both the insuring agreement and the other insurance provision), that it was intended to be excess to both the Allied World E&O Policy and any "other insurance."  Doc. 52 at 38–40.  And, the court examined whether any exceptions to horizontal exhaustion existed—*i.e.*, whether the general rule that an excess policy does not attach until all primary insurance has been exhausted should not apply here. *Id.* at 40–45.  But, the court determined BCBSKS had not shown an exception to horizontal exhaustion based on the cases it cited. *Id.*  BCBSKS now takes issue with how the court distinguished the cases BCBSKS cited from the facts at hand, asserting that the court "focus[ed] on . . . the smallest factual differences" and erred in concluding BCBSKS had not shown this case fell within an exception to horizontal exhaustion as a matter of law.  Doc. 57 at 4.  BCBSKS now cites even more cases that, it contends, show the parameters to the exception to horizontal exhaustion and show the OneBeacon Policy is triggered when the Allied World E&O Policy alone is exhausted. *Id.* at 4–8.  As explained below, BCBSKS now makes a stronger case for its position.  But, making better arguments isn't an appropriate purpose for a reconsideration motion.  And, because the court

concludes it did not commit clear error in its earlier Order, the court denies BCBSKS's motion on this aspect of the September 2019 Order.

### i.   Previously Cited Cases

Some of the cases BCBSKS now cites are the same ones it used to argue an exception to horizontal exhaustion in its Reply to the Motion to Dismiss.  *See* Doc. 26 at 8 (citing *Travelers Cas. & Sur. Co. v. Transcontinental Ins. Co.*, 19 Cal. Rptr. 3d 272, 279 (Cal. Ct. App. 2004); *Fed. Ins. Co. v. St. Paul Fire & Marine Ins. Co.*, 649 N.E.2d 460, 462–64 (Ill. App. Ct. 1995); *Mayor & City Council of Balt. v. Utica Mut. Ins. Co.*, 802 A.2d 1070, 1105 (Md. Ct. Spec. App. 2002)); Doc. 57 at 5 (same).  The court already considered these cases, but concluded their facts were not sufficiently similar to the facts at hand to preclude OneBeacon's claim as a matter of law.  *See* Doc. 52 at 43–44.  BCBSKS again uses these cases to argue the court's ruling was clear error.  Doc. 57 at 4–5.  BCBSKS insists there is an exception to horizontal exhaustion and OneBeacon's obligation to provide coverage is triggered immediately upon exhaustion of the Allied World E&O Policy based on the insuring agreement in the OneBeacon Policy.  A party may not use a motion to reconsider as "a second opportunity for the losing party to make its strongest case, to rehash arguments or to dress up arguments that previously failed."  *Skepnek*, 2012 WL 5907461, at *1.  And that's precisely what BCBSKS tries to do on this issue.

For instance, BCBSKS now argues *Travelers* makes clear that the "exception to horizontal exhaustion applies even when the policy has an 'other insurance' clause[.]"  Doc. 57 at 5.  But, what *Travelers* shows is that whether an exception to horizontal exhaustion exists depends on the language in the policy.  In that case, an excess insurer argued it should not have to defend claims against its insured because the insured was covered by unexhausted primary insurance.  *Travelers*, 19 Cal. Rptr. 3d at 273.  The primary insurers argued the excess insurer's

duty to defend "was triggered" when the scheduled primary policy underlying the excess policy was exhausted, which had occurred. *Id.* at 274. The excess insurer tried to rely on its "other insurance" clause to avoid its duty to defend.[14] *Id.* at 277–79. But, the California Court of Appeals was unpersuaded and sided with the primary insurers. *Id.*

The language of the excess policy provided that the excess insurer would provide coverage and defend claims "*when the applicable limit of [scheduled] **underlying insurance** has been exhausted.*" *Id.* at 277 (emphasis added). And the "other insurance" provision provided: "If **other insurance** applies to *claims covered* by this policy, the insurance under this policy is excess and we will not make *any payments* until the **other insurance** has been exhausted by payment of claims." *Id.* at 278 (emphasis added). The policy defined **other insurance** as another policy "affording coverage that this policy also affords." *Id.* at 277. Based on the "**other insurance**" definition, the court concluded *coverage* must exist under *both* policies before the "other insurance" clause would "come into play." *Id.*

The California Court of Appeals rejected the excess insurer's argument that the other insurance provision was a "condition precedent to the existence of [excess] coverage and, therefore, to the duty to defend." *Id.* at 277. Instead, the court determined the "other insurance" provision "provides a condition precedent to [the excess insurer's] obligation" to *pay claims* that the policy covers. *Id.* at 277–78. But, the "other insurance" provision didn't address the "existence of coverage or the duty to defend[,]" so the court concluded exhaustion of other insurance was *not* a condition precedent to the excess insurer's duty to defend. *Id.* at 278.

The "other insurance" clause in the OneBeacon Policy is different. It provides: "*This Policy* shall be excess and shall not contribute with: (a) any other insurance . . . ." Doc. 1-1 at

---

[14]    The excess insurer had paid a portion of the defense costs before seeking the judicial declaration, arguing it didn't have a duty to defend because other unexhausted primary insurance existed.

24 (emphasis added).  So, it explicitly states that the entire policy—not just OneBeacon's duty to pay claims—is excess to other insurance.  In short, the court's determination that BCBSKS hadn't shown an exception to horizontal exhaustion based on *Travelers* was not clearly erroneous.  It is plausible to interpret the OneBeacon Policy to provide that its *coverage* under the policy is not triggered until other insurance is exhausted.

That said, the *Travelers* court also identified additional reasons why the "other insurance" clause didn't allow the excess insurer to avoid its duty to defend.  *Travelers*, 19 Cal. Rptr. 3d at 278–279.  First, the court explained how the "other insurance" clause in the excess insurer's policy was included in the "Conditions" section of the policy.  *Id.* at 278.  The other provisions in this section gave the excess insurer certain rights like the ability to audit its insured's books and inspect its premises and provided procedures for how to cancel or modify the policy.  *Id.* The court concluded these provisions addressed conditions "'applicable to' coverage," not "conditions that must be fulfilled *prior to the existence of coverage*."  *Id.*  The "Conditions" section of the Allied World E&O Policy, and the OneBeacon Policy by following form, contain many of these same types of conditions.  Doc. 1-1 at 55–61.  But, the provisions also set forth some "condition[s] precedent to any right to coverage" too.  *Id.* at 55 (¶ III(B) providing time limits for giving notice of a claim); *see also id.* at 56 (¶ III(D)(1) providing "[n]o coverage is available" for certain defense expenses incurred without prior written consent), 57 (¶ (H) providing conditions required to receive coverage for wrongful acts).

Second, applying California law, the California Court of Appeals explained insurance provisions that remove or limit coverage "must be conspicuous, plain, and clear."  *Travelers*, 19 Cal. Rptr. 3d at 278.[15]  The excess insurer argued for an interpretation that "would exclude

---

[15]     Kansas law similarly imposes a duty on an insurer to define any limits on coverage in clear and explicit terms.  *Assoc. Wholesale Grocers, Inc. v. Americold Corp.*, 934 P.2d 65, 78 (Kan. 1997).

coverage and preclude any duty to defend if there was any unexhausted 'other insurance.'" *Id.*

But, the court concluded it would not interpret the policy to have such an exclusionary effect

because there was "no hint of this possibility" in the insuring agreement, defense payments, or

exclusions sections of the policy. *Id.* Instead, the purported exclusion was found in the

boilerplate provisions. *Id.* "If [the excess insurer] intended to have coverage be dependent upon

the exhaustion of 'other insurance,' it was required to make such an exclusionary clause

conspicuous, plain, and clear. It did not do so." *Id.*

In this respect, BCBSKS's citation to *Travelers* in its Motion for Reconsideration is more

persuasive. The OneBeacon Policy's insuring agreement and provisions surrounding defense

expenses do not say that exhaustion of other insurance is required before coverage exists. In this

respect, it is similar to the excess insurer's policy in *Travelers* where the court concluded the

policy was "'sufficiently clear'" that coverage and the duty to defend existed when only the

underlying primary policy was exhausted. *Id.* at 278–79 (quoting *Cmty. Redevelopment Agency

v. Aetna Cas. & Sur. Co.*, 57 Cal. Rptr. 2d 755, 761 n.6 (Cal. Ct. App. 1996)). While BCBSKS's

argument is persuasive, the court still finds differences exist between the OneBeacon Policy's

"other insurance" provision and the provision at issue in *Travelers*. Thus, the court cannot say

that its earlier denial of BCBSKS's Motion to Dismiss was clear error. BCBSKS is free to make

this argument later when the case reaches an appropriate procedural juncture. Rehearing on a

motion to dismiss isn't that juncture.[16]

---

[16]     BCBSKS equates the court's citation to *Travelers* in the September 2019 Order to a holding that "[t]he exception to horizontal exhaustion" is "limited only to duty to defend policies." Doc. 57 at 12–14. This characterization is simply wrong. The court focused on the language of the *Travelers* policy, comparing it to the OneBeacon Policy, to explain why BCBSKS hadn't shown a clear exception to horizontal exhaustion sufficient to merit dismissal of Count 1. Doc. 52 at 43. It never "suggest[ed] that the exception applies only to duty to defend policies." Doc. 57 at 13.

Next, BCBSKS cites *Federal Insurance Company*.  In *Federal*, the Illinois Court of Appeals held that "an excess insurance policy which specifically names the underlying policy to which it relates and makes no general reference to other policies operates as an excess policy only to the named primary carrier and not to any other primary policy which covers the insured." *Fed. Ins. Co.*, 649 N.E.2d at 461.  The excess insurer there sought to avoid coverage after the scheduled underlying insurance was exhausted based on its "other insurance" clause.  It provided:  "If the named insured has in force other professional liability insurance in excess of the limits of liability of the underlying policy . . . the insurance afforded by this policy shall not be applicable for a greater proportion of a claim than the applicable limit of liability stated in this policy bears to the total applicable limit of liability of all valid and collectible excess insurance against such claim."  *Id.* at 462.

