## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **ATLANTIC SPECIALTY INSURANCE COMPANY,**[1] | |
| **Plaintiff/Counter-Defendant,** | **CONSOLIDATED CASES** |
| **v.** | **Case No. 18-2371-DDC-ADM** |
| **BLUE CROSS AND BLUE SHIELD OF KANSAS, INC.,** | |
| **Defendant/Counter-Plaintiff,** | |
| **v.** | |
| **ALLIED WORLD SURPLUS LINES INSURANCE COMPANY f/k/a DARWIN SELECT INSURANCE COMPANY and BLUE CROSS BLUE SHIELD ASSOCIATION,** | |
| **Defendants.** | |
| **ALLIED WORLD SPECIALTY INSURANCE COMPANY, f/k/a DARWIN SELECT INSURANCE COMPANY,** | |
| **Plaintiff/Counter-Defendant,** | **Case No. 18-2515-DDC-ADM** |
| **v.** | |
| **BLUE CROSS AND BLUE SHIELD OF KANSAS, INC.,** | |
| **Defendant/Counter-Plaintiff.** | |

---

[1]       On November 16, 2021, the court granted an Unopposed Motion to Substitute a Party—*i.e.*, Atlantic Specialty Insurance Company for Bedivere Insurance Company f/d/b/a OneBeacon Insurance Company—in these consolidated cases under Fed. R. Civ. P. 25(c).  Doc. 180.

## MEMORANDUM AND ORDER

This case arises from an insurance coverage dispute.  Plaintiff Allied World Specialty Insurance Company ("Allied World") filed this declaratory judgment action against defendant Blue Cross and Blue Shield of Kansas, Inc. ("BCBSKS"), seeking a declaratory judgment that the Directors and Officers Liability Policy ("D&O Policy") that it issued to BCBSKS doesn't provide insurance coverage for any claims, losses, or other damages asserted by claimants in an underlying Multi-District Litigation ("MDL Action") in the Northern District of Alabama.  In response, BCBSKS filed a Counterclaim against Allied World seeking its own declaratory judgment that the D&O Policy obligates Allied World to pay BCBSKS's defense costs incurred in the MDL Action.  BCBSKS also asserts counterclaims against Allied World for breach of contract and breach of the duty of good faith and fair dealing.

This matter comes before the court on BCBSKS's Motion for Judgment on the Pleadings (Doc. 202).  Allied World has filed a Response in Opposition to the Motion for Judgment on the Pleadings and a Cross Motion for Judgment on the Pleadings (Docs. 217 & 218).  BCBSKS has filed a Reply in Support of its Motion for Judgment on the Pleadings and an Opposition to Allied World's Cross Motion for Judgment on the Pleadings (Doc. 223).  And, Allied has filed a Reply in Support of its Cross Motion for Judgment on the Pleadings (Doc. 228).  Also, BCBSKS has filed a Notice of Supplemental Authority (Doc. 232), to which Allied World has responded (Doc. 234).  After considering all of the parties' filings, the court denies BCBSKS's Motion for Judgment on the Pleadings (Doc. 202) and grants Allied World's Cross Motion for Judgment on the Pleadings (Doc. 218).  It explains why, below.

## I.      Factual and Procedural Background

The court takes the following facts from Allied World's "Complaint for Declaratory

Judgment" and BCBSKS's "Answer to Plaintiffs' Complaint for Declaratory Judgment,

Affirmative Defenses and Counterclaims" and the supporting documents attached to these two

pleadings.  Complaint for Declaratory Judgment, *Allied World Specialty Ins. Co. v. Blue Cross &*

*Blue Shield of Kan., Inc.*, No. 18-2515-DDC-ADM (D. Kan. Sept. 25, 2018), ECF No. 1

("Complaint"); Defendant's Answer to Plaintiffs' Complaint for Declaratory Judgment,

Affirmative Defenses and Counterclaims, *Allied World Specialty Ins. Co. v. Blue Cross & Blue*

*Shield of Kan., Inc.*, No. 18-2515-DDC-ADM (D. Kan. Nov. 26, 2018), ECF No. 16

("Counterclaim").[2]  The court views these facts in the light most favorable to the non-moving

party.  *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1160 (10th Cir. 2000)

(explaining that on a motion for judgment on the pleadings under Rule 12(c) the court "accept[s]

the well-pleaded allegations of the complaint as true and construe[s] them in the light most

favorable to the non-moving party" (citations and internal quotation marks omitted)); *see also*

*Cessna Fin. Corp. v. JetSuite, Inc.*, 437 F. Supp. 3d 914, 919 (D. Kan. Jan. 28, 2020) (explaining

that courts may consider documents attached to the pleadings when deciding a Rule 12(c) motion

for judgment on the pleadings).

### *D&O Policy*

Allied World issued to BCBSKS a Healthcare Organizations Directors and Officers

Liability Policy ("D&O Policy").  Doc. 1-7.  The D&O Policy is for the period of July 1, 2012 to

---

[2]      The relevant pleadings are filed in the consolidated case:  *Allied World Specialty Insurance Co. v. Blue Cross & Blue Shield of Kansas, Inc.*, No. 18-2515-DDC-ADM.  The references to document numbers in this Factual and Procedural Background section refer to docket entries in Case No. 18-2515-DDC-ADM.  The pending motions and corresponding briefing are docketed in the lead case:  *One Beacon Insurance Co. v. Blue Cross & Blue Shield of Kansas, Inc.*, No. 18-2371-DDC-ADM.

October 1, 2013.  *Id.* at 25 (D&O Policy Endorsement No. 19).  The D&O Policy requires Allied World to pay on BCBSKS's behalf "the **Loss** arising from a **Claim**, first made during the **Policy Period** . . . against the **Insureds** for **Antitrust Activities**[.]"  *Id.* at 27 (D&O Policy § I.D.).  The D&O Policy defines "**Loss**" to include "**Defense Costs**."  *Id.* at 34–35 (D&O Policy § II.R.9.).  And the D&O Policy defines "**Defense Costs**" as "reasonable and necessary fees, costs, charges or expenses incurred by or on behalf of an **Insured** in the investigation, defense or appeal of a **Claim**[.]"  *Id.* at 32 (D&O Policy § II.H.1.).  But, under the D&O Policy, the "**Insurer** does not assume any duty to defend any **Claim**[.]"  *Id.* at 42 (D&O Policy § VI.A.).  Instead, the D&O Policy requires "the **Insurer**" to "reimburse **Defense Costs** in excess of the Retention prior to the final disposition of any **Claim**, subject to all other terms and conditions of this Policy."  *Id.* (D&O Policy § VI.E.).

The D&O Policy contains a Managed Care Activities Exclusion.  *Id.* at 41 (D&O Policy § III.N.).  The Managed Care Activities Exclusion excludes coverage for Loss in connection with any Claim:

> alleging, arising out of, based upon, or attributable to, any actual or alleged act, error or omission in the performance of, or failure to perform, **Managed Care Activities** by any **Insured** or by any individual or entity for whose acts, errors or omissions an **Insured** is legally responsible, except that this Exclusion shall not apply to that portion of an otherwise covered **Claim** for **Provider Selection Practices**[.]

*Id.*  The D&O Policy defines "**Managed Care Activities**" as:

> **Utilization Review;** advertising, marketing, selling, or enrollment for health care or workers' compensation plans; . . . establishing health care provider networks; . . . and services or activities performed in the administration or management of health care, consumer directed health care, behavioral health, prescription drug, dental, vision, long or short term disability, life, automobile medical payment, or workers' compensation plans[.]

*Id.* at 16 (D&O Policy Endorsement No. 10).

The D&O Policy also excludes:

> [A]ny **Loss** in connection with any **Claim** . . . alleging, arising out of, based upon or attributable to, as of the Pending or Prior Date set forth in Item 6. of the Declarations with respect to this Policy, any pending or prior:  (1) litigation; or (2) administrative or regulatory proceeding or investigation, of which an **Insured** had notice, including any **Claim** alleging or derived from the same or essentially the same facts, or the same or related **Wrongful Acts**, as alleged in such pending or prior litigation or administrative or regulatory proceeding or investigation[.]

*Id.* at 38–39 (D&O Policy § III.D.).

Also, the D&O Policy provides, all "**Related Claims** shall be deemed to be a single **Claim** made on the date on which the earliest **Claim** within such **Related Claims** was first made . . . ."  *Id.* at 44 (D&O Policy § VII.D.).  The D&O Policy defines "**Related Claims**" as "all **Claims** for **Wrongful Acts** based upon, arising out of, directly or indirectly resulting from, or in consequence of, the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events."  *Id.* at 37 (D&O Policy § II.CC.).

### *The E&O Policy*

Allied World also issued to BCBSKS a Managed Care Organizations Errors and Omissions Liability Policy ("E&O Policy") for the same period, July 1, 2012 to October 1, 2013. Doc. 1-6 at 45 (E&O Policy Endorsement No. 39).  The E&O Policy requires Allied World to pay on BCBSKS's behalf "**Loss** which the **Insured** is legally obligated to pay as a result of a **Claim** that is first made against the **Insured** during the **Policy Period**[.]"  *Id.* at 51 (E&O Policy § I.).  The E&O Policy's definition of "**Loss**" includes "**Defense Expenses**."  *Id.* at 61 (E&O Policy § IV.J.).  And the D&O Policy defines "**Defense Expenses**" as "reasonable legal fees and expenses incurred in the investigation, adjustment, defense or appeal of a **Claim**[.]"  *Id.* at 60 (E&O Policy § IV.E.).

The E&O Policy defines "**Claim**," in relevant part, as "any written notice received by any **Insured** that a person or entity intends to hold an **Insured** responsible for a **Wrongful Act**[.]" *Id.* (E&O Policy § IV.C.).  The E&O Policy defines "**Wrongful Act**" in relevant part as "any actual or alleged act, error or omission in the performance of, or any failure to perform, a **Managed Care Activity** by any **Insured Entity** or by any **Insured Person** acting with the scope of his or her duties or capacity as such[.]"  *Id.* at 62 (E&O Policy § IV.W.1.).  And the E&O Policy defines "**Managed Care Activity**" to include:

> **Provider Selection; Utilization Review**; advertising, marketing, selling, or enrollment for health care or workers' compensation plans; . . . establishing health care provider networks; . . . and services or activities performed in the administration or management of health care or workers' compensation plans.

*Id.* at 61 (E&O Policy § IV.K.).

### *The MDL Action*

In 2012, various healthcare providers and health insurance subscribers filed several class action lawsuits alleging antitrust violations by certain Blue Cross Blue Shield Plans ("Blue Plans") and the Blue Cross Blue Shield Association ("BCBSA").  Doc. 1 at 2 (Compl. ¶ 7). Generally, the lawsuits allege that the Blue Plans and BCBSA "conspired to leverage their economic power and market dominance to under-compensate healthcare providers for their services and to increase healthcare costs to subscribers by coordinating their operations and limiting their activities through restrictions in their trademark licenses."  *Id.*  Some of these class action lawsuits named BCBSKS as a defendant.  *Id.* at 3 (Compl. ¶ 9).

On December 12, 2012, the Judicial Panel on Multidistrict Litigation consolidated and transferred several of the class action lawsuits to the United States District Court for the Northern District of Alabama ("MDL Action").  *Id.* at 2–3 (Compl. ¶ 8); *see also* Doc. 1-2 (JPML Transfer Order).  The JPML's Transfer Order explained that the "antitrust litigation

concerns the licensing agreements between and among the Blue Cross Blue Shield Association (BCBSA) and its 38 licensees (Blue Plans)" that—according to plaintiffs—allowed the Blue Plans to "divide[ ] and allocate[ ] among themselves health insurance markets throughout the nation to eliminate competition." Doc. 1-2 at 1 (JMPL Transfer Order).

After transfer to the Northern District of Alabama, plaintiffs filed two consolidated complaints in the MDL Action. Doc. 1 at 3 (Compl. ¶ 9). One complaint was for the "Provider Track," *i.e.*, asserting claims on behalf of health care providers; the other complaint was for the "Subscriber Track," *i.e.*, asserting claims on behalf of individuals or businesses who hold health insurance plans issued or administered by one of the Blue Plans. *Id.*; *see also* Doc. 1-3 (Subscriber Compl.); Doc. 1-4 (Provider Compl.). The next two subsections more fully describe the allegations in both tracks of the litigation.

### The Provider Track

The Provider Track Complaint alleges that the Blue Plans, along with BCBSKS and BCBSA, have engaged in two unlawful conspiracies violating Section 1 of the Sherman Act: the "Market Allocation Conspiracy" and the "Price Fixing and Boycott Conspiracy." Doc. 1-4 at 7– 13 (Provider Compl. ¶¶ 1, 4, 7, 8). Also, the Provider Track Complaint asserts claims under the Clayton Act for monopsonization (creating a market dominated by a single buyer), attempted monopsonization, and conspiracy to monopsonize. *Id.* at 232–36 (Provider Compl. ¶¶ 676–95).

The Provider plaintiffs base their "Market Allocation Conspiracy" claims on defendants' alleged division of the U.S. health insurance market into "Service Areas" and the Blue Plans' alleged agreement not to compete or contract with providers or sell insurance outside the Blue Plans' respective "Service Areas." *Id.* at 8–10 (Provider Compl. ¶¶ 1, 3). The Provider plaintiffs allege that the Market Allocation Conspiracy "prevents the development of provider networks

and competition among provider networks" and "prevents [Blue Plans] from developing innovative and collaborative agreements with Providers that would be efficient, improve quality and lower health care costs." *Id.* at 92 (Provider Compl. ¶ 226).

The Provider plaintiffs base their "Price Fixing and Boycott Conspiracy" claims on defendants' alleged agreement to participate in "national programs including the Blue Card and National Accounts Programs, which determine the price and the payment policies to be utilized when a patient insured by a Blue [Plan] or included in an employee benefit plan administered by a [d]efendant receives healthcare services within the Service Area of another Blue [Plan.]" *Id.* at 123 (Provider Compl. ¶ 328). The Blue Card program, for example, reimburses the Provider who treats the patient at the rates agreed to by the Blue Plan in the Service Area where the Provider provides services (the "Host Plan"). *Id.* at 82 (Provider Compl. ¶ 201). But, for the Provider to receive reimbursement, the Provider must comply with the rules of the Blue Plan in which the insured is enrolled (the "Home Plan"). *Id.* The Provider Complaint alleges that this system constitutes an agreement to "fix prices" because it does not allow the Provider to negotiate with the Blue Plan to which the insured belongs. *Id.* at 82–83 (Provider Compl. ¶¶ 202–03). Instead, the Provider must accept the prices negotiated with the Blue Plan in its Service Area, even though the Provider is treating a patient who does not belong to that plan. *Id.* The Provider Complaint alleges that defendants' agreement to fix prices has resulted in the Providers "receiv[ing] significantly lower reimbursement than they would receive absent [d]efendants' agreement to fix prices." *Id.* at 83 (Provider Compl. ¶ 203).