A separate primary insurer also provided coverage.  *Id.*  Its policy also had an "other insurance" clause that provided a means for loss sharing when other insurance covered the loss. *Id.*  The excess insurer sought a declaration that its coverage was excess to the primary insurer's coverage, and thus it was not liable to pay the settlement for its insured until the primary insurer paid its policy limits.  *Id.* at 462–63.  The primary insurer argued it also was an excess insurer based on its other insurance clause and so, the two policies should have to share the loss pro rata based on each policy's other insurance clause.  *Id.* at 463.

The Illinois Court of Appeals explained that "where two insurance policies cover a loss at the *same* level, Illinois courts look to the 'other insurance' clauses to determine each insurer's liability."  *Fed. Ins. Co.*, 649 N.E.2d at 463.  But, because primary and excess policies "inherently serve different functions" and "cover different risks and attach at different stages[,]" the court explained that "[l]iability under an excess policy attaches only after a predetermined

48

amount of primary coverage has been exhausted." *Id.* at 464. And, courts should not reconcile who covers a loss for policies at *different* levels by looking at "other insurance" clauses. *Id.* So, the court explained, it typically would not compare an excess insurer and primary insurer's other insurance clauses because, "absent specific policy language to the contrary," an excess policy is "not [ ] triggered until the limits of the primary policies [are] exhausted." *Id.*

But, that policy at issue in *Federal* contained "specific policy language to the contrary." It permitted the court to compare the primary insurer and excess insurer's other insurance clauses on the same level. *Id.* The excess insurer's policy "specifically confined its status as an excess carrier only to [the scheduled underlying policy and] not [the separate primary policy or] any other named or generic policy." *Id.* The court explained that the express language in the excess insurer's policy "makes no mention" of any other primary policies, so it "must be deemed an excess policy only" to the scheduled primary policy. *Id.* Had the excess insurer intended for its policy to be excess to all other primary insurers, the court explained, it "could have included such language in its policy[,]" but it did not. *Id.* This result put the excess insurer "exactly where it contracted to be, *i.e.*, secondarily liable to" the scheduled underlying primary policy. *Id.* But, the court pointed out—albeit in dicta—if the excess insurer had included different language in its "other insurance" clause "the result might be different." *Id.* The other insurance clause at issue, however, provided a method of sharing among "all valid and collectible" insurance in excess of the limits of the underlying policy. *Id.* at 462. The court specifically identified the "other insurance" clause in another Illinois case as an example of a clause that could have produced a different result. *Id.* at 464 (citing *U.S. Gypsum Co. v. Admiral Ins.*, 643 N.E.2d 1226, 1261 (Ill. App. Ct. 1994)).

In *Gypsum*, the insured argued for vertical exhaustion but the court applied horizontal exhaustion because the excess insurance policy contained an other insurance provision.  It stated: "If other valid and collectible insurance with any other insurer is available to the insured covering a loss also covered by this Policy . . . the insurance afforded by this Policy shall be in excess of and shall not contribute with such other insurance."  *U.S. Gypsum Co.*, 643 N.E.2d at 1261.  The court concluded the other insurance provision "clearly sets forth [the] policy's status as an excess policy" and "unequivocally sets forth that the excess insurer will not contribute 'if other valid and collectible insurance with *any* other insurer is available to the insured.'"  *Id.*  So, the court decided the other insurance language "supports an interpretation that this policy serves as an excess policy to all triggered primary policies . . . ."  *Id.*  And, the court held that a "plain reading of the 'other insurance' provision" requires the insured "to exhaust all triggered primary insurance before pursuing coverage under those excess policies."  *Id.* at 1262.

Like the excess policy in *Federal*, OneBeacon explicitly contracted to be excess to the Allied World E&O Policy and made no mention of any other policies.  Looking at its insuring agreement alone, coverage attaches when the limits of the Allied World E&O Policy are exhausted.  But, the OneBeacon Policy's "other insurance" clause is more like the other insurance clause in *Gypsum* than the one in *Federal*.  *See* Doc. 1-1 at 24.  BCBSKS argues in its Motion for Reconsideration that "[t]he outcome in *Federal* did not depend on the type of 'other insurance' clause at issue."  Doc. 57 at 6.  It asserts the court cannot distinguish this case from *Federal* based on the differences between the other insurance clauses.  *Id.*  BCBSKS contends the only basis for the decision in *Federal* was that the policy did not reference any other primary policies besides the underlying one, so it must be excess only to the scheduled policy.  *Id.*

But BCBSKS's argument ignores the portion of *Federal* summarized above; it specifically discussed how the language of the other insurance clause may indeed make a difference. And here, unlike *Federal*, the OneBeacon Policy contains language explicitly making it excess to other policies and not "specifically confin[ing] its status as an excess carrier only to" the Allied World E&O Policy—the language used in its "other insurance" clause. *Federal*, 649 N.E.2d at 464. In short, *Federal* does not show the court's decision was clearly erroneous.

The court declined to rely on the *Utica Mutual Insurance* case cited by BCBSKS in its Motion to Dismiss because it did not address how an "other insurance" clause may affect BCBSKS's argument that an exception to horizontal exhaustion exists. *See* Doc. 52 at 44. *Utica* explains some general principles applicable to excess policies: "Generally, an excess carrier has no liability until the primary policy is exhausted." *Utica Mut. Ins.*, 802 A.2d at 1101. "Within the meaning of an excess policy, 'exhaustion' does not occur until the limits of underlying insurance have been met." *Id.* at 1105. So typically, when the underlying insurance is exhausted, the excess coverage is triggered. *See id.* at 1101, 1105. Under horizontal exhaustion principles however, "[t]he exhaustion of all of the primary policies on the risk should occur prior to the requirement that any excess policy respond to the loss, unless the language of the excess policy states that (1) it is excess insurance over a particular, specific, primary policy, and (2) will be triggered when that discrete policy is exhausted." *Id.* at 1105.

Absent the "other insurance" provision, this exception to horizontal exhaustion plainly would apply to the OneBeacon Policy. Like the excess policy in *Utica*, the OneBeacon Policy states it is excess to specific underlying insurance and that OneBeacon "shall provide" BCBSKS with insurance in excess of the Allied World E&O Policy if that policy "applies and has been

exhausted."  Doc. 1-3 at 10; *see also Utica Mut. Ins.*, 802 A.2d at 1101.  But, *Utica* does not address the implications of an "other insurance" clause like the one in OneBeacon's policy, *i.e.*, stating that the policy also is excess over other insurance.  Here, OneBeacon seeks to avoid coverage because, it argues, a primary policy—one not identified as an underlying primary policy—must respond to the loss because OneBeacon's policy provides it is "excess of and shall not contribute with . . . any other insurance."  Doc. 1-1 at 24.  In short, *Utica* did not consider similar circumstances for its excess insurer.  It merely concluded that the primary policies underlying the excess insurer's policy would not be exhausted under the facts of the case, so there was no possibility the excess policy would be triggered.  *Utica Mut. Ins.*, 802 A.2d at 1105. While BCBSKS cites this case again, the reasoning the court applied earlier still applies. BCBSKS hasn't identified clear error.

### ii.    New Cases Cited

BCBSKS also cites several cases for the first time.  And they are more persuasive than those cited in its motion to dismiss papers.

First, BCBSKS cites *AmHS Insurance Company v. Mutual Insurance Company of Arizona*, 258 F.3d 1090 (9th Cir. 2001).  In that case, AmHS Insurance Company, Risk Retention Group ("RRG") defended its insured and satisfied a judgment against him.  *Id.* at 1092.  It sought contribution from Mutual Insurance Company of Arizona ("MICA").  *Id.*  To apportion the loss, the Ninth Circuit reviewed the policies to determine if they were excess, primary, or co-excess insurers.  *Id.* at 1093.

Three policies were in play:  (1) a primary policy provided by Samaritan, (2) RRG's policy, and (3) MICA's policy.  *Id.* at 1093–94.  Samaritan already had contributed its policy limit.  *Id.* at 1094.  The MICA policy was a primary policy with an "other insurance" clause that

provided: "This insurance shall not apply unless and until the limits of all other sources of funds have been exhausted," including other insurance. *Id.* RRG's policy was an umbrella policy that provided various layers of insurance. *Id.* at 1094–95. Relevant here, the first layer "was written specifically as excess of the underlying Samarian Policy." *Id.* at 1094. The first layer of RRG's policy included other insurance language, stating that "the insurer had no liability until 'deductions for . . . other insurance' were made." *Id.* The second layer also provided insurance in excess of the underlying Samaritan policy as well as several other scheduled policies. *Id.* The schedule of underlying insurance never mentioned MICA's policy. *Id.* And, the second layer contained a provision providing that it only would cover net losses that exceeded the "applicable underlying limit[,]" which it defined as the limits of the underlying insurance as well as the limits of any other valid and collectible insurance. *Id.* at 1094–95. The second layer also contained an "other insurance clause" providing: "The insurance afforded by this policy shall be excess over any other valid and collectible insurance available to the insured, whether or not described in the Schedule of Underlying Insurance . . . ." *Id.* at 1095. Though RRG's policy contained both scheduled underlying insurance and various "other insurance" type language, the district court "held that the RRG and MICA policies provided equal-level insurance." *Id.* And, it then compared the other insurance clauses on the same level and found them to be mutually repugnant and void. *Id.*

RRG appealed, arguing that its policy provided "'true' excess coverage." *Id.* So, RRG argued that the other insurance clause in MICA's primary policy shouldn't affect RRG's rights. *Id.* at 1095–96. The Ninth Circuit analyzed the RRG policy as a whole and, agreeing with the district court, interpreted the first two layers of coverage as "specific excess" coverage, and not "true excess" coverage. *Id.* at 1095–1099. Basically, the Ninth Circuit determined that once the

Samaritan policy was exhausted, RRG's policy became a primary policy, co-equal with the MICA primary policy. *Id.* at 1096, 1099. The Circuit explained its reasoning, dividing it into four parts.