The Providers allege that defendants have implemented and enforced the Market Allocation and Price Fixing Conspiracies by using License Agreements, Membership Standards,

and Guidelines adopted by the Blue Plans through the BCBSA.  *Id.* at 60 (Provider Compl. ¶ 136).  According to the Provider Complaint, the Blue Plans operate under a "basic rule":

> The [Blue Plans] will not compete in the establishment of healthcare provider networks, where they could develop meaningful innovation through collaboration with providers to improve our healthcare system and diminish overall costs.  The [Blue Plans] will not compete in the administration of healthcare plans including regional and national accounts.  The [Blue Plans] will not compete in the sale of health insurance.

*Id.* at 13 (Provider Compl. ¶ 9).  The Providers assert that defendants' alleged anticompetitive conduct has caused them to sustain damages that "consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for [d]efendants' anticompetitive agreement."  *Id.* at 171–72 (Provider Compl. ¶¶ 470, 475).

### *The Subscriber Track*

Like the Provider Complaint, the Subscriber Complaint alleges that Blue Plans, along with BCBSKS and BCBSA, have conspired to violate the antitrust laws by unlawfully dividing the geographic market into "Service Areas" and entering illegal agreements not to compete against each other within those "Service Areas."  Doc. 1-3 at 14–15 (Subscriber Compl. ¶¶ 8–9).  The Subscriber Complaint alleges that the Blue Plans, using the License Agreements, Membership Standards, and Guidelines adopted by the Blue Plans through the BCBSA, have agreed to limit competition by restricting the ability of Blue Plans to operate outside their respective territories.  *Id.* at 13–14 (Subscriber Compl. ¶ 4).  Specifically, the Subscriber Complaint alleges that each Blue Plan "agrees that neither it nor its subsidiaries will compete under the licensed Blue Cross and Blue Shield trademarks and trade names outside of a designated" Service Area.  *Id.* at 102 (Subscriber Compl. ¶ 470).  The Subscriber Complaint

alleges the Blue Plans' antitrust violations have forced them to pay overcharges for health insurance premiums.  *Id.* at 15 (Subscriber Compl. ¶ 9).

Also, the Subscriber Complaint alleges that the Blue Plans have agreed "to limit their competition against one another when not using the Blue names[,]" *id.* at 102–03 (Subscriber Compl. ¶ 474), by agreeing that (1) "at least 80 percent of the annual revenue" that the Blue Plans "generate from within its designated" Service Area must come from "services offered under the licensed Blue Cross and Blue Shield trademarks and trade names[,]" *id.* at 103 (Subscriber Compl. ¶ 475), and (2) "at least two-thirds of the annual revenue generated by [the Blue Plan] from either inside *or outside* of its designated" Service Area must come from "services offered under the Blue Cross and Blue Shield trademarks and trade names[,]" *id.* (Subscriber Compl. ¶ 477).  According to the Subscriber Complaint, these restrictions "constitute agreements between competitors to divide and allocate geographic markets."  *Id.* at 104 (Subscriber Compl. ¶ 481).  And, the Subscriber Complaint alleges, these agreements are "*per se* violations of Section 1 of the Sherman Act" that have produced "inflated" and "supracompetitive premiums for [Blue Plan] enrollees" in the relevant geographic markets.  *Id.* at 14–15, 104 (Subscriber Compl. ¶¶ 8–10, 481).

The Subscriber Complaint also alleges that the License Agreements, Membership Standards, and Guidelines impose territorial restrictions that "restrict the ability of non-members of [the] BCBSA to acquire or obtain control over any member plan" by "prohibit[ing] acquisition of a Plan by a non-Blue entity without the approval of BCBSA."  *Id.* at 109–10 (Subscriber Compl. ¶¶ 501–03).  And the Subscriber Complaint alleges that "the License Agreements contain a number of acquisition restrictions" that "effectively preclude the sale of a BCBSA member to a non-member entity, absent special approval."  *Id.* at 110 (Subscriber Compl. ¶ 503).  According

to the Subscriber Complaint, these acquisition restrictions "reduce competition in violation of the Sherman Act because they substantially reduce the ability of non-member insurance companies to expand their business and compete against the Individual Blue Plans" by "forc[ing] competitors to build their own networks" instead of "choosing what may often be the more efficient solution of acquiring new networks by purchasing some or all of an existing Blue [P]lan." *Id.* at 111 (Subscriber Compl. ¶ 504).

Also, the Subscriber Complaint alleges that certain Blue Plans have adopted "Most Favored Nation" ("MFN") clauses in their reimbursement agreements that "require a service provider to charge a Blue entity's competitors either more than, or no less than, what the provider charges the Blue entity for the same services." *Id.* at 120 (Subscriber Compl. ¶¶ 531–32).

The Subscriber Complaint seeks injunctive relief prohibiting Blue Plans from "entering into, or from honoring or enforcing, any agreements that restrict the territories or geographic areas in which any BCBSA member plan may compete[.]" *Id.* at 464 (Subscriber Compl. Relief Requested ¶ b). Also, the Subscriber Complaint seeks treble money damages for the amount that defendants artificially inflated premiums above their competitive levels. *Id.* at 464–70 (Subscriber Compl. Relief Requested ¶¶ e–g, i, k, m, o, q, t, u, w, z, aa, cc, ee, gg, ii, kk, mm, pp, qq, rr, tt, uu, ww, yy, bbb, ccc).

### *The* Love *Litigation*

Years before the JPML transferred the MDL Action to the Northern District of Alabama, a group of plaintiffs filed a class action lawsuit against BCBSKS and other Blue Cross Blue Shield entities in the Southern District of Florida ("the *Love* Litigation"). Doc. 1-5 (Pls.' Sixth Am. Class Action Compl. ("*Love* Compl.")). Generally, the *Love* Litigation alleged that

11

BCBSKS, BCBSA, and the other Blue Plans conspired and coordinated "automated processing schemes" that they "used to deny, diminish and delay" reimbursement payments to healthcare providers. *Id.* at 1–4 (*Love* Compl. ¶¶ 1–5, 9). The *Love* Complaint asserted the following allegations:

- The Blue Plans "control a large percentage of the subscribers and providers in the managed care market in most states and in some local areas." *Id.* at 37 (*Love* Compl. ¶ 136).

- The Blue Plans "collectively insure . . . such a large pool of patients," which allows them "to perpetuate this scheme through their combined economic power and market dominance." *Id.* at 9 (*Love* Compl. ¶ 28).

- "In order to perpetuate their scheme, [the Blue Plans] use their overwhelming economic power and market dominance to coerce Individual Plaintiffs and the class, at the risk of being denied patient referrals and/or 'black-listed' altogether, into providing care under Defendants' policies and practice on a 'take it or leave it' basis and pursuant to 'all products' requirements." *Id.* at 38 (*Love* Compl. ¶ 138).

- The Blue Plans "engage in a common fraudulent scheme designed to systematically deny, delay and diminish payments to" healthcare providers. *Id.* at 6 (*Love* Compl. ¶ 16).

- The Blue Plans are "taking funds that have been rightfully earned by physicians and diverting them to their own use . . . ." *Id.* at 2 (*Love* Compl. ¶ 3).

- The Blue Plans "wield their economic power and market dominance . . . in furtherance of the scheme described above." *Id.* at 38 (*Love* Compl. ¶ 139).

- The Blue Plans "have not undertaken the above practices and activities in isolation, but instead have done so as part of a common scheme and conspiracy." *Id.* at 43 (*Love* Compl. ¶ 162).

- "The activities of the [BCBSA] are far-ranging, operating to create consistency and cooperation among the Blue Plans in a multitude of categories, thereby permitting the Defendants to formulate and carry out their conspiracy." *Id.* at 55 (*Love* Compl. ¶ 207).

***Allied World Denies Insurance Coverage and Files this Lawsuit***

After plaintiffs in the MDL Action filed the two consolidated complaints, BCBSKS tendered a claim to Allied World under both the D&O and E&O Policies seeking coverage for the Provider Complaint and Subscriber Complaint. Doc. 1 at 14 (Compl. ¶ 39). On March 4, 2014, Allied World agreed to reimburse "Defense Expenses" incurred by BCBSKS in connection with the MDL Action under the E&O Policy, subject to a full reservation of rights. *Id.* (Compl. ¶ 40); *see also* Doc. 1-8 at 7 (Mar. 4, 2014 Letter). Allied World agreed that the E&O Policy obligated it to provide coverage because:

> The MDL Action alleges a **Wrongful Act** because its alleges acts, errors or omissions in the performance of, or failure to perform, **Managed Care Activities**, including but not limited to **Provider Selection**; **Utilization Review**; advertising, marketing, selling, or enrollment for health care and other plans; establishing health care provider networks; and services or activities performed in the administration or management of health care plans.

Doc. 1-8 at 7 (Mar. 4, 2014 Letter).

In that same March 4, 2014 letter, Allied World denied coverage for the MDL Action under the D&O Policy. Doc. 1 at 14 (Compl. ¶ 41); *see also* Doc. 1-8 at 15 (Mar. 4, 2014

Letter).  Allied World recognized that the MDL Action appeared to fall within both the

"Antitrust Activities" Insuring Agreement and the separate "Wrongful Act" Insuring Agreement.

Doc. 1-8 at 13–14 (Mar. 4, 2014 Letter).  But, Allied World determined there was no coverage

under the D&O Policy because the D&O Policy's Managed Care Activities Exclusion precluded

coverage.  *Id.* at 14–15.  Specifically, Allied World explained:

> [T]he MDL Action alleges, arises out of, or is based upon or attributable to acts in
> the performance of **Managed Care Activities**, including but not limited to
> **Utilization Review**; advertising, marketing, selling, or enrollment for health care
> and other plans; establishing health care provider networks; and services or
> activities performed in the administration or management of health care plans.

*Id.* at 15.  Thus, Allied World concluded, the Managed Care Activities Exclusion applied to

BCBSKS's claim and "coverage for the MDL Action under the D&O Policy is excluded."  *Id.*

Allied World also reserved its rights to apply other conditions and exclusions found in the D&O

Policy.  *Id.* at 16–17.

### *The Current Litigation*

In 2018, Allied World filed this lawsuit against BCBSKS.  Doc. 1.  Allied World's

Complaint asserts one Count against BCBSKS seeking a declaratory judgment that Allied

World's D&O Policy provides no coverage for the MDL Action.  *Id.* at 15–16 (Compl. ¶ 45).

Allied World asserts three reasons why the D&O Policy doesn't cover the MDL Action:  (1) the

MDL Action alleges "acts done by BCBS-KS in the performance of **Managed Care**

**Activities**[,]" and thus falls within a D&O Policy exclusion; (2) the MDL Action "is derived

from essentially the same facts, or the same or related **Wrongful Acts**, as alleged in the prior

*Love* litigation[;]" and (3) the MDL Action plaintiffs "seek relief . . . that does not constitute

Loss and/or is uninsurable as a matter of law."  *Id.*

BCBSKS answered Allied World's Complaint and also filed a Counterclaim against Allied World. Doc. 16. Count I of BCBSKS's Counterclaim seeks a declaration that Allied World's D&O Policy obligates Allied World to pay BCBSKS all Defense Costs incurred in the MDL Action. *Id.* at 27–28 (Def.'s Countercl. ¶¶ 25–29). Count II of BCBSKS's Counterclaim asserts a breach of contract claim against Allied World for its alleged wrongful denial of coverage and failure to pay BCBSKS's Defense Costs for the MDL Action. *Id.* at 28–29 (Def.'s Countercl. ¶¶ 30–33). And Count III of BCBSKS's Counterclaim asserts a breach of the duty of good faith and fair dealing claim based on Allied World's refusal to pay BCBSKS's Defense Costs for the MDL Action under the D&O Policy. *Id.* at 29 (Def.'s Countercl. ¶¶ 34–37).

This matter now comes before the court on the parties' Cross-Motions for Judgment on the Pleadings under Fed. R. Civ. P. 12(c). BCBSKS has filed a Motion for Judgment on the Pleadings (Doc. 202)[3] that seeks a judgment: (a) against Count I of Allied World's Complaint for declaratory judgment declaring that the D&O Policy provides no coverage for the MDL Action; and (b) in BCBSKS's favor on Counts I and II of BCBSKS's Counterclaim. Allied World opposes BCBSKS's Motion for Judgment on the Pleadings and has filed its own Motion for Judgment on the Pleadings (Doc. 218). Allied World seeks a judgment (a) against Counts I and II of BCBSKS's Counterclaims, and (b) in its favor on "subsections (a)–(c) of Count I in Allied World's Complaint."[4] *Id.*

---

[3] As already explained, *see supra* note 2, BCBSKS filed its Motion for Judgment on the Pleadings in the lead case, Case No. 18-2371. The corresponding briefing, as well as Allied World's Motion for Judgment on the Pleadings, is docketed in Case No. 18-2371.

[4] The parties agree that a portion of this case is stayed. *See* Doc. 205 at 4; Doc. 218 at 6 n.1. At the parties' request, Magistrate Judge James P. O'Hara granted a Joint Agreed Motion to stay the claims asserted in Count "45(e) in Allied World's Complaint . . . regarding . . . Allied World's . . . alleged dut[y] to indemnify BCBSKS for a judgment or settlement in the" MDL Action. Doc. 151 at 2. BCBSKS explains that this Order "stayed the part of this case regarding Allied World's indemnity obligations for any judgment or settlement in the" MDL Action but it "has not stayed the part of this case regarding

The court addresses the parties' arguments on their competing Cross-Motions for Judgment on the Pleadings, below.  But first, the court recites the legal standard governing the parties' cross motions.