First, the court looked at the RRG policy and concluded it intended its first and second layers of coverage to attach only upon exhaustion of specific policies that didn't include the MICA policy—and it charged premiums consistent with that risk. *AmHS Ins. Co.*, 258 F.3d at 1096–97. The policy gave "no suggestion . . . that RRG knew of the MICA policy" or priced its policy based on its existence. *Id.* at 1097. And, because the RRG policy didn't "require[] the insured to maintain any additional coverage beyond that provided by the Samaritan policy[,]" the Ninth Circuit concluded the "first two layers of insurance provided coverage that . . . attach[ed] immediately upon the exhaustion of the underlying Samaritan policy" and "should be enforced as intended." *Id.* So, the court held, RRG it must share coverage with MICA. *Id.*

Second, the Circuit reviewed the MICA and RRG policies and explained they provided overlapping coverage for only a short window of time. *Id.* at 1097. So, the Circuit concluded they did not insure the same risk and the RRG policy should not be considered a "'true' excess" insurer. *Id.* Also, the Circuit explained that MICA's policy existed before RRG issued its policy. *Id.* at 1097–98. So, RRG could have taken steps to make sure it would function as excess insurance to the MICA policy—and thus avoid the present dispute entirely—by including the MICA policy as scheduled underlying insurance. *Id.* at 1098. But, it didn't. *Id.* So, the Circuit concluded, "[t]his factor weighs against RRG." *Id.*

Third, the Ninth Circuit also considered the other insurance language in the RRG policy. *AmHS Ins. Co.*, 258 F.3d at 1098. The Circuit reviewed the language that "purport[ed] to accept liability only 'after making deductions for all . . . other insurance.'" *Id.* But, it found this

54

provision was not "an exception" to coverage but a "typical excess insurance clause[]." *Id.* The Circuit explained that exceptions to coverage "provide[] that there is no coverage regardless of the existence of other insurance." *Id.* (citation and internal quotation marks omitted). But under its policy, RRG "clearly provided insurance covering the . . . judgment" and simply intended "for its coverage obligation to change depending on the existence of coverage by other valid insurance." *Id.* Other insurance clauses, the Ninth Circuit explained, allow an insurer to escape if the loss is less than other insurance protection, or provide excess insurance if the insurer's coverage exceeds other valid insurance. *Id.* But, other insurance clauses aren't an exception to coverage and, where two policies apply at the same level, the clauses may cancel each other out. *Id.*

Last, the Circuit rejected RRG's argument that its policy, because it was written as excess to the Samaritan policy, should be excess to any other primary policies covering the same loss. *Id.* at 1098. The Ninth Circuit explained that both the MICA policy and the RRG policy were excess to Samaritan's policy. *Id.* at 1099. It held the RRG policy was "a specific excess policy" that attached (and became primary) when the Samaritan primary policy was exhausted. *Id.* And, it concluded the MICA policy also wasn't required to provide coverage until the Samaritan policy was exhausted because of its other insurance clause. *Id.*; *see also id.* at 1096 (explaining the MICA primary policy was excess to the Samaritan primary policy because the Samaritan policy didn't have an other insurance clause, but the MICA policy did). So, the court treated the policies as same level insurance.[17]

---

[17]     A California Court of Appeals decision has questioned the Ninth Circuit's decision to treat an excess policy and primary policy on the same level and prorate coverage between the two. *See Carmel Dev. Co. v. RLI Ins. Co.*, 24 Cal. Rptr. 3d 588, 595–96 (Cal. Ct. App. 2005). *Carmel* explains that California law would require MICA to exhaust its policy limits before requiring RRG to contribute because a primary policy with an other insurance clause is still primary—*i.e.*, on a different level—compared to an excess insurance carrier with an other insurance clause. *Id.* It would consider the RRG

Judge Graber dissented from the lead opinion in *AmHS Insurance*.  *See*, 258 F.3d at

1103–08 (Graber, J., dissenting).  She opined that the RRG policy was *not* co-primary with the

MICA policy, and MICA must contribute before the RRG policy applies.  *Id.* at 1103–04.  Judge

Graber relied on the "general rule" that "*all* primary insurance policies must be exhausted before

an excess insurance policy provides coverage[.]"  *Id.* at 1104.  And, she concluded the RRG

policy was a "'true excess'" policy because the insured had purchased an underlying policy—the

Samaritan policy—covering the same risk, and the policy required that underlying primary

insurance be exhausted before coverage attaches.  *Id.*

Judge Graber found no reason to depart from the rule that excess policies should be

regarded as excess over any primary coverage.  *Id.* at 1104–05.  And so, she distinguished each

of the cases relied on by the majority to conclude the RRG policy was not a true excess policy.

*Id.* at 1105–06.  She explained that the policy language analyzed in those cases explicitly

provided the policy would become primary when the underlying insurance was exhausted,

explicitly said the policy would apply upon exhaustion regardless of other insurance, or did not

address whether the policy contained any language indicating liability would attach only after

other insurance had been collected.  *Id.* at 1105.[18]  But, RRG's policy included no similar

language.  *Id.* at 1105–06.  Instead, the RRG policy contained express language providing "that it

will not take effect until *all* other insurance has been exhausted."  *Id.* at 1106.  Judge Graber

pointed to the language stating that RRG would pay "after making deductions for . . . other

insurance" and only in excess of an underlying limit that was defined to include the limits of

---

umbrella policy a true excess policy that need not provide coverage until all primary policies were
exhausted, even though more underlying primary insurance existed than the RRG policy contemplated.
*Id.*

[18]     As the court addresses later, BCBSKS argues the court committed clear error by similarly
distinguishing cases BCBSKS cited for its Motion to Dismiss.

other insurance.  *Id.* (emphasis omitted).  Judge Graber also relied on the "other insurance" clause as evidence of "the insurer's express intent that the policy not take effect until all primary insurance is exhausted[.]"[19]  *Id.*

Finally, Judge Graber reviewed two Arizona cases discussed by the majority.  *Id.* at 1107. She opined that RRG's policy was "indistinguishable" from one case that held "an excess policy, written in excess of a specific underlying policy, also *was excess as to an unrelated primary policy* with an 'other insurance' clause, after the exhaustion of the specific underlying policy." *Id.*  RRG's policy similarly defined coverage for a "loss" to mean settlement amounts after deducting recoveries from all other insurance.  *Id.*  And, she explained, the RRG policy should not be considered on the same level as the MICA policy because the RRG policy only applied when underlying insurance was exhausted (*i.e.*, it was a true excess policy).  *Id.*  But the MICA policy, on the other hand, was written to provide primary insurance and its other insurance clause kicked in only if other applicable primary insurance existed.  *Id.*  Judge Graber concluded "[i]t would be a windfall to MICA if its liability were limited by the fortuity that the [insured] purchased excess insurance covering the Samaritan policy."  *Id.* at 1108.  Because the RRG policy "clearly express[ed] the insurer's intent that the policy be excess to *all* primary policies[,]" Judge Graber concluded, "MICA must contribute its share of the judgment before RRG can be required to contribute."  *Id.*

This court's decision denying BCBSKS's Motion to Dismiss aligns more with Judge Graber's dissent in *AmHs Insurance* than it does with the Ninth Circuit majority opinion.  But, Ninth Circuit authority does not bind this court and the court does not find it has committed clear

---

[19]       Here, unlike *AmHs Insurance*, OneBeacon relies only on its "other insurance" clause.  Its policy doesn't have other language making its coverage applicable only after deductions for other insurance or in excess of a retained limit that includes other insurance.  In this respect, BCBSKS's arguments against horizontal exhaustion are persuasive.

error based on the majority's opinion in *AmHS Insurance*. As demonstrated by Judge Graber's similar analysis, the court's conclusions were not "arbitrary, capricious, whimsical, or manifestly unreasonable." *See Wright*, 259 F.3d at 1235–36 (internal quotation marks and citations omitted).

Next, BCBSKS cites another Ninth Circuit case, *20th Century Insurance v. Liberty Mutual Insurance Co.*, 965 F.2d 747 (9th Cir. 1992). BCBSKS contends this case supports the conclusion that an exception to horizontal exhaustion exists even though the OneBeacon Policy has an "other insurance" clause. Doc. 57 at 5. *20th Century*'s analysis focuses on the policies' language and also doesn't convince the court its earlier decision was clear error for reasons explained below.

In *20th Century*, an insured motorist was driving a rental car owned by Alamo when he was in an accident that killed one passenger and seriously injured two others. *20th Century Ins.*, 965 F.2d at 749. Three insurance policies were in play: (1) the motorist's personal policy issued by 20th Century Insurance, (2) Alamo's primary policy issued by Liberty Mutual Insurance Company, and (3) Alamo's excess insurance policy issued by Admiral Insurance Company. *Id.* 20th Century's policy provided primary insurance if the motorist was driving his own car, but excess insurance over all other insurance when he was in a vehicle he didn't own. *Id.* at 756–57. Liberty's policy provided primary coverage when the car was owned by Alamo. *Id.* at 757. And Admiral's policy provided insurance that "shall follow that of the primary insurance," which it designated as the Liberty policy. *Id.*

Because the motorist was driving Alamo's car, the Liberty policy applied first, and Liberty exhausted its coverage limit. *Id.* at 749. Admiral argued it was liable only after *both* Liberty and 20th Century's policies were exhausted under the horizontal exhaustion principle.