## II.      Legal Standard

### A.  Rule 12(c) Motion for Judgment on the Pleadings

Federal Rule of Civil Procedure 12(c) governs motions for judgment on the pleadings.  It provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  A court evaluates a Rule 12(c) motion under the same standard that governs a Rule 12(b)(6) motion to dismiss.  *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1160 (10th Cir. 2000).  To survive a Rule 12(b)(6) motion to dismiss, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

---

Allied World's obligation to pay BCBSKS's Defense Costs[.]"  Doc. 205 at 4.  Thus, BCBSKS asserts, the court "can and should decide now" whether "Allied World wrongfully denied coverage and must pay BCBSKS's Defense Costs."  *Id.*

Allied World doesn't dispute that the stay applies only to its indemnity obligations and not to its duty to provide insurance coverage for Defense Costs.  Thus, this Order decides whether Allied World is entitled to a judgment on the pleadings of only a portion of its Count I—the portion seeking a declaratory judgment about its obligations to pay Defense Costs.  And this Order doesn't address the portion of its Count I asserting that Allied World is entitled to a declaratory judgment that it has no obligation to indemnify BCBSKS for any judgment or settlement in the MDL Action.  Indeed, Allied World specifically explains that it isn't moving for judgment on the pleadings for the portion of its Count I that is stayed.  Doc. 218 at 6 n.1.

In contrast, BCBSKS's Counterclaim doesn't seek any relief against Allied World based on an alleged duty to indemnify BCBSKS for any judgment or settlement in the MDL Action.  *See generally* Doc. 16 (Case No. 18-2515); *see also* Doc. 202 at 3 (Case No. 18-2371).  Instead, it only seeks relief based on Allied World's alleged duty to provide coverage for BCBSKS's Defense Costs in the MDL Action.  Doc. 16 at 27–29 (Def.'s Countercl. ¶¶ 25–37).  Thus, BCBSKS asserts, the court can "resolve Counts I and II of BCBSKS's Counterclaim in their entirety."  Doc. 202 at 3.

inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

When considering a Rule 12(b)(6) motion to dismiss or a Rule 12(c) motion for judgment on the pleadings, the court must assume that the factual allegations in the complaint are true, but it is "'not bound to accept as true a legal conclusion couched as a factual allegation.'" *Id.* (quoting *Twombly*, 550 U.S. at 555); *see also Atl. Richfield*, 226 F.3d at 1160 (explaining that on a Rule 12(c) motion, the court must "accept the well-pleaded allegations of the complaint as true and construe them in the light most favorable to the non-moving party" (citation and internal quotation marks omitted)).  And though this pleading standard doesn't require "'detailed factual allegations,'" it demands more than a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" which, as the Supreme Court explained, "'will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

When deciding cross motions for judgment on the pleadings, courts have recognized that the cross motions "simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Mercury Sys., Inc. v. S'holder Representative Servs., LLC*, 820 F.3d 46, 51 (1st Cir. 2016) (citation and internal quotation marks omitted).  It's an "analysis similar to that used for cross-motions for summary judgment," *id.* (citing *Curran v. Cousins*, 509 F.3d 36, 44 (1st Cir. 2007)), which requires courts to treat the cross motions "separately; the denial of one does not require the grant of another[,]" *Buell Cabinet Co., Inc. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) (citations omitted).

**B.  Kansas Law Governing Interpretation of Insurance Contracts**

The parties agree that Kansas law governs this dispute.  *See* Doc. 205 at 9 (citing Doc. 52 at 25); *see also* Doc. 218 at 17–19.  Kansas law classifies insurance contracts' construction and

effect as issues of law that the court must decide.  *AMCO Ins. v. Beck*, 929 P.2d 162, 165 (Kan. 1996) ("Insurance policies are considered contracts.  The interpretation and construction of a contract is a question of law." (citation omitted)).

The Kansas Supreme Court has summarized Kansas law governing interpretation of insurance contracts this way:

> The language of a policy of insurance, like any other contract, must, if possible, be construed in such manner as to give effect to the intention of the parties.  Where the terms of a policy of insurance are ambiguous or uncertain, conflicting, or susceptible of more than one construction, the construction most favorable to the insured must prevail.  Since the insurer prepares its own contracts, it has a duty to make the meaning clear.  If the insurer intends to restrict or limit coverage provided in the policy, it must use clear and unambiguous language in doing so; otherwise, the policy will be liberally construed in favor of the insured.

*Catholic Diocese of Dodge City v. Raymer*, 840 P.2d 456, 459 (Kan. 1992) (citation omitted).

But when "language in an insurance policy is clear and unambiguous, it must be construed in its plain, ordinary, and popular sense," and the court "shall enforce the contract as made."  *Bhd. Mut. Ins. v. M.M. ex rel. T.C.*, 292 F. Supp. 3d 1195, 1205 (D. Kan. 2017) (applying Kansas law); *see also City of Shawnee v. Argonaut Ins.*, 546 F. Supp. 2d 1163, 1173–74 (D. Kan. 2008) (applying Kansas law) ("If a policy is unambiguous, the intention of the parties and the meaning of the contract are determined from the instrument itself."); *City of Salina v. Md. Cas. Co.*, 856 F. Supp. 1467, 1477–78 (D. Kan. 1994) ("The court must take the exclusionary clause's language in its 'plain, ordinary, and popular sense.'" (quoting *Wing Mah v. U.S. Fire Ins.*, 545 P.2d 366, 369 (Kan. 1976))).

The question a court should ask when deciding whether a particular policy is ambiguous is this:  What would "a reasonably prudent insured" understand the language to mean?  *Bhd. Mut. Ins.*, 292 F. Supp. 3d at 1205 (citation omitted); *see also Dillon Cos., Inc. v. Royal Indem. Co.*, 369 F. Supp. 2d 1277, 1284 (D. Kan. 2005) ("The test to be applied in determining the

intention of the parties to an insurance policy is not what the insurer intended the policy to mean, but what a reasonable person in the position of the insured would understand it to mean." (citation omitted)).  Ambiguity exists if the policy "contains language of doubtful or conflicting meaning based on a reasonable construction of the policy's language." *Bhd. Mut. Ins.*, 292 F. Supp. 3d at 1205.  If terms in an insurance contract are ambiguous, "the construction most favorable to the insured must prevail, because the insurer prepares its own contracts and has a duty to make the meaning clear." *Id.* (citation omitted); *see also Dillon Cos.*, 369 F. Supp. 2d at 1284 ("Because an insurer drafts its own contracts, it bears the responsibility of making the meaning clear, and any failure to do so will result in strict construction against the insurer [and any] ambiguities will be construed in the way most favorable to the insured." (citations omitted)).

But, "[c]ourts should not strain to find an ambiguity where common sense shows there is none.  The court must consider the terms of an insurance policy as a whole, without fragmenting the various provisions and endorsements." *City of Shawnee*, 546 F. Supp. 2d at 1174 (citations omitted).  "An ambiguity does not exist merely because the parties disagree on the interpretation of the language . . . [it] arises only if language at issue is subject to two or more reasonable interpretations and its proper meaning is uncertain." *Id.* (citation and internal quotation marks omitted).

In Kansas, the insured bears the burden to prove the insurance policy provides coverage. *Shelter Mut. Ins. v. Williams ex rel. Williams*, 804 P.2d 1374, 1383 (Kan. 1991).  And then, the insurance company must shoulder the burden to prove that a specific provision of the policy excludes coverage. *Id.*  "Generally, exceptions, limitations, and exclusions to insurance policies require narrow construction on the theory that the insurer, having affirmatively expressed

coverage through broad promises, assumes the duty to define any limitations on that coverage in clear and explicit terms." *Miller v. Westport Ins.*, 200 P.3d 419, 426 (Kan. 2009) (citation and internal quotation marks omitted); *see also Dillon Cos.*, 369 F. Supp. 2d at 1284 ("Grants of coverage will be construed broadly and exclusions or limitations of coverage will be construed narrowly." (citation omitted)).

## III.   Analysis

BCBSKS argues that the D&O Policy obligates Allied World to provide insurance coverage for its Defense Costs for the MDL Action.  Specifically, BCBSKS asserts that the D&O Policy provides coverage—or at least has the potential for coverage[5]—under the Antitrust

---

[5]      Kansas imposes on insurers a "duty to defend" their insureds when an underlying action "give[s] rise to a 'potential for liability' under the policy[.]" *Patrons Mut. Ins. v. Harmon*, 732 P.2d 741, 744 (Kan. 1987) (quoting *Gray v. Zurich Ins.*, 419 P.2d 168, 177 (Cal. 1966)); *see also Miller v. Westport Ins.*, 200 P.3d 419, 425 (Kan. 2009).  Here, BCBSKS concedes that Allied World doesn't have a duty to defend the MDL Action under the D&O Policy, but it argues that Allied World has a duty to pay its Defense Costs in the MDL Action.  BCBSKS asserts that courts outside Kansas apply this same "potential for liability" standard to determine whether an insured has a duty to pay defense costs.  *See In re WorldCom, Inc. Sec. Litig.*, 354 F. Supp. 2d 455, 464 (S.D.N.Y. 2005) ("The duty to pay defense costs exists whenever a complaint against the insured alleges claims that may be covered under the insurer's policy." (citations and internal quotation marks omitted)); *see also Liberty Mut. Ins. v. Pella Corp.*, 633 F. Supp. 2d 714, 724 (S.D. Iowa 2009) (holding that insurer had "contemporaneous duty to reimburse" insured's attorneys' fees in underlying lawsuits "so long as the Underlying Lawsuits contain allegations that potentially bring the action within the policy coverage").

Allied World disagrees.  It argues that the "potential for coverage" standard doesn't apply to the question whether Allied World has a duty to cover BCBSKS's Defense Costs.  For support, Allied World cites cases where courts have refused to apply the "potential for coverage" standard to questions about insurance coverage for litigation costs.  *See Conn. Mun. Elec. Energy Coop. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, No. 3:19cv839 (JBA), 2021 WL 4170757, at *10 (D. Conn. Sept. 14, 2021) (concluding the court would "assess, consistent with the Policy, whether a loss is a covered loss under the Policy, not 'the reasonable potential for coverage' standard"); *see also Jeff Tracy, Inc. v. U.S. Specialty Ins.*, 636 F. Supp. 2d 995, 1003–04 (C.D. Cal. 2009) (refusing to "impos[e] a duty to pay all defense costs once a potential for coverage is shown" and instead requiring insured to "establish that the underlying claims are within the basic scope of coverage").

BCBSKS concedes there's a split of authority on this question.  Doc. 223 at 7 n.2.  But it argues that "the weight of authority, and the better view, is that the 'potential for coverage' standard applies regardless of whether the insurer's duty is to advance defense costs or defend." *Id.* ("'[M]ost courts apply traditional duty to defend analysis when determining whether insurers must advance or reimburse

Activities Insuring Agreement.  *See* Doc. 1-7 at 27 (D&O Policy § I.D.).  That provision of the

D&O Policy provides:

> The **Insurer** shall pay on behalf of the **Insureds** . . . the **Loss** arising from a **Claim**, first made during the **Policy Period** . . . against the **Insureds** for **Antitrust Activities**, and reported to the **Insurer** in accordance with Section VII. of this Policy.

*Id.* at 27 (D&O Policy § I.D.).  The D&O Policy defines "**Antitrust Activities**" as:

> price fixing; restraint of trade; monopolization; unfair trade practices; or violation of the Federal Trade Commission Act, as amended, the Sherman Act[,] the Clayton Act, as amended, or any other federal statute involving antitrust, monopoly, price fixing, price discrimination, predatory pricing or restraint of trade activities, or of any rules or regulations promulgated under or in connection with any of the foregoing statutes, or of any similar provision of any federal, state or local statute, rule or regulation or common law.

*Id.* at 30 (D&O Policy § II.C.).

BCBSKS asserts that allegations in the MDL Action fall within the D&O Policy's

definition of Antitrust Activities, and thus, the D&O Policy provides coverage for its claim based

on the MDL Action.  And Allied World appears to concede as much in its March 4, 2014 Letter.

*See* Doc. 1-8 at 14 (Mar. 4, 2014 Letter) ("The allegations contained in the MDL Action,

violations of the Sherman Act, appear to fall within the definition of **Antitrust Activities**.  Thus,

it appears that [the Antitrust Activities Insuring Agreement is] arguably implicated by the

allegations in the MDL Action.").  BCBSKS asserts that the D&O Policy contains no other

---

insureds' defense expenses.'" (quoting Douglas R. Richmond, *Liability Insurance and the Duty to Pay Defense Expenses Versus the Duty to Defend*, 52 Tort Trial & Ins. Prac. L.J. 1, 9 (2016))).

       The parties have cited no Kansas cases that have decided this question as it applies to insurance coverage for litigation costs.  And the court has located none in its own research.  However, the court predicts that the Kansas Supreme Court—if confronted with this issue—would follow the majority view and apply the "potential for coverage" standard to the question whether an insurer has a duty to pay litigation costs—just as it applies this same standard to the duty to defend.  Thus, the court applies the "potential for coverage" standard to the question whether Allied World has a duty to pay BCBSKS's Defense Costs in the MDL Action.

provisions or exclusions precluding coverage of its Defense Costs in the MDL Action.  Thus, BCBSKS argues, it deserves a declaratory judgment that the D&O Policy obligates Allied World to pay its Defense Costs.

Allied World predictably disagrees.  It argues that the D&O Policy contains certain provisions and exclusions that preclude coverage for the MDL Action's Defense Costs.  Allied World advances two principal reasons for its position.  *First*, Allied World argues that the D&O Policy's Managed Care Activities Exclusion bars coverage for the MDL Action.  *Second*, Allied World contends that the D&O Policy's Prior or Pending Litigation Exclusion and Related Claims Provision both preclude coverage for the MDL Action because, Allied World contends, the MDL Action asserts the same or related unlawful conduct as plaintiffs asserted in the prior *Love* Litigation.  Thus, Allied World argues, the court should declare that it has no obligation to provide insurance coverage for BCBSKS's Defense Costs in the MDL Action under the D&O Policy.

The following subparts address Allied World's two arguments as well as BCBSKS's competing arguments that none of these provisions or exclusions eliminate coverage under the D&O Policy.  For reasons explained, when the courts views the facts in BCBSKS's favor, the court agrees with Allied World.  Specifically, the D&O Policy excludes any potential coverage for Defense Costs incurred by BCBSKS in the MDL Action for two distinct reasons:  (1) the Managed Care Activities Exclusion plainly and unambiguously excludes any potential for coverage of the MDL Action because the MDL Action arises from Managed Care Activities; and (2) the Prior or Pending Litigation Exclusion and Related Claims Provision preclude any potential for coverage of the MDL Action because its claims relate to the prior *Love* Litigation.  Each reason provides a separate and independent reason to conclude that the D&O Policy

provides no potential for coverage of BCBSKS's Defense Costs in the MDL Action.  The court

explains how it comes to these two conclusions, below.