58

*Id.* at 749, 754. But the Ninth Circuit sided with 20th Century, concluding Admiral's policy must provide coverage before 20th Century based on the policies' other insurance clauses. *Id.* at 754–57.

The court is unpersuaded by BCBSKS's reliance on *20th Century*. Unlike the OneBeacon Policy and Allied World D&O Policy at issue here, the Admiral policy and the 20th Century policy were both excess policies under the facts presented—*i.e.,* the 20th Century policy provided excess and not primary coverage where its insured drove a vehicle he didn't own. *Id.* To determine priority between the policies the Circuit explained it must focus on the "other insurance" clauses and the language of the policies to determine when coverage attaches. *Id.* at 756. The Admiral policy did not contain a provision that provided it was excess to *all* other insurance. *Id.* at 757. Instead, its policy provided its insurance would "follow that of the primary insurance"—the Liberty policy. *Id.* And, the Liberty policy's other insurance clause provided for primary insurance coverage for cars owned by its insured, Alamo. *Id.* Meanwhile, the other insurance language in 20th Century's policy provided it was excess over other collectible insurance, analogous to the other insurance language in the OneBeacon Policy. *Id.* at 756–57. So, the Ninth Circuit concluded the Admiral policy was excess only to the Liberty policy, and not *all* primary policies. *Id.* at 757. And, it attached immediately when the Liberty policy was exhausted. *Id.* It's evident that the facts in *20th Century* led the court to determine the Admiral policy attached immediately upon exhaustion of the Liberty policy. Those facts differ from the ones presented here.

BCBSKS next relies on a line of cases applying California law to argue that the exception to horizontal exhaustion applies even though the OneBeacon Policy contains an "other insurance" clause. Doc. 57 at 5–9 (citing *Cmty. Redevelopment Agency v. Aetna Cas. & Sur.*

*Co.*, 57 Cal. Rptr. 2d 755, 761 n.6 (Cal. Ct. App. 1996); *St. Paul Fire & Marine Ins. Co. v. Ins. Co. of the State of Pa.*, No. 15-CV-02744-LHK, 2017 WL 897437, at \*16–18 (N.D. Cal. Mar. 7, 2017); *Carmel Dev. Co. v. RLI Ins. Co.*, 24 Cal. Rptr. 3d 588, 593–94 (Cal. Ct. App. 2005); *Flintkote Co. v. Gen. Acc. Assur. Co. of Can.*, No. C 04-01827 MHP, 2008 WL 3270922, at \*25 (N.D. Cal. Aug. 6, 2008); *Pac. Bldg. Dev., Inc. v. Kensington-Fair Oaks Assocs. Joint Venture*, No. 1-06-cv-056857, 2011 Cal. Super. LEXIS 376, at \*29 (Cal. Sup. Ct. Oct. 27, 2011)).  As discussed below, the court finds these relevant and even persuasive, though they are not controlling precedent.

First, *Community Redevelopment* supports BCBSKS's position in many ways.  But it also supports OneBeacon's position that its "other insurance" clause matters (and not just the insuring agreement).  *Community Redevelopment* includes a footnote that states:  "If an excess policy states that it is excess over a specifically described policy and will cover a claim when that specific primary policy is exhausted, such language is sufficiently clear to overcome the usual presumption that *all* primary coverage must be exhausted."  *See Cmty. Redevelopment Agency*, 57 Cal. Rptr. 2d at 761 n.6.  But, as the California Court of Appeals explained, the excess policy at issue in that case "was intended to be excess to *all* underlying insurance, whether such insurance was described in the [s]chedule of [u]nderlying [i]nsurance or not[,]" so horizontal exhaustion still applied.  *Id.*

In *Community Redevelopment*, an excess insurer—Scottsdale Insurance Company— argued horizontal exhaustion should apply before it had any obligation to "'drop down'" and provide a defense—*i.e.*, the excess insurer argued *all* primary insurers should have to exhaust coverage before it was required to provide coverage.  *Id.* at 756.  United Pacific Insurance Company was a primary insurer who had incurred substantial defense costs and sought a

declaratory judgment that Scottsdale should have to contribute coverage.  *Id.*  The Scottsdale policy was an umbrella policy that provided coverage "specifically (but not exclusively) excess" to a primary policy from State Farm, which had been exhausted.  *Id.* at 758–59.  Because the State Farm policy was the only scheduled underlying insurance for the Scottsdale policy, United argued Scottsdale should immediately have to "drop down and provide primary coverage in State Farm's place."  *Id.*  And so, United argued that Scottsdale thus should share its duty to defend and equitably share the defense expenses.  *Id.* at 759.

The Scottsdale policy contained a variety of provisions relevant to its excess coverage. *Cmty. Redevelopment Agency*, 57 Cal. Rptr. 2d at 759.  First, it specifically provided it would defend a suit against its insured "*provided, however, that no other insurance affording a defense . . . is available to the INSURED.*"  *Id.* at 758.  It also provided that Scottsdale only would be liable for losses in excess of the limits of the scheduled underlying insurance (*i.e.*, State Farm's policy) "*plus the applicable limits of any other underlying insurance collectible by the INSURED.*"  *Id.*  Once any underlying insurance was exhausted, the Scottsdale policy provided it would "*continue in force as underlying insurance.*"  *Id.*  Finally, the Scottsdale policy had an "other insurance" provision that provided it was "*excess* insurance *over any other valid and collectible insurance* available to the INSURED, *whether or not described in the Schedule of Underlying Insurance . . . .*" *Id.*

Much like BCBSKS's argument here, United argued that "Scottsdale's policy was expressly excess to State Farm's policy" and "as soon as [that policy] was exhausted, Scottsdale's duty arose and the existence of other primary coverage was irrelevant."  *Id.* at 759. But, the California court disagreed.  *Id.*  It explained the general rule is that "[u]nless the provisions of an excess policy provide otherwise, an excess insurer has no obligation to provide a

defense to its insured before the primary coverage is exhausted." *Id.* at 760.  The court agreed Scottsdale's policy was purchased as excess to the State Farm policy.  *Id.*  But, the court considered the other express provisions of the policy, which provided it was excess to the applicable limits of any other underlying insurance too.  *Id.*  The court concluded the policy language was unambiguous—the Scottsdale policy was excess to *all* other primary insurance. *Id.*  The court relied on the language in the retained limit section of the policy that stated Scottsdale was liable only for losses in excess of the limits of the scheduled underlying insurance (*i.e.*, State Farm's policy) and '"the applicable limits of *any other underlying insurance* collectible . . . ."'  *Id.*  The court also considered the language in the defense payments, limits of liability, *and other insurance* sections of the policy, explaining the court's conclusion based on the retained limits language—that the policy unambiguously was not triggered until other primary insurance was exhausted—was "consistent with, and is reinforced by" these other provisions.  *Id.*

Next, the court explained that "under California law an excess or secondary policy does not cover a loss, nor does a duty to defend the insured arise, until *all* of the primary insurance has been exhausted."  *Cmty. Redevelopment Agency*, 57 Cal. Rptr. 2d at 760.  The court concluded that Scottsdale did not have to contribute yet, even though its policy was specifically written as excess to the State Farm policy.  *Id.*  Describing a leading California case on the issue, the court explained:

> It did not matter that the primary policy to which the secondary policy had been specifically excess had itself been exhausted.  A secondary policy, by its own terms, does not apply to cover a loss until the underlying primary insurance has been exhausted.  *This principle holds true even where there is more underlying primary insurance than contemplated by the terms of the secondary policy.*

*Id.* at 760–61 (citations and internal quotation marks omitted).

The court contrasted the horizontal exhaustion principle with vertical exhaustion—"where coverage attaches under an excess policy when the limits of a specifically scheduled underlying policy are exhausted and the language of the excess policy provides that it shall be excess only to that specific underlying policy." *Id.* at 761.  But, like this court concluded for the OneBeacon Policy, the California Court of Appeals explained that the Scottsdale policy was intended to be excess to all underlying insurance, not just the scheduled insurance, so the horizontal exhaustion rule applied.  *Id.* at 761 & n.6.  And, "Scottsdale's responsibility to respond was not triggered by State Farm's exhaustion; not until exhaustion of *all* primary policies, including United's, would Scottsdale have had any duty to provide a defense to the insureds."  *Id.* at 761.  The court noted the result may have been different if the excess policy "*specifically describ[ed] and limit[ed] the underlying insurance.*"  *Id.*

To be sure, besides the other insurance provision, the OneBeacon Policy does not contain the various provisions explicitly spelling out that the policy applies only after all other primary insurance, like the Scottsdale policy included.  For example, the Scottsdale policy explicitly provided it would not defend claims if other insurance was available.  *Id.* at 758. The OneBeacon Policy, by following form to the Allied World E&O Policy, provides OneBeacon "will pay or reimburse, *on a current basis*, **Defense Expenses** for which this Policy provides coverage."  Doc. 1-1 at 26 (emphasis added, bold in original).  The Scottsdale policy's retained limit section also provided Scottsdale would only be liable for losses exceeding the scheduled underlying insurance "*plus the applicable limits of any other underlying insurance collectible by the INSURED.*"  *Cmty. Redevelopment Agency*, 57 Cal. Rptr. 2d at 758.  The OneBeacon Policy, in contrast, provides OneBeacon will provide BCBSKS with insurance in excess of the scheduled underlying insurance—which is defined to mean the Allied World E&O

Policy only—"provided that the **Underlying Insurance** also applies and has been exhausted by actual payment thereunder . . . ."  Doc. 1-3 at 3, 10–11.  But, like the Scottsdale policy, the OneBeacon policy also contains an "other insurance" provision that provides it is "excess of and shall not contribute with" "any other insurance . . . unless such other insurance . . . is specifically stated to be in excess of this Policy."  Doc. 1-1 at 24.