### A.  Managed Care Activities Exclusion

Allied World asserts that the Managed Care Activities Exclusion precludes coverage

under the D&O Policy.  As discussed, the Managed Care Activities Exclusion excludes coverage

for "any **Loss** in connection with any **Claim** . . . alleging, arising out of, based upon, or

attributable to, any actual or alleged act, error or omission in the performance of, or failure to

perform, **Managed Care Activities** by any **Insured** . . . ."  Doc. 1-7 at 38, 41 (D&O Policy §

III.N.).  *Id.*  The D&O Policy defines "**Managed Care Activities**" as:

> **Utilization Review;** advertising, marketing, selling, or enrollment for health care
> or workers' compensation plans; . . . establishing health care provider networks;
> . . . and services or activities performed in the administration or management of
> health care, consumer directed health care, behavioral health, prescription drug,
> dental, vision, long or short term disability, life, automobile medical payment, or
> workers' compensation plans[.]

*Id.* at 16 (D&O Policy Endorsement No. 10).

As explained, Kansas law directs the court to construe the "clear and unambiguous"

language of the D&O Policy—including its exclusionary clauses—"in its plain, ordinary, and

popular sense and according to the sense and meaning of the terms used."  *Marshall v. Kan.*

*Med. Mut. Ins.*, 73 P.3d 120, 111 (Kan. 2003) (citation omitted); *see also City of Salina*, 856 F.

Supp. at 1477–78 ("The court must take the exclusionary clause's language in its plain, ordinary,

and popular sense." (citation and internal quotation marks omitted)).  Here, the plain language of

the D&O Policy's Managed Care Activities Exclusion excludes coverage for the MDL Action

because that litigation "alleg[es], aris[es] out of, [is] based upon, or [is] attributable to"

BCBSKS's performance of "**Managed Care Activities** . . . ."  Doc. 1-7 at 41 (D&O Policy §

III.N.).

Both the MDL Action's Provider Track and Subscriber Track allege the Blue Plans, along with BCBSKS and BCBSA, have engaged in unlawful conspiracies violating the antitrust laws in their performance of Managed Care Activities.  Specifically, both Tracks of claims allege defendants have conspired unlawfully to divide the geographic market into "Service Areas" and enter illegal agreements not to compete against one another within those "Service Areas," thereby preventing provider networks from developing and competing against one another.  Doc. 1-4 at 8–13, 92 (Provider Compl. ¶¶ 1, 4, 7, 8, 226); Doc. 1-3 at 14–15, 102, 109 (Subscriber Compl. ¶¶ 8–9, 470, 500).  Also, both Tracks allege that defendants unlawfully have agreed to limit their revenues from selling non-Blue Cross Blue Shield branded insurance.  Doc. 1-4 at 17–18 (Provider Compl. ¶ 15); Doc. 1-3 at 102–03 (Subscriber Compl. ¶¶ 474–77).  And the Provider Track alleges a price fixing conspiracy based on defendants' alleged agreement to participate in "national programs including the Blue Card and National Accounts Programs, which determine the price and the payment policies to be utilized when a patient insured by a Blue [Plan] or included in an employee benefit plan administered by a [d]efendant receives healthcare services within the Service Area of another Blue [Plan.]"  Doc. 1-4 at 123 (Provider Compl. ¶ 328).

The Provider Track asserts that defendants' alleged antitrust violations have forced them to accept less favorable rates for services provided to non-Blue Cross Blue Shield insureds and have precluded them from having access to more patients than they otherwise would have had but for defendants' anticompetitive agreement.  Doc. 1-4 at 171–72 (Provider Compl. ¶¶ 470, 475).  And the Subscriber Track asserts that defendants' alleged antitrust violations have forced them to pay overcharges for health insurance premiums.  Doc. 1-3 at 14–15 (Subscriber Compl. ¶¶ 8–9).

These alleged antitrust violations arise out of or are attributable to BCBSKS's performance of Managed Care Activities—as the D&O Policy defines that term.  The allegations that BCBSKS and other defendants divided the geographic market into "Service Areas" and then entered illegal agreements not to compete against one another in those "Service Areas" plainly involve "advertising, marketing, selling, or enrollment for health care . . . plans" and "establish[ment] of health care provider networks;" something that the D&O Policy specifically includes within the Managed Care Activities' definition. Doc. 1-7 at 16 (D&O Policy Endorsement No. 10).  The allegations about defendants' unlawful agreement to limit their revenues from selling non-Blue Cross Blue Shield branded insurance undoubtedly constitute "selling, or enrollment for health care . . . compensation plans[.]"  *Id.*  The price fixing conspiracy alleged—one that asserts BCBSKS and other defendants unlawfully fixed reimbursement rates for Providers—indisputably involves "services or activities performed in the administration or management of health care . . . plans[.]"  *Id.*  And the damages alleged by both Tracks of claims in the MDL Action—*i.e.*, that defendants' unlawful activities have forced Providers to accept less favorable rates and Subscribers to pay overcharges for health insurance premiums—plainly constitute "services or activities performed in the administration or management of health care . . . plans[.]"  *Id.*  Thus, the court concludes, the MDL Action "alleg[es], aris[es] out of, [is] based upon, or [is] attributable to" BCBSKS's performance of "**Managed Care Activities** . . . ."  *Id.* at 41 (D&O Policy § III.N.).  As a consequence, the court holds that Allied World—as insurer—has shouldered its burden to prove that the Managed Care Activities Exclusion applies to preclude any potential for coverage of BCBSKS's Defense Costs in the MDL Action.

BCBSKS disputes this conclusion.  It asserts at least four arguments trying to support its position that the Managed Care Activities Exclusion doesn't apply here to bar any potential for coverage of its Defense Costs in the MDL Action.

*First*, BCBSKS argues that the Managed Care Activities Exclusion presents an ambiguity in the D&O Policy that the court must construe against the insurer—here, that's Allied World. Specifically, BCBSKS argues that Allied World's interpretation of the Managed Care Activities Exclusion eviscerates coverage for most—if not all—antitrust claims under the D&O Policy. Yet, BCBSKS asserts, it specifically contracted for and purchased an express grant of antitrust coverage through the D&O Policy's Antitrust Activities Insuring Agreement.  Doc. 1-7 at 27 (D&O Policy § I.D.).

But, as Allied World correctly asserts, an ambiguity exists if the policy "contains language of doubtful or conflicting meaning based on a reasonable construction of the policy's language." *Bhd. Mut. Ins.*, 292 F. Supp. 3d at 1205.  "An ambiguity does not exist merely because the parties disagree on the interpretation of the language . . . [it] arises only if language at issue is subject to two or more reasonable interpretations and its proper meaning is uncertain." *City of Shawnee*, 546 F. Supp. 2d at 1174–75 (citation and internal quotation marks omitted). Here, BCBSKS hasn't shown that the D&O Policy contains language that conflicts or is susceptible to two or more reasonable interpretations.  Instead, as discussed, the unambiguous language of the Managed Care Activities Exclusion applies here to preclude any potential for coverage.  In these circumstances, the court must enforce the D&O Policy as it was written.  *See Farm Bureau Mut. Ins. v. Old Hickory Cas. Ins.*, 810 P.2d 283, 286 (Kan. 1991) ("When an insurance contract is not ambiguous, the court may not make another contract for the parties.  Its function is to enforce the contract as made."); *see also Liggatt v. Emps. Mut. Cas. Co.*, 46 P.3d

1120, 1127 (Kan. 2002) ("Unless there is a finding that an insurance policy is ambiguous, the reasonable expectations doctrine does *not* permit the court to reform the unambiguous meaning of the contract.").

BCBSKS asserts that Kansas law doesn't require it to identify particular language in the D&O Policy that has doubtful or conflicting meaning.  Instead, it contends that "the whole [Managed Care Activities] Exclusion is ambiguous as applied to a claim alleging Antitrust Activities, when considered in light of the insuring agreement for Antitrust Activities."  Doc. 223 at 15.  For support, BCBSKS's opening brief cites cases where courts found ambiguous insurance policies expressly granting insurance coverage for certain acts but also contained an exclusion precluding coverage for those same acts.  *See Tews Funeral Home, Inc. v. Ohio Cas. Ins.*, 832 F.2d 1037, 1045 (7th Cir. 1987) ("In effect, one part of [the insurance] policy insures against intentional torts or acts, while another part of the policy attempts to exclude coverage for these same acts.  We therefore must resolve this ambiguity against [insurer] and hold that it must defend [insured] against [underlying lawsuit] because its policy potentially covers the conduct alleged there."); *see also N. Bank v. Cincinnati Ins.*, 125 F.3d 983, 986 (6th Cir. 1997) (holding that policy contained an "ambiguity" that was "construed against the drafter and in favor of coverage" where "policy purports to cover 'discrimination,' but the exclusion is sufficiently ambiguous that it allows the defendant to argue that the policy does not provide coverage for most discrimination cases because they normally arise from claims of intentional discrimination"); *Alstrin v. St. Paul Mercury Ins.*, 179 F. Supp. 2d 376, 397–98 (D. Del. 2002) (holding that "where the policy states that it provides coverage for securities claims" but "only provides coverage for those claims that are based on reckless or negligent behavior[,]" the exclusion was "irreconcilable with the coverage grant itself, because no one purchasing a policy

27

that provides coverage for securities claims . . . would intend to purchase such restricted coverage").

These cases differ from the facts presented here.  In BCBSKS's cases, the insurance policies at issue contained exclusions that completely precluded coverage for certain acts for which the policies expressly had granted coverage in another part of the contract.  Here—and as discussed in more detail below—the Managed Care Activities Exclusion doesn't apply to preclude *all* claims involving Antitrust Activities.  Instead, the Managed Care Activities Exclusion applies only to antitrust claims arising out of the performance of Managed Care Activities.  To the extent BCBSKS faces an antitrust claim that arises out of some conduct other than Managed Care Activities—for example, "in connection with a merger or acquisition, claims involving the offering of an equity or debt, . . .  and myriad other claims against directors or officers arising from commercial transactions"—the Managed Care Activities Exclusion wouldn't preclude coverage.  *See Benecard Servs., Inc. v. Allied World Specialty Ins.*, No. 15-8593 (MAS) (TJB), 2020 WL 2840135, at *13 (D.N.J. May 31, 2020), *aff'd* Nos. 20-2359, 20-2360, 2021 WL 4077047 (3d Cir. Sept. 8, 2021).  Instead, the Antitrust Activities Insuring Agreement likely would apply—depending on the facts of the claim—and the Managed Care Activities Exclusion wouldn't operate as a bar to insurance coverage under the D&O Policy.

Thus, the Managed Care Activities Exclusion creates no ambiguity in the D&O Policy.  *See Everest Indem. Ins. v. Jake's Fireworks, Inc.*, 501 F. Supp. 3d 1158, 1178 (D. Kan. 2020) (applying Kansas law and holding that insurance policy's "exclusion is not so broad as to make it ambiguous or to render coverage illusory; rather, the exclusion makes sense given the purpose to be accomplished by the commercial general-liability policy at issue"); *see also Coleman v. Sch. Bd. of Richland Parish*, 418 F.3d 511, 521 (5th Cir. 2005) (applying Louisiana law and holding

that "while the policy's exclusion for intentional acts cabin[ed] the scope of the policy's coverage, it [did] not render the policy's discrimination and harassment provisions wholly ineffective" and did "not give rise to an absurd outcome whereby the policy completely takes back with one hand what it gives with the other[,]" so "no intractable or irreconcilable conflict exist[ed] between the policy's coverage of racial discrimination and harassment and its exclusions"); *Safeco Ins. Co. of Am. v. Mares*, 71 F. App'x 808, 812 (10th Cir. 2003) (applying New Mexico law, noting that the "fact that a particular policy contains a broad coverage provision followed by a specific coverage exclusion does not automatically render the policy ambiguous or invalidate the exclusion[,]" and holding that although "the exclusion in this case may deny coverage in certain circumstances, it is not so broad or nebulous that it swallows and effectively nullifies a broad insuring clause" (citations and internal quotation marks omitted)). As a consequence, the court must construe the Managed Care Activities Exclusion according to its "plain, ordinary, and popular sense," and the court must enforce the contract as made. *Bhd. Mut. Ins.*, 292 F. Supp. 3d at 1205 (citations omitted). As already discussed, the plain and ordinary language of the Managed Care Activities Exclusion applies to preclude any potential for coverage under the D&O Policy for BCBSKS's Defense Costs in the MDL Action.

      *Second*, BCBSKS asserts that Allied World mischaracterizes the MDL Action's allegations to fit them within the Managed Care Activities Exclusion. BCBSKS argues that the allegations don't arise from Managed Care Activities. Instead, BCBSKS asserts, the MDL Action alleges "antitrust violations, namely an alleged conspiracy to use Exclusive Service Areas and other means to limit competition among" the Blue Plans and a scheme to increase the Blue Plans' "profits by paying providers less and charging subscribers more[.]" Doc. 223 at 9. BCBSKS argues that "the real core of the litigation is the [Blue Plans'] alleged agreement not to

compete with each other." *Id.* at 10.  The court agrees with that description.  The MDL Action

asserts antitrust claims based on the Blue Plans' alleged agreement not to compete with one

another *when performing Managed Care Activities.*  Thus, the MDL Action asserts claims

"alleging, arising out of, based upon or attributable to, any actual or alleged act . . . in the

performance of . . . **Managed Care Activities**[.]"  Doc. 1-7 at 41 (D&O Policy § III.N.).  As a

consequence, the Managed Care Activities Exclusion applies to preclude the potential for

insurance coverage.

> *Third*,  BCBSKS argues that Allied World's interpretation of the Managed Care

Activities Exclusion—one that applies the Exclusion to the claims asserted in the MDL Action—

is much too broad because it precludes coverage for virtually all of BCBSKS's business.

BCBSKS is a managed care organization.  Thus, it contends, Allied World's broad interpretation

of the Managed Care Activities Exclusion nullifies coverage for any antitrust claims arising out

of BCBSKS's business.  And so, BCBSKS argues, it makes no sense to construe the D&O

Policy in this fashion when BCBSKS expressly purchased coverage for antitrust claims through

the Antitrust Activities Insuring Agreement.