Still, the differences between the two policies do not render the court's conclusion that horizontal exhaustion may apply here clearly erroneous.  *See Wright*, 259 F.3d at 1235–36 (explaining a clearly erroneous decision is one that is "arbitrary, capricious, whimsical, or manifestly unreasonable" (internal quotation marks and citations omitted)).  BCBSKS contends vertical exhaustion must apply.  But, it cites a case that explains this isn't always so, even where the schedule of underlying insurance lists just one policy.  In its September 2019 Order, the court explained OneBeacon's horizontal exhaustion position was plausible because the excess OneBeacon Policy contains a provision stating it is excess to all other insurance—*i.e.* the OneBeacon Policy by its terms is not limited as excess only to the scheduled underlying insurance; it contains a provision (the "other insurance" clause) saying it is excess to other policies too.  *See Cmty. Redevelopment*, 57 Cal. Rptr. 2d at 760–62 (noting other insurance language reinforced court's conclusion that Scottsdale did not have duty to defend yet).

BCBSKS's exception-to-horizontal exhaustion argument is persuasive, however, because the California Court of Appeals did emphasize the Scottsdale policy's language—specifically the insuring clauses—to determine when Scottsdale's liability was triggered.  *Id.* at 762.  The court's interpretation that Scottsdale's liability wasn't triggered until all primary insurance was exhausted was "confirmed and reinforced by the 'Defense' and 'Other Insurance' sections of the" policy.  *Id.*  And, because the excess insurer "require[d] in its policy that all primary

insurance be first exhausted . . . Scottsdale's duty . . . to 'drop down' and provide a defense never

arose." *Id.* Here, the Complaint alleges the Allied World E&O Policy limit was nearing

exhaustion, at which point OneBeacon must decide whether to drop down and provide coverage

or refuse to provide coverage until the Allied World D&O Policy is exhausted. Doc. 1 at 3

(Compl. ¶ 9).[20] But, looking at the insuring agreement provisions in the OneBeacon Policy,

OneBeacon's duty to provide coverage is triggered when the Allied World E&O Policy alone is

exhausted, supporting BCBSKS's position. Doc. 1-1 at 3, 10–11, 26. Except, viewing the entire

policy, the follow form "other insurance" provision does not reinforce that position because it

provides the policy is "excess of and shall not contribute with" "any other insurance . . . unless

such other insurance . . . is specifically stated to be in excess of this Policy." Doc. 1-1 at 24. The

additional California cases discussed next provide guidance about how California law would

treat the OneBeacon Policy where the insuring provisions refer only to the Allied World E&O

Policy, but the policy also has an excess "other insurance" clause.

     BCBSKS's next case—*St. Paul Fire and Marine Insurance Company*—decided a dispute

between two insurers who both provided *excess* coverage. Insurance Company of the State of

Pennsylvania ("Penn") and American Guarantee and Liability Insurance Company ("American

Guarantee") disagreed about which insurer must provide coverage to their insured first. *St. Paul

Fire & Marine Ins. Co.*, 2017 WL 897437, at *12. Penn provided insurance policies in excess of

a policy from Travelers. *Id.* at *3. American Guarantee provided insurance policies in excess of

policies from Zurich. *Id.* Each company insisted its policies were excess to the other's policies.

*Id.* at *12.

---

[20]    The Amended Complaint alleges the Allied World E&O Policy now has been exhausted and
OneBeacon has begun reimbursing defense expenses. Doc. 55 at 3 (Am. Compl. ¶ 12).

The insuring agreement in the Penn policy provided it would "afford the Insured such additional insurance as the issuers of the Underlying Coverage . . . would afford . . . provided that it is expressly agreed that liability shall attach to [Penn]:  (a) only after" the Underlying Coverage has paid the full amount of its underlying limit and "(c) in no greater amount than the limit(s) set forth under the Declarations ultimate net loss . . . ."  *Id.* at \*15.  Underlying Coverage was defined as the Travelers' Policy.  *Id.*  And the policy defined "ultimate net loss" as "the amount payable in settlement of the liability for the insured *after making deductions for . . . other valid and collectible insurance*[.]"  *Id.* (emphasis added).  So, the "other insurance" language was included in the Penn policy's insuring agreement because the policy stated its payments were limited to the ultimate net loss *after* deducting for other insurance.  *See id.*

The insuring agreement in the American Guarantee policy provided American Guarantee "will pay on behalf of the **insured**, those damages covered by this insurance in excess of the total applicable limits of **underlying insurance**."  *Id.* at \*15.  Underlying insurance was defined as the Zurich insurance.  *Id.* at \*16.  And, the Conditions section of the policy included an "other insurance" clause that stated:  "If **other insurance** applies to damages that are also covered by this policy, this policy will apply excess of the **other insurance**."  *Id.* at \*15–16.

Because the two insurers covered the same level of liability on the same risk—*i.e.*, they both provided excess insurance coverage for their insured—the court compared the policies' other insurance provisions that attempted to limit liability to determine which insurer should provide coverage first, or if they should share liability.  *Id.* at \*14.  The court explained that where two *excess* insurance policies compete, the court conducts a two-step inquiry.  *Id.*  "First, the [c]ourt looks to whether the policies were actually 'insuring the same risk at the same level of coverage.'"  *Id.* (citing *Carmel Dev. Co.*, 24 Cal. Rptr. 3d at 592).  Next, if the policies do insure

66

the same risk at the same level, "California courts then determine whether the other insurance provisions are in irreconcilable conflict." *Id.* "If they are in conflict, California courts then split the excess payments between the insurers on a *pro rata* basis." *Id.*

For step one, the court explained how two excess policies could provide "differing 'levels' of coverage" because there are two types of excess policies—specific excess and general excess. *Id.* "A specific excess insurance policy is an insurance policy that 'provide[s] excess coverage *only* over specified primary policies.'" *Id.* (quoting *Flintkote Co.*, 2008 WL 3270922, at *19). A specific excess policy must provide coverage "as soon as the limits of the specified underlying insurance are exhausted." *Id.* A general excess policy, on the other hand, "'provide[s] excess coverage only when all primary policies are exhausted.'" *Id.* (quoting *Flintkote Co.*, 2008 WL 3270922, at *19). So, a general excess policy applies horizontal exhaustion—each primary policy must exhaust before the general policy is implicated. *Id.*

"California courts consider specific excess policies to be on a lower level than general excess policies and, thus, specific excess policies must pay before general excess policies." *Id.* The general rule is that an excess policy is a general excess policy. *Id.* But, "this default is rebutted if the insurance policy contains language stating that the policy is excess to a specific underlying policy." *Id.* And, like this court concluded about the OneBeacon Policy in its earlier Order, "[e]ven where a specific underlying policy is listed, other provisions in the policies *such as the 'other insurance' provision* may indicate that the policy remains a general excess policy." *Id.* (emphasis added).

But, unlike this court's earlier Order, the federal court for the Northern District of California determined that both the Penn and American Guarantee policies were *specific* excess policies, despite the other insurance clauses. *Id.* at *16–18. American Guarantee's insuring

agreement and other insurance clause are similar to the provisions in the OneBeacon Policy. And, *St. Paul* relied on California precedent (the *Carmel* case) holding that similar policy provisions mean the excess policy was legally obligated to provide coverage immediately when the underlying primary policy was exhausted—*i.e.*, it was a specific excess policy despite the other insurance clause. *Id.* at *16. The California federal court relied on the plain language of the insuring agreement, which didn't mention other insurance, to determine when coverage attached. *Id.* at *16–17. It did not look to the other insurance provision because it was buried in the conditions section of the policy and did not "clearly and unequivocally inform the insured that it was excess over *all* other insurance, primary and excess[.]" *Id.* (citation and internal quotation marks omitted). The insuring clause, on the other hand, made it clear that the American Guarantee policies were excess only to the specific underlying policies. *Id.* at *17. And "the 'other insurance' provision [did] not clearly alter that insuring clause." *Id.* So, the court held, the American Guarantee policies were specific excess policies and their coverage was triggered when the underlying Zurich policies were exhausted. *Id.*

The court reached the same conclusion about the Penn policy based on its insuring language. *Id.* Even though the ultimate net loss definition referenced other insurance, the court concluded it was not sufficiently clear and unequivocal to make known to the insured that the policy was excess over all other insurance. *Id.* at *17–18. And, while the Penn policy language limited the amount of liability, it did "not speak to the timing of when Penn becomes liable" and was ambiguous about what other insurance meant. *Id.* at *18.

Because it concluded both policies were specific excess policies, the court moved on to step two. *Id.* at *18–19. Comparing the two other insurance provisions, the court concluded the American Guarantee provision was clear that it was excess to *all* other insurance. *Id.* at *18.

But, Penn's policy was ambiguous and one could read not to include American Guarantee's policy as other insurance.  *Id.* at *19.  So, the court required Penn to pay before American Guarantee had to provide coverage.  *Id.*

The analysis in *St. Paul* does make a persuasive case that coverage under the OneBeacon Policy should be triggered immediately upon exhaustion of the Allied World E&O Policy. BCBSKS argues the OneBeacon Policy is a specific excess policy and, based on the language in its insuring agreement, must provide coverage when the Allied World E&O Policy is exhausted. And, *St. Paul* discusses horizontal exhaustion as applicable only to *general* excess policies for purposes of when the coverage obligation is triggered, concluding policies with similar language to OneBeacon's are specific excess, and not general excess, policies.  *Id.* at *14, 16–18 (explaining horizontal exhaustion requires all primary policies and all specific excess policies to exhaust before a general excess policy "becomes implicated").  *St. Paul* doesn't address how coverage should be allocated between a primary policy and specific excess policy, however— *i.e.*, whether they should be treated on different levels even though the specific excess policy was written as excess to a different primary policy.  *See also Carmel Dev. Co.*, 24 Cal. Rptr. 3d at 589–90, 592–98 (first considering insuring provisions of two excess insurance policies to determine if policies provided same level of coverage and holding one was specific excess and the other general excess, so the court declined to compare the "other insurance" clauses).