> BCBSKS argues that the court must construe the Managed Care Activities Exclusion

"especially narrowly" because it is a professional services exclusion contained within a D&O

policy that is "designed to cover liability for actions taken in the conduct of the insured's

business" and a broader reading of the exclusion "will render the coverage provided by the D&O

Policy virtually worthless."  Doc. 205 at 16–17; *see also* Doc. 223 at 8.  BCBSKS cites several

cases to support its argument.  *See* Doc. 205 at 15–17.  None of them were decided by a Kansas

court, and none purported to apply Kansas law.  Also, none of the cases instruct courts to apply

an "especially narrow" construction to a professional services exclusion.  *See id.*

Instead, the cases hold—based on the facts germane to the individual case—that an exclusion's "specific language" didn't apply to cover "specific allegations in the Underlying Complaint" to preclude coverage. *See Atl. Healthcare, LLC v. Argonaut Ins.*, No. 19-14420-CIV, 2020 WL 6393114, at *8 (S.D. Fla. Oct. 15, 2020) (holding that the managed care activities exclusion didn't apply "to everything alleged in the Underlying Complaint simply because [p]laintiffs operate a nursing home," and concluding that "while some allegations arguably pertain to performing, rendering, or failing to render managed care activities as set forth in the exclusion, others [did] not[,]" including allegations about "taking [nursing home patient's] assets despite her being a vulnerable adult"); *see also Great Am. Ins. v. Geostar Corp.*, Nos. 09-12488-BC, 09-12608-BC, 09-14306-BC, 2010 WL 845953, at *12 (E.D. Mich. Mar. 5, 2010) (noting that "professional E & O exclusions in D & O policies must be interpreted more narrowly to avoid negating the entire coverage scheme through the operation of an overly broad exclusion" and recognizing that "inquiry is extremely fact-intensive and varies from case to case and from claim to claim" and concluding that the exclusion barred "[s]ome . . . but . . . certainly not all" of the underlying claims); *Gallup, Inc. v. Greenwich Ins.*, No. N14C-02-136FWW, 2015 WL 1201518, at *12 (Del. Super. Ct. Feb. 25, 2015) (concluding that insurer drafted exclusion "so broadly . . . that virtually any aspect of [p]laintiff's business would be 'related' to rendering 'professional services' which conceivably would preclude coverage for all claims made under the Policy" and "interpreting exclusionary provisions so broadly as to vitiate all coverage undermines the purpose of having an insurance policy").

Because none of BCBSKS's cited cases call for the court to apply an "*especially* narrow" construction to the Managed Care Activities Exclusion, the court declines to do so here. Still, the court recognizes that Kansas law requires "narrow construction" of the Managed Care

Activities Exclusion because Kansas recognizes that "the insurer, having affirmatively expressed coverage through broad promises, assumes the duty to define any limitations on that coverage in clear and explicit terms." *Miller v. Westport Ins.*, 200 P.3d 419, 426 (Kan. 2009) (citation and internal quotation marks omitted); *see also Dillon Cos. v. Royal Indem. Co.*, 369 F. Supp. 2d 1277, 1284 (D. Kan. 2005) ("Grants of coverage will be construed broadly and exclusions or limitations of coverage will be construed narrowly." (citation omitted)).

Here, applying a narrow construction, the Managed Care Activities Exclusion uses clear and explicit language to exclude coverage for Managed Care Activities. Because the MDL Action's claims allege, arise out of, and are based upon "alleged act[s] . . . in the performance of . . . **Managed Care Activities**[,]" Doc. 1-7 at 41 (D&O Policy § III.N.), the court concludes that no potential for coverage exists because the Managed Care Activities Exclusion excludes coverage of BCBSKS's Defense Costs in the MDL Action.

Also, the Managed Care Activities Exclusion doesn't nullify insurance coverage for Antitrust Activities under the D&O Policy, as BCBSKS contends it does. As Allied World correctly asserts, a New Jersey federal court rejected a similar argument in *Benecard Services Inc. v. Allied World Specialty Insurance Co.*, No. 15-8593 (MAS) (TJB), 2020 WL 2840135, at *13 (D.N.J. May 31, 2020), *aff'd* Nos. 20-2359, 20-2360, 2021 WL 4077047 (3d Cir. 2021) (applying New Jersey law). In *Benecard*, plaintiff—the insured—sought a declaratory judgment that its D&O Policy obligated the insurer to indemnify and provide defense coverage for an underlying lawsuit brought against the insured. *Id.* at *5. The D&O Policy at issue provided "Wrongful Act" coverage and also contained a Managed Care Activities Exclusion that excluded coverage for claims arising out of the performance of Managed Care Activities. *Id.* at *3–4. The *Benecard* plaintiff argued that applying the Managed Care Activities Exclusion to bar coverage

of its claim "renders its coverage illusory and, if applied, would frustrate [the insured's] reasonable expectations" because it would "render its coverage inapplicable to [the insured's] business entirely." *Id.* at *7.

The New Jersey federal court rejected the argument by *Benecard*'s insured. *Id.* at *13. It found that "reading the Policy to exclude coverage for the [underlying lawsuit] does not provide [the insured] illusory insurance coverage nor contravene New Jersey's policy against such coverage." *Id.* The court recognized that, even if the *Benecard* insured "only performs Managed Care services, the exclusion bars coverage from claims involving the performance of [the *Benecard* insured's] commercial services—*not any claim relevant to its business*," as the insured had alleged. *Id.* (emphasis added) (citation and internal quotation marks omitted). The court noted that the D&O Policy "would cover wrongdoing in connection with a merger or acquisition, claims involving the offering of an equity or debt, defense coverage for directors or officers indicted for stealing from [the insured] or others, and myriad other claims against directors or officers arising from commercial transactions." *Id.* And the court agreed with the insured that those types of claims "are the very risks for which D&O coverage is generally sought, not the risk of claims by customers." *Id.* (citation and internal quotation marks omitted). Thus, the court held, applying "the Managed Care Exclusion as written does not render its coverage illusory simply because it does not apply to claims arising out of the performance of Managed Care Activities." *Id.* As a consequence, the court refused to "override the plain language of the Policy and extend coverage to an occurrence which was explicitly carved out" by the Policy's Managed Care Activities Exclusion. *Id.*

The Third Circuit affirmed the federal district court's decision. *Benecard Servs., Inc. v. Allied World Specialty Ins.*, Nos. 20-2359, 20-2360, 2021 WL 4077047, at *5 (3d Cir. 2021).

The Circuit found "unavailing" the *Benecard* insured's argument that the Managed Care Activities Exclusion precluded coverage for its business entirely, thus rendering its coverage illusory.  *Id.*  Instead, the Circuit held that the "District Court's reading of the Managed Care exclusion does not render coverage illusory simply because it bars coverage for the particular claim" at issue—*i.e.*, coverage for the underlying lawsuit.  *Id.*  The Circuit recognized that the Managed Care Activities Exclusion bars coverage for "'Managed Care Activities,' defined to include services like the ones [the insured] performed while managing the prescription drug plans, such as enrollment and claims handling[,]" but the Exclusion "does not affect coverage for alleged wrongful acts by [the insured's] executives, or other forms of coverage provided under the policy."  *Id.*

The reasoning in *Benecard* is highly persuasive and fits this case's facts.  Here, the D&O Policy's Managed Care Activities Exclusion unambiguously precludes coverage for claims arising out of the performance of, or the failure to perform, Managed Care Activities.  The Exclusion applies to the express grant of coverage provided in the Antitrust Activities Insuring Agreement.  Although BCBSKS is a managed care organization who performs Managed Care Activities, the Managed Care Activities Exclusion only precludes coverage for antitrust claims arising from those Managed Care Activities.  But it does not bar "any [antitrust] claim relevant to [BCBSKS's] business."  *Benecard*, 2020 WL 2840135, at *13.  BCBSKS makes a conclusory assertion that any "claim against BCBSKS alleging Antitrust Activities almost certainly will involve Managed Care Activities[,]" thereby rendering the "explicit grant of antitrust coverage . . . meaningless if coverage" is excluded under the Managed Care Activities Exclusion.  Doc. 205 at 13.  But that's not right.  Not every claim alleging Antitrust Activities will arise from BCBSKS's performance of Managed Care Activities.  As *Benecard* noted, the Managed Care

34

Activities Exclusion wouldn't apply to antitrust claims asserted "in connection with a merger or acquisition, claims involving the offering of an equity or debt, defense coverage for directors or officers indicted for stealing from [the insured] or others, and myriad other claims against directors or officers arising from commercial transactions." *Benecard*, 2020 WL 2840135, at *13.

BCBSKS predictably disagrees that *Benecard* applies to this case's facts. BCBSKS asserts that *Benecard* differs because that case didn't involve antitrust claims or an express grant of antitrust coverage. That much is true. But BCBSKS fails to explain why this difference matters. *Benecard* involved an express grant of coverage for claims based on "Wrongful Acts" while the D&O Policy here provides an express grant of coverage for claims arising from Antitrust Activities. Both the D&O Policy at issue in *Benecard* and the D&O Policy at issue here contain a Managed Care Activities Exclusion. Both Exclusions apply to bar coverage for claims arising out of the performance of, or failure to perform, Managed Care Activities. But the *Benecard* Exclusion didn't nullify completely the express grant of coverage for "Wrongful Acts" in the *Benecard* D&O Policy. Likewise, the Managed Care Activities Exclusion in Allied World D&O Policy doesn't eviscerate coverage for Antitrust Activities under the D&O Policy's Antitrust Activities Insuring Agreement. As discussed, the Managed Care Activities Exclusions in both D&O Policies wouldn't preclude coverage for claims "in connection with a merger or acquisition . . . and myriad other claims against directors or officers arising from commercial transactions." *Benecard*, 2020 WL 2840135, at *13.

BCBSKS asserts that none of those types of claims are antitrust claims that fall under the Antitrust Activities Insuring Agreement. The court disagrees. Mergers and acquisitions commonly give rise to antitrust claims. *See California v. Am. Stores Co.*, 495 U.S. 271, 276,

295–96 (1990) (holding that district court had the power to order divesture under the Clayton Act in an action where plaintiff "alleged that [supermarket chain] merger violated § 1 of the Sherman Act, 15 U.S.C. § 1, and § 7 of the Clayton Act, 15 U.S.C. § 18"); *see also Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 663 F. Supp. 1360, 1489–91 (D. Kan. 1987), *aff'd* 899 F.2d 951 (10th Cir. 1990) (granting summary judgment against defendant's counterclaim alleging that hospital acquisition violated § 7 of the Clayton Act because "the evidence of record demonstrate[d] . . . that the acquisitions in question have neither occasioned nor threatened any anticompetitive consequences"). And—depending on the facts alleged by a particular antitrust claim—the Managed Care Activities Exclusion in the Allied World D&O Policy wouldn't preclude coverage of that antitrust claim if it didn't involve performance of, or failure to perform, Managed Care Activities.

As many courts have recognized, "an insurance policy provision is only illusory where it results in a complete lack of any coverage." *Sweetberry Holdings LLC v. Twin City Fire Ins.*, No. 20-08200 (FLW), 2021 WL 3030269, at *8 (D.N.J. July 19, 2021) (applying New Jersey law); *see also Sentynl Therapeutics, Inc. v. U.S. Specialty Ins.*, No. 21-55370, 2022 WL 706941, at *2 (9th Cir. Mar. 9, 2022) (applying California law and explaining that an "exclusion does not render coverage illusory unless it entirely eliminates coverage"); *Neighborhood Hous. Servs. of Am., Inc. v. Turner-Ridley*, 742 F. Supp. 2d 964, 973 (N.D. Ind. 2010) (applying Indiana law and holding that "professional services exclusion does not render the D & O policy illusory" because "while the professional services exclusion excludes some D & O coverage, it does not exclude all D & O coverage" and the "D & O coverage still covers some reasonably anticipated risk despite the existence of the professional services exclusion"). Here, the Managed Care Activities Exclusion excludes some—but not all—antitrust claims—*i.e.*, it excludes just those claims that

36

arise from BCBSKS's performance of, or failure to perform, Managed Care Activities.  Thus, the Managed Care Activities Exclusion doesn't render BCBSKS's coverage under the D&O Policy illusory.

As a consequence, Kansas law requires the court to apply the Managed Care Activities Exclusion as written and enforce the plain and unambiguous terms of the D&O Policy.  Based on that plain and unambiguous language, no potential for coverage of BCBSKS's claim exists under the D&O Policy because, as already explained, the Managed Care Activities Exclusion excludes coverage of BCBSKS's Defense Costs in the MDL Action.

*Fourth*, and *last*, BCBSKS argues that Allied World wrongly relies on the E&O Policy's coverage of BCBSKS's claim for the MDL Action's Defense Costs as a reason to deny coverage under the D&O Policy.  BCBSKS asserts that Allied World made this assertion in its March 4, 2014 letter by stating:  "for the same reason that the insuring agreement of the E&O Policy is implicated, *i.e.*, that the acts alleged in the MDL Action are **Managed Care Activities**, there is no coverage under the D&O Policy."  Doc. 1-8 at 14 (Mar. 4, 2014 Letter).  BCBSKS contends that the potential for coverage under the D&O Policy and the E&O Policy is not mutually exclusive.

Allied World doesn't address this argument in its briefing.  Instead, it contends that the plain language of the D&O Policy's Managed Care Activities Exclusion applies to and thus precludes coverage for the MDL Action's defense costs.  And, based on that plain language, there is no potential for overlapping coverage between the D&O Policy and the E&O Policy.[6] The court agrees.

---

[6]     BCBSKS asserts that the D&O Policy and E&O Policy aren't mutually exclusive because they define Managed Care Activities differently by listing "Provider Selection Practices" in the D&O Policy's definition while listing "Provider Selection" in the E&O Policy's definition.  And, BCBSKS asserts, the two policies define these two terms differently.  Allied World explains why the differences in these

BCBSKS also invokes the court's earlier conclusion in the lead consolidated case that "there is a potential for overlapping coverage under the two policies"—*i.e.*, the Allied World E&O Policy and D&O Policy.  Doc. 52 at 46.  The court made this observation in a wholly different context.  It was deciding whether another insurance policy issued by a different insurer (the OneBeacon excess E&O Policy) was triggered after the Allied World E&O Policy was exhausted.  The court explained that it could not "determine now whether other primary insurance is available here" through the Allied World D&O Policy "which provides coverage to BCBSKS for the same losses covered by the OneBeacon Policy" because at that "stage of the pleadings, the court [did] not have enough information to determine if the policies provide coverage for some of the same losses arising from 'Provider Selection Practices' and 'Antitrust Activities,' or if the claims arising from the Antitrust Litigation involve only 'Managed Care Activities' that fit squarely within an exclusion, making the policies' coverage mutually exclusive." *Id.* at 46–47 (emphasis omitted).  Thus, on the record that existed when it decided that motion, the court couldn't "decide as a matter of law that the two policies do not insure the same loss[.]" *Id.* at 47.