BCBSKS next cites another case from the Northern District of California and discussed by the *St. Paul* court—*Flintkote Company v. General Accident Assurance Company of Canada.* There, Aviva provided a primary insurance policy but refused to pay defense and liability costs from asbestos claims brought against its insured.  *Flintkote Co.*, 2008 WL 3270922, at *1. Liberty Mutual and American Mutual also provided primary policies.  *Id.*  And, Flintkote—the

insured—also had a variety of excess insurance policies. *Id.* Flintkote argued the primary policies from Aviva, Liberty, and American all must be exhausted before any of its excess policies must pay under the horizontal exhaustion rule. *Id.* at *12, 14. Aviva argued "Flintkote's excess carriers can become primary carrie[r]s upon the occurrence of certain events[,]" and advocated for vertical exhaustion "whereby excess insurers that are specifically linked to particular underlying primary insurers be considered primary upon unavailability of the linked-to primary insurers." *Id.* at *12, 14.

The court first explained that other insurance clauses only determine each insurer's "ultimate liability" when the "insurers cover the same risk at the same level." *Id.* at *14. "In other words, an 'other insurance' dispute cannot arise between excess and primary insurers." *Id.* Because Aviva—though it had an "other insurance" clause—did not list any underlying limits or policies "that would make its policy an excess policy" the court determined that Aviva, Liberty, and American all were primary policies. *Id.* And, it proceeded to compare the policies' other insurance provisions. *Id.* at *15–16. The court held liability should be distributed among the three primary insurers on a pro rata basis. *Id.* at *16–17.

Next, the court considered the "other insurance" language in Aviva's policy and how excess insurance should play a role in determining Aviva's liability. *Id.* at *18–21. Aviva's other insurance clause provided:

> If the Insured has other insurance against a loss covered by this policy, the Insurer shall not be liable for a greater proportion of such loss than the applicable limit of liability bears to the total applicable limit of liability of *all valid and collectible insurance against such loss. Excess insurance shall not be considered as valid and collectible Insurance until such time as the limit of primary insurance has been exhausted as the result of a loss.*

*Id.* at *18 (emphasis added). The court endeavored to determine how Aviva's excess insurance sentence should apply to specific excess policies versus general excess policies—*i.e.*, "Does the

'excess insurance' clause above require that all primary insurance be exhausted before *specific* excess policies are considered 'collectible insurance'?"  *Id.* at *19.  The court answered that question in the negative.  *Id.*  It explained that horizontal exhaustion requires all primary policies to exhaust before excess policies are implicated.  *Id.*  But, specific excess policies are an exception to horizontal exhaustion—they only depend on exhaustion of specific underlying insurance—and thus specific excess policies "can be considered 'collectible insurance' as soon as the relevant underlying primary policies are legitimately unavailable [or exhausted]."  *Id.* at *19 & n.9.

The court then examined a Hartford excess policy to determine if it was a specific excess or general excess insurance policy.  *Id.* at *22.  Because the policy's underlying limit was defined to include only specifically scheduled policies, the court explained this provision implies it is a specific excess policy, and "seems to . . . overcome" the presumption that excess policies are general excess ones to which horizontal exhaustion would apply before the excess policy must provide coverage.  *Id.*  But, the court realized, the Hartford policy also contained an "other insurance" clause providing it was excess over any other valid and collectible insurance, whether scheduled as underlying insurance or not.  *Id.*  The court noted this provision "adds confusion" and "purports to make the Hartford policy excess above *all* primary policies."  *Id.* at *22–23.

Despite the "other insurance" clause, the court ultimately held the Hartford policy was a specific excess policy.  *Id.* at *23–26. The court explained the other insurance clause applies when multiple policies apply to the same loss at the same level of coverage.  *Id.* at *23.  But, the court first must determine the level of coverage by examining the policy—including the other insurance clause—in a broader context.  *Id.*  It determined the level of coverage provided by the

Hartford policy was specific excess, not general excess, despite the other insurance clause for reasons explained below. *Id.* at *23–26.

First, the court cited *Community Redevelopment*, discussed above. *Id.* at *23. Because the "critical language" in the Hartford policy appeared only in the "other insurance" clause and not as part of the definition of underlying limit or ultimate net loss, the court concluded the other insurance provision conflicted with the underlying limit definition. *Id.* And, the court found *Carmel* more analogous to the Hartford policy. *Id.* at *23–24. The court explained *Carmel* and *Community Redevelopment* show the difference between a general excess policy and a specific excess policy. *Id.* at *24. A general excess policy specifies as part of its underlying limit or limit of liability that its coverage is excess to both scheduled underlying insurance and unscheduled other insurance. *Id.* In contrast, a policy with an insuring agreement that only references specific underlying insurance is a specific excess policy. *Id.* And, a conflicting "other insurance" clause found later in the policy cannot make it a general excess policy because the policy doesn't clearly and unequivocally inform its insured that its coverage is excess over both scheduled and unscheduled other insurance. *Id.* Applying these principles, the court concluded the Hartford policy was a specific excess policy. *Id.* at *25; *see also Pac. Bldg. Dev., Inc.*, 2011 Cal. Super. LEXIS 376, at *29 (reading "other insurance" language "in conjunction with the excess policy's express language" identifying it as underwritten to be excess of only one specific policy, and holding only scheduled policy "must be exhausted . . . to trigger [the] excess policy"). Under *Flintkote's* guidance, the OneBeacon Policy similarly would be a specific excess policy, triggered upon the exhaustion of the Allied World E&O Policy, despite the "other insurance" clause.

Still, because the three primary policies in *Flintkote* shared liability proportionally, the court explained that it should be "impossible for a particular [triggered] primary policy to reach its per occurrence policy limit before the others"—*i.e.*, the Aviva, Liberty, and American policies should all reach their per occurrence limits at the same time. *Flintkote Co.*, 2008 WL 3270922, at *20. But, the court realized that one party—such as Aviva—could breach its obligation to pay, causing another primary policy to exhaust prematurely and trigger an excess policy. *Id.* For example, if Aviva and American's policies were triggered and Aviva had a $100,000 per limit occurrence and American had a $1,000,000 per limit occurrence, the two policies should share a $1,100,000 claim in proportion to their limits. *Id.* If Aviva failed to pay its $100,000 and American paid its $1,000,000—exhausting American's limit—a specific excess policy providing coverage after American would be triggered. If that excess policy provided a $5,000,000 coverage limit and paid the $100,000 left on the claim, the court made clear Aviva cannot benefit from its breach. *Id.* The court explained that Aviva cannot argue its share of liability should now be apportioned with the triggered excess coverage ($100,000 / [$100,000 (Aviva) + $1,000,000 (American) + $5,000,000 (Excess)] = 1/61 of the claim). *Id.* Instead, it is still liable for its $100,000 and the excess insurer has a subrogation claim against Aviva. *Id.* In short, Aviva can't rely on its "other insurance" clause to argue the excess insurance is now "collectible insurance" and try to apportion liability, because damages must be calculated as if Aviva's breach had not occurred. *Id.*

Applying this concept to our case, OneBeacon argues the Allied World D&O Policy is a primary policy that owes BCBSKS coverage, but has refused to pay. Assuming coverage would be apportioned between the two primary policies—the Allied World E&O Policy and the Allied World D&O Policy—Allied World's refusal to pay under the D&O Policy caused the E&O

Policy to exhaust prematurely.  So, under *Flintkote*, the OneBeacon Policy would be considered a specific excess policy that is triggered when the Allied World E&O Policy is exhausted—*i.e.*, OneBeacon's request in Count I for a declaration that BCBSKS must exhaust the Allied World D&O Policy before its liability *to BCBSKS* is triggered would be denied.  But, OneBeacon would have a subrogation claim against Allied World because its underlying policy would not have been exhausted but for Allied World's breach of the Allied World D&O Policy.  *Id.*  So, OneBeacon's position that all primary policies should share coverage first—before excess policies are reached—still has merit even where horizontal exhaustion doesn't apply because a specific excess policy is involved, and not a general excess policy.  Even though *Flintoke* discussed how specific excess policies fall within the exception to horizontal exhaustion—and don't require all primary policies to exhaust before they are triggered—the court still didn't apply the excess policy and the primary policy on the same level.  It apportioned liability among the primary policies first, and explained the excess insurer would be able to recover amounts it paid prematurely from the primary insurer.

### iii.     Conclusion

In sum, BCBSKS's arguments that OneBeacon must provide coverage to BCBSKS now—and seek contribution from Allied World later—are persuasive based on some of the new cases it cites.  Those opinions focus on the language in the insuring agreement provisions to determine if horizontal exhaustion should apply and when coverage to the insured is triggered.  But, a motion to reconsider is not an opportunity to make a stronger case or advance arguments that could have been raised before.  *See Coffeyville Res. Refining*, 748 F. Supp. 2d at 1264.  OneBeacon maintains that the court's interpretation of the policy that considered both the

insuring agreement and the "other insurance" clause to conclude OneBeacon's horizontal exhaustion argument was plausible was correct.  Doc. 62 at 8–10.

BCBSKS argues the court's September 2019 Order "does not cite *any* [cases holding] that a generally worded 'other insurance' clause in an excess policy is sufficient by itself to require horizontal exhaustion even when the policy states that the excess insurer must provide coverage as soon as the limits of a specific underlying policy are exhausted."  Doc. 57 at 5–6.[21] BCBSKS also contends the September 2019 Order "does not cite a single case holding that the exception to horizontal exhaustion *requires* something more than an insuring agreement which states that the excess insurer must provide coverage upon exhaustion of a specific policy."  *Id.* at 14.