The case occupies a different procedural posture now.  The parties have submitted the MDL Action's Complaints from both the Subscriber Track and the Provider Track to support their competing Cross-Motions for Judgment on the Pleadings.  After reviewing those

---

definitions don't preclude the D&O Policy's Managed Care Activities Exclusion from applying to BCBSKS's claim for the MDL Action's Defense Costs.  Doc. 218 at 22–23.  And BCBSKS concedes that it "is not arguing that the [Managed Care Activities] Exclusion's carve out for 'Provider Selection Services' applies to the Antitrust Litigation."  Doc. 223 at 11.  Instead, it simply argues that Allied World's determination that the E&O Policy provides coverage for the claim doesn't preclude coverage under the D&O Policy automatically because the two polices aren't mutually exclusive.  As discussed, Allied World doesn't assert that argument here.  Instead, Allied World has shown that the plain and unambiguous language of the Managed Care Activities Exclusion provides no potential for coverage of BCBSKS's claim for Defense Costs under the D&O Policy.

Complaints, the court has determined that the claims alleged in the MDL Action fall squarely

within the D&O Policy's Managed Care Activities Exclusion.  Thus, the facts here abide no

potential for coverage for BCBSKS's Defense Costs under the plain language of the D&O

Policy.

     For all these reasons, the court concludes that the Managed Care Activities Exclusion

applies to the claims asserted in the MDL Action.  Thus, Allied World has shouldered its burden

to prove that no potential for coverage exists for BCBSKS's claim for the MDL Action's

Defense Costs under the D&O Policy.

### B.  Prior or Pending Litigation Exclusion and Related Claims Provision

     A second and independent reason leads the court to conclude that the D&O Policy

provides no potential for coverage of BCBSKS's Defense Costs in the MDL Action.  Both the

Prior or Pending Litigation Exclusion and the Related Claims Provision bar any potential for

coverage under the D&O Policy.  As already discussed, the D&O Policy includes a Prior or

Pending Litigation Exclusion.  It provides that the D&O Policy does not cover:

> [A]ny **Loss** in connection with any **Claim** . . . alleging, arising out of, based upon
> or attributable to, as of the Pending or Prior Date set forth in Item 6. of the
> Declarations with respect to this Policy, any pending or prior:  (1) litigation; or (2)
> administrative or regulatory proceeding or investigation, of which an **Insured** had
> notice, including any **Claim** alleging or derived from the same or essentially the
> same facts, or the same or related **Wrongful Acts**, as alleged in such pending or
> prior litigation or administrative or regulatory proceeding or investigation[.]

Doc. 1-7 at 38–39 (D&O Policy § III.D.).

     The D&O Policy also includes a Related Claims Provision.  It provides that all "**Related**

**Claims** shall be deemed to be a single **Claim** made on the date on which the earliest **Claim**

within such **Related Claims** was first made . . . ."  *Id.* at 44 (D&O Policy § VII.D.).  The D&O

Policy defines "**Related Claims**" as "all **Claims** for **Wrongful Acts** based upon, arising out of,

directly or indirectly resulting from, or in consequence of, the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events." *Id.* at 37 (D&O Policy § II.CC.).

Here, Allied World asserts that both the Prior or Pending Litigation Exclusion and Related Claims Provision preclude any potential for coverage. The court agrees. The allegations in the MDL Action "aris[e] out of, [are] based upon or attributable to . . . the same or essentially the same facts, or the same or related **Wrongful Acts**," that the *Love* Litigation alleged. *Id.* at 39 (D&O Policy § III.D.). So, the Prior or Pending Litigation Exclusion applies to exclude any potential for coverage of Defense Costs in the MDL Action. Also, the MDL Action involves claims "based upon, arising out of, directly or indirectly resulting from, or in consequence of, the same or related facts" as alleged in the *Love* Litigation. *Id.* at 37 (D&O Policy § II.CC.). So, the Related Claims Provision applies to make BCBSKS's claim for Defenses Costs related to the *Love* Litigation which, in turn, "deem[s]" the two claims as "a single **Claim** made on the date on which the earliest **Claim** within such **Related Claims** was first made . . . ." *Id.* at 44 (D&O Policy § VII.D.). Because the *Love* Litigation is the earliest of the two claims, the D&O Policy considers those two claims as "made on the date on which" the *Love* Litigation claim was made. Because the *Love* Litigation claim was made outside the D&O Policy's coverage period (*i.e.*, July 1, 2012 through October 1, 2013), the Related Claims Provision provides no potential for coverage of the MDL Action's Defense Costs.

The court recognizes that this conclusion requires Allied World to sustain the burden to show that the Prior or Pending Litigation Exclusion applies. *See Shelter Mut. Ins. v. Williams ex rel. Williams*, 804 P.2d 1374, 1383 (Kan. 1991) (explaining that, in Kansas, the insured bears the burden to prove coverage under the insurance policy while the insurance company must shoulder

the burden to prove that a specific provision of the policy excludes coverage).  Also, the court applies a "narrow construction" to the Prior or Pending Litigation Exclusion because Kansas recognizes that an "insurer, having affirmatively expressed coverage through broad promises, assumes the duty to define any limitations on that coverage in clear and explicit terms."  *Miller v. Westport Ins.*, 200 P.3d 419, 426 (Kan. 2009) (citation and internal quotation marks omitted).

To determine whether the MDL Action's allegations arise out of the "same or essentially the same facts" or the "same or related facts" as alleged in the *Love* Litigation, courts outside of Kansas have explained that the "insurer may rely on the facts as alleged in the complaints to demonstrate that an exclusion applies[,]" while the "courts have focused on whether there was a sufficient factual nexus between the two lawsuits."  *Pereira v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, No. 04 Civ. 1134(LTS), 2006 WL 1982789, at *4 (S.D.N.Y. July 12, 2006) (applying New York law) (citations and internal quotation marks omitted); *see also Zahoruiko v. Fed. Ins.*, No. 3:15-cv-474 (VLB), 2017 WL 776645, at *5 (D. Conn. Feb. 28, 2017) (explaining under Connecticut law that when "'determining whether a prior litigation clause excludes coverage, courts have focused on whether there was a sufficient factual nexus between the two lawsuits' and 'coverage does not depend upon the pleader's art but rather upon underlying facts'" (quoting *Nat'l Waste Assocs., LLC v. Travelers Cas. & Sur. Co. of Am.*, 988 A.2d 402, 409 (Conn. Super. Ct. 2008))); *Fiserv Sols., Inc. v. Endurance Am. Specialty Ins.*, No. 11-C-0603, 2016 WL 8674661, at *20 (E.D. Wis. Sept. 30, 2016) (applying Wisconsin law and adopting the "sufficient factual nexus" test to determine whether the two lawsuits or claims came within a prior-notice exclusion (citation and internal quotation marks omitted)).

An analysis of the two Complaints at issue—one in the *Love* Litgation and the other in the MDL—reveals that the two lawsuits both allege a conspiracy between BCBSKS and other

Blue Plans, through BCBSA, involving:  (a) an agreement not to compete against each other, (b) an agreement to adhere to certain BCBSA program requirements, (c) and the use of market dominance (that the Blue Plans acquired through conspiratorial conduct) to underpay Providers and collect supracompetitive profits.

The MDL Action—specifically the Provider Track Complaint—asserts that BCBSKS, other Blue Plans, and BCBSA have engaged in unlawful conspiracies to divide the market, thereby restraining competition, and fixing prices paid to Providers, thus producing significantly lower reimbursement rates to Providers than they otherwise would have received absent defendants' price fixing agreement.  Doc. 1-4 at 8–13 (Provider Compl. ¶¶ 1, 4, 7, 8).  The *Love* Litigation's Complaint alleged that BCBSKS, BCBSA, and the other Blue Plans conspired and coordinated "automated processing schemes" that they "used to deny, diminish and delay" reimbursement payments to healthcare providers.  Doc. 1-5 at 1–4 (*Love* Compl. ¶¶ 1–5, 9).

Like the MDL Action's Provider Track Complaint, the *Love* Litigation alleged that BCBSKS, BCBSA, and the other Blue Plans engaged in a "common scheme and conspiracy" to "increase their profits at the expense of medical providers and to the detriment of patients and the patient-physician relationship."  Doc. 1-5 at 43–44 (*Love* Compl. ¶¶ 162–64); *see also* Doc. 1-4 at 119, 153 (Provider Compl. ¶¶ 318, 408) (alleging that defendants' "anticompetitive practices and resulting market power permit [d]efendants to pay in-network and out-of-network providers less than what they would have paid absent" the market allocation conspiracy and "have resulted in their collection of supracompetitive profits").  Also, like the Provider Track Complaint, the *Love* Litigation asserts that the Blue Plans "collectively insure . . . such a large pool of patients," which allows them "to perpetuate their scheme through their combined economic power and market dominance."  Doc. 1-5 at 9 (*Love* Compl. ¶ 28); *see also* Doc. 1-4 at 121 (Provider

Compl. ¶ 321) ("Absent competition, the [Blue Plans] have achieved significant market power and domination in the markets in their Service Areas.").

The *Love* Litigation alleges that the Blue Plans "wield their economic power and market dominance . . . in furtherance of the scheme described above."  Doc. 1-5 at 38 (*Love* Compl. ¶ 139).  The Provider Track makes the same or essentially the same or related allegations.  *See* Doc. 1-4 at 11–13 (Provider Compl. ¶ 8) (alleging that defendants "exploited the market dominance they have secured" through their division of the markets by entering a conspiracy to "divide the excess profits that they achieve through their illegal anticompetitive conduct").

The *Love* Litigation—like the Provider Track Complaint—alleged that defendants "and the other Blue Plans are not competitors; rather they are all licensees of [BCBSA] who operate in distinct geographical regions."  Doc. 1-5 at 43–44 (*Love* Compl. ¶ 164); *see also* Doc. 1-4 at 8–10 (Provider Compl. ¶¶ 1, 3) (alleging that defendants "have agreed with each other to carve the United States into 'Service Areas' in which only one Blue [Plan] can sell insurance, administer employee benefit plans or contract with healthcare providers" and "have agreed that they will not compete with each other in terms of their Provider Networks").  The *Love* Litigation asserted that the "activities of the [BCBSA] are far-ranging, operating to create consistency and cooperation among the Blue Plans in a multitude of categories, thereby permitting the [d]efendants to formulate and carry out their conspiracy."  Doc. 1-5 at 55–56 (*Love* Compl. ¶ 207).  The Provider Track Complaint asserts the same or essentially the same or related allegations: "BCBSA is simply a vehicle used by admittedly independent health insurance companies to conspire, coordinate, and enter into agreements that restrain competition."  Doc. 1-4 at 64 (Provider Compl. ¶ 148); *see also id.* at 62 (Provider Compl. ¶ 143) (alleging that the Blue Plans "are potential competitors that use their control of BCBSA to coordinate their activities" and

"[a]s a result, the rules and regulations imposed 'by' the BCBSA on the member plans are in truth imposed by the member plans on themselves").

Also, both the *Love* Litigation and the MDL Action allege that BCBSKS, other Blue Plans, and BSBCA have created and agreed to participate in the mandatory Blue Card program that allows them to share pricing information and use payment policies to underpay Providers. *Compare* Doc. 1-5 at 6, 44 (*Love* Compl. ¶¶ 18, 166) (alleging that defendants agreed to participate in the mandatory Blue Card Program which allows them to share and use improper editing practices), *with* Doc. 1-4 at 123 (Provider Compl. ¶¶ 326, 328) (premising price fixing allegations on defendants' alleged agreement to participate in "national programs including the Blue Card and National Accounts Programs, which determine the price and the payment policies to be utilized when a patient insured by a Blue [Plan] or included in an employee benefit plan administered by a [d]efendant receives healthcare services within the Service Area of another Blue [Plan]").

In sum, comparing the allegations asserted in the two lawsuits reveals that both the *Love* Litigation and the MDL Action are based on or arise out of an alleged conspiracy by BCBSKS, other Blue Plans, and BCBSA to restrain competition and increase profits by exploiting their market dominance and economic power and by paying Providers at rates less than what defendants otherwise would have paid Providers absent their unlawful scheme.  Thus, the MDL Action's allegations—at least in the Provider Track Complaint—arise out of "the same or essentially the same facts, or the same or related **Wrongful Acts**," as well as "the same or related facts" that the *Love* Litigation alleged.  Doc. 1-7 at 37, 39 (D&O Policy §§ II.CC., III.D.).  As a consequence, Allied World has shouldered its burden to show that the plain and unambiguous

language of both the Prior or Pending Litigation Exclusion and the Related Claims Provision
apply to preclude any potential for coverage of BCBSKS's claims.

        Indeed, at least two courts have reached the same conclusion when deciding whether the
MDL Action's Provider Track is sufficiently similar or related to the *Love* Litigation to bar
coverage under an insurance policy's related claims provision.  In August 2021, a Pennsylvania
federal court held that "the claims in the *Love* litigation . . . are related" to the claims asserted in
the MDL Action as the insurance policy at issue defined those terms.  *Atl. Specialty Ins. Co. v.
Indep. Blue Cross, LLC*, No. 20-937, 2021 WL 3784242, at *4 (E.D. Pa. Aug. 26, 2021).  The
insurance policy defined a claim as "related . . . when it is 'based on, arising out of, resulting
from, or in any way involving the same or related facts, circumstances, situations, transactions or
events . . . whether related logically, causally or in any other way.'"  *Id.*  After "[c]omparing the
*Love* litigation to the" MDL Action, the Eastern Pennsylvania federal court found it was "clear
the facts in the [MDL Action] are based on, or at the very least involve, the same or related facts
from the *Love* litigation."  *Id.*  The court explained that the *Love* claims "arose based on
allegations that the defendants had engaged in a common scheme to systematically deny, delay,
and diminish the payments due to the doctor-providers" and that the "scheme was facilitated by
the [Blue Plans'] significant market power."  *Id.*  The court held that "[s]imilarly, in the Provider
Track portion of the [MDL Action], the plaintiffs allege the defendants conspired to suppress
competition and to increase their profits by decreasing the rates paid to healthcare providers."
*Id.* (citation and internal quotation marks omitted).  The court explained that both "*Love* and the
Provider Track assert the defendants, acting through [BCBSA], conspired to reduce provider
reimbursement based on their significant market share and anti-competitive behavior."  *Id.*  "As a
result," the court held, "there is a substantial overlap between the Provider Track in the [MDL

Action] and the *Love* litigation." *Id.* The court thus held that the Provider Track is "based on and 'ar[ose] out of' the same wrongful acts as the *Love* litigation." *Id.* (citation and internal quotation marks omitted).