Importantly, as discussed in the court's September 2019 Order, BCBSKS didn't cite any sufficiently analogous cases holding horizontal exhaustion can't apply under circumstances where the insuring provisions provide for coverage upon exhaustion of scheduled underlying insurance but the excess insurer also has an excess "other insurance" clause.  So, BCBSKS didn't meet its burden to show the court must dismiss Count I.  Now on rehearing, BCBSKS has cited decisions providing stronger support for its position.  But none are controlling precedent,

---

[21]     BCBSKS overlooks the court's citation of a number of analogous cases to support treating an excess policy as providing a different level of insurance than a primary policy, where the excess policy has an "other insurance" clause making it excess to other insurance in addition to scheduled underlying insurance.  *See* Doc. 52 at 34 n.28 (citing cases including *Gypsum* discussed above).  And, though some of those cited cases dealt with umbrella excess insurers rather than follow form insurers—which BCBSKS argues makes them inapplicable here (Doc. 57 at 14–15)—the *Rivere* case cited by the court in the same footnote found that distinction doesn't matter.  *See Rivere v. Heroman*, 96-1568, p. 2–4 (La. App. 4 Cir. 2/5/97); 688 So. 2d 1293, 1294–95 (holding that primary policy with "other insurance" provision must provide coverage before follow form excess insurance policy, even where excess policy did not provide umbrella coverage because a "'follow form' policy is still an excess policy[;]" the court made this determination after considering the premiums required by each policy but "more importantly" based on the fact that excess policy required an underlying insurance policy and the other policy didn't; indeed, the court explicitly rejected the argument that such a rule should only apply to umbrella policies and not standard follow form policies).

nor do any apply Kansas law.  But, they do provide persuasive support that horizontal exhaustion shouldn't apply to determine when OneBeacon's obligations *to BCBSKS* are triggered, while at the same time allowing OneBeacon to use horizontal exhaustion/different levels of coverage general principles to argue Allied World's coverage applies first (enabling OneBeacon to recover via a subrogation claim).

The court has found one case more analogous than many of the cases cited by BCBSKS that supports OneBeacon's general position—*Olympic Insurance Company v. Employers Surplus Lines Insurance Company*, 178 Cal. Rptr. 908 (Cal. Ct. App. 1981).  *Olympic Insurance* involved three insurance policies analogous to those here.  A primary policy from Pacific Indemnity Company, with an excess other insurance clause.  *Id.* at 910–911.  A primary policy from Insurance Company of North America (INA), with an excess other insurance clause.  *Id.* And, an excess policy from Employers Surplus Lines Insurance Company, written as excess to Pacific's policy and containing an excess other insurance clause.  *Id.*  The court held Employers' policy didn't apply to cover the loss or owe a duty to defend until both primary policies were exhausted, even though "the total amount of primary insurance exceed[ed] the amount contemplated" by its policy.  *Id.* at 912–13.  Because the two primary policies had to share the loss first, the scheduled underlying primary coverage wasn't exhausted to trigger Employers' liability.  *Id.*  However, this case didn't discuss horizontal exhaustion in terms of an excess insurer avoiding coverage to an insured because the dispute was resolved among insurers after one primary policy covered the settlement.  *Id.* at 910.

As the cases discussed in this Order show, an "other insurance" clause may be used to argue for horizontal exhaustion.  *See, e.g.*, *St. Paul Fire & Marine Ins. Co.*, 2017 WL 897437, at *14 ("Even where a specific underlying policy is listed, other provisions in the policies *such as*

76

*the 'other insurance' provision* may indicate that the policy remains a general excess policy." (emphasis added)).  So, the court does not find clear error in its September 2019 Order.

BCBSKS may raise its arguments that OneBeacon's obligations to BCBSKS are triggered only when the Allied World E&O Policy is exhausted in a later motion with the additional legal support it now uses to try to make a stronger argument.  *See, e.g.*, *California Insurance Law & Practice*, *supra* at § 14.07[5][b] ("If provisions in the insuring agreement suggest that a secondary policy is excess only to specifically scheduled policies, the existence of an excess "other insurance" clause *may not* be sufficient in and of itself to require horizontal exhaustion." (emphasis added)).  But, a motion to reconsider is not appropriate for the ambitious result BCBSKS seeks.

        **b.  BCBSKS's Argument that the Court's Interpretation of the Policy is Contrary to the Purpose and Function of "Other Insurance" Clauses**

BCBSKS next argues that the court can't look at the "other insurance" clause to determine when OneBeacon's coverage obligation begins because it is "directly contrary to the purpose of an 'other insurance' clause."  Doc. 57 at 8.  BCBSKS argues the purpose of an "other insurance" clause is to apportion coverage between insurers, and not to determine when coverage is triggered.  *Id.*  So, it argues, OneBeacon can't rely on the "other insurance" clause to modify its coverage obligation in the insuring provision.  *Id.* at 8–9.  This argument goes hand in hand with BCBSKS's arguments above that the OneBeacon Policy is a *specific* excess policy, not a general excess policy.  It also is tied to the discussion above in Part III.B.1. whether OneBeacon can avoid its coverage obligation while the existence of other insurance is disputed—which the court has now concluded it cannot.  The court briefly addresses BCBSKS's new arguments in this section of its brief, but generally refers the parties to the discussion above.

BCBSKS cites an Illinois Supreme Court case to argue an "other insurance" clause doesn't affect when coverage is triggered.  But, this case addressed whether an insurer's "other insurance" clause allowed the insurer to trigger coverage *under a different policy* from a second insurer, where the insured didn't want to look to the second insurer for coverage.  *See John Burns Constr. Co. v.  Ind. Ins. Co.*, 727 N.E.2d 211, 213–17 (Ill. 2000) (where insurer argued second insurer should have to share defense and indemnity duties because of its "other insurance" clause that provided for sharing among other available, valid, and collectible primary insurance, the court concluded the other insurance wasn't "available" other insurance because insured didn't elect coverage under the second insurer's policy).  The court explained that "the purpose of an 'other insurance' clause is not to trigger coverage [from another insurer] but to provide a method of apportioning coverage that would be triggered otherwise." *Id.* at 216.

*John Burns* confirms "other insurance" clauses only come into play where two policies provide coverage.  It stands for the proposition that OneBeacon can't rely on its "other insurance" clause to *trigger* coverage under *other* policies, like the Allied World D&O Policy.  But here, unlike in *John Burns*, BCBSKS already is seeking coverage from both OneBeacon and Allied World.  *See* Doc. 1 at 2 (Compl. ¶¶ 5–7).  OneBeacon and BCBSKS both take the position other coverage exists.  And OneBeacon is relying on its "other insurance" clause to argue coverage that "would be triggered otherwise" under its policy, is not triggered yet because the Allied World D&O policy also owes coverage and should pay first.  *John Burns*, 727 N.E.2d at 216.  As discussed in Part III.B.1., paying for the insured's purchased coverage takes priority, and the dispute among insurers should be resolved without leaving the insured unprotected.  But, if other insurance is found to owe coverage first, *John Burns* explains an "other insurance" clause can be used to apportion "coverage that would be triggered otherwise." *Id*.

BCBSKS also cites a Tenth Circuit case where our court had "held that the Other Insurance provision did not affect coverage." *Progressive Nw. Ins. Co. v. Handshumaker*, 662 F. App'x 630, 632 (10th Cir. 2016).  There, an insured tried to argue language in the other insurance clause in Progressive's policy provided excess coverage for a type of vehicle, even though the insuring agreement in the policy explicitly listed that type of vehicle as one excluded from coverage.  *Id.* at 631–32.  The Circuit agreed with the district court that the other insurance clause addressed "the contingency of Progressive's *shared* coverage with another entity" but did not apply when "the policy did not provide coverage in the first place."  *Id.* at 632.  Reading the policy as a whole, the other insurance clause didn't provide an independent basis for coverage, but only provided for a means to determine priority when more than one policy affords coverage for a loss.  *Id.  Handshumaker* doesn't require the court to ignore the "other insurance" provision under the circumstances alleged in this case, provided the Allied World D&O Policy provides concurrent coverage; it supports looking at the other insurance clause to determine priority for coverage between the two insurers.

BCBSKS also cites *Carmel* and *St. Paul*, where the California Court of Appeals and United States District Court for the Northern District of California concluded an "other insurance" clause found later in the policy doesn't modify the insuring agreement provisions that require coverage as soon as a specified underlying policy is exhausted.  Doc. 57 at 9; *St. Paul Fire & Marine Ins. Co.*, 2017 WL 897437, at *16 (concluding specific excess policy with other insurance clause buried in the conditions must provide coverage when the specified underlying policy is exhausted); *Carmel Dev. Co.*, 24 Cal. Rptr. 3d at 593–94, 598 (holding other insurance clause insufficient to modify insuring agreement that made policy excess only to specified underlying policy, so policy was specific excess and not general excess and explaining the

"principal statement of coverage" is found in the insuring agreement section and not the "other insurance" clause). In short, BCBSKS argues the court is required to look only at the insuring provision, and not the "other insurance" provision to determine when OneBeacon's coverage obligation to BCBSKS is triggered. Doc. 57 at 9. The court considered these cases more fully above in Part III.B.2.a. BCBSKS's arguments are persuasive but a motion to reconsider is not an opportunity for a litigant to make a better case than it did the first time.

### c. BCBSKS's Argument that the Court Added an Unnecessary Requirement for an Exception to Horizontal Exhaustion

Next, BCBSKS takes issue with how the court distinguished *Coffeyville Resources Refining & Marketing, LLC v. Liberty Surplus Insurance Corp.*, 714 F. Supp. 2d 1119 (D. Kan. 2010). Doc. 57 at 10. BCBSKS contends the court clearly erred when it didn't apply the exception to horizontal exhaustion after considering this case. *Id.* It argues the court erroneously created a requirement that the exception to horizontal exhaustion can apply only if an excess policy's insuring agreement explicitly states it becomes primary when the underlying insurance is exhausted. *Id.* at 10–12. Yet again, BCBSKS simply is rehashing arguments and trying to make a stronger case, which is inappropriate for a motion to reconsider.