Then, in July 2022, an Illinois federal court held, under an insurance policy's related claims provision that "the MDL Provider Track and the *Love* litigation [were] related" such that the policy's related claims provision applied to bar coverage of a claim based on the MDL Action. *Homeland Ins. Co. of N.Y. v. Health Care Serv. Corp.*, No. 18 C 6306, 2022 WL 2828752, at *7 (N.D. Ill. July 19, 2022). The court explained that the two lawsuits "both allege that the Blue Plans conspired, in collaboration with and facilitated by [BCBSA], to leverage their overwhelming economic power and market dominance to force physicians to accept below-market reimbursement rates." *Id.* (citations and internal quotation marks omitted). Also, the *Love* Litigation had alleged "that the Blue Plans' market dominance resulted from the fact that they were not competitors, but rather operate[d] in distinct geographical regions, and that all participated in the BlueCard program, which was key to implementing the conspiracy to underpay providers.[,]" while along "much the same lines, the Provider Track complaint alleges that the Blue Plans are able to impose below-market reimbursement rates because of their agreements not to compete within defined geographic markets, and further alleges that the conspiracy is enabled in large part by the BlueCard program." *Id.* (citations and internal quotation marks omitted). The Northern Illinois federal district court thus held "[g]iven the substantial overlap between the 'facts, circumstances, [and] situations' grounding the claims in the *Love* and Provider Track complaints, the Provider Track and the *Love* litigation are related

within the meaning of the [relevant insurance policy's] Related Claims provision." *Id.* (quoting language from Related Claims Provision").[7]

While *Homeland* and *Atlantic Specialty Insurance Company* involved different insurance policies with related claims provisions that aren't identical to the language contained in Allied World's D&O Policy at issue here,[8] these cases still are highly persuasive. Like the court has done here, the two cases compared the allegations in the *Love* Litigation and the MDL Action. In *Atlantic Specialty Insurance Company*, the court considered a related claims provision that defined a claim as related "when it is 'based on, arising out of, resulting from, or in any way involving the same or related facts, circumstances, situations, transactions or events . . . whether related logically, causally or in any other way.'" 2021 WL 3784242, at *4. And, the Pennsylvania federal court held that the MDL Action's facts "are based on, or at the very least involve, the same or related facts from the *Love* litigation." *Id.* Likewise, in *Homeland Insurance Company*, the court considered a related claims provision that defined "Related Claims" as all "Claims for Wrongful Acts based on, arising out of, resulting from, or in any way involving the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances[,] situations, transactions or events, whether related

---

[7]     BCBSKS argues that *Homeland*'s holding doesn't apply here because that case "held that [the insured] was estopped from arguing that the Provider Action was 'related' to *Love*." Doc. 232 at 1. And Allied World doesn't seek judicial estoppel here. *Id.* That's not accurate. *Homeland* held that "*Love* and the Provider Track *are* related under the Related Claims provision's plain terms," and noted that the court's "analysis could stop here[.]" *Homeland*, 2022 WL 2828752, at *8. But the court continued its analysis, discussing the insured's "representations and arguments" in a different lawsuit (*i.e.*, *Musselman*, discussed *infra*) and found that "[j]udicial estoppel [also] applies here." *Id.* Thus, the court concluded that judicial estoppel "provide[d]" a second and "*independent reason* for granting [the insurer] summary judgment on the Related Claims provision as to the Provider Track." *Id.* at *9 (emphasis added).

[8]     Also, the court recognizes that these cases didn't apply Kansas law, as the court does here. But the law governing the policies at issue in the two cases doesn't differ significantly from Kansas's law governing insurance policy construction. *See Atl. Specialty Ins.*, 2021 WL 3784242, at *3–4 (discussing Pennsylvania's law governing interpretation of insurance policies); *see also Homeland*, 2022 WL 2828752, at *6 (identifying Illinois law governing construction of insurance policies).

logically, causally or in any other way."  2022 WL 2828752, at *6.  The Northern Illinois federal court held, "substantial overlap" existed "between the 'facts, circumstances, [and] situations' grounding the claims in the *Love* and Provider Track complaints," thus, the court concluded, "the Provider Track and the *Love* litigation are related within the meaning of the Related Claims provision."  *Id.* at *7.

Here, the court must construe a Related Claims Provision that defines "**Related Claims**" as "all **Claims** for **Wrongful Acts** based upon, arising out of, directly or indirectly resulting from, or in consequence of, the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events." Doc. 1-7 at 37 (D&O Policy § II.CC.).  This Provision uses language similar to the related claims provision at issue in *Atlantic Specialty Insurance Company* and *Homeland Insurance Company*. And for the same reasons discussed in those cases, the court finds that the allegations asserted in the MDL Action are "related" to the *Love* Litigation such that the Related Claims Provision applies to preclude any potential for coverage.

Also, the court recognizes at least two more courts have found the MDL Action related to the *Love* Litigation, albeit in a somewhat different context.  *First*, a Florida federal court considered whether three doctors—including Dr. Rick Love, the named plaintiff in the *Love* Litigation—could secure a declaration that they could pursue antitrust claims in the MDL Action despite the settlement agreements they had entered to resolve the *Love* Litigation.  *Musselman v. Blue Cross & Blue Shield of Ala.*, No. 13-20050-CV, 2013 WL 4496509, at *1 (S.D. Fla. Aug. 20, 2013).  Defendants (who included BCBSA and various Blue Plans) moved to dismiss.  *Id.* They argued that the claims asserted in the MDL Action were "Released Claims" under the plaintiff doctors' settlement agreements in the *Love* Litigation.  *Id.*  The Southern Florida federal

court granted the motion after concluding that the MDL Action's Provider Track Complaint "arises out of and relates to the 'facts, acts, events . . . or other matters' in *Love*." *Id.* at *5. The court explained that "both complaints are based on allegations that [d]efendants, acting through BCBSA, conspired to reduce provider reimbursement[,]" and thus, the Provider Tracks fell "within the scope of the first sentence of the release" that had released all claims "aris[ing] out of, or in any way related to any of the facts, acts, events . . . or other matters referenced in" *Love*. *Id.* at *2, 5. In a one-sentence per curiam opinion, the Eleventh Circuit affirmed the district court's dismissal "on the basis of the District Court's thorough and well-reasoned order[.]" *Musselman v. Blue Cross & Blue Shield of Ala.*, 684 F. App'x 824, 824–25 (11th Cir. 2017).

*Second*, in the MDL Action itself, several defendants—including BCBSKS—asserted release, waiver, res judicata, and collateral estoppel defenses based on the *Love* settlement agreements. *See In re Blue Cross Blue Shield Antitrust Litig.*, No. 2:13-CV-20000-RDP, 2018 WL 6333563, at *1 (N.D. Ala. Oct. 17, 2018). They asserted these defenses even though these specific defendants (BCBSKS included) were not signatories to the *Love* settlement agreements. *Id.* The Provider plaintiffs moved for partial summary judgment against these defenses arguing that these "Non-Settling Defendants"—as non-signatories to the settlement agreements—couldn't invoke the *Love* settlement agreements' releases. *Id.* at *5. The Non-Settling Defendants—BCBSKS included—opposed this summary judgment motion. *Id.* They argued that the *Love* settlement agreements' release applied to the claims asserted against them in the MDL Action because the release barred "claims against 'any other Persons' that 'arise from, or are based on, conduct by any of the Released Parties.'" *Id.* Also, they cited *Musselman* to argue that the Florida court already had "determined that [the Provider Track] claims 'arise out of' the conduct of the *Love* Settling Defendants within the meaning of the *Love* Settlement

Agreements." *Id.*  The MDL court agreed with BCBSKS and the Non-Settling Defendants, concluding that the "Providers' claims in this MDL fall squarely within the reach of the *Love* releases because they arise from, or are based on, conduct by the Released Parties."  *Id.* at *7 (citing *Musselman*, 2013 WL 4496509, at *8).

Later in the MDL proceedings, BCBSKS and other Blue Plans moved for partial summary judgment against certain Providers who also were members of the *Love* settlement classes because, the Blue Plans alleged, the *Love* settlements barred claims they asserted in the MDL Action.  *See In re Blue Cross Blue Shield Antitrust Litig.*, No. 2:13-CV-20000-RDP, 2022 WL 480140, at *1 (N.D. Ala. Feb. 16, 2022).  The MDL court agreed with BCBSKS and the other Blue Plans.  *Id.* at *12–14.  Specifically, the MDL court held that claim preclusion barred the Providers' claims in the MDL Action.  *Id.*  The court explained:

> In this Circuit, [i]f a case arises out of the same nucleus of operative facts, or is based upon the same factual predicate, as a former action, . . . the two cases are really the same claim or cause of action for purposes of res judicata.  As Judge Moreno has already correctly held, the *Musselman* and [Provider Track] Complaints are both based on allegations that [d]efendants, acting through BCBSA, conspired to reduce provider reimbursement and those parties could have asserted these claims before *Love* [was] settled.  Although the claims in *Love* and in [the Provider Track] were based on different causes of action, *for purposes of claim preclusion they arose out of the same nucleus of operative facts*.  Therefore, all elements of claim preclusion are present here.

*Id.* at *12 (emphasis added) (citations and internal quotation marks omitted).

It's true that neither *Musselman* nor the MDL court's Order analyzed provisions or exclusions of an insurance policy.  Instead, the two cases considered whether the allegations of the MDL Action arose out of the same facts alleged in the *Love* Litigation such that the language of the *Love* settlement agreements barred certain *Love* plaintiffs from asserting claims in the MDL Action.  But that distinction doesn't matter here.  As Allied World correctly explains, a court's interpretation of a settlement agreement is governed by the same legal standard that

applies to the construction of an insurance policy.  Both are contracts.  *See Musselman*, 2013 WL 4496509, at *4 ("A litigation release of claims is a contract and is construed according to the normal rules of contract interpretation."); *see also AMCO Ins. v. Beck*, 929 P.2d 162, 165 (Kan. 1996) (explaining that "[i]nsurance policies are considered contracts" and thus are subject the rules governing contract interpretation).  Also, as *Atlantic Specialty Insurance Company* explained, this distinction didn't matter to its analysis of the related claims provision at issue there:

> Though those courts [in *Musselman* and the MDL Action] were addressing whether the providers' claims were released in the *Love* litigation, the outcome here is no different.  This Court therefore joins the courts in *Musselman* and the [MDL Action] in finding the Provider claims are related to the *Love* litigation, and thus constitute "related claims" under the Excess Policy.

2021 WL 3784242, at *5.  In short, the court finds persuasive *Musselman* and the MDL Action's decisions about the relatedness between the *Love* Litigation and the MDL Action.

The court thus concludes—based on the plain and unambiguous language of the Prior or Pending Litigation Exclusion and the Related Claims Provision as well as the persuasive authority of other courts' decisions—that the MDL Action Provider Track allegations arise out of "the same or essentially the same facts, or the same or related **Wrongful Acts**," as well as "the same or related facts" that the *Love* Litigation alleged.  Doc. 1-7 at 37, 39 (D&O Policy §§ II.CC., III.D.).  So, the Prior or Pending Litigation Exclusion and the Related Claims Provision apply to preclude any potential for coverage of BCBSKS's claim for Defense Costs in the MDL Action.

Naturally, BCBSKS disagrees with this proposition.  BCBSKS asserts that neither the Prior or Pending Litigation Exclusion nor the Related Claims Provision bars coverage of the MDL Action's Defense Costs.  It makes at least five arguments supporting this contention.  The

court addresses each of them, in turn, below.  None of BCBSKS's arguments persuade the court that there is any potential for coverage under the D&O Policy.

*First*, BCBSKS asserts that Allied World hasn't shown that the Prior or Pending Litigation Exclusion and the Related Claims Provision are unambiguous on their face.  BCBSKS asserts that the use of the term "related" in both the Prior or Pending Litigation Exclusion and the Related Claims Provision make both provisions ambiguous.  For support, BCBSKS argues that "courts applying Kansas law have held that the term 'related' is ambiguous because it has no accepted legal meaning and there is a general lack of agreement on the meaning and clarity of the term."  Doc. 223 at 23 (citing *St. Paul Fire & Marine Ins. v. Chong*, 787 F. Supp. 183, 187–88 (D. Kan. 1992)).  BCBSKS cites just one case to support its characterization of Kansas contract law.[9]  And that case simply doesn't stand for the broad proposition that BCBSKS attaches to it.

---

[9]       BCBSKS's opening brief also cites a New York case holding that "the terms 'same,' 'essentially the same,' and 'related' are 'so elastic, so lacking in concrete content, that they import into the contract . . . substantial ambiguities.'"  *David v. Am. Home Assurance Co.*, No. 95 Civ. 10290(LAP), 1997 WL 160367, at *3 (S.D.N.Y. Apr. 3, 1997) (applying New York law and quoting *McCuen v. Am. Cas. Co.*, 946 F.2d 1401, 1407–08 (8th Cir. 1991)).  But several other New York cases disagree with this conclusion.  *See Lonstein L. Off., P.C. v. Evanston Ins.*, No. 20-cv-9712 (LJL), 2022 WL 311391, at *9 n.6 (S.D.N.Y. Feb. 2, 2022) (declining to follow "Judge Preska's decision in *David v. American Home Assurance Co.*, holding that language of 'related' as used in an insurance policy was ambiguous" because the case "predated" another New York case and "[i]ndeed, after *David*, Judge Preska held that language in a Prior Notice Exclusion defining a claim to include 'interrelated wrongful acts' was unambiguous and granted judgment on the pleadings to the insurer" (quoting *Zahler v. Twin City Fire Ins.*, No. 04 Civ. 10299(LAP), 2006 WL 846352 (S.D.N.Y. Mar. 31, 2006)); *see also Nomura Holding Am., Inc. v. Fed. Ins.*, 45 F. Supp. 3d 354, 368 (S.D.N.Y. 2014) (applying New York law and holding that the terms of a "Related Claims" provision "are unambiguous").