Trying to show that the court committed clear error, BCBSKS argues the court should have only considered one portion of *Coffeyville*—where the *Coffeyville* court said that because the Illinois Union policy "generally follows form to the Liberty policy . . . it stands to reason it would attach after exhaustion of the underlying policy" and thus it "is plainly triggered by exhaustion" of the Liberty policy. *Coffeyville*, 714 F. Supp. 2d at 1129. BCBSKS contends the court should have applied this logic to hold horizontal exhaustion can't apply to the OneBeacon policy. And, it urges the court to ignore the other considerations that *Coffeyville* took into

account when determining priority between Illinois Union and National Union—that the Illinois Union policy (1) also included specific language that it will "continue in force as primary coverage" once Liberty's policy was exhausted, and (2) had a follow form "other insurance" clause which stated that the coverage was "primary insurance" and described a method of sharing if other primary insurance was also available.  *Id.* at 1125–26.  BCBSKS argues "nothing in *Coffeyville* suggests the outcome would have been different in that case if these other factors highlighted . . . were not present, or that [they] should be outcome determinative in this case."  Doc. 57 at 11.  And, it notes, *Coffeyville* dealt with determining priority among two excess insurers—not whether an exception to horizontal exhaustion should apply.  *Id.*

The court doesn't disagree with BCBSKS that "it stands to reason" that an excess policy generally should attach when the scheduled underlying policy is exhausted.  And, contrary to BCBSKS's assertion, the court's earlier Order never created a rule that "an excess policy which states that its coverage attaches after the exhaustion of a specific underlying primary policy can only fall within the exception to horizontal exhaustion if it also states that its coverage becomes 'primary' upon exhaustion of the underlying policy."  *Id.*  Instead, the court considered the differences between the "other insurance" clause here and the "other insurance" clause in the Illinois Union policy.  Specifically, the court concluded "OneBeacon's 'other insurance' clause differs significantly from the 'other insurance' clause in *Coffeyville*, providing it is in 'excess of' and 'shall not contribute with' any other insurance."  Doc. 52 at 42–43.  This difference, coupled with the fact that the Illinois Union policy explicitly provided for primary coverage upon exhaustion of the underlying insurance led the court to conclude *Coffeyville* did not mandate an exception to horizontal exhaustion here—as BCBSKS argued in its Motion to Dismiss.  Doc. 52 at 40–43.  *I.e.*, the Illinois Union policy was a classic example of when the exception to

horizontal exhaustion should apply—it expressly stated it would apply and become primary upon exhaustion of a specific policy and contained no language making it excess to any other policies because its other insurance clause provided for sharing among primary policies.  But, to determine if horizontal exhaustion should apply between a primary and excess policy here, the court decided these distinctions may matter.

The court analyzed *Coffeyville* similar to Judge Graber's dissent in *AmHs Insurance*.  *See supra* note 18.  And the court concluded OneBeacon's horizontal exhaustion position for Count I was plausible because its policy has an excess "other insurance" clause, unlike *Coffeyville—i.e.*, the OneBeacon Policy has language suggesting it remains excess to other insurance even when the underlying policy is exhausted.  So, the court disagreed with BCBSKS's contentions that an exception to horizontal exhaustion must exist because *Coffeyville* did not involve an excess policy with an excess "other insurance" clause.[22]

### 3.  "Factors" for Horizontal Exhaustion

*Finally*, BCBSKS argues the court predicted the Kansas Supreme Court "would adopt the majority rule requiring horizontal exhaustion, but then simply assumes that horizontal exhaustion applies to the OneBeacon Policy without actually analyzing the factors courts use to determine whether this rule applies to a particular excess policy."  Doc. 57 at 3.  It contends, had the court analyzed these factors—like the type of policies and amount of premiums paid—rather than focus on the "other insurance" language, the court would have concluded horizontal exhaustion doesn't apply to the OneBeacon Policy.  *Id.* at 15–17.  OneBeacon responds that there is no definitive set of "factors" that courts must consider to determine if horizontal exhaustion applies,

---

[22]     BCBSKS breaks its "exception to horizonal exhaustion" clear error arguments into two additional sections of its brief.  But, the court already has addressed the arguments within those sections so it doesn't separately address them here.  *See* Doc. 57 at 12–15.

and the differences in premiums between its policy and the Allied World D&O Policy aren't comparable or outcome determinative.  Doc. 62 at 10–11.

As the court's extensive review of cases demonstrates, courts focus on the type of coverage, the intent of the parties, the premiums relative to the risk, and the language across the policies owing coverage (including the "other insurance" clauses), among other factors to determine if horizontal exhaustion applies.  BCBSKS is free to raise this argument that the factors weigh against horizontal exhaustion here at a later stage of this case, but it hasn't demonstrated clear error.[23]  *See, e.g.*, *Rivere*, 688 So.2d at 1294–95 (finding the "more important[]" factor was that the excess policy required an underlying policy, and the primary policy didn't).

### IV.    Motion to Certify Questions

Kan. Stat. Ann. § 60-3201, authorizes our court to certify questions to the Kansas Supreme Court if "questions of law of [the state of Kansas]" arise in the case before it "which may be determinative . . .  and [about] which it appears . . . there is no controlling precedent in the decisions" of the Kansas Supreme Court or Kansas Court of Appeals.  Where the law is unsettled and dispositive, the court may ask the Kansas Supreme Court to answer those questions of law to aid the court.  Kan. Stat. Ann. § 60-3201; *Union Ins. Co. v. Mendoza*, 374 F. App'x 796, 801–02 (10th Cir. 2010) (certifying insurance questions because (1) it "is a state-law issue, and it has not been addressed by the Kansas Supreme Court," (2) no disputed fact issues exist,

---

[23]     BCBSKS contends it advances this argument because the court committed clear error when it didn't conclude, at the motion to dismiss stage, that the OneBeacon Policy falls within the exception to horizontal exhaustion.  And, when it concluded Count I shouldn't be dismissed on a motion to dismiss, the court relied on certain cases it found in its own research to understand more fully the parties' positions.  BCBSKS explains it raises these new arguments to respond to the cases cited by the court.  But, BCBSKS's new arguments against horizontal exhaustion essentially use a motion to reconsider to make a stronger case than it did before.  They aren't appropriate for a motion to reconsider.  *Coffeyville Res. Refin. & Mktg., LLC*, 748 F. Supp. 2d at 1264.

and (2) the questions present pure questions of state law and policy, and explaining "the question of how to interpret a standard pollution exclusion clause is a matter of exceptional importance for state insurers and insureds"); *see also Nationwide Mut. Ins. Co. v. Briggs*, 491 F. App'x 931, 934 (10th Cir. 2012) (certifying insurance coverage "state law issue of first impression" because it "will further the interests of comity and federalism by giving the Supreme Court of Kansas the opportunity to address the question in the first instance"); *Ohio Cas. Ins. Co. v. Unigard Ins. Co.*, 564 F.3d 1192, 1197–98 (10th Cir. 2009) (certifying dispute about "other insurance" clause to Utah Supreme Court).

BCBSKS argues "the horizontal exhaustion and 'other insurance' questions presented in this case are matters of first impression under Kansas law."  Doc. 57 at 3.  And, it contends there is "significant uncertainty . . . whether the Kansas Supreme Court would . . . decide these issues in the manner predicted by the [September 2019] Order."  *Id.* at 3–4.  So, it asks the court to certify two questions to the Kansas Supreme Court:

1. Under Kansas law, is there an exception to the general rule of horizontal exhaustion where an excess insurance policy contains a general "other insurance" provision in the conditions section of the policy, but the insuring agreement states that coverage attaches upon the exhaustion of a specific underlying policy?

2. Under Kansas law, can an excess insurer rely upon an "other insurance" provision to deny coverage entirely until exhaustion of any "other insurance" is complete, despite listing only one underlying policy as scheduled underlying insurance and where the other insurer has denied coverage?

Doc. 57 at 27.

OneBeacon responds, arguing the court should deny BCBSKS's belated certification request.  Doc. 62 at 2.  It argues that the Tenth Circuit disfavors requests to certify questions that are made after a party receives an adverse ruling.  *Id.*; *see also Enfield v. A.B. Chance Co.*, 228

84

F.3d 1245, 1255 (10th Cir. 2000) (explaining certification "is never compelled," federal courts have a "duty to decide questions of state law even if difficult or uncertain," and the Circuit "generally will not certify questions to a state supreme court when the requesting party seeks certification only after having received an adverse decision from the district court" (citations and internal quotation marks omitted)).  And, it asserts the court did not err in its September 2019 Order when it concluded Kansas would apply horizontal exhaustion.  Doc. 62 at 8–9.

With the court's correction to the September 2019 Order above, coupled with the court's detailed review of the cases BCBSKS has cited to support its exception-to-horizontal-exhaustion position, the court denies BCBSKS's request to certify questions here.  The parties can reassert their Count I horizontal exhaustion arguments in the later stages of this case, focused in light of the above discsussion.

## V.      Conclusion

For reasons explained, the court grants in part BCBSKS's Motion for Reconsideration and denies BCBSKS's Motion to Certify Questions.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Blue Cross and Blue Shield of Kansas, Inc.'s Motion for Reconsideration, or in the Alternative, to Certify Questions (Doc. 57) is granted in part and denied in part.

**IT IS SO ORDERED.**

**Dated September 30, 2020, at Kansas City, Kansas.**

                                                      s/ Daniel D. Crabtree
                                                      **Daniel D. Crabtree**
                                                      **United States District Judge**