       In the same vein, our Circuit, applying Kansas law, has declined to follow "decisions holding the term 'similar' ambiguous in other insurance policy contexts . . . to suggest that the term as used [in the policy at issue] must also be ambiguous."  *Payless Shoesource, Inc. v. Travelers Cos.*, 585 F.3d 1366, 1374 (10th Cir. 2009).  Instead, the Circuit explained that when "asking whether or not an ambiguity exists, our analysis does not turn on whether a word *could* be used ambiguously, or *has* been used ambiguously in other contexts.  Rather, we must ask whether the word *is* used ambiguously within the actual contractual context in which it appears."  *Id.*  And, in that context, the Tenth Circuit found, the insurance policy's use of "similar" wasn't ambiguous.  *Id.*  The court declines to follow the *David*

In *Chong*, Judge O'Connor of our court held that the phrase "series of related wrongful acts" was ambiguous because "the use of the term 'related,' which itself has no accepted legal definition, allows the entire phrase to be construed in many different ways." *Id.* at 187. Thus, Judge O'Connor defined "the term 'related' as used in the policy at issue . . . solely in terms of causation" and determined that "the phrase 'series of related wrongful acts' refers only to 'multiple, causally connected' negligent acts or omissions." *Id.* at 188. Judge O'Connor's analysis is limited to the use of "related" in the context of the particular insurance policy at issue in *Chong*. He made no sweeping conclusion that use of the term "related" always creates an ambiguity.

Since *Chong*, our court, when interpreting a contract under Kansas law, has recognized that the "'words "relate" or "related" are commonly understood terms in everyday usage. They are defined in the dictionary as meaning a "logical or causal connection between" two events.'" *Everest Indem. Ins. v. Jake's Fireworks, Inc.*, 501 F. Supp. 3d 1158, 1184 (D. Kan. 2020) (applying Kansas law and quoting *Cont'l Cas. Co. v. Wendt*, 205 F.3d 1258, 1262 (11th Cir. 2000) (quoting Webster's Third New International Dictionary (1981))). Also, our Circuit and others have held that "related" is not an ambiguous term because it has a "plain and ordinary meaning[ ] that can be applied to the language of the insurance policy." *See Berry & Murphy, P.C. v. Carolina Cas. Ins.*, 586 F.3d 803, 810, 813–14 (10th Cir. 2009) (applying Colorado law); *see also Wendt*, 205 F.3d at 1263 (applying Florida law and holding that the term "relate" wasn't ambiguous because its "plain" and "common meaning" is "to show or establish a logical or casual connection between" (internal quotation marks omitted)); *Gregory v. Home Ins.*, 876 F.2d

---

decision here for the same reasons. The terms found in the Prior or Pending Litigation Exclusion and the Related Claims Provision are used unambiguously within the actual contractual context of this D&O Policy.

602, 605–06 (7th Cir. 1989) (holding that insurance policy language was unambiguous and noting the "common understanding of the word 'related' covers a very broad range of connections, both causal and logical").

Here, the term "related" as used in the Prior or Pending Litigation Exclusion and Related Claims Provision, has a plain and common meaning and creates no ambiguity in the context of the D&O Policy at issue. Thus, because the D&O Policy's terms are unambiguous, the court's analysis, above, has construed its provisions in their "plain, ordinary, and popular sense," and has enforced the contract the parties made. *Bhd. Mut. Ins.*, 292 F. Supp. 3d at 1205.

*Second*, BCBSKS argues that the Prior or Pending Litigation Exclusion and Related Claims Provision don't preclude coverage because they apply to claims for "Wrongful Acts" but the MDL Action involves "Antitrust Activities," which the D&O Policy explicitly covers under the Antitrust Activities Insuring Agreement. *See* Doc. 205 at 27; Doc. 223 at 16 n.4. The plain and unambiguous language of the D&O Policy doesn't support BCBSKS's argument. The D&O Policy defines "**Wrongful Act**" as "any actual or alleged act, error, omission, neglect, breach of duty, breach of trust, misstatement, or misleading statement[.]" Doc. 1-7 at 38 (D&O Policy § II.GG.). As Allied World correctly asserts, the word "act" has a plain and ordinary meaning. *See* Doc. 218 at 38 ("The word 'act' is commonly understood to mean 'the doing of a thing.'" (quoting *Act*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/act (last visited Feb. 8, 2023))). The D&O Policy defines "Antitrust Activities" and includes several "acts" that this definition includes. *See* Doc. 1-7 at 30 (D&O Policy § II.C.) (defining "**Antitrust Activities**" to include acts such as "price fixing; restraint of trade; monopolization; unfair trade practices;" and violating any laws governing antitrust activities). Thus, even though BCBSKS contends that the MDL Action alleges "Antitrust Activities," the claims asserted in that

litigation also qualify as "Wrongful Acts" under the D&O Policy.[10]  So, the Prior or Pending Litigation Exclusion and Related Claims Provision apply to BCBSKS's claim for the MDL Action's Defense Costs.

*Third*, BCBSKS contends that the Related Claims Provision can't bar coverage for the MDL Action because that provision won't permit Allied World to "relate back" the MDL Action to the *Love* Litigation asserted in a prior policy period.  Doc. 205 at 28–29.  The court disagrees. The unambiguous language of the Related Claims Provision provides that all "**Related Claims** shall be deemed to be a single **Claim** made on the date on which the earliest **Claim** within such **Related Claims** was first made . . . ."  Doc. 1-7 at 44 (D&O Policy § VII.D.).  The D&O Policy only provides for coverage "a **Claim**, first made during the **Policy Period**[.]"  *Id.* at 27 (D&O Policy §§ I.A., I.B.).  And the D&O Policy period is July 1, 2012 to October 1, 2013.  *Id.* at 25 (D&O Policy Endorsement No. 19).  Thus, the D&O Policy unambiguously excludes coverage for Related Claims if the earliest Claim was made outside that controlling the Policy Period.

*Fourth*, BCBSKS argues that the MDL Action's allegations are not the same or related to the *Love* Litigation.  BCBSKS asserts that Allied World has mischaracterized the *Love*

---

[10]      BCBSKS also argues that the D&O Policy's express coverage for "Antitrust Activities" undermines Allied World's position that the Prior or Pending Litigation Exclusion and Related Claims Provision apply to bar coverage for the MDL Action.  Doc. 205 at 33.  The court disagrees.  For reasons already explained, the D&O Policy's exclusions do not render coverage illusory under the Antitrust Activities Insuring Agreement.  Specifically, in this context, the Prior or Pending Litigation Exclusion and Related Claims Provision preclude coverage for a claim involving "Antitrust Activities" only if the claim arises out of the "same or essentially the same facts, or the same or related Wrongful Acts," as alleged in prior or pending litigation or the "same or related facts" of another claim made outside the Policy Period.  Doc. 1-7 at 37, 39 (D&O Policy §§ II.CC., III.D.).  Thus, the Prior or Pending Litigation Exclusion and Related Claims Provision don't nullify coverage completely for all Antitrust Activities. *Cf. Homeland*, 2022 WL 2828752, at *8 (holding that "the Related Claims provision" didn't "render[ ] superfluous the provision in the [insurance] policy providing coverage for 'claims for Antitrust Activity,'" because "no basis [existed] to conclude that any action against [the insured] alleging collusion would be related to *Love*, which means that the Antitrust Activity coverage is not 'negate[d]' by finding that the Provider Track is related to *Love*" and noting, "[f]or example, the fact that the Provider Track is related to *Love* would not preclude Antitrust Activity coverage for allegations that [the insured] colluded to fix prices with insurers—such as Aetna, Cigna, or Humana—that compete with Blue Plans").

Litigation's allegations and that the alleged wrongful conduct at issue in *Love* had nothing to do with the alleged antitrust violations claimed in the MDL Action.  BCBSKS contends that the *Love* Litigation involved unfair claims processing practices by the Blue Plans.  But the MDL Action doesn't assert any claims based on claims processing practices.  BCBSKS concedes, however, that both actions allege that the Blue Plans engaged in "collusive activity," but, BCBSKS contends, "the alleged collusion [in the two actions] involves very different conduct and gives rise to very different alleged liability."  Doc. 205 at 31.  Those differences between the two lawsuits don't matter though.  That's because there otherwise is a "substantial overlap between the 'facts, circumstances, [and] situations' grounding the claims in the *Love* and Provider Track complaints[.]"  *Homeland*, 2022 WL 2828752, at *7; *see also Atl. Specialty Ins.*, 2021 WL 3784242, at *4 (concluding "there is a substantial overlap between the Provider Track in the Antitrust Litigation and the *Love* litigation").  And that overlap makes the two lawsuits sufficiently the same or related to fall within the Pending or Prior Litigation Exclusion or the Related Claims Provision.

Indeed, when interpreting a prior or pending litigation exclusion, courts don't require "complete identity between the lawsuits[.]"  *Fed. Ins. Co. v. Raytheon Co.*, 426 F.3d 491, 497–98 (1st Cir. 2005) (explaining that "the two complaints need not be identical" and "differences in theories of recovery or the identity of the parties in the proceedings do not in and of themselves preclude exclusion"); *see also Zunenshine v. Exec. Risk Indem., Inc.*, No. 98-9251, 1999 WL 464988, at *1–2 (2d Cir. June 29, 1999) (unpublished table opinion) (affirming district court's decision that the "language of the policy is unambiguous, and that it clearly applies to exclude coverage for losses incurred in connection with" a lawsuit under a prior or pending litigation exclusion and noting that "it is immaterial that the two lawsuits involved different parties and

somewhat different legal harms" because the "policy terms clearly focus on the existence of common *facts*" and also "it is immaterial that the [prior lawsuit's] claims also involved a series of additional misrepresentations beyond those connected with the [later-filed] lawsuit, because the exclusions apply if the . . . claims were based on any fact underlying the [prior] litigation"). Here, as already discussed in detail, the *Love* Litigation and the MDL Action both involve allegations of an alleged conspiracy by BCBSKS, other Blue Plans, and BCBSA to restrain competition and increase profits by exploiting their market dominance and economic power and by paying Providers at rates less than what defendants otherwise would have paid Providers absent their unlawful scheme. And as the court already has explained, those allegations are sufficiently similar or related to trigger application of either the Prior or Pending Litigation Exclusion or the Related Claims Provision.

*Fifth*, BCBSKS asserts that the allegations of the MDL Action's Subscriber Complaint aren't the same or related to the *Love* Litigation, and thus, Allied World wrongly denied coverage for the Subscriber Complaint. Allied World disagrees. It argues that the Subscriber Track, like the Provider Track, also involves the same allegations asserted in the *Love* Litigation. Doc. 217 at 29–33. At least two other courts have disagreed with Allied World's argument. *See Homeland*, 2022 WL 2828752, at *9 (concluding that "*Love* and the Subscriber Track allege conspiracies with different goals, mechanisms, and effects," and thus "they are not based on, arising out of, resulting from, or in any way involving the same or related facts" (citations and internal quotation marks omitted)); *see also Atl. Specialty Ins.*, 2021 WL 3784242, at *5 (holding that "[u]nlike the Provider Track, the Subscriber Track does not significantly overlap with the *Love* litigation" because the Subscriber Track "involves allegations that the defendants engaged in a common scheme to systematically restrict competition resulting in higher insurance

premiums for subscribers" while "[n]o subscriber was ever involved in, or had claims pending in, the *Love* litigation").

But here, the court need not decide this issue. It doesn't matter whether the Subscriber Track is the same or related to the *Love* Litigation because there's only one claim at issue under the D&O Policy for coverage of the MDL Action's Defense Costs. Indeed, the parties have treated all lawsuits consolidated into the MDL Action as one claim under the E&O Policy. *See* Doc. 1-8 at 6 ("Allied World agrees to recognize *Conway*, the other lawsuits consolidated into the MDL, and the MDL Action as a single **Claim** deemed to have been first made during the **Policy Period**, subject to a single retention and single Limit of Liability."). Thus, the one claim provision encompasses both the Provider Track and Subscriber Track.

Allied World asserts that "there is no basis for carving out the Subscriber Track from the relatedness inquiry based on the plain terms of the D&O Policy" when the Subscriber Track and Provider Track are part of a single claim. Doc. 228 at 17 n.3. BSBCKS provides no basis for splitting the two Tracks into two insurance claims. And the court isn't aware of any reason to do so. The court can't find any provision in the D&O Policy that allows splitting of a single Claim into separate claims, thereby allowing for partial insurance coverage. And the court won't write and impose such a provision into the D&O Policy when none exists. Thus, the court concludes that it doesn't matter whether the Subscriber Track relates to the *Love* Litigation when the Subscriber Track and Provider Track are part of the same claim for insurance coverage of BCBSKS's defense costs. And because the court already has concluded that the allegations in the Provider Track arise out of or are based on the allegations asserted in the *Love* Litigation, BCBSKS's single claim for coverage of the MDL Action's Defense Costs falls under both the Prior or Pending Litigation Exclusion and the Related Claims Provision.

IV.     **Conclusion**

For reasons explained in this Order, the court concludes that Allied World has shouldered its burden to show that no potential for coverage exists under the D&O Policy for BCBSKS's claim for the MDL Action's Defense Costs.  The court reaches this conclusion after viewing the facts in the light most favorable to BCBSKS on Allied World's Motion for Judgment on the Pleadings.  And the court bases its conclusion on two separate and independent reasons:  (1) the D&O Policy's Managed Care Activities Exclusion applies to preclude any potential for coverage, and (2) the D&O Policy's Prior or Pending Litigation Exclusion and Related Claims Provision both apply to preclude any potential for coverage.  Either reason, by itself, would suffice.  And thus, Allied World has shown there is no potential for coverage under the D&O Policy for BCBSKS's claim for Defense Costs in the MDL Action.

The court thus denies BCBSKS's Motion for Judgment on the Pleadings.  And the court grants Allied World's Motion for Judgment on the Pleadings.  Specifically, the court grants judgment on the pleadings in Allied World's favor on subsections (a)–(c) of Allied World's Count I, declaring that Allied World has no duty under the D&O Policy to provide insurance coverage for BCBSKS's Defense Costs in the MDL Action.  Also, the court grants judgment on the pleadings against Counts I and II of BCBSKS's Counterclaim because (1) BCBSKS isn't entitled to a declaratory judgment against Allied World under Count I; and (2) BCBSKS hasn't alleged a plausible breach of contract claim against Allied World in Count II.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant/counter-plaintiff Blue Cross Blue Shield of Kansas, Inc.'s Motion for Judgment on the Pleadings (Doc. 202) in Case No. 18-2371 is denied.

**IT IS FURTHER ORDERED THAT** plaintiff/counter-defendant Allied World Specialty Insurance Company's Cross Motion for Judgment on the Pleadings (Doc. 218) in Case No. 18-2371 is granted.

**IT IS SO ORDERED.**

**Dated March 27, 2023, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**